**EXHIBIT "2"**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| William A. Demmons and | * | DIVISION "B" |
| Karen S. Fowler | * | |
| Debtors | * | |
| | * | CASE NO. 14-11638 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| William A. Demmons and | * | |
| Karen S. Fowler | * | |
| | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; | * | |
| American Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit Management | * | |
| Corporation, | * | |
| Defendants | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S RESPONSE TO FIRST SET INTERROGATORIES
AND REQUESTS FOR PRODUCTION ISSUED BY R3 EDUCATION INC.,
<u>DBA SABA UNIVERSITY SCHOOL OF MEDICINE</u>**

William Demmons and Karen Fowler, Plaintiffs and Debtors, herein ("Debtors" or

"Plaintiffs") respond as follows to the discovery requests issued upon Plaintiffs by R3 Education,

Inc., dbab Saba University School of Medicine, in the above captioned suit.

1

**Interrogatory #1**

1. Please state and explain the basis for your assertion in Paragraph 65.1 of the Amended Complaint that "although approximately $31,000 in Health Xpress proceeds were available to Saba, a second disbursement to Fowler was denied because she was only taking one class that semester."

**Response to Interrogatory #1**

*(See supporting documents in the Interrogatories file labeled #1 - Paragraph 65.1)*

Karen Fowler:

   Karen Fowler's first loan #1 CLUID: GRTLKORIGA0V7YHG approval was in the amount of **$46,660** and was meant to cover the three semesters; however, she only received two disbursements. The first disbursement was on 01/20/06, the second disbursement for Summer 2006 was denied and she received a disbursement on 08/09/06. Since she had already paid for Fall 2005 tuition out-of-pocket in September 2005 and then took LOA due to Katrina that tuition was then applied to Winter 2006 which was originally meant to be her final semester on the island. As it turned out, she dropped a course that semester and then had to take it in Summer 2006 to complete the basic sciences. Even though funds were available from her first loan to pay her Summer 2006 tuition she received an email from Janet stating that since she was considered less than half-time she was ineligible to receive her second disbursement. (It is interesting to note that after collecting her out-of-pocket tuition payment for her final semester on the island that Saba would then go on to collect three semester's worth of tuition payments from loans; even though, she never received any educational benefit from Saba after leaving the island.) The obvious question is why on one hand she was denied a loan disbursement for the semester in which she only took one course and yet on the other hand, went on to receive three more disbursements even though she was never allowed to take another course at Saba University.

   ***#1- Para 65.1***
   Janet Baczewski - SLX Loan - 03-07-06

Subject: SLX Loan
   From: Janet Baczewski - Tuesday, March 07, 2006 10:37 AM
   To: Karen Fowler

   The Finance Dept. has been notified that you will be taking only one course for the upcoming May 2006 semester. Being **"below half-time status" makes you ineligible to receive loan funds at this time**. Therefore I have **rescheduled your second loan disbursement** on your current Student Loan Xpress loan to Aug. 2006. This disbursement is **to cover your semester 6 tuition and living expenses** (Sept. 2006 billing period). Your **third disbursement (to cover your semester 7 tuition and living expenses)** is currently

rescheduled out to Nov. 2006 (this is subject to change depending on your step 1 study and exam test date.)

2.    Please state and explain the basis for your assertions in Paragraph 69 of the Amended Complaint that "Fowler was never allowed to participate in the Clinical Medicine Program for Semester 6 although she was charged tuition for this Semester" and that "her Xpress Loan proceeds held by Saba were used to fund this tuition."

**RESPONSE:**

Saba University students attend the Basic Sciences classes on the island of Saba and then complete the Clinical Medicine rotations at various hospitals in the US. Even though Plaintiff Fowler finished her Basic Sciences on the island, she was never allowed to begin her Clinical Medicine rotations in the US. In Aug 2006 after completing her Basic Sciences, she left the island and returned to the US to begin rotations. Also in Aug 2006, Saba withheld tuition payments from Loan #1 CLUID: GRTLKORIGA0V7YHG to pay for her upcoming Clinical Medicine Semester 6 rotations.

A key factor in her selecting a medical school was to find a conducive and supportive environment. Since this school was founded by Dr. David Fredrick in order to assist older students in obtaining an M.D. by offering accommodating solutions, she chose to invest her resources, her money and herself into Saba University. Dr. Fredrick, Saba University founder and president, allowed students to adjust their schedules in a way that would be most beneficial to the individual student, including allowing them to graduate before sitting for their USMLE licensing exams. (Eventually, on 5/6/2010, Saba Board of Trustee's sent out an email to students changing this policy and requiring that students first pass their step one prior to beginning clinical rotations and complete their step 2 exam prior to graduation.)

In Aug 2006, her intention was to begin her clinical medicine rotations as soon as possible. She was forced to sign an LOA prior to leaving the island. She always thought she could begin her rotations as soon as a spot became available.

During her exit interview, Sandy Murphy, the clinical coordinator required that she sign an LOA before leaving the island. She stated that since Saba had limited availability for clinical medicine rotation preference would be given to students with GPA's of 3.0 or higher and that since her GPA was below a 3.0, Murphy required that Fowler immediately sign an LOA. In addition, unbeknown to her at that time, Saba had incorrectly calculated her GPA which was actually 3.15+. The exit interview proved to be a sobering experience for her in that she understood that Saba/Sandy Murphy had categorized her as a weak student who would most likely not move forward. This was later confirmed in a subsequent conversation with Saba's Dean Arthur Maron who explained that he had reviewed her file and said that he had evaluated many students and that with a GPA of 2 something, she would never pass the step 1 exam. Murphy further went on to state that as a matter of fact, he could guarantee exactly what she would score on the next attempt and that she should take out a pen and paper and write down this number, " one, eight, two". This would fall short of a passing score of 185. The

3

ramifications were tremendous, not only was she denied opportunity to begin her clinical medicine rotations, she felt that she had lost all support from Saba and this was then followed by a personal complete loss of confidence in her abilities. To this day, she continues to try to have her transcript errors rectified; including, informing and repeatedly asking Saba's representing counsel to address this issue which has been to no avail.

Although other students who did not pass or complete their steps were allowed to enter into Clinical Medicine and start their rotation, she was never afforded this opportunity. she held the belief that she would be allowed to begin rotations as soon as a spot became available.  Saba continued to bill her for tuition which required that she take out additional loans.  A second loan was required to cover semesters 7 and 8, but at the same time, Saba did not schedule her for rotations and required that she continue to pre-date LOA's to cover this time frame. The burden of trying to finance her continuing education while at the same time not knowing whether she would be allowed to reap the benefits was tremendously stressful and overwhelming.

3.    Please state and explain the basis for your assertions in Paragraph 72 of the Complaint that "Saba should have had sufficient proceeds on hand to pay for Semester 7" and "although Saba had already billed Fowler for tuition for Semester 6 that Fowler was not allowed to complete, Fowler applied for and Saba received the proceeds of a second Xpress loan of $57,690."

**RESPONSE:**

See Response to Interrogatory Number 2. Additionally, Fowler's  first loan **#1 CLUID: GRTLKORIGA0V7YHG** was meant to cover 3 semester's worth of tuition and living expenses. She had received her first disbursement in Jan 2006 for Winter Semester 2006.  In the following Summer Semester 2006, she was denied the second disbursement because of being less than half time, the email from Janet indicated that the remainder of this loan would cover Semester 6 and Semester 7.  However, in Oct 2007, Janet instructed her to apply for a second loan and Saba withheld tuition for Semester 7 and Semester 8 from that loan in Dec 2007.  She was never allowed to participate in Semesters 6, 7, or 8 even though Saba collected tuition payments for these semesters from loan proceeds from both Loan **#1 CLUID: GRTLKORIGA0V7YHG** and Loan **#2  CLUD:  GRTLKSORIGASNUGYC**. It is also interesting to note that the refund to Loan **#1 CLUID:  GRTLKORIGA0V7YHG** was never made by Saba.

4.    Please state and explain the basis for your assertion in Paragraph 76 of the Complaint that "Saba diverted funds and cannot account for the full amount of the student loan proceeds from the two Xpress loans."

**RESPONSE:**

See Response to Interrogatory #2. In addition, Fowler paid all tuition out-of-pocket for the Basic Sciences.  Saba used proceeds from student loans later made to Fowler to pay tuition for Clinical Medicine Semesters 6, 7 and 8; but she was never scheduled nor allowed to participate in those clinical rotations.  These loan-funded tuition payments were retained by Saba in Aug 2006 and Dec 2007.  In Aug 2006 funds from Loan No. 1 were used to pay tuition for Semester 6 for which she was never allowed to begin.  In Dec 2007 funds from Loan No. 2 were used to pay tuition for Semesters 7 & 8 which she was also never allowed to begin.  In Nov 2009, **over three years since she was last enrolled in classes and received her first loan disbursement,** the lenders of Loan No. 2 received a refund from Saba which was in an incorrect amount and the lenders of Loan No. 1 have never received a refund from Saba. After all of this time Saba still cannot appropriately account for the funds.

The following is Plaintiffs itemization of Plaintiff Fowler's misapplication of loan proceeds.

# Student Loan-Xpress
# Tuition Refund Explained

Original Amount Requested
$46,660.00 **CLUID: GRTLKORIGA0V7YHG**

| | | | | |
|---|---|---|---|---|
| 01/19/2006 1st  Disbursements Loan No.1 to Karen | | $15,000.00 | | $14,975.00 Deposited |
| 08/07/2006 2nd  Disbursements Loan No.1 to Karen | Adjusted Loan Amount: | $16,130.00 $31,130.00 | $8,825.00 | Tuition 6th $7,305.00 Deposited |
| Adjusted by Lender for < ½ Time / Non Matriculated | Original Request Amount: | $15,530.00 $46,660.00 | | |

Original Amount Requested $57,690.00
 $38,460.00 **CLUD:  GRTLKSORIGASNUGYC.**

| | | | | |
|---|---|---|---|---|
| 12/05/2007 Tuition Retained From Loan No.2 | | $17,260.00 | $8,070.00 $9,190.00 | Tuition 7th Tuition 8th |
| 12/13/2007 1st  Disbursements Loan No.2 to Karen | | $21,200.00 | | $21,200.00 Deposited |
| | Adjusted Loan Amount: | $38,460.00 | **$26,085.00** | **Tuition to be** |
| **Refunded** | | | | $25,210.00 Actual |
| Refund Adjusted by Lender for < ½ Time / Non Matriculated | Original Request Amount: | $19,230.00 $57,690.00 | | |

A total of $26,085.00 should have been refunded and applied in the following manner**.**
$8,825.00 Tuition for the 6th semester should have been refunded and applied to Loan No. 1
**CLUID: GRTLKORIGA0V7YHG**

$17,260.00 ($8,070.00 tuition for the 7th semester and $9,190.00 tuition for the 8th semester) should have been refunded and applied to Loan No. 2 **CLUID: GRTLKSORIGASNUGYC**

**RESPONSE (Cont.)**

5

Saba's Finance Department refunded $25,210.00 (with a check date of 06/09/2009 and letter addressed to Great Lakes dated 07/17/2009); Great Lakes did not receive the refund from Saba until November 2009. The total amount of $25,210.00 was applied to Loan No. 2 **CLUID: GRTLKSORIGASNUGYC**, with an original disbursement date of 12/04/2007 as indicated by Saba's Finance Department.

5. Please state and explain the basis for your assertion in Paragraph 76.2 of the Amended Complaint that "Saba paid itself at least $26,085.00 in school tuition for Semesters 6, 7, and 8 while simultaneously denying Fowler's attendance in the Clinical Medicine Program."

**RESPONSE:**

See Response to Interrogatory #4. Additionally, Plaintiff Fowler had been able to pay the basic sciences tuition out of her personal funds while she attended classes on the island, loan proceeds were used to pay for tuition to cover Clinical Medicine Semesters 6, 7 & 8. After leaving the island, Saba continued to bill her for tuition and instructed her on exactly how to and when to apply for student loans; but Saba never allowed Fowler to be scheduled to begin clinical rotations.

6. Please state and explain the basis for your assertions in Paragraph 76.4 of the Amended Complaint that Saba "acted with intent to deceive both Fowler and the student loan lender" and "Saba certified to the lender that Fowler was a full time student while at the same time denying Fowler access to the Clinical Medicine Program."

**RESPONSE:**

See Responses to Interrogatories above. Additionally, Plaintiff Fowler was under the impression that she would be scheduled and able to start her Clinical Medicine rotations as soon as a spot was available. Saba's finance department continued to bill her and instructed her to apply for loans. Saba falsely verified to the lending agencies that she was an active student greater than half time in order that she receive the student loans.

At the same time, Saba's clinical medicine department did not schedule her for any rotations and then forced her to sign and pre-date LOA's after the fact. Saba made it clear to her that she had to continue to pay tuition to be enrolled. If a student did not pay on a timely basis, additional fees could be incurred and a student could be pulled from a rotation as Plaintiff Demmons was pulled from his final semester.

Not only did Saba instruct Fowler on how and when to apply for loans as they suspected these loans would soon be unavailable to students, they failed to provide Fowler with any educational benefit.

**RESPONSE (Cont.)**

There was a tremendous pressure to apply for the loans and pay tuition as they suspected that the loans might soon be unavailable

Lenders require schools to certify that students are enrolled more than half time and to verify that they qualify for student loans.

> 7.  Please state and explain the basis for your assertion in Paragraph 76.6 of the Amended Complaint that "Fowler relied upon Saba's misrepresentation as she believed that by applying the loans, she would continue to be an active student and be allowed to participate in the Clinical Medicine Program."

**RESPONSE:**

Saba made it clear to Plaintiff Fowler that she had to continue to pay tuition to be enrolled.  Not only did Saba pressure her to take out the student loans, Saba led her to believe that she must pay to play.  The lenders required that Saba certify that students are enrolled greater than half time and verify that they qualify for student loans.  Saba led Fowler to believe that she would be allowed to enter rotations; however, they never allowed her to do a single rotation and she never received any educational benefit from the tuition payments taken from the Loans insert that covered Semesters 6, 7, and 8.

By the simple fact that she continued to be billed for tuition and was receiving emails from Saba finance department instructing her on how to and when to take out loans , she continued to believe that she was an active student and believed that she would be scheduled for Clinical Medicine rotations.  However, even after paying tuition for semesters 6, 7, & 8, she was never afforded that opportunity.

> 8.  Please state and explain the basis for your assertion in Paragraph 77 of the Complaint that "to the extent Fowler's Student Loans are found to not be dischargeable, the debt and accrued interest otherwise payable by Fowler should be recoverable from Saba as it paid itself proceeds for school attendance while simultaneously denying Fowler access to school."

**RESPONSE:**

See Response to Interrogatories 1, 2, 3, 4, 5, 6 and 7 above.

7

9.    Please state and explain the basis for your assertion in Paragraph 77.1 of the Amended Complaint that Saba "committed an intentional tort by fraudulently paying itself proceeds for school attendance while simultaneously denying Fowler access to school."

**RESPONSE:**

In addition to the Responses set forth in Responses 1, 2, 3, 4, 5, 6 and 7 above, Plaintiff Fowler was controlled and instructed on how and when to apply for loans, falsely certifying her student enrollment status to the Lenders, forcing her to sign and pre-date LOA's, and denying her access to Clinical Medicine rotations all in order that Saba could continue to collect tuition funds.

**RESPONSE (Cont.)**

Fowler believed that whereas Saba had retained three semesters of tuition she would be scheduled for Clinical Medicine rotations and be permitted to finish her medical degree.  She was also fearful that if she did not continue to pay tuition that she would be dismissed and all of her efforts, money and time would be for naught.

10.    Please state and explain the basis for your assertion in Paragraph 77.3 of the Amended Complaint that "Fowler is also entitled to damages in the form of attorneys' fees she has incurred in the filing and prosecution of this action."

**RESPONSE:**

Debtor objects to this Interrogatory as it calls for a legal opinion. Debtor otherwise states that she would not be in this legal situation if not for Saba; therefore, Saba should be required to cover these costs.

11.    Please state and explain the basis for your assertion in Paragraph 78 of the Complaint that Saba is liable to Fowler for "false and deceptive practices that have injured her."

**RESPONSE:**

Saba practiced false and deceptive practices by taking Fowler's loans proceeds to pay her tuition for Clinical Medicine Semesters 6, 7 and 8; but never scheduled nor allowed her to participate in those clinical rotations.  These loan-funded tuition payments were retained by Saba in Aug 2006 and Dec 2007.

8

## RESPONSE (Cont.)

In Aug 2006 funds from Loan #1 were used to pay tuition for Semester 6 for which she was never allowed to begin. In Dec 2007 funds from Loan #2 were used to pay tuition for Semesters 7 & 8 which she was also never allowed to begin.

In Nov 2009, over three years after she was last enrolled in classes, the lenders of Loan # 2 received a refund from Saba which was an incorrect amount and the lenders of Loan #1 have never received a refund from Saba.

As to Fowler's injury, her experience with Saba has left her financially, mentally, and emotionally bankrupt in ways that she finds it difficult to express in words. She gave Saba everything she had to give and in return they took advantage of her dream and simply drained her. Fowler's response to this tremendous stress has been similar to someone who suffers from Post-Traumatic Stress Syndrome as she nearly completely mentally shut down, not knowing how to pick up the pieces of her life and proceed. Her money, her heart, her time were all invested to no avail and now an impossible debt looms over her head. Resolution is necessary so that she may return to being a contributing member of society. And resolution is necessary so that Saba University might be forced to examine their practices and cease preying on the hopes and dreams of people like Fowler.

12. Please state and explain the basis for your assertion in Paragraph 78.3 of the Amended Complaint that Saba's "student handbook, financial aid applications, and billing statements" constitute a "written or implied contract" with Fowler.

## RESPONSE:

Plaintiff objects to this Interrogatory as it calls for a legal conclusion. In addition to the Responses above, Fowler states that all written promises made by Saba constitute implied contracts. In particular, Saba was paid for tuition while Saba intentionally cut off Fowler's access to clinical medical rotations. See Document Production for further support. Saba reviewed, certified and forwarded her loan applications to the lenders indicating that she was actively enrolled in classes. Saba subsequently, retained tuition for semesters 6, 7 and 8 without allowing her to be enrolled in classes (i.e. Clinical Medicine rotations) or providing her with any benefits or services in return for the tuition payments retained.

Whereas it is incumbent upon the school to certify the enrollment status with the lender and disburse the loan funds to the student, no loans would have been made or dispersed without Saba's involvement. Furthermore, whereas Saba charges a fee for its services rendered, namely tuition for credit hours, she never received any such benefit or services for Clinical Medicine Semesters 6, 7, & 8.

Fowler was under the impression that since the school was instructing her on how and when to apply for the loans and the fact that she was able to successfully obtain the loans with Saba's

9

support and the fact that Saba retained tuition payments meant that she would be scheduled and able to start her Clinical Medicine rotations as soon as a spot became available.

13. Please state and explain the basis for your assertions in Paragraph 78.6 and 78.7 of the Amended Complaint that "Saba breached its contract to Fowler by failing to provide any service in exchange for the student loan proceeds received by Saba for Semesters 6, 7, and 8" and "no educational services were provided by Saba to Fowler for Semesters 6, 7, and 8".

**RESPONSE:**

See responses set forth in Interrogatory #4 above.

14. Please state and explain the basis for your assertion in Paragraph 80.4 of the Amended Complaint that Saba failed to follow "reasonable industry practices in timely refunding student loan monies to Demmons' student loan lenders".

**RESPONSE:**

There was always a tremendous concern by the university regarding the "...condition in the student loan market" and potential loss of student loan availability, that Dr. Fredrick referred to as "frustrating and stress-inducing". Saba's financial aid office was always instructing students on how to and when to submit new loan applications. (At one point in time, Saba even created a loan program known as the Tuition Assistance Program funded by their parent company.)

Saba's Student Loan Information Guide indicates that "...once the pre-approved loan is in place, those loan funds will not be disbursed to the student until after classes begin." In actual practice, Saba processed Fowler's student loans and retained the tuition payments far in advance of Fowler's matriculation into successive Clinical Medicine rotations. And as common practice by the university, Saba subsequently required LOA forms to be signed and pre-dated to cover any gaps in time.

Although Demmons had the benefit of eventually attending his Clinical Medicine rotations, his loan origination dates did not equate to his actual dates of matriculation and therefore, the interest that accrued on his loans is substantially greater than it should have been. In reality, according to several servicing agencies and schools the typical timeframe (industry standard) for loans to be returned to the lender is within a 45 day period. With that said, he was always under the assumption that clinical placements would be available sooner rather than later.

15. Please state and explain the basis for your assertion in Paragraph 80.5 of the Amended Complaint that "Saba withheld the return of student loan proceeds to Demmons' student loan lenders for Demmons' attendance during Semesters 6, 7, 8, 9, and 10".

Saba retained tuition payments far in advance of each and every clinical semester. Whereas Saba had limited clinical positions available, they should have delayed their tuition payments until the rotations were available or they should have refunded the payment whenever there was a 45 day delay as practiced in the industry.

Saba was constantly informing the student body that certain lenders were not going to be available in the future and that students needed to be proactive. Consequently, Saba would instruct students on how and when they needed to complete a student loan application.

**RESPONSE (Cont.)**

According to the Student Loan Xpress Student Loan Information Guide "... once the pre-approved loan is in place, those loan funds will not be disbursed to the student until after classes begin."

16. Please state and explain the basis for your assertions in Paragraphs 80.6 through 80.10 of the Amended Complaint that "Saba withheld Demmons' student loan proceeds" for 455 days prior to matriculation into Semester 6, 146 days prior to matriculation into Semester 7, 199 days prior to matriculation into Semester 8, 332 days prior to matriculation into Semester 9, and 152 days prior to matriculation into Semester 10.

**RESPONSE:**

Saba's financial aid office was always instructing students on how to and when to submit new loan applications. (At one point in time, Saba even created a loan program known as the Tuition Assistance Program funded by their parent company.)

Students were constantly under tremendous duress regarding the availability of financial aid. Based on the fact that Saba was so insistent on students acquiring loans, students did not dare to question Saba's practices in fear of retaliation as students had witnessed so many first-hand retaliatory actions by the university throughout Basic Sciences. Ultimately, Demmons was in fear of the loss of funding and not being able to complete our degree.

An example of a retaliatory action that Saba used against Demmons was being placed on a "Financial Hold" by Doreen Gallant, the former bursar in the finance department. On

11

Wednesday, July 15, 2009,  he sent an email to Doreen Gallant disputing Saba's handling of refunding Fowler's tuition for her Semesters 6, 7, & 8.  On July 24, 2009, Demmons received an email from Sandy Murphy, Clinical Coordinator notifying Demmons that she would be not certify his step 2 CK certification because he had been placed on  a "Financial Hold" and should payment not be received by the end of the week, he would be pulled out of my current rotation.  This "Financial Hold" which was enforced for lack of payment of Semester 10 tuition was levied 152 days prior to his matriculation into Semester 10.  Furthermore, it was enforced even though

## RESPONSE (Cont.)

Demmons provided documentation indicating that his loan application had been approved and loan disbursement would be made in August 2009.  He was not scheduled to enter his final Semester 10 until Feb 1, 2010 and yet Saba demanded payment in July 2009.

Saba's Student Loan Information Guide indicates that "...once the pre-approved loan is in place, those loan funds will not be disbursed to the student until after classes begin."  In actual practice, Saba processed Demmons' student loans and retained the tuition payments far in advance of his matriculation into successive Clinical Medicine rotations. And as common practice by the university, Saba subsequently required LOA forms to be signed and pre-dated to cover any gaps in time.

Demmons' suspects that Saba's practices were due to a multitude of issues, i.e., a limited number of Clinical Medicine rotations, the structural expansion of the schools' campus and augmentation of the library, hiring of new faculty, the increased cost of hospital affiliations, predatory lenders, and the student loan xpress scandal.

Although Demmons had the benefit of eventually attending his Clinical Medicine rotations, his loan origination dates did not equate to his actual dates of matriculation and therefore, the interest that accrued on his loans is substantially greater than it should have been.  In reality, according to several servicing agencies and schools the typical timeframe (industry standard) for loans to be returned to the lender is within a 45 day period.

    17.    Please state and explain the basis for your assertion in 80.12 of the Amended Complaint that "Demmons avers that Saba should be liable for the interest charged to Demmons on the loan proceeds that were not returned to student loan lenders".

## RESPONSE:

    See Response to Interrogatory #16 above.

18. Identify each person whom You know or believe to have knowledge or information relating to the facts, matters, communications, documents, or occurrences described in the allegations in the Complaint and including without limitation knowledge or information concerning the Tuition charged You by Saba, payments made by You for such Tuition, Loans associated with your education at Saba, and your enrollment status and academic standing at Saba. For each such person, state the name, address, and telephone number of each person and describe in detail the knowledge You believe each possesses.

**RESPONSE:**

Saba Faculty:
Dr. Fredrick
Dr. William Keller
Dr. Hugh Duckworth
Dr. Mark Dykestra
Dr. James Stewart

Saba Administration:
Arthur Maron, MD, MPH – Executive Dean
Bernice Ouellet - University Registrar
Cheryl L. Jones – Financial Aid Officer (refund)
Doreen Gallant – Former Bursar
Jacey Rosa - Bursar
Janet Baczewski - Loan Officer
Noela Burks – Clinical Services
Sandra J Murphy - Clinical Coordinator

Lenord J. Charbert Medical Center
Michael Garcia, MD, Medical Director
Thomas G. Ferguson, MD, DIO / Chief of Internal Medicine

MEDICAL
Alan David Kaye, M.D., Ph.D., D.A.B.A., D.A.B.P.M., D.A.B.I.P.P
Editor-in Chief Pain Physician, Tenured Professor, Director Pain Services, & Chairman

Mary Mathai, MD, Chief of Physical Medicine & Rehabilitation

19. Identify each person who helped prepare or supply information for your answers to these Discovery Requests and identify the particular Request with which each such person assisted.

**RESPONSE:**

These responses were composed by Karen Fowler and Bill Demmons using information that Debtors acquired and obtained since 2003 through the present. They represent a comprehensive collection of information but are not limited to financial documents, transcripts, evaluations, statements, invoices, notices, emails, letters, calendars, day planners, business and personal correspondence, etc. as identified and provided in the production of documentation section of these interrogatories.

20.     Identify any and all expert witnesses that You may call to testify at trial or have retained in connection with this case, and identify and state for each such person:



a.      name and address;
b.      educational background;
c.      qualifications and expertise;
d.      subject matter of opinions to be offered;
e.      all facts which form the basis of each opinion to be offered;
f.      a summary of each opinion to be offered and the reasons for such opinion; and
g.      prior expert testimony experience whether at trial or in a deposition, including the case name and number, the court in which the case was pending, the dates of such testimony, and the subject matter of any opinions offered.

**RESPONSE:**

Debtors have identified no expert witnesses at this time.

21.     Identify the type and amount of any damages You seek from Saba and explain the factual basis for each calculation.

**RESPONSE:**

Debtors seek to set-off any student loans that are found to be nondischargable and damages associated with Saba's wrongful accounts.

# DEBTORS' RESPONSE TO THE REQUEST
# FOR PRODUCTION SECTION

### REQUESTS FOR PRODUCTION

Please produce the documents identified below. Please produce any and all documents within your possession or control, including without limitation any and all documents held or controlled by You or any companies or business entities affiliated with You.

1. All documents relating to Tuition that You were charged by Saba and Tuition that You paid to Saba, including without limitation the entire contents of your "file" concerning Tuition, copies of checks used to pay Tuition, as well as any associated papers, notes, and/or correspondence.

**RESPONSE:**

See documents on the attached disk.

2. All documents relating to the Loans associated with your education at Saba, including without limitation the entire contents of your "file" concerning such Loans, documentation of payments on such Loans, as well as any associated papers, notes, and/or correspondence.

**RESPONSE:**

See documents on the attached disk.

3. All documents relating to your enrollment and academic standing at Saba, including without limitation the entire contents of your "file" concerning your enrollment and academic standing, as well as any associated papers, notes, and/or correspondence.

**RESPONSE:**

See documents on the attached disk.

4.    All communications, including without limitation emails, letters, faxes, text messages, and any other communications relating to Tuition.

**RESPONSE:**

See documents on the attached disk.

5.    All communications, including without limitation emails, letters, faxes, text messages, and any other communications relating to the Loans.

**RESPONSE:**

See documents on the attached disk.

6.    All communications, including without limitation emails, letters, faxes, text messages, and any other communications relating to your enrollment and academic standing at Saba.

**RESPONSE:**

See documents on the attached disk.

7.    All documents identified in, referred to, or that support the facts set forth in, your responses to the preceding Requests for Admissions and Interrogatories.

**RESPONSE:**

See documents on the attached disk.

8.    All documents You intend to introduce into evidence at the trial of this lawsuit.

**RESPONSE:**

See documents on the attached disk.

9.    All documents which evidence, refer, or relate to any and all allegations and/or causes of action contained in your Complaint in regards to Saba.

**RESPONSE:**

See documents on the attached disk.

10. All documents which support your failure to unequivocally admit each Request for Admission below, identified by the number of the Request for Admission which was not unequivocally admitted.

**RESPONSE:**

See documents on the attached disk.

11. Copy of any correspondence or communication evidencing any agreement (as you allege) of Saba to "apply the prepaid Fall 2005 tuition to Fowler's Winter 2006 Semester" as alleged in Paragraph 62 of the Complaint.

**RESPONSE:**

See documents on the attached disk.
See also PDF - Saba - Billing Statements - Demmons - Fowler - 2003 - 2009

12. Copy of any correspondence, communication, or document supporting or evidencing your claim in Paragraph 65.1 of the Amended Complaint that "although $31,000 in Health Xpress proceeds were available to Saba, a second disbursement to Fowler was denied because she was only taking one class that semester"

**RESPONSE:**

See documents on the attached disk.
See also **Para 65.1**
See J. Baczewski - SLX Loan - 03-07-06

Subject:  SLX Loan
From: Janet Baczewski - Tuesday, March 07, 2006 10:37 AM
To:  Karen Fowler

**"The Finance Dept. has been notified that you will be taking only one course for the upcoming May 2006 semester. Being "below half-time status" makes you ineligible to receive loan funds at this time. Therefore I have rescheduled your second loan disbursement on your current Student Loan Xpress loan to Aug. 2006.**

**This disbursement is to cover your semester 6 tuition and living expenses (Sept. 2006 billing period).**  Your third disbursement (to cover your semester 7 tuition and living expenses) is currently rescheduled out to Nov. 2006 (this is subject to change depending on your step 1 study and exam test date.)"

13.    Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 68 of the Complaint that "Saba refused to allow Fowler to begin the Clinical Medicine Program in Semester 6 without passing the Step One Examination".

**RESPONSE:**

See documents on the attached disk.
See also below email

J. Baczewski - FW SLX Loan - 11-09-06

Subject:  FW:  SLX Loan
        From: Janet Baczewski - Thu, 9 Nov 2006 10:17:32 -0500
        To:  Karen Fowler

"I just wanted to update you on your SLX loan situation. **Since you have already received your sem. 6 loan funds (prepaying you for 14.5 clinical rotation weeks) and you are currently on a Leave of Absence with no rotations scheduled, you are not eligible to receive loan funds at this time.**

As a result, I have cancelled the third disbursement of your current SLX (Health Xpress Loan), sem. 7 funds previously rescheduled to 11/27/2006.

**We will not be billing you for semester 7 until you have passing step 1 scores and have some clinical rotation weeks scheduled.  At that time, you will be eligible to reapply for loan funds the next loan period."**

14.    Copy of any communications, correspondence, or documents supporting or evidencing your assertion and that "on August 9, 2006, Saba paid itself $8,825.00 in tuition from the Student Loan proceeds and wired $7,305.00 to Fowler's bank account."

**RESPONSE:**

See PDF - Saba - Billing Statements - Demmons - Fowler - 2003 – 2009;
 - Health Xpress Disclosure - Fowler 11-10-06a;
 - Health Xpress Disclosure - Fowler 11-10-06b; and

18

- Saba Xpress Loan Disbursement - Fowler 08-09-06

15.    Copy of any communications, correspondence, or documents supporting or evidencing your assertions in Paragraph 69 of the Amended Complaint that "Fowler was never allowed to participate in the Clinical Medicine Program for Semester 6 although she was charged tuition for this Semester and her Xpress Loan proceeds held by Saba were used to fund this tuition."

**RESPONSE:**

See documents on the attached disk.

16.    All correspondence Fowler received from Saba referenced in Paragraph 70 of the Complaint, communicating to Fowler (as you assert) that "the third disbursement of the Xpress loan would be cancelled" and "Fowler would not be billed tuition for Semester 7 until she passed the Step One Examination."

**RESPONSE:**

See documents in response to Document Production #13 (above) and on the attached disk.

17.    Any bill for tuition for Semester 7, as well as a copy of the instructions to "apply for another student loan from Xpress loan" referenced in Paragraph 71 of the Complaint.

**RESPONSE:**
Karen Fowler - Loan Application - 10-23-2007

From: Karen Fowler [mailto:karensfowler@hotmail.com]
      Sent: Tuesday, October 23, 2007 4:19 PM
      To: Janet Baczewski; karensfowler@hotmail.com
      Subject: Loan Application

Hello Janet,

This responds to our past conversation regarding this semester's tuition statement.  I just wanted to confirm that I understood your instructions correctly; the dates that I should enter on my application should include the current Fall semester 07 and the up-comming Winter and Summer semesters 08.

Could you please confirm these dates at your earliest convenience?

From: Janet Baczewski <finance@saba.edu>
      Sent: Friday, October 26, 2007 12:48 PM
      To: 'Karen Fowler'
      Subject: RE: Loan Application

      Here is the information to help get you started on the online loan application process. **I recommend you submit your online loan application today (the signed paper promissory note can be submitted after the end of this month, but the pre-approved loan application date of submittal must be before). Your new loan period will be 09/01/2007 – 08/31/2008 to cover sem. 7, 8, and 9 tuition and living expenses, 4th Year Grad Loan.**

Also, please complete the attached two forms and return them to my attention in the Finance Dept. by fax, mail or email, so I will know how to disburse your funds when the time comes.

Feel free to contact me with any further questions.

      18.    Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 72 of the Complaint that "although Saba should have had sufficient proceeds on hand to pay for Semester 7, and although Saba had already billed Fowler for tuition for Semester 6 that Fowler was not allowed to complete, Fowler applied for and Saba received the proceeds of a second Xpress loan of $57,690."

**RESPONSE:**

03 - Health Xpress Original Application - Fowler - 10-26-07

From: Janet Baczewski <finance@saba.edu>
      Sent: Friday, October 26, 2007 12:48 PM
      To: 'Karen Fowler'
      Subject: RE: Loan Application

      Here is the information to help get you started on the online loan application process. **I recommend you submit your online loan application today (the signed paper promissory note can be submitted after the end of this month, but the pre-approved loan application date of submittal must be before). Your new loan period will be 09/01/2007 – 08/31/2008 to cover sem. 7, 8, and 9 tuition and living expenses, 4th Year Grad Loan.**

Also, please complete the attached two forms and return them to my attention in the Finance Dept. by fax, mail or email, so I will know how to disburse your funds when the time comes.

Feel free to contact me with any further questions.

19. Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 76 of the Complaint that "from the second Xpress loans, Saba paid itself tuition of $8,070.00 for Semester 7 and $9,190 for Semester 8. Saba then wired $21,200 in loan proceeds directly to Fowler."

**RESPONSE:**

#2 - Saba - Billing Statements - Demmons - Fowler - 2003 – 2009

20. Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 76 of the Complaint that "Saba diverted funds and cannot account for the full amount of the student loan proceeds from the two Xpress loans?"

**RESPONSE:**
*See files in folder #4- Para 76*
> #1 - Student Loan-Xpress Documents
> #1a - Student Loan - Xpress Document Guide
> #2 - Saba - Billing Statements - Demmons - Fowler - 2003 – 2009
> #3a - Fowler - Saba Loans – Summarized
> #3b - Fowler - Saba - Sem. Courses and Associated Tuition and Fees
> #4 - Fowler Student Loan Accounts - 12-17-14b
> #5 - Saba - HXLs Refund Amount Explained
> #6 - Noela Burks - LOA Forms 08-02-2007
> #7 - Noela Burks - LOA Forms 09-06-2007
> #8 – Jacey Rosa - Update from Saba University - 01-07-2015

21. Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 76.2 of the Amended Complaint that "Saba paid itself at least $26,085.00 in school tuition for Semesters 6, 7, and 8 while simultaneously denying Fowler's attendance in the Clinical Medicine Program."

**RESPONSE:**

#2 - Saba - Billing Statements - Demmons - Fowler - 2003 – 2009
#7 - Dr. Eliastam - Letter of Appeal - 10-27-08

Subject:  Letter of Appeal
     From: Karen Fowler – Monday, October 27, 2008 8:47 PM
     TO: m.eliastam@saba.edu - Dr. Eliastam

    "It is with sincerity and conviction that I have invested myself and my resources to this end; **pre paying my clinical tuition and insurance for Semesters 6, 7, and 8; even though I have not participated in any clinical rotations thus far.**  I have tremendous confidence in my background and my abilities and know that once I start my clinical rotations I will shine and will be viewed as an asset to my school."

    22.    Copy of the correspondence or communication referenced in Paragraph 76.3 of the Amended Complaint in which Saba "informed Fowler that she had to pay for attendance at Saba in order to continue to be eligible to take the Step One Examination."

**RESPONSE:**

From: Janet Baczewski <finance@saba.edu>
    Sent: Friday, October 26, 2007 12:48 PM
    To: 'Karen Fowler'
    Subject: RE: Loan Application

    Here is the information to help get you started on the online loan application process. **I recommend you submit your online loan application today (the signed paper promissory note can be submitted after the end of this month, but the pre-approved loan application date of submittal must be before). Your new loan period will be 09/01/2007 – 08/31/2008 to cover sem. 7, 8, and 9 tuition and living expenses, 4th Year Grad Loan.**

Also, please complete the attached two forms and return them to my attention in the Finance Dept. by fax, mail or email, so I will know how to disburse your funds when the time comes.

Feel free to contact me with any further questions.

23. Copy of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 76.4 of the Amended Complaint that "Saba acted with intent to deceive both Fowler and the student loan lender. Saba certified to the lender that Fowler was a full time student while at the same time denying Fowler access to the Clinical Medicine Program.

**RESPONSE:**

See J Baczewski - SLX FYI - 10-26-2007 Attachment

24. Copy of the Saba Student Handbook referenced in Paragraphs 76.5 and 80.1 through 80.3 of the Amended Complaint.

**RESPONSE:**

Part #3 Saba Policies and Loan Guidelines

25. Any documents supporting or evidencing your assertion in Paragraph 76.7 of the Amended Complaint that "Fowler was damaged as a result of the misrepresentations as she was forced to incur debt of at least $26,050.00 in student loans paid to Saba in exchange for no services provided by Saba."

**RESPONSE:**

See documents on the attached disk.

26. Copy of all correspondence or communications between Saba and Fowler where Fowler "questioned the appropriateness of Saba paying itself for Semesters 6, 7, and 8" and where Saba "assured Fowler on numerous occasions that it would provide an accounting of the loan fees spent and applied and that all actions taken by Saba were appropriate," as referenced in Paragraph 76.8 of the Amended Complaint.

**RESPONSE:**

See documents on the attached disk.

27.    Copy of any documents supporting or evidencing your assertion in Paragraph 77.1 of the Amended Complaint that "the debt and accrued interest otherwise payable by Fowler should be recoverable from Saba as it committed an intentional tort by fraudulently paying itself proceeds for school attendance while simultaneously denying Fowler access to school."

**RESPONSE:**

See documents on the attached disk.

28.    Copies of any documents supporting or evidencing your assertion in Paragraph 77.2 of the Amended Complaint that "as a result of Saba's intentional misrepresentation, Fowler has been damaged as she was forced to incur attorney's fees in the filing and prosecution of this Adversary Proceeding."

**RESPONSE:**

See documents on the attached disk.

29.    Copies of Saba's "student handbook, financial aid applications, and billing statements" that you assert in Paragraph 78.3 of the Amended Complaint "constitute a written or implied contract with Fowler."

**RESPONSE:**

See documents on the attached disk.

30.    Copies of the student handbook and the fee bills that created "contractual obligations between Saba and Fowler" as alleged in Paragraph 78.5 of the Amended Complaint.

**RESPONSE:**

See documents on the attached disk.

31.    Copies of the Saba student handbook, financial aid applications, and billing invoices that "constituted a contract between Saba and Demmons" as alleged in Paragraph 80 of the Amended Complaint.

**RESPONSE:**

See documents on the attached disk.

31.    Copies of any communications, correspondence, or documents supporting or evidencing your assertion in Paragraph 80.3 of the Amended Complaint that there was an "obligation to return the loan proceeds as set forth in the Student Handbook on Saba's part."

**RESPONSE:**

See documents on the attached disk.

32.    Copies of any documents, communications, or correspondence supporting or evidencing your assertion in Paragraph 80.4 of the Amended Complaint that "Saba failed to follow reasonable industry practices in timely refunding student loan monies to Demmons' student loan lenders."

**RESPONSE:**

See documents on the attached disk.

33.    Copies of any documents, communications, or correspondence supporting or evidencing your assertion in Paragraph 80.5 of the Amended Complaint that "Saba withheld the return of student loan proceeds to Demmons' student loan lenders for Demmons' attendance during Semesters 6, 7, 8, 9, and 10."

**RESPONSE:**

See documents on the attached disk.

25

34.    Copies of any documents, communications, or correspondence supporting or evidencing your assertions in Paragraphs 80.6 through 80.10 that Saba "withheld Demmons' student loan proceeds" for 455 days prior to matriculation into Semester 6, 146 days prior to matriculation into Semester 7, 199 days prior to matriculation into Semester 8, 332 days prior to matriculation into Semester 9, and 152 days prior to matriculation into Semester 10.

**RESPONSE:**

See documents on the attached disk.

35.    Copies of any documents, communications, or correspondence supporting or evidencing your assertion in Paragraph 80.11 that Demmons has been injured by Saba's failure to return the student loan proceeds within a reasonable period of time. As a result, Demmons' was charged interest for use of the funds during the period of time in which Saba simply sat on the proceeds."

**RESPONSE:**

See documents on the attached disk.

36.    All documents or other materials that You intend to use or offer at trial, or attach as exhibits, including all graphics and demonstratives or visual aids, whether maintained in hard copy or electronic form.

**RESPONSE:**

See documents on the attached disk.

37.    All treatises, periodicals and/or pamphlets on any subject that You propose to offer or use during the trial of this case as well as those that were reviewed by any consulting or testifying expert.

**RESPONSE:**

None at this time.

38.    For any consulting expert whose mental impressions or opinions have been reviewed by a testifying expert, produce all documents and other materials provided to, reviewed by or prepared by or for such expert in anticipation of a testifying expert's testimony.

**RESPONSE:**

None at this time.

39.    With regard to each consulting expert whose opinions or impressions have been reviewed by a testifying expert, produce

a. The most recent resume or curriculum vitae of such expert;

b. Each written contract that the expert has signed in any matter regarding his/her services as an expert.

**RESPONSE:**

None at this time.

40.    For any testifying expert, all documents reviewed or relied upon by the testifying expert.

**RESPONSE:**

None at this time.

41.    For any testifying expert, all expert reports, current resume or curriculum vitae.

**RESPONSE:**

None at this time.

42.    All documents related to any damages You seek from Saba through this Lawsuit.

**RESPONSE:**

None at this time.

27

1.  Admit that You did not include Saba as a creditor on your schedules filed in the Bankruptcy Case.

**RESPONSE:**

Objection. The document speaks for itself.

2.  Admit that You did not include in your schedules, as a scheduled asset, any litigation claim, cause of action, amount due, or claim against Saba.

**RESPONSE:**

Objection. The document speaks for itself.

Respectfully submitted,

THE DE LEO LAW FIRM, L.L.C.

/s/ Robin R. De Leo
Bar Roll No. 20347
800 Ramon St.
Mandeville, LA 70448
(985) 727-1664
Jennifer@northshoreattorney.com
(985) 727-4388 Facsimile

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of January, 2016, I have served a copy of the foregoing pleading upon counsel for R3 Education, dba Saba by electronic mail.

THE DE LEO LAW FIRM, L.L.C.

/s/ Robin R. De Leo
Bar Roll No. 20347
800 Ramon St.
Mandeville, LA 70448
(985) 727-1664
Jennifer@northshoreattorney.com
(985) 727-4388 Facsimile