UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| William A. Demmons and | * | DIVISION "B" |
| Karen S. Fowler | * | |
| Debtors | * | |
| | * | CASE NO. 14-11638 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| William A. Demmons and | * | |
| Karen S. Fowler | * | |
| | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; | * | |
| American Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit Management | * | |
| Corporation, | * | |
| Defendants | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT BY SABA**

William Demmons and Karen Fowler, Plaintiffs and Debtors herein, oppose the Motion for Summary Judgment filed by R3 Education Inc., dba Saba University School of Medicine ("Saba") and respectfully represent as follows:

1

I. **STATEMENT OF FACTS**

William Demmons ("Demmons") and Karen Fowler ("Fowler") (collectively referred to as "Debtors") are husband and wife who filed for relief under Chapter 7 of the United States Bankrutpcy Code on June 25, 2014. Debtors initiated the above captioned Adversary Proceeding to Object to the Dischargeability of Student Loans, in part incurred by Debtors while in attendance at Saba medical school. Although not a student loan lender itself, Saba followed a practice of (i) in the case of Fowler, paying itself tuition and fees from student loan proceeds while at the same time denying Fowler access to the Clinical Medicine program and (ii) in the case of Demmons, pre-paying itself for tuition from student loan proceeds far in advance of any educational benefit derived by Demmons (Saba pre-paid itself tuition and fees between 455 days to 146 days in advance to the actual start of each Semester). Based upon Saba's financial aid "practices," Saba should be held liable under a theory of set-off to pay a portion of Debtors' student loans that may ultimately be found nondischargeable.

Rather than attempting to remedy the injury caused to Debtors for the blatant errors in Saba's accounting practices and reporting, Saba has defended its actions by filing two separate Motions to Dismiss this Adversary Proceeding, a Motion to Withdraw the Reference of this Proceeding to District Court and now, its current Motion for Summary Judgment. In response to discovery propounded to Debtors, Fowler and Demmons produced to Saba hundreds of pages of documentation to justify their legal position. Recall the fact that the Debtors initiated this Adversary Proceeding because they cannot afford the repayment of their student loans. With no budget for their mounting legal fees caused by Saba's aggressive legal tactics in this Adversary Proceeding, Debtors have been forced to weather through the storm, knowing that the

2

dischargeability trial is only 45 days away. Now, however, Saba has the gall to allege that there is no factual dispute in this action.

### A. Fowler Student Loans

Saba's records indicate that Fowler was enrolled *as a student* at Saba between January 5, 2004 and June 9, 2009.[12] At the time of the Debtors' attendance at Saba, the curriculum consisted of two parts: first a "Basic Sciences" component consisting of five semesters of classroom work, followed by second, "Clinical Medicine" program comprised of 72 weeks of clinical clerkship in hospitals in the United States or abroad.[3][4] Fowler completed the Basic Science portion of the Saba circulumn in the Spring of 2005 (this was Fowler's Fifth Semester).[5] Fowler paid all tuition out-of-pocket to Saba for the Basic Sciences portion of medical school.[6] The only financial assistance initially requested by Fowler was to cover her living expenses for Semester Five.[7] Fowler originally applied for a student loan in January 2006 and was lent $31,130 ("Student Loan #1").[8] From this balance, Saba made two [9] disbursements to Fowler.[10] On January 19, 2006, Fowler received $14,975 from Saba's initial disbursement of $15,000 to cover Fowler's living expenses for Semester 5.[11] The remaining

---

[1] Saba Statement of Undisputed Facts, 12.
[2] Fowler disputes her status as a "student" after Semester 5. Fowler was not allowed to participate in any educational program at Saba following her 5th Semester.
[33] Saba Statement of Undisputed Fact, 13.
[4] Saba incorrectly relies upon the Saba 2015-2016 Student Catalog to allege that students were also required to complete a eight weeks of a Research: Literature Review and Analysis module. This reflects a newer curriculm added by Saba following the Debtors attendance. The eight week Research module was not required at the time that Demmons and Fowler attended Saba.
[5] Fowler Affidavit #3.
[6] Fowler Affidavit #4
[7] Fowler Affidavit #4.
[8] Fowler Affidavit #5.
[9]
[10] Fowler Affidavit #5.
[11] Fowler Affidavit #5.

3

loan balance of $16,130 was retained by Saba on behalf of Fowler.[12]

Following the completion of her Basic Sciences coursework in the Spring of 2006 (Semester 5), Fowler moved back to the United States to await her assignment by Saba of a clinical rotation. Fowler believed that she would be beginning the Clinical Medicine portion of medical school in the Fall of 2006 with Semester 6.[13] This must also have been Saba's belief at the time, as Saba disbursed the remaining proceeds of Student Loan #1 by paying itself $8,825 in tuition and fees for Semester 6 and sending Fowler the remaining loan balance of $7,305 for living expenses.[14] The current owner of Student Loan #1 – with an outstanding balance of approximately $40,539.95 as of June 2, 2014 is Deutsche Bank.

From the Fall of 2006 through the Spring of 2009, Fowler studied on her own and without assistance from Saba for the USMLE Step 1 Exam (the "Step 1 Exam").[15] To this end, Fowler utilized review courses which were unaffiliated with Saba in order to prepare for the Step 1 Exam.[16] Although studying for the Step 1 Exam, Fowler at all times believed that she would be placed by Saba in a clinical rotation once an opening became available.[17] This belief is justified as Fowler continued to pay Saba's tuition and fees with no other reciprocal benefit, and Fowler was charged by Saba for Malpractice Liability Insurance as part of her Semester 6 Clinical Medicine tuition.[18] Obviously, only students participating in the Clinical Medicines program are required to maintain malpractice liability insurance.[19]

---

[12] Fowler Affidavit #6.
[13] Fowler Affidavit #7.
[14] Fowler Affidavit #6.
[15] Fowler Affidavit #8.
[16] Fowler Affidavit #8.
[17] Fowler Affidavit #8.
[18] Fowler Affidavit #9 and Saba Invoice attached as Exhibit 1 to Fowler Affidavit.
[19] Fowler Affidavit #10.

Saba now disputes Fowler's classification as a full time student and claims that she had to first complete the USMLE Step 1 prior to placement in the clinical programs.[20] Saba's position is contradicted not only by its billing actions, but also by correspondence from its then president Dr. Fredrick who stated that "After successful completion of your Basic Sciences, you may enter the Clinical Medicine program either in the United States or abroad.... with a 100% placement rate of our clinical medicine students."[21] In fact, Plaintiffs knew other Saba students starting their Clinical Medicine rotations prior to passing the Step 1 Exam in both the US and abroad.[22] In fact, at that time, many foreign medical schools allowed their students to enter the Clinical Medicine rotations before taking the Step 1 examination.[23]

Saba claims that Fowler was dismissed for failure to successfully pass the USMLE Step 1 Exam.[24] Fowler attempted and failed the USMLE Step 1 Exam on three separate occasions between 2007 and 2009.[25] However, Fowler argues that she was not dismissed for failure to pass the Step 1 Exam, but for failure to complete the clinical rotation that Saba never scheduled. Fowler was not able to progress because she was never scheduled to begin a clinical rotation. According to Saba Bursar J. Rosa in an email from December 2014, Fowler entered the Clinical Medicine Program in August 2006 and was subsequently charged tuition for clinical semesters 6 along with Medical Malpractice insurance. Thus, Saba's own records reflect Fowler as a student in the Clinical Medicine Program although Fowler was never assigned a clinical rotation.

---

[20] Saba Statement of Undisputed Fact, #14.
[21] Fowler Affidavit #28 and Exhibit 6 attached thereto.
[22] Fowler Affidavit 28.
[23] Fowler Affidavit 28.
[24] Moya Affidavit #9; Fowler Affidavit # 30
[25] Saba Statement of Undisputed Fact, #21.

Contrary to Saba's assertion that Fowler made "a student loan," Fowler actually incurred two student loans during her "clinical program."[26] In October, 2007, Fowler was contacted by Janet Baczewski of Saba's financial aid office, advising Fowler to apply for a second student loan to cover her tuition and fees for Semesters 7 and 8. The second student loan was borrowed in November 2007 for $38,460 ("Student Loan #2").[27] From the Student Loan #2 proceeds, Saba withheld tuition and fees of $17,260 for Semester 7 and $9,190 for Semester 8.[28] The remaining proceeds of $21,200 were disbursed to Fowler on December 13, 2007, to cover student living expenses associated with Semesters 7 and 8.[29] The current owner of Student Loan #2 is FCDB NPSL 2010-Trust[30], a party in the Adversary Proceeding. The balance owed by Fowler on Student Loan #2 as of June 2, 2014 was $14,031.35.

Total tuition withheld by Saba to cover Fowler's non-existent Clinical Medicine program was $26,085.[31] Saba paid itself tuition and fees, certified to student loan lenders that Fowler was a full-time student,[32] but never allowed Fowler to participate in the Clinical Medicine program.[33] In June, 2009, Fowler was academically dismissed from Saba "for failure to progress."[34]

Coincidentally, also in June, 2009, Saba claims to have issued a check to Great Lakes in order to refund Fowler's tuition and fees for Semesters 6, 7 and 8 of $25,210. Although the refund check is dated June 9, 2009, the cover letter to Great Lakes enclosing the check is dated

---

[26] Fowler Affidavit # 5 and # 13
[27] Fowler Affidavit #12.
[28] Fowler Affidavit # 13.
[29] Fowler Affidavit #13.
[30] Fowler Affidavit #23.
[31] Fowler Affidavit #14.
[32] Part-time students are ineligible for student loans according to Janet Baczewski of the Saba Finance Department. *See* Fowler Affidavit #26 and Exhibit 2 attached thereto.
[33] Fowler Affidavit #11, #25
[34] Fowler Affidavit #24.

45 days later.[35] The refund check was not actually received by Great Lakes until November, 2009, five months after the check date.[36] As a result, student loan proceeds were withheld by Saba for over three years for no benefit to Fowler.[37]

The refund by Saba was not caused by the fact that Saba suddenly discovered that it had erroneously billed Fowler. Rather, the refund was made because Demmons and Fowler threatened and complained nonstop to Saba about Fowler's unjust treatment.[38]

Saba contends that, with the exception of a non-refundable administrative fee ($100.00) and a non- refundable deposit ($500.00), the tuition and fees borrowed by Fowler covering semesters 6, 7, and 8 were refunded to the lender through a Saba check in the amount of $25,210.00. See Exhibit "A" to the Moya Declaration, attached to Saba's Statement of Undisputed Fact, ¶23 and Exhibit 1 at ¶6 and attached Exhibit "A" thereto. Saba is incorrect in two respects – Saba paid the wrong dollar amount and paid on the wrong Student Loan.

First, as to the amount of the refund check, there was neither a "non-refundable administrative fee" of $100 nor a "non-refundable deposit" of $500, deducted from the Fowler student loan proceeds.[39] Rather, the fee of $600 is associated with a Malpractice Liability Insurance fee of $600 charged to all students entering Clinical Medicine.[40] This is supported by Saba Invoice #142816 attached as Exhibit "A" to Fowler's Affdavit.

If Ms. Moya, Saba's financial representative, cannot correctly identify fees charged for malpractice insurance versus non-refundable deposits – particularly when it is so clearly set forth in Saba's own invoice to Fowler – one must question the veracity of Moya's entire

---

[35] Fowler Affidavit #15.
[36] Fowler Affidavit #16.
[37] Fowler Affidavit #17.
[38]
[39] Fowler Affidavit #32.
[40] Fowler Affidavit #9.

Affidavit.

The refund check should have been in the amount of $26,085 as opposed to $25,210.[41] The $875 difference between the Saba tutition and fees charged to Demmons and that refunded to Great Lakes is set forth mathematically in Fowler's Affidavit.[42]

Second, the tuition and fees refunded on behalf of Fowler covering semesters 6, 7, and 8 were not properly segregated by Saba to the appropriate student loan. Instead, the refund by Saba was made in a single lump sum. By lumping the refund together, Student Loan #1 (the older loan) recieved no credit while Student Loan #2 received the entire credit.[43] Because the two student loans at issue are owned by two different lenders, the loan amounts have become hopelessly intertwined.

### B. Relevant Demmons Student Loans

Saba's records indicate that Demmons was enrolled as a student at Saba from January 5, 2004 through May 21, 2010.[44] Demmons completed his required Basic Sciences coursework at Saba in 2006.[45] Demmons successfully passed the USMLE Step 1 Examination on October 31, 2007.[46] Demmons completed his clinical program in May, 2010[47] and thereafter graduated with a Doctor of Medicine.[48] At Demmons exit interview from Saba, Demmons was willing to take Clinical placement in hospitals located in multiple states and not limiting his clinical rotation to

---

[41] Fowler Affidavit #19, #22, #33, #34.
[42] Folwer Affidavit # 33 and #34.
[43] Fowler Affidavit #21 and #22.
[44] Saba Statement of Undisputed Fact, # 11.
[45] Saba Statement of Undisputed Fact # 15.
[46] Saba Statement of Undisputed Fact #16.
[47] Saba Statement of Undisputed Fact, #16.
[48] Saba Statement of Undisputed Fact, #18.

Louisiana. [49] Contrary to Saba's assertion that the delay in the placement of Demmons in a clinical rotation was Demmons own fault. [50] The delay was intentionally caused by Saba. [51]

Saba prepaid itself its expenses from Demmons student loan proceeds. Saba withheld his student loans and retained tuition for 455 days in advance of Semester 6: 146 days in advance of Semester 7; 199 in advance of Semester 8; 229 days in advance of Semester 9; and for 152 days in advance of Semester 10. Demmons did not derive any benefit for the pre-payment of my tuition from my student loan proceeds. [52] The interest on my student loans began to accrue when my student loans were executed. [53] Saba benefited by the prepayment of its tuition and expenses. Demmons received no corresponding benefit. Saba's practice of prepaying itself tuition and fees violates industry standards. [54]

## II.   LEGAL ARGUMENT

### A. Summary Judgment Is Not Warranted

Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* In essence, the inquiry is whether the evidence presents a sufficient disagreement to require

---

[49] Demmons Affidavit #2
[50] Moya Affidavit #10
[51] Demmons Affidavit #3
[52] Demmons Affidavit #10
[53] Demmons Affidavit #10
[54] Demmons Affdavit #12 and #13

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.*

Summary judgment should be granted only where the evidence is such that it "would require a directed verdict for the moving party." Sartor v. Arkansas Gas Corp., 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944). The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 2171, n. 11, 76 L.Ed.2d 277 (1983).

As evidenced by the Debtors' Statement of Disputed Material Fact and the Affidavits of Demmons and Fowler, Saba cannont credibly substantiate that there is no material factual dispute between the parties.

### B. Saba's Fraudulent Misrepresentation

Debtors rely upon Louisaana negligence law to hold Saba accountable for its broken promises. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art 2315(A). Debtors further rely upon the legal theories of negligent misrepresentation and intentional misrepresentation to hold Saba accountable.

Saba's actions constitute negligent misrepresentation if: (i) there is a legal duty to provide correct information; (ii) there is a breach of that duty which can occur by omission or affirmative misrepresentation; and (iii) the breach caused damages to the plaintiff based upon plaintiff's reasonable reliance on the misrepresentation .Kadlec Medical Center v. Lakeveiw Anesthesia, 527 F.3d 412, 418 (5th Cir. 2008); Wyant v. Nationstar Mortgage, 2014 WL 3446633 (W.D. La. 2014).

Intentional misrepresentation occurs when there is (i) a misrepresentation (or suppression) of a material fact; (ii) made with the intent to deceive, and (iii) causing justifiable reliance and injury to the plaintiff. Wyant v. Nationstart Mortgage, 2014 WL 3446633. A party may obtain recovery when he has suffered a loss due to intentional fraudulent misrepresentation. *Id. citing* Taylor v. Dowling Gosslee & Assoc., Inc., 22 So.3d 246, 255 (La. App. 2nd Cir. 2009).

1. The evidence shows a concerted effort by Saba to mislead Fowler as to her status at the school so that Fowler would continue to borrow, and Saba would continue to remit payment to itself, for nonexistent services. Saba is guilty of both fraudulent and negligent misrepresentation to Fowler.

2. Saba owed a duty to provide correct information to Fowler as to her status at the medical school for Semesters 6, 7 and 8. Further, there is a duty owed to the tort victim under factual scenarios of both nondisclosure and misinformation. Barrie v. VP Exterminators Inc., 625 So.2d 1007 (La. 1993).

3. Saba breached its duty to Folwer by both omission and by affirmative misrepresentation. Fowler has been damaged by the resultant student loans which she believed she was taking in order to stay in medical school and now learns that she actually borrowed money for no recipriocal benefit by Saba to her. Fowler was reasonable in relying upon Saba's accurate representation as to her student status.

4. As set forth in the Plaintiff's Contested Issues of Material Facts – whether or not Fowler was required to complete the Step 1 Exam prior to participating in the Clinical Medicine portion of medical school is a fundamental issue for trial. Saba states that it has a particular policy, but its actions show otherwise. Saba's active misrepresentation of this fact caused Fowler to incur thousands of dollars in student loan debt.

### C. Saba's Breach of Contract

A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. Civ. Code 1906. A contract is formed by the consent of the parties established through offer and acceptance. La Civil Code 1927. Unless otherwise prescribed, offer and acceptance may be oral, in writing, or by action or inaction, that under the circumstances is clearly indicative of consent. *Id.*

A breach of contract occurs when a party fails to perform, resulting in the damage to another party. *See* Favort v. Favort, 68 So.3d 1099 (La. App. 4 Cir. 2011). An obligor in bad faith is liable for all damages, foreseeable or not, that are a direct consequence of his failure to perform. La. Civil Code 1997.

1. Saba breached its contract with both Fowler and Demmons.

2. As to Fowler, the contract was breached when Saba encouraged Fowler to take student loans, from which Saba withheld tuition and fees, and gave Fowler no reciprocal benefit. If there was a long standing policy at Saba not to promote a student until after successful passage of the Step 1 Exam, why was it represented to Fowler – and supported by Saba's actions – that she was participating in the Clinical program and simply waiting for an opening to become available?

3. Saba cannot simply wash its hands and claim there is no damage to Fowler because three years after the fact, Saba refunded a portion of the student loans. Saba damaged Fowler by encouraging her to borrow student loans when she was not actually a student. Saba caused Fowler to accrue massive debt – while making her believe that she was still going to receive her medical school education. After the fact, Saba changed its policy three years later and dismissed Fowler for failure to pass the Step 1 Exam. Had Fower known she was not a student, she could not have taken the loans because she would not have qualified based upon Saba's own written student loan financial policies. If not the <u>full amount</u> of the outstanding student loans, Fowler at

12

the very least is entitled to recover interest accrued on such loans for the three year period of time that she was misled by Saba as to her status.

4. Saba also breached its contractual obligations to Demmons by advancing payment to itself for tuition and fees. Demmons derived no benefit by prepaying tuition and fees to Saba. Yet, Demmons was damaged as he became liable for interest at the time that the loans were made. Demmons received no corresponding benefit for the thousands of dollars in interest he accrued based upon the pre-payment of the tuition and fees to Saba.

5, Saba is an integral party to the Debtors current inability to repay their student loans. Recall, Fowler did not need student loan proceeds for tuition until the inception of her Semester 6 her clinical medicine program. Therefore, it is conceivable that Fowler would never have taken the loans had her standing at Saba been correctly portrayed. Instead, Saba made a concerted effort to hide from Fowler her actual status. Saba actively misrepresented to Fowler – every time it charged her tuition and fees – that she was a student in the clinical medicine program. In the consummation of the loans, Saba falsely certified/verified student eligibility, processed and incorrectly distributed funds and refunds to both Demmons and Fowler.

6. Fowler never had the opportunity to participate in the clinical medicine program even though she was falsely certified/validated and charged for medical malpractice insurance and even while other students in a similar position were allowed to participate. This ultimately violated Saba President, Dr. Fredrick's promise to Fowler stating that "After successful completion of your Basic Sciences, you may enter the Clinical Medicine program either in the United States or abroad....."

7. As to Mr. Demmons, he asserts a breach of contract claim based upon Saba's practice of holding student loan proceeds for unreasonably long periods of time. Specifically, during

Demmons clinical semesters, he paid tuition for each semester in advance, but then faced long delays in commencing each clinical program. Saba should have refunded Demmons' student loan lenders during this delay in order to reduce the amount of interest accumulation on the loans. Saba argues that it had no contractual obligation to refund tuition paid "too far in advance." To the contrary, Saba's Financial Aid Information indicates that a student loan application can be submitted no earlier than 60 days prior to the start of classes. Delays were not caused by Mr. Demmons who was amenable to participating in clerkships all over the country. Saba's contention that Demmons chose only to participate in Clinical only in the state of Louisiana is just plain wrong. Saba failed to comply with industry standards.

WHEREFORE Debtors/Plaintiffs pray that after due proceedings be had, Saba's Motion for Summary Judgment be denied and all other relief as is just and equitable.

The De Leo Law Firm LLC

/s/ Robin De Leo
Bar Roll No. 20347
800 Ramon St
Mandeville, LA 70448
(985) 727-1664
(985) 727-4388 (Facsimile)
Elaine@northshoreattorney.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing copy of the Memorandum of Law was served on February 24, 2016 by Electronic Filing through the Court's electronic filing system, and/or postage prepaid, US Mail upon:

C. Davin Boldissar, Locke Lord LLP      dboldiss@lockelord.com
601 Poydras Street, Suite 2660
New Orleans, LA 70130

Bradley C. Knapp, Locke Lord LLP      bknapp@lockelord.com
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036

| | |
|---|---|
| Earl F. Sundmaker<br>The Sundmaker Firm<br>1027 Ninth St.<br>New Orleans, LA 70115 | trey@sundmakerfirm.com |
| Joseph M McCandlish<br>Weltman Weinberg & Reis Co., LPA<br>3705 Marlane Drive<br>Grove City, OH 43123 | jmccandlish@weltman.com |
| Heather LaSalle<br>McGlinchey Stafford, PLLC<br>601 Poydras Street, 12th Floor<br>New Orleans, LA 70130 | hlasalle@mcglinchey.com |
| FCDB NPSL, LLC<br>c/o Goal Structured Solutions<br>401 W. A Street, St. 1300<br>San Diego, CA 92101 | |
| FCDB NPSL, LLC<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange St<br>Wilmington, DE 19801 | |

THE DE LEO LAW FIRM LLC
/s/ Robin R. De Leo
Bar Roll No. 20347
800 Ramon St.
Mandeville, LA 70448
(985) 727-1664
(985) 727-4388 (Facsimile)