UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| William A. Demmons and | * | DIVISION "B" |
| Karen S. Fowler | * | |
| Debtors | * | |
| | * | CASE NO. 14-11638 |

*************************************************************

| | | |
|---|---|---|
| | * | |
| William A. Demmons and | * | |
| Karen S. Fowler | * | |
| | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; | * | |
| American Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit Management | * | |
| Corporation, | * | |
|     Defendants | * | |
| | * | |

*********************************************

## PLAINTIFFS' STATEMENT OF CONTESTED MATERIAL FACTS

Plaintiffs Karen Fowler and William Demmons, Debtors and Plaintiffs herein, submit the following Statement of Contested Material Facts in connection with the Debtors' Opposition to Saba's Motion for Summary Judgment:

1. Was Fowler appropriately classified as a student by Saba from 2006 through 2009 when Fowler was denied access to all Saba educational programs. In order to qualify for a

1

student loan, Saba had to certify that Fowler was a full time student – however, Fowler was prohibited from participating in the Clinical Program.

2. Was Fowler required to pass the Step 1 Examination prior to beginning her Clinical Medicine program at Saba?

3. If Fowler was in fact required to pass the Step 1 Exam, why did Saba (i) charge Fowler for tuition for Semesters 6, 7 and 8; (ii) disburse the remaining proceeds from Student Loan #1 to Fowler for Semester 6 since Fowler would not have been a full-time student at that time; (iii) certify to student loan lenders that Fowler was a full time student and therefore eligible for Student Loan; and (iv) NOT follow its own financial aid policies and procedures?

4. If Fowler was not required to pass the Step 1 Exam in order to begin her Clinical Medicine program (as Fowler believed), why did Saba take no action to assign a clinical rotation to Fowler but still continue to bill her for tuition and fees?

5. Would Fowler have borrowed the proceeds associated with Student Loan #2 if Fowler was accurately informed by Saba that she was not an actual student at the medical school?

6. Was Fowler treated differently than the other medical student who were admitted to the Clinical Medicine program despite the fact that they either did not take the Step #1 Exam or failed the Step 1 Exam.

7. Did Saba accurately calculate the amount of the refund check to Great Lakes.

8. Is Ms. Moya's Affiant inaccurate when it provides:

    a. Saba's records reflect that Fowler borrowed under a student loan, a total of $25,810.[1]

    b. There was a non-refundable administrative fee of $100 and a non-refundable deposit of $500 retained by Saba when refunding Fowler's tuition and fees to Great Lakes.[2]

    c. Saba had a longstanding practice and policy not to allow participation in the clinical program after successful passage of the USMLE Step 1 Exam.[3]

    d. As a result of her failure to pass the USMLE Step 1 Exam, Fowler was academically dismissed from Saba effective June 9, 2009, for failure to progress.[4]

    e. The timing of Demmons clinical programs were dependent upon availability at the specific program locales requested by Demmons.[5]

    f. Any delays experienced by Demmons were caused by the fact that Demmons requested specific program locales, and such locales had limited availability and fixed start times for such clinical programs.[6]

9. Did Saba actually refund the student loan proceeds on the date the check was issued on June 9, 2009 and why was the refund delayed?

10. Why was Fowler charged for Malpractice Liability Insurance if she was not in the Clinical Medicine Program

11. Why do Saba's records reflect that Fowler entered the Clinical Medicine Program on September 4, 2006, if this is not in fact accurate?[7]

---

[1] Moya Affidavit #5 attached to Saba's Statement of Uncontested Facts

[2] Moya Affidavit #6 attached to Saba's Sattement of Uncontested Facts.
[3] Moya Affidavit #7 attached to Saba's Statement of Uncontested Fact.
[4] Moyer Affidavit #9 attached to Saba's Statement of uncontested Facts
[5] Moyer Affidavit #10 attached to Saba's Statement of Uncontested Facts
[6] Moyer Affidavit #10 attached to Saba's Statement of Uncontested Facts.

3

12. Why does Moya dispute the validity of Saba Invoice **#142816 attached as Exhibit "1" to Fowler's Affidavit, charging Fowler $600 for malpractice insurance.**

13. Total Saba tuition and fees billed to Fowler was $26,085, not $25,810 as asserted by Saba.

14. The graduation requirements set forth in the 2015-2017 Saba University Catelogue are not applicable to Plaintiffs as the graduation requirements were different at the time of their attendance in 2004-2009.

15. Saba violated its own financial aid policies and industry standards by holding Demmons student loans hostage and pre-paying its own medical tuition expenses in advance of the 60 day window.

16. Why weren't Demmons excess student loan proceeds refunded to the lender rather than retained to pre-pay Saba tuition expense.

17. The industry standard for issuing refunds by educational institutions to student loan lenders is contained in the Common Manual Unified Student Loan Policy.

Dated: February 24, 2016.

THE DE LEO LAW FIRM LLC<br>
/s/ Robin R. De Leo<br>
Bar Roll No. 20347<br>
800 Ramon St.<br>
Mandeville, LA 70448<br>
(985) 727-1664<br>
(985) 727-4388 (Facsimile)

---

[7] Based upon Fowler Affidavit Exhibit #4 - Email from Saba to Fowler