UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| William A. Demmons and | * | DIVISION "B" |
| Karen S. Fowler | * | |
| Debtors | * | |
| | * | CASE NO. 14-11638 |

*************************************************************

| | | |
|---|---|---|
| William A. Demmons and | * | |
| Karen S. Fowler | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; | * | |
| American Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit Management | * | |
| Corporation, | * | |
| Defendants | * | |
| | * | |

*******************************************

## AFFIDAVIT OF WILLIAM A. DEMMONS

**STATE OF LOUISIANA**

**PARISH ST. TAMMANY**

1. My name is William A. Demmons and I am the Plaintiff/Debtor in the above captioned Adversary Proceeding. The facts contained herein are true and correct to the best of my knowledge and recollection.

2. Saba's assertion that I caused the delay in the origination of my Clinical Medicine

1

program is incorrect. As indicated in my Basic Sciences exit interview with Sandy Murphy, I was willing to take a Clinical placement in hospitals located in multiple states, and throughout the process I always kept my options open– not limiting myself to just Louisiana, as argued by Saba.

3. The fact is Saba had limited available clinical spots for the increasing number of enrolled students and they arbitrarily and capriciously made last minute changes in policies and academic requirements. All of which, in my opinion, were employed in an attempt to manage the clinical bottleneck which ultimately led to increased delays and increased financial obligations and increased loan interest charges for the students. The fact is that by bumping out periods of enrollment and forcing students to backdate LOA's (Leave of Absence) Saba was able to retain student loan proceeds for extended periods of time.

4. The requirements for graduation as described in the 2015-2017 Saba University catalogue, have changed and are not applicable to Fowler and myself. The updated catalogue reflects a newer curriculum and different requirements added by Saba since our attendance. For example, the Research Literature Review and Analysis module was not an option or requirement when Fowler and I attended Saba. Therefore, the newer catalog relied upon by Saba for graduation requirements is irrelevant to our case.

5. When Fowler and I attended Saba, it was understood that students would be permitted to begin the Clinical Medicine program after a successful completion of the Basic Sciences. Entrance into the Clinical Medicine program and subsequent rotations was not dependant on the passage of the Step 1 Exam. Students were permitted to start clinical rotations prior to receiving a passing Step 1 score while some started their clinical rotations with Step 1 failures. These facts are well supported by the attached letter from Dr. Fredrick, president of Saba University, which provides that "After successful completion of your Basic Sciences, you may enter the Clinical Medicine program either in the United

2

States or abroad.... with a 100% placement rate of our clinical medicine students." Attached hereto as Exhibit 1 is the Fredrick's Placement Letter.

6. Saba argues that it had no contractual obligation to refund tuition paid "too far in advance." To the contrary, Saba's Financial Aid Information indicates that a student loan application can be submitted no earlier than 60 days prior to the start of classes. See Exhibit 2 attached hereto.

7. Saba is further obligated by its own Financial Aid Information which stipulates that the student's tuition and fee payments are due 30 days prior to matriculation, which hinges on Saba's financial aid office being able to certify the student with the lender. If a student is non-matriculated or less than half-time the financial aid office is obligated to refund the student loan to the lender. See Exhibit 3 attached hereto.

8. In the case of a student withdrawal, a refund must be calculated by the financial aid office and returned within 30 days. *See* Exhibit 3 above. As refunds must be generated for students unable to attend classes due to non-matriculation or failure to attend full time, similarly the policy is applicable to Saba's practice of inappropriately retaining loan proceeds for extended periods of time when Saba is unable to place a student in a Clinical Medicine program.

9. Although refunding loan proceeds is an industry norm, Saba's practice is to circumvent the process of refunding student loans by bumping out periods of enrollment and forcing students to backdate LOA's (Leave of Absence) in order to retain student loan proceeds for extended periods of time. This forces Saba students to incur finance charges on student loans without receiving a benefit in exchange from Saba for these extended periods of time.

10. The interest on my student loans began to accrue when such loans were remitted to Saba, however Saba withheld my student loan funds and retained tuition for 455 days in

advance of my Semester 6; 146 days in advance of my Semester 7; 199 in advance of my Semester 8; 229 days in advance of my Semester 9; and for 152 days in advance of my Semester 10. I did not derive any benefit for the pre-payment of my tuition from my student loan proceeds.

11. Saba's practice of retaining funds so far in advance of providing a corresponding benefit is illogical and injured me by forcing me to pay interest on my student loans that far exceeded the amount that I would have been obligated to pay had the loans been taken within 60 days prior to attendance in the program as set forth as the procedure supposedly followed by Saba in Saba's own financial aid package (*ie.* "a student loan application can be submitted no sooner than 60 days prior to the start of class").

12. In footnote 7 of the Saba Memorandum in Support of Summary Judgment, Saba recognizes that I produced in discovery the "Common Manual Unified Student Loan Policy" (the "Common Manual"). The Common Manual is evidence of industry standards for refunding student loan proceeds.

13. The Common Manual is a cooperate effort of all the nation's loan guarantors that participate in the Federal Family Education Loan Program (FFELP). The Common Manual provides a single, standardized set of current student loan rules and policy guidance for schools and lenders. Saba's practice of taking student loans to advance payment of tuition to itself does not meet industry standards.

FURTHER AFFIANT SAYETH NOT

_____
William A. Demmons, III

SWORN TO AND SUBSCRIBED BEFORE ME, THIS 24

DAY OF FEBRUARY, 2016.

_____
Notary Public #20347

4