UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| William A. Demmons and | * | DIVISION "B" |
| Karen S. Fowler | * | |
| Debtors | * | |
| | * | CASE NO. 14-11638 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| William A. Demmons and | * | |
| Karen S. Fowler | * | |
| | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; | * | |
| American Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit Management | * | |
| Corporation, | * | |
|     Defendants | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### AFFIDAVIT OF KAREN S. FOWLER

**STATE OF LOUISIANA**

**PARISH OF ST. TAMMANY**

1. My name is Karen S. Fowler and I am the Plaintiff/Debtor in the above captioned Adversary Proceeding. The facts contained herein are true and correct.

2. I attended medical school at Saba beginning January 5, 2004.

1

3. I completed the Basic Sciences required by Saba in the Spring of 2006 (Semester 5).

4. I paid all tuition out-of-pocket to Saba for the Basic Sciences portion of medical school. The only financial assistance I requested was for Semester 5 living expenses.

5. To that end, I applied for a student loan in approximately January 2006 (account number ending 7YHG). Of the $31,130 loan balance ("Student Loan #1"), Saba made two disbursements to me. I received $14,975 from an initial $15,000 disbursement on January 19, 2006 to cover my living expenses for Semester 5.

6. From Student Loan #1, Saba subsequently made a disbursement of $16,130 – of which $8,825 was retained by Saba to cover Semester 6 tuition and fees; and $7,305 was disbursed to me for living expenses.

7. I believed that I was to begin the Clinical Medicine portion of medical school beginning in the Fall of 2006 with Semester 6. I allowed Saba to keep Semester 6 tuition and fees of $8,825 for what I believed would be my Semester 6 Clinical Medicine expenses.

8. From the Fall of 2006 through the Spring of 2009, I studied on my own and without assistance from Saba for the USMLE Step 1 Exam (the "Step 1 Exam"). I successfully completed the Basic Sciences and left the island in August 2006 and in 2007, 2008, and 2009, I was living in Louisiana, not on the Island of Saba. I utilized review courses which were unaffiliated with Saba in order to prepare for the Step 1 Exam and I at all times believed that I would be placed in a clinical rotation once an opening became available.

9. I was charged $600 by Saba for "Malpractice Liability Insurance" as part of my Clinical Medicine Tuition (*See* Saba Invoice attached as Exhibit 1).

10. Malpractice Liability Insurance is only charged to a student when they participate in the Clinical Medicine program.

2

11. I never participated in the Clinical Medicine program in the Fall of 2006 because no available spots existed, despite the fact that I paid tuition and malpractice liability insurance for Semester 6.

12. In order to continue to fund my Clinical Medicine program, I took out a second student loan, account number ending UGYC, in November 2007 ("Student Loan #2").

13. Student Loan #2 had an adjusted loan amount of $38,460. From this amount, $17,260 was retained by Saba to cover Semester 7 Clinical Medicine program of $8,070 and Semester 8 Clinical Medicine program of $9,190. The remaining proceeds of Student Loan #2 in the amount of $21,200 was disbursed to me on December 13, 2007 to cover living expenses.

14. The total tuition withheld by Saba from my student loan proceeds was $26,085 consisting of payment of Clinical Medicine program of $8,825 for Semester 6; $8,070 for Semester 7; and $9,190 for Semester 8.

15. After much complaining and threatening by Demmons and myself, Saba eventually made a refund payment of $25,210, payable to Great Lakes, with a check dated June 9, 2009 attached to a cover letter dated July 17, 2009 (45 days later).

16. In actuality, the refund check dated June 9, 2009, was not received by Great Lakes until November 2009.

17. The refund from Saba was not received by Great Lakes until November, 2009, over three years since I was last enrolled in classes and received my first loan disbursement.

18. In issuing the refund, however, Saba did not appropriately divide the amount refunded between the two loans. Instead, Saba returned one lump sum all referencing the later loan number – Student Loan #2 ending in UGYC.

19. Saba should have refunded tuition of $8,825 for Student Loan #1.

3

20. The current owner of Loan #1 is Deutsche Bank.

21. Because Saba failed to accurately credit the correct student loan, I have continued to accrue interest over a higher amount over a longer period of time than had Saba correctly credited Student Loan #1 instead of applying this amount to Student Loan #2.

22. Saba should have refunded tuition of $17,260 on Student Loan #2.

23. The current owner of Loan #2 is FCDB NPSL 2010-1 Trust.

24. In June, 2009, I was academically dismissed from Saba for failure to progress. Despite the fact that I was prohibited from beginning my Clinical Program, Saba considered me a full time student until June 9, 2009.

25. By paying itself $26,085 for tuition and fees while simultaneously prohibiting me from attendance in the Clinical Program, Saba has caused me damage.

26. Student Loan policies – as advanced by Saba – provide that being "below half-time status" makes you ineligible to received loan funds." *See* E-Mail to me from Janet Baczewski of the Saba Finance Department dated March 7, 2006, attached hereto as Exhibit 2.

27. By waiting until June, 2009 to academically dismiss me, Saba has damaged me by advancing student loans that have cost me thousands of dollars while at the same time, denying my admission into the Clinical Medicine program.

28. According to Dr. Fredrick, President of Saba University when I attended, "After successful completion of your Basic Sciences, you may enter the Clinical Medicine program either in the United States or abroad…. with a 100% placement rate of our clinical medicine students." I know Saba students starting their Clinical Medicine rotations prior to passing the Step 1 Exam in both the US and abroad. At the time that I attended Saba, many of the foreign

4

medical schools allowed their students to enter the Clinical Medicine rotations before taking the Step 1 examination. See Exhibit #5 attached hereto.

29. In October 23, 2007, I was told by email received from Janet Baczewski of Saba, to apply for Student Loan #2 and Saba withheld tuition for Semester 7 and Semester 8 from Student Loan #2. Obviously Saba treated me as if I was enrolled in the Clinical Medicine program by advising me to apply for additional student loans to cover ongoing tuition. See Exhibit 3 attached hereto.

30. I was not dismissed for failure to pass the Step 1 Exam, but for failure to progress. I was not able to progress because I was never scheduled to begin a clinical rotation. According to Saba Bursar J. Rosa in an email dated Jan. 2015, I entered the Clinical Medicine Program in August 2006 and was subsequently charged tuition for clinical semester 6 along with Medical Malpractice insurance. This clearly indicates that I was slotted to begin a clinical rotation as soon as a spot became available. A copy of Bursar Rosa's Jan. 2015 e-mail is attached as Exhibit 4.

31. Additionally, Arthur Maron, MD, MPA the Executive Dean, members of the Promotions Committee and the Associate Dean for Clinical Medicine, recognized that "personal issues have hampered your progress" and indicated that my Basic Science grades and GPA were a consideration in their review process; Even after repeated requests, Saba failed to correct my academic transcript by adding my missing course MED 903 Medical Board Review (grade is Pass) in Winter 2006, recalculating my final grades and cumulative averages that were miscalculated for Summer 2006, GPA should be 3.4 (i.e., 37.4 quality points / 11 hours for Clinical Pathology II = 3.4 semester GPA) generating a final overall cumulative GPA greater than or equal to 3.15. HBOT 1, 2 & 3 grades should be recorded as A's for me (the research grant was awarded to both Demmons and myself and the research project was conducted as a

5

joint effort with the findings defended in the same Master's thesis presentation, refer to Dr. Angel Kurtev). Finally, I earned a BS and MS (my transcript is missing the M.S. in Hyperbaric Medicine awarded on 04/11/2006).

32. In the clinical semesters 6, 7, and 8, there was not a non-refundable administrative fee of $100.00 nor a non-refundable deposit of $500.00, as alleged by Saba. This fee was in fact the $600.00 Malpractice Liability Insurance fee charged to Clinical Medicine students.

33. Below is a summary of my student loans:

Student Loan-Xpress

Tuition Refund Explained

Student Loan #1 –

CLUID: GRTLKORIGA0V7YHG

DEUTSCHE BANK -- PARTS 2 is the Current Owner of Loan #1

| | | | |
|---|---|---|---|
| 01/19/2006 1st | Disbursements Loan No.1 | $15,000.00 | |
| $14,975.00 Deposited to Karen | | | |
| 08/07/2006 2nd 6th | Disbursements Loan No.1 | $16,130.00 | $8,825.00 Tuition |
| | Adjusted Loan Amount: | $31,130.00 | $7,305.00 |
| Deposited to Karen | | | |
| Adjusted by Lender for < ½ Time / Non Matriculated | | $15,530.00 | |
| | Original Request Amount: | $46,660.00 | |

6

Student Loan #2

CLUD: GRTLKSORIGASNUGYC.

FCDB NPSL TRUST 2010-1 is the Current Owner of Loan #2

| | | | |
|---|---|---|---|
| 12/05/2007 Tuition Retained From Loan No.2 | $17,260.00 | $8,070.00 | Tuition 7th |
| | | $9,190.00 | Tuition 8th |
| 12/13/2007 1st Disbursements Loan No.2 | $21,200.00 | | |

$21,200.00 Deposited to Karen

| | | | |
|---|---|---|---|
| Adjusted Loan Amount: | $38,460.00 | $26,085.00 | Tuition to be Refunded |
| | | $25,210.00 | Actual Refund |
| Adjusted by Lender for < ½ Time / Non Matriculated | | $19,230.00 | |
| Original Request Amount: | | $57,690.00 | |

34. The difference in the amount charged by Saba for tuition in fees and the amount refunded by Saba to Great Lakes was $875.

35. When questioned as to my academic record at Saba, it replied by email with the following analysis:

08/09/2006 - 1st loan disbursement of $16,130.00 received ($8,825.00 applied to 6th semester invoice, $7,305.00 refunded to student)

7

09/04/2006 - Student entered CM

10/31/2007 – Failed 1st Step 1 attempt (13 months after entering CM)

12/05/2007 – 2nd loan disbursement of $38460.00 received ($17,260.00 applied to 7th and 8th semester invoices, $21,200.00 refunded to student)

03/31/2008 – Failed 2nd Step 1 attempt (5 months after 1st attempt)

08/18/2008 - Failed 3rd Step 1 attempt (4.5 months after 2nd attempt)

06/09/2009 – Student academically dismissed from university

07/17/2009 – Loan funds retained by the university returned to Great Lakes in the amount of $25,210.00 on behalf of student with respect to the above 2 disbursements.

Exhibit 4 attached hereto is the email referenced above.

36. The Declaration made by Terry Moya of Saba, attached as Defendant's Exhibit 1 to its Statement of Uncontested Facts, is inaccurate in the following ways:

(i) Statement #5 provides that Saba's records reflect that Fowler borrowed under a student loan, a total of $25,810. Fowler did not have one student loan; but in fact, had two student loans. Fowler did not borrow a total of $25,810 in student loan proceeds to cover tuition and fees, but in fact, borrowed a total of $26,085 in tuition and fees for Semesters 6, 7 and 8. *See* Saba Invoices to me for semesters 6, 7 and 8 attached as Exhibit 7.

(ii) Statement #6 states that there was a non-refundable administrative fee of $100 and a non-refundable deposit of $500 were retained from my student loan account, to explain the $600 discrepancy in the amount Saba's records indicate that I paid for tuition and fees and the amount refunded by Saba to Great Lakes. My invoices and records from Saba never reveal an assessment of $600 in non-refundable fees, with the exception of the $500 non-refundable fee charged to me in association with my acceptance letter dated July 25, 2003. In that case, in order to start school

8

at Saba and reserve a place in the class, I had to remit a $500 non-refundable fee by August 25, 2003. I made this payment – in cash – in August, 2003. If that is the amount referred to by Moya as the $500 non-refundable fee – it is nonsensical to insinuate that this was taken from student loan proceeds borrowed three years after the non-refundable fee was due.

More believable, however, is Saba's Semester 6 billing statement to me (attached hereto as Exhibit 1), which evidences a $600 malpractice liability charge made to all clinical medicine students.

(iii) Statement #7 provides that Saba had a longstanding practice and policy not to allow participation in clinical programs until after successful passage of the USMLE Step 1 Exam. If this was Saba's policy, it was sporadically enforced. If this was Saba's policy, this is contrary to Fredrick's placement letter. *See* Exhibit 5.

(iv) Statement #9 states that "As a result of her failure to pass the USMLE Step 1 Exam, Fowler was academically dismissed from Saba effective June 9, 2009 for failure to progress. However, according to the letter by Saba dated July 17, 2009 refunding the student loan proceeds to Great Lakes, it states that Fowler "no longer needs this loan. She has been withdrawn from Saba University School of Medicine as of 6/9/2009." *See* Exhibit 6 attached hereto correspondence from Saba to Great Lakes

FURTHER AFFIANT SAYETH NOT

*Karen S. Fowler*
Karen S. Fowler

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS 24 DAY OF FEBRUARY, 2016.

_____
Notary Public #20347

9