1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS

\* \* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF:                    \*   LEAD CASE NO. 14-11638

WILLIAM A. DEMMONS, III, AND         \*   SECTION "B"

KAREN S. FOWLER,                     \*   CHAPTER 7

        DEBTORS.                  \*

WILLIAM A. DEMMONS, III, AND         \*   ADVERSARY NO. 15-01024

KAREN S. FOWLER,                     \*

        PLAINTIFFS,               \*

           v.                   \*

R3 EDUCATION, INC., D/B/A SABA        \*

UNIVERSITY SCHOOL OF MEDICINE,        \*

ET AL,                               \*

        DEFENDANTS.               \*

\* \* \* \* \* \* \* \* \* \* \* \* \*

        Transcript of the proceedings taken in the above

captioned matter on **Tuesday, April 12, 2016,** the Honorable

Jerry A. Brown, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR:    Jennifer Nunnery

TRANSCRIPTIONIST:  Ann B. Schleismann
                1403 Calder Street
                Gretna, Louisiana 70053
                (504) 366-6672

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

**APPEARANCES:**


The DeLeo Law Firm
By:  Robin R. DeLeo, Esquire
800 Ramon Street
Mandeville, Louisiana 70448

    Representing William A. Demmons, III and
    Karen S. Fowler


McGlinchey Stafford
By:  Heather LaSalle Alexis, Esquire
601 Poydras Street, Suite 1200
New Orleans, Louisiana 70130

    Representing Educational Credit Management
    Corporation


Weltman, Weinberg & Reis Co., L.P.A.
By:  Joseph M. McCandlish, Esquire
3705 Marlane Drive
Grove City, Ohio 43123

The Sundmaker Firm
By:  Earl F. Sundmaker, Esquire
1027 Ninth Street
New Orleans, Louisiana 70115

    Representing Deutsche Bank and Key Bank

3

I N D E X

**DR. ALAN KAYE:**

Direct Examination by Ms. DeLeo. . . . . . . . . . . . . .  5

Cross-Examination by Ms. LaSalle . . . . . . . . . . . . 12

Redirect Examination by Ms. DeLeo. . . . . . . . . . . . 17

**WILLIAM A. DEMMONS, III:**

Direct Examination by Ms. DeLeo. . . . . . . . . . . . . 20

Cross-Examination by Ms. LaSalle . . . . . . . . . . . . 91

Cross-Examination by Mr. McCandlish. . . . . . . . . . .150

Redirect Examination by Ms. DeLeo. . . . . . . . . . . .169

**KAREN S. FOWLER:**

Direct Examination by Ms. DeLeo. . . . . . . . . . . . .175

Cross-Examination by Ms. LaSalle . . . . . . . . . . . .207

Cross-Examination by Mr. McCandlish. . . . . . . . . . .215

Redirect Examination by Ms. DeLeo. . . . . . . . . . . .217

**WILLIAM A. DEMMONS:**

Direct Examination by Ms. DeLeo. . . . . . . . . . . . .221

**EXHIBITS**                                    **MARKED**   **RECEIVED**

(Bench Book admitted into evidence)

4

1           P R O C E E D I N G S

2             (Tuesday, April 12, 2016)

3           THE CLERK:  Adversary Number 15-1024, William A.

4    Demmons, III and Karen S. Fowler v R3 Education, Inc., et al.

5    This matter arises out of Main Case Number 14-11638, William A.

6    Demmons, III and Karen S. Fowler.

7           THE COURT:  Counsel, are you ready for trial?

8           MS. DELEO:  Yes, Your Honor.

9           THE COURT:  All right, make your appearances.

10          MS. DELEO:  Robin DeLeo on behalf of Mr. Demmons and

11   Ms. Fowler, the Debtors.

12          MS. LASALLE:  Heather LaSalle on behalf of ECMC.

13          MR. MCCANDLISH:  Joe McCandlish admitted pro hac vice

14   for Deutsche Bank and Key Bank.

15          MR. SUNDMAKER:  Earl Sundmaker as well for Key Bank

16   and Deutsche Bank.

17          MS. LASALLE:  Your Honor, just one thing to point

18   out, ECMC has consented to discharge a portion of their

19   student loans.  The balance as of March 17th was $51,955.25.

20   They are agreeing today to discharge up to the amount over

21   $25,000, meaning they're going to reduce their balance to

22   $25,000.

23          THE COURT:  Okay.  All right, go ahead.

24          MS. DELEO:  Your Honor, I would like to call Dr. Kaye

25   as our first witness, please.

1                        *   *   *   *   *

2                **DR. ALAN KAYE, WITNESS, SWORN**

3                        *   *   *   *   *

4           THE COURT:  Be seated and give the Court Reporter

5   your full name and your current address.

6           THE WITNESS:  My full name is Alan David Kaye and my

7   full address is Room 656, 1542 Tulane Avenue, New Orleans,

8   Louisiana 70112.

9           THE COURT:  All right.

10          THE CLERK:  How do you spell Alan?

11          THE WITNESS:  A-l-a-n.

12          THE CLERK:  Thank you.

13                      *   *   *   *   *

14                    DIRECT EXAMINATION

15  BY MS. DELEO:

16  Q.   Dr. Kaye, where are you currently employed?

17  A.   At LSU School of Medicine here in New Orleans.

18  Q.   And in what capacity are you employed?

19  A.   Since January of 2005 I've served as a Tenured Professor

20  and Chairman of the Anesthesia Department, and Director of

21  Interventional Pain Management, as well as I'm currently the

22  Program Director of the Anesthesia Residency.

23  Q.   What is your educational background?

24  A.   Well, I have two Bachelor of Science degrees.  I have a

25  Medical Degree from the University of Arizona graduating in

1    1989.  I have a PhD in pharmacology that I got a Tulane School

2    of Medicine.  I have an internship at the Alton Ochsner Clinic

3    in internal medicine, a residency at Harvard Medical School at

4    Massachusetts General Hospital, and at Tulane School of

5    Medicine where I was the Chief Resident, and a fellowship in

6    interventional pain at Texas Tech Health Science Center in

7    Lubbock, Texas, one of the premiere places in the world.

8    Q.   And do you have any special licenses or board

9    certifications?

10   A.   I do.  I have a board certification through the American

11   Board of Anesthesia with a special certificate in pain

12   management.  I also have two more board certifications from the

13   American Board of Pain Medicine and the American Board of

14   Interventional Pain Physicians.

15   Q.   And what is your specialty?

16   A.   Well, I'm an anesthesiologist with a specialty in

17   interventional pain management.

18   Q.   Have you ever written any publications?

19   A.   Yes, ma'am, I have.  I have over 500 publications in peer

20   review journals.  I also have over 200 books chapters and two

21   dozen of books that I've served as an editor on some of which

22   are in pain management and focus as well in anesthesia and

23   pharmacology.

24        MR. MCCANDLISH:  At this time objection, Your Honor.

25   We would stipulate that he is an expert for the purpose of the

Kaye - Direct                                                    7

1  hearing if that would --

2           THE COURT:  Okay, but that's not an objection.

3           MS. LASALLE:  No, Your Honor.  We're just saying that

4  we'll stipulate to him being an expert.

5           THE COURT:  All right.

6           MS. LASALLE:  You don't have to proceed with that

7  line of questioning.

8           MS. DELEO:  And I was going to tender him as an

9  expert, Your Honor.

10          THE COURT:  All right, tender him and they agree.

11 Let's make sure we're talking about what field he's an expert

12 in.

13          MS. DELEO:  I'd like to tender Dr. Kaye, Your Honor,

14 as an expert in the field of pain management.

15          THE COURT:  Anesthesiology with a specialty --

16          MS. DELEO:  And anesthesiology.

17          THE COURT:  -- in pain management.

18          THE WITNESS:  Sure.  Thank you.

19          THE COURT:  Okay.

20          MR. MCCANDLISH:  No objection.  Thank you,

21 Your Honor.

22          MS. LASALLE:  No objection, Your Honor.

23          THE COURT:  All right.

24 BY MS. DELEO:

25 Q.   And, Dr. Kaye, when did you start seeing Mr. Demmons?

1    A.   Well, the first time I saw him was the summer of 2011.  He

2    had been in a car accident in December of 2010 and he was

3    referred to my clinic.  And at that time he had -- I would say

4    my entire career as a physician, so this goes back 27 years, I

5    would say he had some of the most pronounced and severe damage

6    to his cervical spine, and to a lesser degree his lower lumbar

7    spine.  And so for example all of his hands were completely

8    numb.  He had massive deficits in sensation, in his motor

9    strength, in his reflexes.  And what I think was particularly

10   interesting is that he was really trying to get better.  He had

11   told me that he had completed medical school and was hoping to

12   pursue his residency.  And so you know it seemed very genuine

13   and also very devastating, particularly because I could imagine

14   if it were me having that type of problem trying to fulfill my

15   long-term career aspirations and how devastating his injuries

16   were.

17   Q.   How was he treated?

18   A.   Well, for a period of time through till the

19   Governor Jindal cuts that closed our clinic for the indigent in

20   2013, so between the time that I met him and the closing of the

21   clinic he came and saw me many times and I did a number of

22   injections on him.  Some of them were cervical epidural steroid

23   injections, so I injected local and steroid and an opiate into

24   his cervical epidural space to try to calm down these very

25   angry nerve roots that were causing all of this pain and

Kaye - Direct                                                      9

1   discomfort and catastrophic deficits down in his shoulder, into

2   his arms, and into his fingers and hands.

3       I also did some injections into his nerves that go to his

4   facet joints, both in his neck and in his lower back, and some

5   injections into his muscles to again try to restore some

6   function for him so that he could you know do the things that

7   he wanted to do.  He indicated years ago he was a triathlete.

8   He was a very active and healthy person.  And so seeing him and

9   examining him and managing him over those years and then seeing

10  him again and examining him as recently as this week, you know

11  I have plenty of thoughts on his state back then and his state

12  now.

13  Q.   Why is it that he would have come to the indigent clinic?

14  Is that for people without health insurance?

15  A.   Yes.  It was the only clinic in the State of Louisiana,

16  and I was the only physician seeing patients like Bill who did

17  not have insurance.  And it's unfortunate because people who

18  you know can't afford insurance usually are traced back to

19  inability to work and do the things that everyone else does

20  daily, weekly, monthly, yearly.  So, he was in our indigent

21  clinic and that's where I saw him and that's where I took care

22  of him under that umbrella through the LSU School of Medicine.

23  Q.   And did the treatments seem to help back in 2012?

24  A.   Yeah.  So, we had some improvement from the injections.

25  We had some improvement in function.  I would say that nothing

1   ever approached that of you know a normal person in terms of

2   their functionality; but you can imagine someone who can't tie

3   their shoe or hold a pen who has numbness, and tingling, and

4   pain, and burning, anything that's impactful.  I know he was

5   grateful to me even though I didn't fix his problem, I think we

6   made a little bit of progress.

7        Seeing him as recently as this week I can tell you that

8   he's had further setbacks because there's no one -- you know

9   there's no one to take care of him.  And his prognosis looking

10  at him from 2010 through till the end of 2012 and even this

11  week I would say that you know he's not going to get better

12  today, this week, in the foreseeable future.  This is a man who

13  can't even tie his shoe.  He clearly has undue hardship.

14       And he has a really difficult situation because his brain

15  wants to do all the things and he's also been given by other

16  doctors different medications that are attempts to alleviate

17  his discomfort and disabilities.  And that's all been you know

18  a mixed bag in terms of success.  How do you measure success?

19  Well, he's alive, but I am certain that he will remain with

20  undue hardship in this very, very damaged spine that he has.

21       And let me say one more thing.  I haven't even mentioned

22  all the psychological issues of somebody who dreamed for them

23  self and went through all the steps of pre-medical education

24  and medical education who now can't even tie their shoe.  So he

25  has depression.  He has anxiety.  He has sleep issues.  You

Kaye - Direct                                                11

1    know he is catastrophically damaged in his current state and I

2    don't see in the future any evidence looking at him over a six-

3    year period that he suddenly will get better or be able to

4    function, certainly not as a doctor.  And there's no residency

5    in the United States that he could do or would be selected to

6    at his advanced age with his disability because you need to

7    have physical robustness.  And I say this as a program director

8    for 23 years who selects residents; no one is going to select a

9    59-year old man with a severely damaged spine who can't tie his

10   shoe into their program to become a physician of the future.

11   Q.   And you believe that his condition cannot be improved or

12   cured over time?

13   A.   Well, it can't be cured.  I think that what I was trying

14   to do and I'm sure other physicians have tried to do pieces to

15   make him as optimally functional as he can, but I would say you

16   know in general we've all failed if he can't even tie his shoe.

17   To me that's undue hardship and those are catastrophic deficits

18   that he has.

19   Q.   Are you surprised that Mr. Demmons is employed today?

20   A.   Well, you know I've gotten to know him probably better

21   than most all of my patients because he tries -- he's tried so

22   hard to make a success and even in his damaged state to his

23   credit I'm not surprised because I do respect what a determined

24   gentleman this is to try to do the things that he dreamed to do

25   throughout his life and his career thus far.  You know you have

Kaye - Cross                                                    12

1   to not look at what someone is accomplishing, you have to look

2   at what they have overcome to accomplish it.  And though he

3   can't tie his shoes, he still is able to find a role in a job

4   to be helpful and a productive member of society.  So for that

5   I give him a lot of credit.

6   Q.   Do you think he would be capable of having a more advanced

7   job than he has today which is kind of a menial job at Ochsner

8   Hospital as a PT -- PDT -- ED -- ET --

9   A.   A lot of abbreviations there, but the answer is no.  I

10  think that he's -- this is about as much as he can do because I

11  think if there was anything more he could do, he'd be doing it.

12          MS. DELEO:  Thank you, Dr. Kaye.

13          That's all I have, Your Honor.

14          THE COURT:  All right, cross-examination.

15                  *    *    *    *    *

16                  CROSS-EXAMINATION

17  BY MS. LASALLE:

18  Q.   Good morning, Dr. Kaye.

19       Does Mr. Demmons have a physical disability?

20  A.   Yes.

21  Q.   A permanent physical disability?

22  A.   Yes.

23  Q.   Can Mr. Demmons continue working?

24  A.   Well, I think it's a free country.  As long as someone

25  employs him and they're satisfied with his work I think there's

Kaye - Cross                                                    13

1   -- you know we don't tell people in society what they can't do.

2   We hopefully feel they're inspired to see what they can do.

3   Q.   What would be his physical limitations based on your

4   examination of Mr. Demmons?

5   A.   Well, I think he has a profound motor weakness in his

6   arms, in his hands, and even he has pretty significant deficits

7   in his legs.  So, he's limited in anything that would require

8   strength and coordination with his upper body.  He is able to

9   ambulate, but he certainly is limited in his vigor and his

10  capacity to do anything that's physical.

11  Q.   You said that you examined Mr. Demmons in the summer of

12  2011, that's correct?

13  A.   Yes, ma'am.

14  Q.   Can you turn to Exhibit 8 in the exhibit book in front of

15  you please, and specifically to Page 138 within Exhibit 8?

16          THE COURT:  What was the exhibit number?

17          MS. LASALLE:  Exhibit 8.

18          THE COURT:  Thank you.

19          THE WITNESS:  Yeah.

20  BY MS. LASALLE:

21  Q.   Dr. Kaye, I know that this might not have been your form

22  that you filled out, but does this look familiar to you this

23  type of form?

24  A.   I'm looking at a progress note from the Neurosurgery

25  Clinic --

Kaye - Cross                                    14

1    Q.    Uh-huh (affirmative response).

2    A.    -- and it says that he had a cervical laminectomy and --

3    Q.    What is that?

4    A.    He basically had pieces of his spine removed to take away

5    pressure on the nerve roots.

6    Q.    Okay.

7    A.    Unfortunately, if you look, that was going back prior to

8    his December 2010 accident.  His 2010 December accident

9    basically took a functional, stable spine, although not a

10   perfect spine but a stabilized spine and basically created you

11   know added pathogenesis.

12   Q.    Okay.  Can you read for me down towards the bottom of that

13   Page 138, "physical examination," can you tell me what it says

14   for extremities?

15   A.    Yes.  It says he has good strength in his upper and lower

16   extremities.  He has no focal weakness detected.  His gait is

17   slightly myelopathic.  He has a very slight Hoffmann reflex on

18   the left hand.

19   Q.    So this was in June of 2011?

20   A.    Yes.

21   Q.    But you said that his hands weren't working, his feet

22   weren't working at that time, correct?

23   A.    I'm saying that he had deficits and he's always been able

24   to walk.  And this is dated June 27, 2011.  And I think that he

25   basically from that point has had other issues.  He had another

Kaye - Cross                                          15

1  car accident.

2  Q.   When was the second car accident that you're referring?

3  A.   Well, I know that while I was treating him towards the end

4  of my treatment he had a subsequent injury that set him back.

5  Q.   Okay.

6  A.   And I can't tell you the date --

7  Q.   Sure.

8  A.   -- or the location.  I'm sure that Mr. Demmons or

9  Dr. Demmons will be able to speak to it.  But I do know you

10 know was -- I am an optimist.  He was progressing.  He was

11 doing better, but I think that his deficits today -- I examined

12 him yesterday at University Hospital.  He's 70 pounds less in

13 weight that he was when I last saw him in our clinic at the end

14 of 2012.  He's lost a third of his weight.  He has profound

15 sensory and motor deficits.  He has abnormal reflexes.  He has

16 if you do testing in terms of motor strength or sensation

17 deficits you see these in his upper extremities.  You see it to

18 a lesser degree in his lower extremities.  So, this page here

19 from 2011 relative to where we are today in 2016 is a little

20 misleading I think.

21 Q.   But in 2011 he still had good strength according to this

22 in his upper and lower extremities?

23 A.   Well, I didn't write this, so it's not really fair for me.

24 I have notes that I've written that I wrote in this time period

25 and I don't think it was ever considered you know normal.  And

1    so I can't speak to what the neurosurgeon said.  You'd have to

2    bring him in here and ask him why he wrote this.

3         To me he had deficits from the first time I saw him in

4    2011 in the summer until yesterday when I saw him and examined

5    him once again.  So over this period of time he's never had a

6    normal finding.  But I will say that his examine yesterday was

7    worse than anything that I saw going back five and six years.

8    Q.   So the damage that you saw back in 2011, you mentioned

9    something about being able to somewhat repair some of it or --

10   A.   Yeah.

11   Q.   -- do some work towards it.

12   A.   I did, yeah.

13   Q.   So was that temporary damage as a result of the car wreck

14   that could be fixed through pain management or other medical

15   procedures?

16   A.   Well, I think that you know he had a cervical laminectomy

17   before his car accident.  And so what I did was I tried to

18   target each of his deficits to try to reverse some of them, and

19   I was successful with some of them.  But looking at it today

20   you know it's as if I never had touched him.  So, I'm saying

21   that it was short-lived and it was dubious because it's not

22   that he suddenly was cured long-term, that he was made more

23   functional long-term.  He remains with catastrophic deficits

24   today, there's no doubt in my mind.

25   Q.   You mentioned on your direct examination about tying shoes

Kaye - Redirect                                              17

1  and holding a pen.  Are you aware if Mr. Demmons cannot tie his

2  shoes or cannot hold a pen?

3  A.   I am aware that he cannot tie his shoes, yes, ma'am.

4  Q.   What about holding a pen?

5  A.   I don't believe he can hold a pen.  I asked him yesterday.

6           MS. LASALLE:  Thank you.

7           No further questions.

8           MR. MCCANDLISH:  No questions, Your Honor, of this

9  Witness.

10          THE COURT:  All right.

11          MS. DELEO:  Your Honor, redirect just for a moment,

12 please?

13          THE COURT:  I don't know how you get redirect where

14 there's no cross-examination.  Oh, there was cross-examination.

15 I'm sorry, yeah.

16          MS. DELEO:  That's okay.

17          THE COURT:  All right.  Oh, it was the other party

18 that didn't -- all right.  Yes, go ahead.

19                     *    *    *    *    *

20                     REDIRECT EXAMINATION

21 BY MS. DELEO:

22 Q.   Dr. Kaye, what is a cervical laminectomy?  Can you explain

23 in layman's terms what it is this procedure?

24 A.   A cervical laminectomy is a neurosurgical procedure

25 whereby materials of the spine are pulled away and taken away

1   to free up the nerve roots so that they can function freely

2   without compression.  In this case he had a fusion with metal

3   screws placed to try to fix that open spot so that it wouldn't

4   you know reverse back and impede or compress the cervical nerve

5   roots.

6   Q.   Okay, and if I told you that although this report refers

7   to a laminectomy in 2005 the actual date is 1985, would you

8   have any question as to the date this was performed?

9   A.   Well, I know because I've spoken to him that it was

10  before.  And so that's why I was hoping that the person who

11  wrote the record might be asked the question.

12  Q.   Okay.

13  A.   But I did my best.

14  Q.   Do you believe that it could have been an aggravation of

15  the cervical laminectomy that has actually occurred in

16  Mr. Demmons' problems he's had in 2010 since his car accident?

17  A.   Yes.

18  Q.   Was it a preexisting condition that reoccurred in 2010, or

19  is this something new?

20  A.   Well, you know from his history after that surgery he was

21  stabilized.  He was functional.  He was able to complete his

22  medical studies.  He was a stable person going forward.  So, he

23  would have thought at that point that -- and many people have

24  stable futures with a cervical laminectomy.  The car accident

25  really did him in.  It basically took what was a stable yet

Demmons - Direct                                    19

1   fragile repair and it caused this catastrophic exacerbation.

2   Q.   And there is no doubt from your findings based on 2011 and

3   your findings again yesterday that this is a permanent

4   condition?

5   A.   No doubt, no.  Like I said, in 27 years I would say his

6   condition is amongst the very worst that I've seen.  It a poor

7   unfortunate circumstance for someone so motivated and driven.

8   You know it's Murphy's law, unfortunately.

9             MS. DELEO:  Thank you, Dr. Kaye.

10            That's all I have, Your Honor.

11            THE COURT:  All right.  You may step down, Doctor.

12   Thank you.

13            Now, is this Witness excused?

14            MS. DELEO:  Yes, Your Honor.

15            THE COURT:  All right, thank you.

16            MS. DELEO:  Your Honor, I'd like to call Mr. Demmons

17   to the stand.

18            THE COURT:  All right.

19                         *   *   *   *   *

20            **WILLIAM A. DEMMONS, III, WITNESS, SWORN**

21                         *   *   *   *   *

22            THE COURT:  Be seated.

23            THE WITNESS:  Thank you.

24            THE COURT:  Give the Court Reporter your name and

25   your current address, full name and current address.

1    THE WITNESS:  Yes.  William A. Demmons, III,

2  400 Baptiste, B-a-p-t-i-s-t-e, Circle, and that's Houma,

3  Louisiana 70363.

4                    *    *    *    *    *

5                    DIRECT EXAMINATION

6  BY MS. DELEO:

7  Q.   Mr. Demmons, are you the Debtor in this Chapter 7

8  proceeding?

9  A.   Yes, ma'am.

10  Q.   And did you receive a bankruptcy discharge?

11  A.   Yes, ma'am.

12  Q.   Do you recall when that was?

13  A.   I think it was in June of 2014.

14  Q.   If I told you September of 2014 would you agree that was

15  probably the date?

16  A.   I would agree with that, yes, ma'am.

17  Q.   Why did you file this adversary proceeding that we're here

18  on today?

19  A.   I had an inordinate amount of debt and I was hoping to get

20  the student loan debt dismissed.

21  Q.   How many student loans do you have today?

22  A.   Today?  I had a -- I have some loans with Key Bank.  I

23  have three loans with Key Bank of Maine are the MedAchiever

24  loan.  I have a loan with Deutsche Bank and I have a loan with

25  NPLS Trust, and one -- those are all private loans.  And I have

Demmons - Direct                                              21

1    a National Direct Student Loan with Nelnet.  So I think that's

2    six loans total, yes, ma'am.

3    Q.   Six loans.  When you're saying "Nelnet," you're now

4    referring to the current owner, ECMC?

5    A.   Yes, ma'am.  I'm sorry.

6    Q.   Okay, that's fine.

7         And does your wife have any student loans?

8    A.   Yes, she does.  I believe she has two loans.  She has one

9    loan with Deutsche Bank and one loan with NPSL Trust.

10          THE WITNESS:  Could I stand up, please?  Would it be

11   possible to stand up?

12          THE COURT:  Certainly.  Certainly, what is more

13   comfortable for you.

14          THE WITNESS:  Thank you.

15          THE CLERK:  Just adjust the microphone.

16          THE WITNESS:  Yes, ma'am.

17          Thank you.  Is that better?

18   BY MS. DELEO:

19   Q.   So in your household how many student loans are we talking

20   about in this adversary proceeding?

21   A.   Eight total loans, ma'am.

22   Q.   Okay.

23   A.   And actually there were two other loans.  There was a loan

24   with Sally Mae that was an undergraduate loan.  And actually I

25   should have mentioned that the Nelnet loan was also an

Demmons - Direct                                           22

1    undergraduate loan, the previous loan that I mentioned.  And

2    there was a loan, a graduate loan with Maine Medical

3    Association Loan, but they have elected to dismiss those loans,

4    the Sally Mae loan and the Maine Medical loan with a zero

5    balance.

6    Q.   Okay.  How were your student loans originally accumulated?

7    Did you start in college with a student loan?

8    A.   Yes, ma'am.  I went to the University of New England to

9    get prepared for medical school and that's when I acquired the

10   Nelnet loans, the National Direct Student Loans, and the other

11   loans came through graduate school.

12   Q.   And how old were you when you started college?

13   A.   I believe I was 42 I believe.

14   Q.   Okay.  Did you have any other loans other than the ECMC

15   loan in college?

16   A.   I think that there was a consolidation of loans that

17   occurred.

18   Q.   Okay.

19   A.   I think that I consolidated those on 11/13 of 2003 through

20   Nelnet.

21   Q.   And when did you graduate from college?

22   A.   I graduated in May of 2003.

23   Q.   And what was your undergraduate degree in?

24   A.   Medical biology.

25   Q.   And did you go directly to medical school after college?

1   A.   I went to medical school the following January 2004, I

2   started medical school, yes, ma'am.

3   Q.   So it was about a seven-month period of time between

4   graduation from college and the beginning of medical school?

5   A.   Yes, ma'am.  I elected to do that because I also was

6   working at the time and worked through college, through

7   undergraduate school and I --

8   Q.   What were you working as?

9   A.   I had a dive shop and a café.

10  Q.   So you were an active scuba diver?

11  A.   Yes, ma'am.  I worked with -- I used to teach people with

12  disabilities how to scuba dive.

13  Q.   Okay, did that require physical strength?

14  A.   Very much so.

15  Q.   Prior to starting college had you previously been in a car

16  accident?

17  A.   Yes, ma'am.

18  Q.   And did you suffer some injury from that car accident?

19  A.   Yes.  My crushed my C7 and fractured my L5 and has had a

20  subsequent laminectomy.

21  Q.   And what year was that?

22  A.   I believe that was 1985.

23  Q.   And what year did you start college?

24  A.   1999.

25  Q.   Okay.  So do you believe that you had fully recovered from

Demmons - Direct                                                    24

1   the earlier injury in 1985?

2   A.   I was an avid kickboxer.  I worked with people who

3   couldn't move from the neck down in the water.  I set up the

4   land and sea recuse network for the state.  I trained people

5   with disabilities and rescue divers, and I also was an active

6   marathoner and triathlete.  So this was after I was fixed.

7   Q.   So in college how would you describe your physical

8   condition?

9   A.   I was in excellent health.  I used to work with the

10  university medical students and the paramedics and teach them

11  surface rescue and high angle.

12  Q.   Did you repay any of your student loans during this period

13  of May 2003 to when you started medical school in January of

14  2004?

15  A.   There was some concern.  Opposing counsel presented us

16  with some documents that was kind of -- it was a very detailed

17  document but kind of hard to interpret.  I went out to the

18  Department of Education and looked at their website to see what

19  their recollection was.  They're actually the department that

20  underinsures or insures these particular loans.  And last night

21  I went out to Nelnet.com and pulled up my account and actually

22  printed out -- there was some controversy or some problems that

23  was raised regarding some checks that had bounced and I have a

24  updated transaction list of the payments that I made.  I

25  believe there's either six, maybe six, I can present that.  If

Demmons - Direct                                                    25

1    I could see that I could list them.  And I also identified when

2    I went into income-based repayments.  I took it very seriously

3    to keep not only to try to pay, but I was mostly in forbearance

4    during that period because I was in school or deferment.

5    Q.   Okay, we're talking about just the seven-month period

6    between graduation from college and the beginning of medical

7    school.  Did you make payments to ECMC on your student loans at

8    that point in time?

9    A.   I believe at that time -- without looking at the

10   particular record I couldn't off the top of my head say, but I

11   believe that the last payment that was reflected I think it was

12   -- I'd have to see the transaction list, ma'am, but when I was

13   in school I was in forbearance and I might have been in a grace

14   and then a forbearance between that period.  But I could easily

15   tell you what the last transaction was.

16   Q.   Okay, can you turn to Exhibit 7 in your book?  And if you

17   need me to help you just let me know.

18   A.   Is that the student loan payments, ma'am?

19   Q.   Yes, it is.

20   A.   Okay.  And this is the -- I have -- could I have that?

21   Could I have that to look at so I could --

22        MS. LASALLE:  I'm going to have to see that before.

23        THE WITNESS:  I mean I printed that from Nelnet this

24   morning and I confirmed with their servicing agents this

25   morning.  That's the Nelnet transaction history of my payments.

Demmons - Direct                                                    26

1          MS. LASALLE:  Your Honor, I'm going to object to

2   this.  ECMC is the current holder of note that he's talking

3   about.  Nelnet was a prior servicer.  We have plenty of

4   information in the exhibit book that both sides have looked at

5   that shows what payments he made.  I don't know where this came

6   from, the notes.  I mean I can't look at it today and decide if

7   it's accurate.  I would say what was in the book what's been

8   presented through discovery and exchanged between the parties

9   with the Pretrial Order would be what we need to look at today.

10         MS. DELEO:  Your Honor, can he use this document for

11  the purpose of refreshing his memory as to the student loans

12  that he made, and Ms. LaSalle on cross-examination can

13  introduce other evidence that may contradict his recollection

14  as to the loans made?

15         THE COURT:  But who made this document?  These are

16  not his notes.  These are not the Witness' notes.

17         MS. LASALLE:  Yes, Your Honor.  This would be the

18  Witness' notes that he wrote --

19         THE COURT:  Oh, it's the Witness' --

20         MS. LASALLE:  It's his notes.  But he put together

21  Exhibit 7, so I'd like to go off of what we've agreed to that's

22  in the book rather than these notes that are just being

23  presented here this morning.

24         THE WITNESS:  Ma'am, as discussed yesterday I was not

25  in agreement with the numbers that were there.  Those numbers

1    came from your papers and that this -- if I could see that for

2    a moment please?

3              Your Honor, may I?

4              THE COURT:  What are we talking about here?

5              MS. LASALLE:  I'm talking about this, Your Honor.

6              THE COURT:  Yeah, but holding it up and saying

7    "This," doesn't help me.

8              MS. LASALLE:  Sorry.  Your Honor, this says "Payment

9    History Nelnet Scheduled Payments," and then there are a lot of

10   notes written on it.  I've never seen this before.  As I

11   mentioned, ECMC is the current holder of the notes not Nelnet.

12   There were prior loans that Nelnet also held that were -- I

13   think they were servicing for Maine Educational and a couple of

14   other people, so I don't even know if this is for the ECMC note

15   or for something else.

16             THE COURT:  But this is his own notes.

17             MS. LASALLE:  He printed this out.

18             THE WITNESS:  No, Your Honor, that was from the

19   Nelnet website.  If you go logon to the Nelnet.com website and

20   type in my transaction history of the payments that I made to

21   Nelnet, the loans that are now owned by ECMC, this is a

22   historical payment transaction history of what I made for

23   payments as identified by Nelnet this morning from my past

24   history for the years 1999 to 2000-whatever.  If I could see it

25   I could --

 1          MS. LASALLE:  Your Honor, the loan in question that's

 2  held by ECMC was originated in 2003.  So anything prior to that

 3  time wouldn't be applicable here.

 4          THE WITNESS:  But that is applicable to those

 5  particular loans.

 6          MS. DELEO:  Yeah, this is 2004 on.

 7          THE WITNESS:  Those are 2004 on.

 8          MS. LASALLE:  You just said 1999.

 9          THE WITNESS:  Well, I'm saying that -- if I could see

10  it, please, ma'am, then I could refresh my memory and talk

11  about the history.

12          THE COURT:  Well, whose document is it?  Who just

13  produced it?

14          MS. DELEO:  Those are his handwritten notes on a

15  document that he researched this morning to see what payments a

16  government --

17          THE WITNESS:  They reflected.

18          MS. DELEO:  -- entity reflects that he made on his

19  student loans.  And he wrote notes on it and he would like to

20  look at these notes for the purpose of refreshing his

21  recollection as to payments made.

22          MS. LASALLE:  Your Honor, there are exhibits within

23  the book that show what the government entity showed was paid.

24          THE COURT:  Yeah, but a witness can use notes to

25  refresh his recollection so long as it's made available to the

Demmons - Direct                                          29

1   opposition to cross-examine him, that's generally speaking.

2   Now, the question is whether this is something that was sought

3   in discovery and not furnished.  Is that your basis of your

4   objection?

5          MS. LASALLE:  In discovery I had asked what payments

6   were made, Your Honor, I definitely asked that.  I mean this

7   was never provided.  You know defense counsel --

8          THE COURT:  But he just ran this on the internet.

9          THE WITNESS:  This morning.

10         THE COURT:  And then he made some notes, his own

11  notes on it.

12         THE WITNESS:  Yes, sir, that's correct.

13         THE COURT:  I'm going to let him use that to refresh

14  his recollection and I'll give you time to look at it before

15  you cross-examine him.

16         MS. LASALLE:  Thank you, Your Honor.

17         THE COURT:  All right.

18         THE WITNESS:  Okay, so the loans in question -- the

19  loans -- I attended school from 1999 to get back to your -- and

20  I'm sorry, sir, for diverging --

21  BY MS. DELEO:

22  Q.   This is college loans, right?

23  A.   Yes, the college loans at the University of New England.

24  I took out the Nelnet loans from 1999 to 2003.  Those loans

25  were consolidated on 11/13/2003.  And the question -- the

Demmons - Direct                                                    30

1    reason that I went back to research this is in a conversation

2    yesterday in your office with opposing Counsel there was some

3    concern regarding when I went into income-based repayment,

4    whether or not I was in it.  And I was concerned about the fact

5    that opposing Counsel's records indicated some returned

6    payments.  I had no recollection of that.  But I made it clear

7    to Counsel yesterday that I did in fact remember making a

8    payment of 2916.  I thought it was in 2011.  It actually was

9    made in 2010.  And as indicated today by Nelnet, their records

10   indicate that it was the only time that I called in and made a

11   payment over the phone.  So, opposing Counsel's records do not

12   reflect this payment.  And the numbers that I put into the

13   document that opposing Counsel is referencing the student loan

14   payments document was derived -- those numbers came from her

15   very complete detailed records.  But I didn't feel comfortable

16   with those particular records and our conversation yesterday

17   indicated that.  So, I took it upon myself to research this

18   further.  I didn't think I had access to Nelnet any longer

19   because of the prior bankruptcy.  And I actually did have

20   access.  I was able to get in last night and that's where this

21   document was generated.

22   Q.   Okay, so it is your recollection that after you graduated

23   from college before you started medical school some six months

24   later that you made a payment to the student loan holder which

25   is now ECMC?

Demmons - Direct                                                      31

1   A.   Yes, ma'am.  According to the information I got early this

2   morning --

3   Q.   No.  Is it your recollection that that's correct that you

4   made a payment?

5   A.   Yes.

6             THE COURT:  Well, his recollection as refreshed by --

7             THE WITNESS:  Yes.

8             MS. DELEO:  Okay.

9             THE WITNESS:  My recollection as refreshed.

10            THE COURT:  Okay.

11            THE WITNESS:  Yes, ma'am.

12  BY MS. DELEO:

13  Q.   Okay.

14  A.   I made payments in 2004 and 2005 and 2006 --

15  Q.   Okay, now you're getting ahead of me.

16  A.   I'm sorry.

17  Q.   Okay.  So you made one payment between college and med

18  school, and then you started medical school.

19  A.   Yes, ma'am.

20  Q.   Okay.  If you will turn to Exhibit Number 7 in the book --

21  A.   Yes, ma'am.

22  Q.   -- can you tell me who prepared this document?

23  A.   Yes, ma'am, I prepared this document.

24  Q.   And what did you use to prepare the information that is

25  set forth in this document?

1  A.   With respect to ECMC I used the information that was

2  provided to me by opposing Counsel.

3  Q.   And how did you receive that information?

4  A.   I received it through discovery.

5  Q.   Okay.  So you took ECMC's information provided in

6  discovery --

7  A.   Yes, ma'am.

8  Q.   -- and you created this spreadsheet?

9  A.   Yes.

10 Q.   And can you tell me based on this spreadsheet does it

11 reflect that you made any payment prior to 2003?

12 A.   Um --

13 Q.   Well, let me rephrase that.  Did you make any payment

14 according to this spreadsheet during that six-month period of

15 time between college and medical school?

16 A.   It shows a payment in -- well, no, it doesn't reflect

17 that.  It shows on 11/27/04.  I started medical school in

18 January of '04, of 0-4.

19 Q.   What is this?  The first column says "Year 2003," and then

20 you go down four sections and it says, "ECMC" and there's a

21 number $140.90.

22 A.   Yes, ma'am.

23 Q.   What does that reflect?

24 A.   That actually came from a 1098-E that was provided to me

25 by Nelnet.

Demmons - Direct                                                    33

1    Q.   So you don't recall this payment but you received a 1090-E

2    indicating that you made a payment in that amount?

3    A.   Yes.  I received a 1098-E from Nelnet for that particular

4    year.  And I also included when I received those 1098-E's in

5    the other documents that I've created.  That's a reflection of

6    the year's interest payments made --

7    Q.   Okay.

8    A.   -- for that particular loan.

9    Q.   Okay.  Now, when you started medical school in January of

10   2004 --

11   A.   Yes, ma'am.

12   Q.   -- did you inform Nelnet, now ECMC, that you were enrolled

13   in medical school?

14   A.   Yes, ma'am.  I worked very diligently to do that.  We had

15   a bad internet service.  For some reason I think that there was

16   some complications with our office.  We had to go through our

17   office and the office would either fax it, or send it, or

18   transmit it.  So, I was up in the office on multiple occasions.

19   As opposing Counsel's document will indicate that there were

20   multiple renditions of me trying to go into forbearance or

21   hardship -- excuse me, forbearance or deferment.

22   Q.   Because when you start medical school is it typical that a

23   student loan lender would not collect on its debt while you're

24   enrolled full-time in another institution?

25   A.   Yes, ma'am.

1    Q.    So you informed Nelnet of this?

2    A.    Yes, ma'am.

3    Q.    And can you show me what payments were made, if any,

4    despite the fact that you thought or you should have been on

5    deferment or whatever the other word was?

6    A.    Yes, ma'am.

7    Q.    What's the other word beside deferment?

8    A.    Forbearance.

9    Q.    Forbearance.

10   A.    A deferment is no interest accumulated.  Forbearance is

11   with interest accumulated.

12   Q.    Okay.

13   A.    And I don't know how to make that distinction.  I needed

14   to somehow --

15   Q.    So you don't know if this should have been forbearance

16   period or --

17   A.    I'm sure opposing Counsel has the answer for that --

18   Q.    Okay.

19   A.    -- but I know that there's some -- to me it was -- I'm

20   sure there's a formula that they use, but sometimes I was in

21   deferment, sometimes I was in forbearance.  And I think when I

22   left university the first time undergraduate school I think

23   there was a grace period a couple of times, but that was

24   mentioned as well.

25   Q.    Okay.  You were full-time in the year 2004 in med school,

Demmons - Direct                                            35

1   is that correct?

2   A.   Yes, ma'am.

3   Q.   Okay.  And did you make payments to Nelnet despite the

4   fact that you were enrolled full-time at a medical school as

5   reflected by their records on your chart?

6   A.   Yes, it reflects, but I have -- these numbers are

7   identified with prejudice.  I don't agree with the numbers.

8   And as I explained yesterday, I was in between on one of the

9   days I was in repayment but shortly after when I made a payment

10  to Nelnet it appears, according to opposing Counsel, it was

11  rescinded for some reason.  But then I went into forbearance

12  like shortly after, so I don't quite understand.  And that

13  further again necessitated my going to the actual source, the

14  original people that hold these loans to see what their

15  transaction history was.

16  Q.   Okay.  But if we looked down these columns for the year

17  2004 --

18  A.   Yes, ma'am.

19  Q.   -- you were in school full-time in medical school,

20  correct?

21  A.   Yes, ma'am.

22  Q.   And yet some payments were made on this loan?

23  A.   Yes, ma'am.

24  Q.   Okay.  In the year 2005 were you also a full-time student?

25  A.   Yes, ma'am.

1   Q.   In the year 2010 were you also a full-time student?

2   A.   In 2010?

3   Q.   Yes.  You graduated in 2010?

4   A.   I graduated in May of 2010, ma'am.

5   Q.   Okay.

6   A.   And I worked --

7   Q.   And what happened --

8   A.   And I was working as well.

9   Q.   What happened with the Nelnet note, your payments to

10  Nelnet on their loan after you graduated?

11  A.   In 2 of 2010 I believe I went into income-based repayment.

12  Q.   And that's reflected also for the remaining years?

13  A.   I was in -- I applied for income-based repayment on 11/30

14  '09 and it was granted on 2/2/10.  I applied -- the renewal

15  came up in 12/27/10 and I went into renewal on income-based

16  repayment on 2/2/11.  And then I applied again on 2/23/12 and I

17  went into renewal for income-based repayment on 4/2/12.  And

18  I'm using these from my notes and they should be reflected in

19  here (indicating).  The dates should be the same.

20  Q.   Okay.

21  A.   I'm just saying that I now know what the application date

22  was and when the actual income-based status was awarded.  So

23  with respect to the records that I have in front of me, the

24  income-based repayment schedule is as is identified here.

25  Q.   Okay.  And what amount of money were you to pay on a

1    monthly basis under this income-based repayment plan?

2    A.   Based on mine income after my accident --

3    Q.   Yes.

4    A.   -- and inability to work, I was not -- I had a zero

5    charge.

6    Q.   For 2011, 2012, 2013, and 2014?

7    A.   That was 2010, 2011, 2012, 2013, and 2014, and I was in

8    income-based repayment when I went into bankruptcy to see if I

9    could attempt to have the other loans taken care of and find

10   them if they were dischargeable.  And I guess that it was at

11   that point that it came out of income-based repayment.

12   Q.   All right, Mr. Demmons, moving on from college to medical

13   school --

14   A.   Yes, ma'am.

15   Q.   -- why did you choose an offshore medical school?

16   A.   It wasn't something that I just happened upon.  A great

17   deal of thought -- I had been thinking about this for a long

18   time.  And I guess kind of in the medical field it's kind of

19   like pilots and when you reach a certain age you're

20   automatically out the door no matter if you have 23 years

21   experience, you're not able to charter or pilot planes any

22   longer.  And when I was looking at medical schools I had heard

23   stories of people that were comparable in age where the board

24   when they met with them they would -- the common phrase was

25   "Why would I give you the position when I can give it to

1   someone 20 years younger?"

2       I was in my later 40s and I was concerned about money.

3   And my university the founder specifically said that he was

4   looking for people that had real life experience that never had

5   the previous opportunity.  They had a very high, exceedingly

6   high pass rate which showed that they were mastering it for the

7   USMLE.  It showed that they were getting the proper amount of

8   education across to people and it was more affordable.  And

9   that was at that point.  You know the market has changed

10  substantially since then.  There's more schools, there's more

11  students, and it's more difficult now.  But at that particular

12  time it seemed like a very viable option.

13      I was driven.  I did very well in undergraduate school.  I

14  was in the top percents.  And I thought it was something that I

15  would perform quite well at.  And I spent 10 years getting

16  through this process doing the undergraduate work and

17  preparing, taking courses to get ready and then go in.  So it's

18  not something that I just on a whim thought I'd do.

19  Q.   Did you pass the science portion of medical school?

20  A.   I did, ma'am.

21  Q.   And then what occurs after you pass the science portion?

22  A.   You take your Step 1 and then go into your clinical

23  medicine rotations.

24  Q.   Did you pass your Step 1 exam?

25  A.   I did, ma'am.

1    Q.   And so what year did you start your clinical portion of

2    your program?

3    A.   I started my clinical medicine program in December of

4    2007.

5    Q.   Okay.  And when did you graduate from medical school?

6    A.   I graduated in May of 2010.

7    Q.   What type of physical shape were you in when you were in

8    medical school?

9    A.   Well, I was always the first one there.  I was always the

10   last to leave.  I volunteered every weekend and holiday.  I was

11   sitting on the Critical Care Committee and I worked in the ER.

12   Q.   I think I was referring more to physical condition.

13   A.   You have to have physical stamina and condition to do all

14   of that.

15   Q.   Okay.

16   A.   I was in excellent health.

17   Q.   Were you still an athlete?

18   A.   I was at the hospital all the time.

19   Q.   Okay.  What did you do following graduation from medical

20   school?

21   A.   I was working towards the Match.  The Match is when at the

22   end of graduation or near to it once a year all of the

23   potential prospective residents kind of throw their hat into

24   the ring so to speak.  You have to file a standardized

25   application so that everybody -- it's homogenous so there's no

Demmons - Direct                                    40

1    -- everybody fits in this box.  They put in their accolades and

2    all the things that they've accomplished including letters from

3    the dean, and research, and those types of things.  That goes

4    through a process that's further evaluated and then you

5    disseminate those out to programs throughout the country.  If

6    the programs in the country, the residency programs, if the

7    directors like you, like Dr. Kaye who's a director, they'll

8    invite you to come interview.  After interviewing -- they

9    interviewed so many, like a certain number of people, and after

10   interviewing from my perspective if I had 10 schools that I

11   interviewed with I would rank them in order of how greatly --

12   how much I'd like to work with them most likely to least

13   likely, and they do the same with their candidates.  And come

14   March of that next year, that's why they call it a Match, the

15   people that sync up are placed.  They're offered a position to

16   do their residency.

17   Q.   And this would have been March of 2010?

18   A.   Yes, ma'am.

19   Q.   Okay.  And did you match?

20   A.   No, I didn't.

21   Q.   And then you graduated two months later in May of 2010?

22   A.   I graduated in May of 2010 and in December of 2010 I was

23   in an accident prior to the match.

24   Q.   Okay, going back to May of 2010 --

25   A.   Yes, ma'am.

1  Q.    -- where were you working?

2  A.    I was working in the ER.

3  Q.    At what facility?

4  A.    At Chabert Medical Center.  I had been there since the

5  inception of my clinicals.

6  Q.    Which was in what year?

7  A.    That was --

8  Q.    2007?

9  A.    No, I started at Chabert in 2008 and actually I started my

10 paperwork was all processed in December of 2008 and I think my

11 effective date I started working in January of 2009.  I think

12 that's how they have it listed from Chabert.

13 Q.    Okay.  And so you were there.  Following graduation May

14 2010 you stayed at Chabert?

15 A.    Yes, ma'am.

16 Q.    And you were an employee at that point in time?

17 A.    Yes, ma'am.  I was PRN employee but I was considered --

18 there was a special position for people that -- for medical

19 students that worked there.  It was called a Medical

20 Specialist.  And the reason that I took the job was because I

21 got more opportunity to perform things that I wouldn't normally

22 have the ability to do on the floor, paracentesis,

23 thoracentesis, those types of things because I was still

24 covered by insurance and I knew the director quite well and he

25 was very accommodating with me.

Demmons - Direct                                                    42

1   Q.   Okay.  And so then what occurred?

2   A.   In December of 2010 I was at a stop light and was rear

3   ended by a texting driver.

4   Q.   And what medical issues resulted from this car accident?

5   A.   It was pretty shocking to me.  The laminectomy that was

6   mentioned previously, when they cut out the bone from my neck

7   the only way I can describe it is there's like if you get a cut

8   on your arm the cut scabs over.  Well, the bone leeches out

9   calcium in an attempt to heal itself.  And behind the bone in

10  front of the -- if you're facing me from the back and you're

11  looking at my spine, you see the spine, the cervical spine.  A

12  piece of that spine was taken out and directly behind the spine

13  is what they call the posterior longitudinal ligament.  Well,

14  the leeching of the calcium from my -- from the surgery

15  calcified or ossified that ligament.  So they're supposed to be

16  -- they're flexible and movable and inside in front of the

17  ligament is the neural canal which houses the spinal cord.  My

18  posterior longitudinal ligament is so severely calcified that

19  it's pushing in on that neural canal so there's not a lot of

20  space.  Normally you'd like to see some fat around that

21  protecting that, but the ligament pushes on that.  And when I

22  was rear ended when I hyper-reflexed my neck it compressed my

23  spinal cord and the spinal cord had no place to swell.  And

24  consequently a lesion was created which means I damaged my

25  spinal cord and the subsequent problems ensued.

1     I immediately had nausea and headache intractable for six

2   months.  It didn't go away.  And then I started losing

3   sensation in my arms, and down my hands, and down my legs, and

4   then the burning came.  So it wasn't just like if you fall

5   asleep on your arm and the tingling.  It was like electric

6   shocks constantly and then this burning like your hands, and

7   arms, and legs are in a fire.  So that was the consequence of

8   this impingement or this compression of the spinal cord.

9   Q.    And that was December of 2010?

10  A.    Yes, ma'am.

11  Q.    Did you work in the year of 2011?

12  A.    I think I worked just a little bit, but I couldn't.  It

13  was progressively worse.  I think I made less than a thousand

14  dollars.  I was trying to see if I could stay somewhat active.

15  I was getting physical therapy and it just didn't work out for

16  me.  I just went from bad to worse and I didn't work at all in

17  2012.

18  Q.    And when you worked in 2011 that was at Chabert?

19  A.    Yes, ma'am.

20  Q.    Okay.  In 2012 you had no work?

21  A.    No, ma'am.

22  Q.    And 2012 is when you started the injections with Dr. Kaye?

23  A.    No, in 2011.

24  Q.    Okay.

25  A.    The first when -- some of the things that he talked about

Demmons - Direct                                            44

1    was the headaches.  We were able to abate the headaches and the

2    nausea, and then he was able to give me some function as

3    opposed to no function.

4    Q.    So you went back to work in 2013?

5    A.    Yes, ma'am.

6    Q.    And explain to us what are your duties at your job?

7    A.    I'm considered now no longer a Medical Specialist.  I'm

8    considered an ED Tech, an Emergency Department Tech.  And I

9    specifically work in the queue track where I try to help

10   facilitate getting people through the process.  So as people

11   come in, we see 150 patients or something like that, whatever

12   they see for whatever time I'm there; if patients are coming in

13   I will direct them to where they need to go, if they need to be

14   seen in a clinic room, or they need to have a minor procedure

15   or something.

16       And the thing about the capacity or the thing that works

17   for me with this particular job is that I can't stand, or sit,

18   or do things for a long period of time and I'm able to kind of

19   move throughout the department.  And oftentimes I'll move from

20   the queue track and go over to be an observer with the

21   psychiatric patients.  And if I have a problem working and I

22   can't make it in because I have an exacerbation, I can go in at

23   different times and/or work in different areas of the hospital

24   doing the same thing as far as being a psychiatric observer.

25   Q.    So they're making a great deal of accommodation based on

1  your physical condition?

2  A.   They've been very, very accommodating with me.

3  Q.   What is your current physical limitations or what are your

4  current physical limitations?

5  A.   I have some days of course are better than others.

6  Q.   Can you use your hands?

7  A.   Some days I do better.

8  Q.   Can you write?

9  A.   I can write.  I have very weak hands.  I have a problem

10  with dexterity and fine motor skills.  So, I think Dr. Kaye

11  alluded to tying shoes.  It's just I don't -- like opening up a

12  bag of chips or something I don't have the dexterity or the

13  strength to do that.  And oftentimes I don't have the senses

14  that people normally have like grabbing a hot pan or something,

15  I don't have that sensation.

16      And a lot of this is positional as well.  This has really

17  affected by sleep because at night when you're laying there and

18  you're not distracted by anything I have this burning and this

19  electrical shooting pain that goes down my arms.  And if I turn

20  my head a certain way when I wake up in the morning if I do

21  fall asleep I can't move from the neck down.  It's called like

22  capelike distribution.  So I can move my limbs by I can't

23  physically move from the shoulders, my arms and shoulders and

24  I'm kind of stuck in that position.

25  Q.   How often does that happen to you?

1    A.    All the time.

2    Q.    What about your legs, do you have full use of your legs?

3    A.    I'm able to ambulate.  I'm very weak.  I have a lot of

4    atrophy in my feet and throughout my whole body.  I think as

5    Dr. Kaye has indicated that I've -- I'm about 70 pounds lighter

6    than I was.  Dr. Mathias described me as emaciated.  A lot of

7    this is -- yeah, sorry.

8    Q.    Are you still having headaches?

9    A.    Not as much as I was.

10   Q.    What about other psychological mental issues?

11   A.    I was in a bad place -- I'm sorry.

12   Q.    That's fine.

13   A.    When I saw Dr. Kaye -- excuse me.

14         THE CLERK:  Would you like some water?

15         THE WITNESS:  Yes, please.

16         I'm sorry.

17         UNIDENTIFIED SPEAKER:  No, don't apologize.

18         THE WITNESS:  Thank you.

19         I was -- I've been very depressed over this for you

20   know a multitude of reasons, but I'm very blessed.  When I went

21   to PT the first time they had indicated that they thought I'd

22   come in a wheelchair.  I actually was on a walker for --

23   because my long tracks were affected I think I was on a walker

24   for a year and a half.  And as I indicated, I'm -- I was an

25   avid triathlete, and marathoner, and kickboxer, and very just

1    active and I can take a lot of pain.  And this got to the point

2    where it was more than I could deal with.

3              I think that says enough about this, please.

4              MS. DELEO:  I think it does.

5    BY MS. DELEO:

6    Q.   All right, can you turn to Exhibit Number 1 in the trial

7    book?

8    A.   Yes, ma'am.

9              THE COURT:  Which exhibit, 1?

10             MS. DELEO:  Exhibit 1.

11   BY MS. DELEO:

12   Q.   Can you identify what this is?

13   A.   I guess this is our Chapter 7.

14   Q.   That's correct.

15   A.   Yes, ma'am.

16   Q.   And you know the date that you filed Chapter 7?

17   A.   June -- where is it?

18   Q.   It's at the top of the document.

19   A.   You said Number 1?  Oh, I'm sorry, I'm looking at the

20   wrong place, I'm sorry -- 6/25/14.

21   Q.   Okay, thank you.

22        What is your household size?

23   A.   Two, ma'am.

24   Q.   And who is the other individual living in your household?

25   A.   That's my wife, Karen Fowler.

1   Q.    And when were you married?

2   A.    The greatest day of my life.

3   Q.    What --

4   A.    That was 12 --

5   Q.    -- calendar date was that?

6   A.    December 12th, 2012.

7   Q.    Okay.  If you could please turn to Page 16 of your

8   bankruptcy schedules?  And the page number is written on the

9   bottom.

10  A.    Do you have one of those little sticky things, please?

11  Q.    Sure.

12  A.    I mean like for moving pages or something -- like the --

13           THE CLERK:  Like a --

14           THE WITNESS:  -- you know like the thumb thing or

15  something like that.  I don't know what they call them.

16           I'll find my way though.

17           MS. DELEO:  Your Honor, can my paralegal, Elaine,

18  stand next to him and turn the pages for him?

19           THE COURT:  Yeah.

20           THE WITNESS:  I'm sorry.

21           THE CLERK:  We used to have those a long time ago but

22  I don't think we have them anymore.

23           THE WITNESS:  I think my grandpa had one.  That's

24  where I remember it from.

25           THE COURT:  We can't find any of those things now.

1    They've all gone the way of horse collars and buggy whips.

2              THE WITNESS:  He probably hoarded them.

3              THE COURT:  Yeah, I'd like to find them myself,

4    actually.

5              THE WITNESS:  Yes, sir.

6    BY MS. DELEO:

7    Q.   On Page 16 you list your vehicles that you had about two

8    years ago when you filed bankruptcy.  The first one is a 2000

9    Chrysler Town & Country?

10   A.   Yes, ma'am.  That was a salvaged title vehicle.

11   Q.   Do you still have that vehicle?

12   A.   We have it but it's inoperable.

13   Q.   Okay.

14   A.   And it's uninsured.  I'm sorry.

15   Q.   And it's uninsured?

16   A.   Yes, ma'am.

17   Q.   The second vehicle you list here is a 2000 Dodge Ram 350

18   -- 3500.  Do you still have that vehicle?

19   A.   Yes, ma'am.

20   Q.   And what is its current condition?

21   A.   It's insured but it is inoperable.  There was -- we're

22   trying to get it worked on.

23   Q.   And this is a 16-year old vehicle?

24   A.   Yes, ma'am.

25   Q.   Do you have any newer or more recent motor vehicles that

1    you may have acquired since the filing of the bankruptcy?

2    A.    No, ma'am.  This is -- these are our vehicles.  We're

3    borrowing a vehicle to get through this period and hopefully

4    get our car fixed -- our truck fixed.

5    Q.    Okay.

6    A.    At which time hopefully we can maybe get something else at

7    some point.

8    Q.    All right, if you continue through your bankruptcy

9    schedules to Page 31.

10   A.    Yes, ma'am.

11   Q.    And again this was two years ago, it showed your

12   employment as a Med Tech at Ochsner.

13   A.    Yes, ma'am.

14   Q.    And you're still there, is that correct?

15   A.    Yes, ma'am.

16   Q.    What is your currently hourly rate, wage?

17   A.    I believe it's 12.25, 12.25 I think.

18   Q.    Okay.

19   A.    Yes, ma'am.

20   Q.    So is that greater than two years ago when you had gross

21   income on this Schedule I at $1,462?

22   A.    Yes.  It took me eight years to get that raise --

23   Q.    Okay.

24   A.    -- from 11.50.

25   Q.    If you turn to Exhibit Number 2, can you tell me what this

1   document is?

2   A.   Schedule I Income.

3   Q.   And when did you prepare this?

4   A.   I believe this was prepared yesterday.

5   Q.   Okay.  And what was the purpose of the preparation of this

6   schedule?

7            THE COURT:  I'm sorry, which schedule are we on now?

8            MS. DELEO:  We're on Exhibit Number 2 --

9            THE COURT:  Yeah.  Schedule I?

10           MS. DELEO:  -- Schedule I.

11           THE COURT:  Okay.

12           MS. DELEO:  But, Your Honor, this was not part of the

13  original bankruptcy file.  It's never been filed in court.

14           THE COURT:  Okay.

15           MS. DELEO:  It's just what he used as an update to

16  show current income and expenses.

17           THE COURT:  All right.

18  BY MS. DELEO:

19  Q.   So on the new Schedule I you did yesterday is this your

20  accurate income for the year now -- your monthly income at

21  Ochsner?

22  A.   I believe that this is the average from January to the

23  present time.

24  Q.   Okay.  Now, if you can flip back to the original

25  schedules, Page 31, that were filed in the court -- sorry, I

1   should have told you to keep your finger there -- originally

2   your wife, Ms. Fowler, had income also.

3   A.   Yes, ma'am.

4   Q.   And that was $1,748?

5   A.   Yes, ma'am.

6   Q.   And now looking at your new Schedule I it lists zero.   Why

7   is that?

8   A.   The position that she was working in she had -- she can

9   probably tell you better about what she was doing, but I think

10  that there was some complications with reimbursement with the

11  company that she does this for and they have scaled down.

12  They've used her for several different types of jobs.   And

13  again I would defer to her on that, on that particular issue.

14  Q.   Do you know if she has earned any income since January?

15  A.   No, ma'am, she has not since January.

16  Q.   Okay.   So this is a reflection of January through the

17  present?

18  A.   Yes, ma'am.

19  Q.   Okay.   Now going to Page 62 of your new income --

20  A.   Yes, ma'am.

21  Q.   -- well it's missing here, but aren't you required to make

22  mandatory contributions to a retirement plan?

23  A.   I have -- when I work at Chabert and in June of 2013 with

24  the budget cuts Ochsner ended up taking over Chabert.   And

25  these deductions were coming out of my pay and they're not

Demmons - Direct                                                              53

1    matched so --

2    Q.    So you're required to participate --

3    A.    Yes.

4    Q.    -- in mandatory retirement?

5    A.    That's my understanding, yes.

6    Q.    Okay.  If you look -- again I'm sorry, keep your fingers

7    there -- to Tab 3, I believe these are your paychecks?

8    A.    Yes, ma'am.  This is what we based the income on.

9    Q.    And this from January through April --

10   A.    I believe so.

11   Q.    -- 2016?

12        Do you see the retirement there?

13   A.    Yes, ma'am.  And I believe what it is, is it's a

14   percentage.  I think that I read something it's a five percent

15   contribution.

16   Q.    So when your paycheck lists 401(k) and a contribution, you

17   don't have any control over whether that contribution is made?

18   A.    I don't -- it just started coming out when we came over

19   and I was concerned that usually when there's a contribution

20   there's a matching contribution and I've not ever -- you can

21   see that year-to-date that there's -- I don't see any matching

22   contribution.  It was my understanding that everybody was

23   taking them out.

24   Q.    If you were able to have another $53 out of your paycheck

25   would you rather that money come out as opposed to being stuck

1    in a retirement?

2    A.    I would use it for food and for personal.

3    Q.    Okay.

4    A.    Although it would be nice to plan for the future as well.

5    Q.    So going down your new Exhibit Number 2, what is your

6    monthly net income?

7    A.    Monthly --

8    Q.    It's on Page 62.

9    A.    Oh, yes, ma'am.  I believe it's 1,587.08.

10   Q.    Okay.  And now let's look at your expenses on the next

11   page.  The first expense is a home mortgage payment of 1,036,

12   Page 63.

13   A.    Oh, okay, I see it.  I'm sorry.

14         Yes, ma'am.

15   Q.    And is that the same amount as you paid two years ago?

16   A.    I believe that this reflects the mortgage and taxes and

17   insurance.  I think that a previous one was listed as just the

18   mortgage amount.

19   Q.    Okay.  So, you escrow on your mortgage?

20   A.    Yes, ma'am.  I believe -- I think when you add them up

21   that this is the appropriate number of all of that combined.

22   Q.    Okay.  And turning to the next page where there's an

23   itemization of your expenses --

24   A.    Yes, ma'am.

25   Q.    -- we're now on Page 64.  There is a food expense --

1    A.    Yes.

2    Q.    -- of $800.

3    A.    Yes.

4    Q.    Can you explain that?

5    A.    I can.  I have had multiple complications with

6    medications.  I've had multiple side effects.  When I was

7    taking Neurontin or Gabapentin which is a neuropathic, my hands

8    became -- I developed hyperplasia in my hands and developed

9    what they call a Dupuytren's contracture.  And so I don't --

10   medications don't mix well with me.  And as stated by

11   Hippocrates, "Let your foods be the medicine that heal you."

12   There's diets out there that are proven to help people with

13   cancer and remove and/or abate inflammation in the system.  My

14   system is riddled with inflammation from the spinal cord

15   injury.  And I would much rather eat greens and whole plant

16   based foods that will make me well and keep me well as opposed

17   to take medications and dull my senses and riddle me with side

18   effects.

19   Q.    And those types of foods are more expensive?

20   A.    They're nutritionally high, but they're low in calories so

21   you eat a lot more and they are -- yeah, I would say that it's

22   more expensive.  This is -- you know I mean I could put this in

23   other types of medications or I could put it into something

24   that's going to sustain my body --

25   Q.    Okay.

Demmons - Direct                                                    56

1    A.    -- and not dull my senses.

2    Q.    Is $800 a month what you actually spend on food?

3    A.    No.

4    Q.    This is what you wish you had to spend on food, is that

5    correct?

6    A.    This is exactly what -- it would probably take about this.

7    I think my estimation is if I would need like two plus pounds

8    of greens a day to go through this process at a minimum along

9    with of course other things.

10   Q.    What is the actual amount you spend on food?

11   A.    It varies from my ability to work and what our paycheck is

12   and what we're paying at the time, what bills are due.  We're

13   always putting out fires.

14   Q.    Okay.  And there are no vehicle payments or vehicle -- oh,

15   there is vehicle insurance but no vehicle payments on the

16   schedule.

17   A.    Yes, ma'am.  I can explain the vehicle insurance.  Clearly

18   we'd rather have the money, but once you come out of a payment

19   plan and you're out for a while it becomes -- for us it would

20   be prohibitively expenses to suffer this.  And I'm forever the

21   optimist and hopeful that I'll be able to get this fixed and --

22   Q.    I'm sorry, you lost me.  Why do you still have insurance?

23   A.    Well, the insurance on the vehicle that isn't operable

24   because when you come out of insurance if I were to stop paying

25   my insurance rate would go up for not having insurance on a

1   vehicle that's registered.

2   Q.   I see.

3   A.   And we've been fortunate enough to only have to pay for

4   gas in the car that we're using during this process.

5   Q.   And how much is it that you're paying for clothing on this

6   new schedule per month?  Can you see that, Number 9?

7   A.   Yeah, it reads about $25.

8   Q.   And what about your entertainment budget, Number 13?

9   A.   Number 13, that's about $25.  I think actually our

10  entertainment is probably Netflix.  We don't have cable.  We

11  just maintain internet.

12  Q.   Okay.  So starting with your current income and

13  subtracting your current expenses what is the net income that

14  you're looking at every month?

15  A.   It looks like $1,139.44 in the negative.

16  Q.   Now we know you're not really operating in the negative,

17  correct?

18  A.   That's correct.

19  Q.   So what's missing in here?

20  A.   Well, the food is missing for one thing.  I think that's

21  not as high.  We've been substituting with rice and beans and

22  potatoes because they're calorie laden and they're satiating.

23  Q.   Okay.  Now looking back to your original bankruptcy

24  expenses --

25  A.   Yes, ma'am.

Demmons - Direct                                                58

1    Q.    -- which are on Page 34, two years ago when you filed

2    bankruptcy what was your net income?

3    A.    Net income?  Oh, it was 3820.

4    Q.    And is it your testimony that you don't have $38.20 at the

5    end of the month anymore?

6    A.    Once again there's a lot of variables, but it runs pretty

7    tight.

8    Q.    If you could now please turn to Exhibit Number 4, do you

9    know what this document is?

10   A.    Louisiana Means Test Table.

11   Q.    Okay.  And what does it reflect as the median income for a

12   household size of two, annual income?

13   A.    Fifty thousand five eighty-two.

14   Q.    And what about monthly income?

15   A.    Four thousand two-one-five.

16   Q.    And do you recall what your monthly income is on the new

17   Schedule II you prepared?

18   A.    It's less than that.

19   Q.    Do you remember what that is?  That's on Page 62, your

20   current monthly income.

21   A.    My gross is 1,984.49.

22   Q.    Okay.  So that's well below the 4,215 median, correct?

23   A.    Yes, ma'am.

24   Q.    And then what about your earlier schedule that you filed

25   when you were in bankruptcy on Page 34 -- I'm sorry, on Page 31

Demmons - Direct                                        59

1   or 32, excuse me.

2   A.    It was -- my particular or --

3   Q.    Your household.

4   A.    Sorry -- 2,562.79.

5   Q.    And again is that below the median for a household size of

6   two?

7   A.    Yes, ma'am.

8   Q.    If you look at the expenses on Exhibit 4, see the box

9   marked "National Living Allowance"?

10  A.    Yes, ma'am.

11  Q.    How much does it say for food for a household size of two?

12  A.    Five-eight-eight.

13  Q.    Per month?

14  A.    Yes, ma'am.

15  Q.    Do you believe you're spending $588 a month on food now?

16  A.    I don't.

17  Q.    And based on your original schedules when you filed

18  bankruptcy, Page 32 -- I'm sorry, no Page 34, were you spending

19  $588 a month for food on the day you filed bankruptcy?

20  A.    No, ma'am, 450.

21  Q.    And there is the next item on Exhibit 4 is a housekeeping

22  expense of $66.

23  A.    For two people, yes, ma'am.

24  Q.    That is usually reflected on your schedules under

25  Paragraph 4c on Schedule J which would be Page 33 of your

1   original schedules, did you take anything under the category

2   "Home Maintenance, Repair, and Upkeep Expense"?

3   A.   No, ma'am.

4   Q.   Do you have anything in your current income set aside for

5   "Home Maintenance, Repair, and Upkeep Expense"?  It's on

6   Page 63 under little 4c.

7   A.   I'm sorry, under little 4c?  No, ma'am.

8   Q.   Okay.  Lastly, on the national Internal Revenue Code

9   numbers on Exhibit 4, Page 72, how much does it show as a

10  monthly expense for apparel?

11  A.   For apparel, 162.

12  Q.   And what do you reflect in your original bankruptcy

13  schedules would be the cost for apparel in that budget?  On

14  Page 34, "Clothing," Line 8?

15  A.   I think it was Line 9, 115.  Is that correct?

16  Q.   No, clothing --

17  A.   Clothing.

18  Q.   -- Line 8.

19  A.   It says on 34 it's Line 8 is "Childcare."

20  Q.   I'm sorry, Line 9.

21  A.   Line 9, "Clothing/Laundry" is 115.

22  Q.   Okay.  And what is it in your budget that you prepared for

23  today?  For clothing.

24  A.   Twenty-five.

25  Q.   So in either event whether we look at your original

1    schedule or we looked at the new Schedule I and J that you

2    prepared yesterday, are the categories that you have for food,

3    housekeeping, and clothing below the minimum expenses as set

4    forth by the IRS on this national table --

5    A.    Yes, ma'am.

6    Q.    -- on Page 72.

7    A.    Yes.

8    Q.    Okay.  What parish do you live in, Mr. Demmons?

9    A.    Terrebonne.

10   Q.    Okay.  Looking at Exhibit 4 it's going to list the housing

11   expense for Terrebonne Parish and that is at Page 76.

12   A.    Yes, ma'am.

13   Q.    What does it reflect as total utility and mortgage?

14   A.    Utility is 478 and mortgage is 917, a total of 1,395.

15   Q.    And can you tell me in your new Schedule J that you

16   prepared what is your total for utilities and mortgage?

17   A.    Utilities are 164.30 and mortgage is 1,036.

18   Q.    And then you also have water at 53?

19   A.    Oh, I'm sorry.

20   Q.    That's all right.

21          THE WITNESS:  This is not working for me, sorry.

22          UNIDENTIFIED SPEAKER:  That's okay.

23          THE WITNESS:  Water and sewer and collection is 53.

24   BY MS. DELEO:

25   Q.    Okay.  So if you add those numbers together would you

1    agree that that totals $1,225?

2    A.    And thirty cents.

3    Q.    Okay.  And is that more or less?

4    A.    That's less.

5    Q.    That's less than the average.

6    A.    The stated amount.

7    Q.    Okay, thank you.

8    A.    Yes, ma'am.

9    Q.    Thank you.

10        Mr. Demmons, --

11   A.    Yes, ma'am.

12   Q.    -- prior to the car accident what physical condition were

13   you in?

14   A.    I was in very good health.

15   Q.    And what is your current physical condition?

16   A.    I'm forever the optimist, but I'm also a realist.  I'm in

17   fairly poor health.

18   Q.    What medications are you currently taking?

19   A.    I take -- I stopped the neuropathics because of the

20   problems.  I've been on Lyrica.  I've been on mostly pain

21   medications such as Tramadol, Oxycodone, Hydrocodone, Dilaudid,

22   Tramadol, Lortab, Zofran for nauseated stomach, Promethazine.

23   I've added magnesium because it helps with -- chemically it's

24   used as a co-factor in many reactions in the body and helps

25   with pain.  I use Lidoderm patches that go like a Nicotine

Demmons - Direct                                                    63

1   patch only a big patch for pain.  And I do those PRN and Valium

2   as needed.

3   Q.   Do you have medical insurance today?

4   A.   No, ma'am, I don't.  I lost it after I graduated medical

5   school.

6   Q.   So you haven't had medical insurance since 2010?

7   A.   That's correct.

8   Q.   How do you pay for your prescription medicine?

9   A.   I eat food.

10  Q.   You're saying you substitute it with food?

11  A.   I'm substituting because of complications and because of

12  prices.  I think it's a better alternative for who I am as a

13  person and my metabolism, how I metabolize the drugs.

14  Q.   Do you also receive free samples from the physicians?

15  A.   Yes, ma'am, I do.  I try to use them judiciously as

16  possible because I think that there's a cycle that develops.

17  I'm depressed enough at times and these kind of facilitate that

18  depression.  And I think that I'd rather -- I don't want to

19  fall in that cycle again.  I was -- I've been -- I've had very

20  bad thoughts in the past of suicidal nature because of the --

21  Q.   Physical pain?

22  A.   Yes, ma'am.

23  Q.   Has the car accident impacted your ability to earn more

24  income in the future?

25  A.   Well, clearly I'm not going to be a physician and clearly

Demmons - Direct                                                          64

1    I have to have a job that is willing to work with me and I have

2    the latitude to kind of move around.  Last year I think I was

3    out for a month and a half.  I had to slither out of bed which

4    puts an inordinate amount of stress on my wife.  Sorry.

5    Q.   Was the car accident caused by factors outside of your

6    control?

7    A.   I was at a red light.

8    Q.   Stopped?

9    A.   Stopped.  I didn't even know what happened.  I ended up on

10   the side of the road and my head was smashed against the

11   windshield and my thorax was crushed into the steering wheel.

12   I didn't even know what was going on.  I had just gone to pay

13   my mortgage.

14   Q.   Do you believe your physical limitations are persistent

15   and anticipated to continue for the rest of your life?

16   A.   This injury has affected every aspect of my life.

17   Q.   What about your future, do you believe that it will

18   continue?

19   A.   It has destroyed my future.

20   Q.   And that has an impact on your future earnings?

21   A.   I will say this, it has destroyed this dream that I have

22   held so dearly -- that I've -- I've grown.

23   Q.   So you believe you will never be able to match and use the

24   medical degree?

25   A.   That's an incontrovertible fact.

Demmons - Direct                                          65

1   Q.   Okay.   Some people may wonder why you are at a job that is

2   paying so such a minimal amount when you have a college degree

3   and you did graduate from medical school.

4   A.   Yes.

5   Q.   You can't be a practicing doctor, but you have that

6   degree.   Do you agree that you are underemployed in your

7   current field?

8   A.   I would like to think so.   I think that I have applied

9   within the medical community and the hospital for about, I

10  don't know, 34 or 43 jobs since 2013.   I think that there's a

11  couple of things that are interfering.   Number one, I intend on

12  working as long as I can.   I don't intend on collecting Social

13  Security disability, or unemployment.   I don't believe in it, I

14  never have.   And I think that as long as I can work I'm a

15  contributing member and I can hold my head high.   As a person I

16  have grown in the sense that I was very angry after this and I

17  think there are other ways to contribute and spiritually I have

18  grown.   And I think that that's enhanced our relationship.   I

19  wouldn't be here if it wasn't for my wife and for the services

20  of Dr. Kaye and others like him.

21  Q.   What about growth in your future economically, your

22  monthly income?

23  A.   That depends day-to-day where I'm at.   I don't anticipate

24  anybody coming and saying at 59 that we're going to put you in

25  this particular capacity.   I think that my moves will be more

1    horizontal than vertical.  And I think that I'll be hindered by

2    the fact that I have severe limitations.  It's unfortunate.

3    Q.    Have you attempted to obtain other jobs?

4    A.    I have searched within the hospital.  I have searched

5    within research areas.  I have searched within other

6    universities.  The problem is is that I don't have enough money

7    to pay for health insurance let alone fix my truck, or go back

8    to school to get a designation or a certification that would

9    allow me to do something else.  And even if I could, there's no

10   saying that I could do it for any extended period of time with

11   the latitude that they show me where I'm working now.  So maybe

12   I get a job tomorrow and they like me but they're not going to

13   be comfortable with my work if I don't show up for a month and

14   a half after I start.  And that's the most debilitating aspect

15   of this is that I can deal with the pain, I can push through

16   it, but I can't change it.  It is totally beyond my control and

17   so is my ability to be able to function.  It comes when -- I

18   can be -- I can sneeze and I won't be able to move for a week

19   if my head goes a certain way.

20        There are alternatives to my particular condition and

21   that's to maybe work with them and that's a total cervical

22   laminectomy.  They take out -- and that's one of Counsel's --

23   opposing Counsel made reference to the neurosurgery team that

24   looked at me.  And they said that it wasn't emergent in the

25   sense that I have bladder and bowel functions, but I'm at risk

1   to the community meaning that if I trip over the dog I could be

2   paralyzed.  And the surgeries themselves are so extensive and

3   so dangerous that maybe you don't come out moving, maybe you

4   don't come out at all because all of the nerves that innervate

5   the diaphragm run through there and innervate the rest of the

6   body run through this particular region.  And they wanted to

7   take out the whole C3 through C7 and essentially just leave me

8   without any cervical spine.

9   Q.   Mr. Demmons, going back to Exhibit 7 that we looked at

10  briefly earlier --

11  A.   Yes, ma'am.

12  Q.   -- can you identify this exhibit for me again?

13  A.   The student loan payments form that I kind of generated

14  from information that was -- came through discovery.

15  Q.   And did you divide these by your different student loan

16  lenders?

17  A.   Yes, ma'am.

18  Q.   Okay, so ECMC is one of your lenders.  And what's the

19  approximate balance owed to ECMC?

20  A.   I think that ECMC if I recall correctly is around -- the

21  consolidation was around 37,000 and the total loan amount now

22  is around 51,000 something, maybe closer to 52 if memory serves

23  me correctly.

24  Q.   All right.  And ECMC has an income based repayment option

25  available, is that correct?

Demmons - Direct                                              68

1   A.   That's correct, ma'am.

2   Q.   Now, your other loans that are still outstanding you have

3   three loans with Key Bank, is that correct?

4   A.   Yes, yes, ma'am.

5             THE COURT:   What bank?

6             MS. DELEO:   Key Bank.

7             THE COURT:   Key Bank, okay.

8             THE WITNESS:   Yes, ma'am.

9             Could I comment on ECMC?   This is a wonderful loan

10  and that's why I tried so hard to keep it in forbearance or

11  deferment when I was in school.   I tried very, very hard to

12  keep it up because unlike the other loans they actually do --

13  the interest rate you know what you're getting.   The interest

14  rate doesn't change.   And they're -- when I worked with Nelnet

15  they were wonderful to work with and they do come out with

16  options like.   The other private loans, the Key Bank loans, the

17  Deutsche loans, the NPSL loans are private loans.   The rates

18  are variable.   You never know what the rate is going to be.   It

19  changes.   And the options to modify or the options to go in and

20  do something like this IRB status are just not available to

21  those private loans through those private lenders.

22  BY MS. DELEO:

23  Q.   Okay.   Do you recall going back again to the Key Bank

24  loans?

25  A.   Yes, ma'am.

Demmons - Direct                                                        69

1   Q.   And if you want you can refer to the Pretrial Order that's

2   in the front of the book on Page 3.

3   A.   Yes.

4   Q.   Do you recall how many loans you had with Key Bank?

5   A.   Yes, ma'am.  I have three loans with Key Bank.

6   Q.   And were those loans executed prior to October 2005 or

7   after?

8   A.   Prior to 2005.

9   Q.   Okay.  And if you turn to Page 4 --

10  A.   Yes, ma'am.

11  Q.   -- you will see that the original balance on the note

12  under -- look at Number 17 on the Pretrial Order --

13  A.   Yes, ma'am.

14  Q.   -- what was the original balance due to Key Bank on the

15  three disbursements?

16  A.   It was 85,120 which included both the medical school and

17  the masters and HBOT.

18  Q.   Oh, okay.

19  A.   Through medical school.

20  Q.   Okay, through medical school.  And if you look down in

21  Paragraph 22 can you tell me the current balance due on this

22  Key Bank loan as of March 11, 2016?

23  A.   One hundred and twenty-three thousand six hundred and

24  seventy-nine point three seven cents.

25  Q.   And if you look down at Paragraph Number 24, can you tell

1    me what the monthly payments would be if you had to start

2    making those loan payments today?

3    A.    I can tell you what it would be and I can tell you what it

4    was because I made several of those loan payments.

5    Q.    Okay, but what would it be today?

6    A.    Six hundred and thirty dollars and twenty-seven cents.

7    Q.    For all three of the loans, correct?

8    A.    Yes, ma'am.

9    Q.    Okay.  Now, did you make some payments on the Key Bank

10   loans after you graduated from medical school?

11   A.    Yes, ma'am.

12   Q.    For what period of time, before the bankruptcy case was

13   filed in 2014?

14   A.    Yes, ma'am.

15   Q.    Okay.  And that's shown on Exhibit 7?  Exhibit 7, Page --

16   A.    Yes, ma'am.

17   Q.    -- 94, right?

18   A.    Yes, ma'am.  Yes, I started making payments in --

19   Q.    Page 84.

20   A.    Yes, ma'am.

21   Q.    How much did you pay to Key Bank in student loan payments

22   in the year 2011 after the car accident?

23   A.    One thousand two hundred and seventy-nine dollars and

24   twelve cents.

25   Q.    And, Mr. Demmons, that's the year that you testified that

1  you didn't even earn thousand dollars?

2  A.   Yes, ma'am.

3  Q.   Okay, how much did you pay to Key Bank in the year 2012?

4  A.   Three thousand six hundred and forty-one dollars and

5  forty-one cents.

6  Q.   And that's the year you didn't have any income, is that

7  correct?

8  A.   I had no income.

9  Q.   And how much did you pay to Key Bank in the year 2013?

10 A.   Three thousand four hundred and sixty-one dollars and

11 eighty-eight cents.

12 Q.   And what about in year 2014?

13 A.   Two thousand five hundred and fifteen dollars and eleven

14 cents.

15 Q.   All right.  Have you made any payments to Key Bank since

16 your bankruptcy filing?

17 A.   No, ma'am.  We have no more funds.

18 Q.   Okay.  Moving on to Deutsche Bank, and that's on Page 6 of

19 the Pretrial Order if you want to look at your original loans.

20         THE COURT:  Page what of the Pretrial Order?

21         MS. DELEO:  Page 6 of the Pretrial Order, Your Honor.

22         THE COURT:  Thank you.

23         THE WITNESS:  Yes, ma'am.

24 BY MS. DELEO:

25 Q.   Under Number 40 what was the current -- what was the

Demmons - Direct                                    72

1    original amount of the loan by Deutsche Bank to you while you

2    were in medical school?

3    A.    The original loan was through Liberty Bank and I believe

4    that Deutsche picked it up and that number is $46,660.

5    Q.    Okay.  And if you go to Page 7, Number 46, can you tell me

6    what the current balance is due on that loan?

7    A.    Sixty-four thousand five hundred and eighty-nine dollars

8    and fifty-eight cents.

9    Q.    And continue reading.

10   A.    Oh, I'm sorry.

11   Q.    That's okay.

12   A.    Sixty-eight thousand six hundred and seventeen dollars and

13   thirty-five cents.  I apologize.

14   Q.    That's all right.

15        And if you'll read Number 47, what would be the current

16   monthly note due to Deutsche Bank?

17   A.    I believe it was calculated off the original terms when I

18   think it was $168.48.

19   Q.    Okay.  And $168.48 --

20   A.    Yes.

21   Q.    -- is in addition to the $630.27 that you would be paying

22   to Key Bank if none of these loans are discharged, is that

23   correct?

24   A.    Right.  Yes, ma'am, and I think -- I think it's important

25   to note that the loans that we're talking about in the

1   origination amounts were based over a 120-month period, a ten-

2   year period and that's where these -- when they calculated out

3   the per diem that's where these numbers came from.  But since

4   that time these numbers have grown in value and I don't think

5   that the numbers are representative to get the same reduction

6   in the overall amount.

7   Q.   Okay.

8   A.   If that makes sense.

9   Q.   I understand what you're saying --

10  A.   Yeah.

11  Q.   -- but for the purposes of the trial we agreed to --

12  A.   Yes, ma'am, I understand.   Sorry.

13  Q.   That's okay.

14  A.   I'm just thinking as I'm seeing these numbers in front of

15  me.

16  Q.   Now, if you look again at Exhibit Number 7 --

17  A.   Yes, ma'am.

18  Q.   -- the first page where you show the payments that were

19  made to Deutsche Bank since the filing -- no, since the car

20  accident in 2010, can you tell me what that was for the year

21  2011?

22       MS. DELEO:  Do you see that, Your Honor?  We're on

23  Page 84.  It's under American Education Service.

24       THE WITNESS:  Oh.

25       THE COURT:  Oh, okay.

Demmons - Direct                                                    74

1          MS. DELEO:  Deutsche is listed as the second entry.

2          THE COURT:  Yeah, I got you.  All right, I'm with you

3     now.

4     BY MS. DELEO:

5     Q.   Okay, for the year 2011 --

6     A.   Yes, ma'am.  I was in hardship in 2011.

7     Q.   And what does that mean?

8     A.   I was experiencing financial difficulties.

9     Q.   And so?

10    A.   I didn't have to pay in 2011.  Actually --

11    Q.   Did you contact Deutsche and they told you you didn't have

12    to pay?

13    A.   Yes, ma'am.  As a matter of fact what happened was with

14    the Deutsche loan when -- I guess the qualifier is 30 days.  I

15    was behind on the payment in 2011 and I believe that I called

16    after 30 days.  I called American Educational Services to tell

17    them that I needed to apply for hardship to keep in hardship or

18    forbearance.  And at that time the representative I was talking

19    to told me they were pushing it through, so I thought that it

20    was taken care of.  I learned after the fact several months

21    later I got a notice that I was in default.  And I immediately

22    contacted them and they said I didn't put it in writing because

23    I was over 30 days.  Then I obtained Deutsche's number and

24    contacted them directly about the default and told it was never

25    my intention.  I was hoping that things were going to work out

1   for me and I didn't want to go into default.  They said there

2   was nothing they could do.  And I went back to AES, they

3   referred me back to AES, and I met this incredible person by

4   the name of Tina Knisley (phonetic), who is the Conversion

5   Director I think and works in conversions.  And I explained my

6   situation about the hardship and what I had gone through and

7   what had happened and she took it out of default and gave me

8   the opportunity to go back into repayment.  So I know this loan

9   well and that's why there's less money on this.  I think that I

10  only made two payments because there was a period of time that

11  I didn't have to pay and then I made -- she told me to make one

12  payment and then the payments that came after then obviously we

13  got into over our heads with no more available funds.

14  Q.    So in 2012 your testimony is you made how many payments?

15  A.    In 2012 I paid $356.66.

16  Q.    No, I'm sorry, Mr. Demmons --

17  A.    Oh, 176.32.  I'm sorry.

18  Q.    Okay, and in 2013?

19  A.    Three fifty-six sixty-six.

20  Q.    And then what happened in 2014?

21  A.    I was able to get hardship and then I wasn't able to do

22  anymore after that.

23  Q.    Okay.

24  A.    We had depleted everything.

25  Q.    Have you been proactive in contacting your student loan

Demmons - Direct                                          76

1   lenders, not just Deutsche but all your student loan lenders to

2   explain what is happening with you and the car accident and

3   your income?

4   A.   I was and they were proactive with me as well.  I think on

5   numerous occasions Key Bank would call me up to seven times a

6   day and it was -- you know I mean so I was trying to explain to

7   them where I was at.  And as far as Key Bank, in I believe it

8   was 2011, if I may, because they -- AES used to offer the same

9   hardships and forbearances for Key that they did.  This was

10  serviced by AES, Key Bank loan, and I called them to re-up my

11  hardship or forbearance with AES for my Key Bank loans and they

12  told me that Key is no longer offering, you can't go through us

13  anymore for that.  You have to go through them directly.

14       And I immediately called them, and it took me several

15  months to work that out because they hadn't worked out all the

16  details at that time.  I had to go back to a branch in my

17  hometown to find a number that I could get in touch with a guy

18  by the name of Mr. Vinetti (phonetic) who was the Director of

19  the Workout Program, I think that was the department, and I

20  ended up getting him to get onboard with me and a person up

21  there worked with me to get me a deferment and that's when I

22  started paying the $630.  I think I paid them like $11,000 over

23  the time period.

24  Q.   Okay.  Can you make any payment today to Deutsche Bank

25  based on your current financial income status?

1   A.   No, ma'am.

2   Q.   All right, if you could turn to the Pretrial Order Page 7

3   and you will see an entry for FCDB?

4   A.   Yes, ma'am.

5   Q.   Mr. Demmons, this is a defendant you sued as part of this

6   adversary proceeding, is that correct?

7   A.   That is correct.

8   Q.   Did they file an answer in this adversary proceeding?

9   A.   No, ma'am, they didn't.

10  Q.   Have you instructed my office to proceed against them

11  despite the fact that they haven't filed an answer?

12  A.   Very aggressively.

13  Q.   Okay.  Do you know if the Clerk has issued a Notice of

14  Default?

15  A.   Yes, the Clerk has.

16  Q.   Okay.  Looking at Page 7, FCDB, how much did you

17  originally borrow from them?

18  A.   I believe the number was 57,690.

19  Q.   Okay.  And what is the current balance approximately due

20  to FCDB?

21  A.   I'm not sure if this is a hundred percent correct but --

22  Q.   Okay.  And this is as of December 17, 2014?

23  A.   Yes, ma'am.  So obviously it would be higher than that,

24  but at that time it would be 72,443.56.

25  Q.   Okay.  Can you tell me as to that loan of payments made by

Demmons - Direct                                        78

1   you since graduation and the car accident, again going back to

2   Exhibit 7 --

3   A.   Yes, ma'am.

4           MS. DELEO:  And, Your Honor, this lender is referred

5   to NPSL Trust under the American Education Service column at

6   the top.

7   BY MS. DELEO:

8   Q.   For 2011?

9   A.   For 2011 I believe that I was in hardship.

10          THE COURT:  What's it referred to as?

11          MS. DELEO:  NPSL Trust, it's the third entity in that

12  American Education Services box under Deutsche.

13          THE COURT:  All right.

14          MS. DELEO:  Do you see it?  Page 7.

15          THE COURT:  All right, I have Page 7 on the Pretrial

16  Order.

17          MS. DELEO:  I'm sorry, Your Honor.  Now I'm looking

18  at the exhibit book, Exhibit 7.

19          THE COURT:  All right.  Exhibit 7.

20          MS. DELEO:  Uh-huh (affirmative response).

21          THE COURT:  Okay.

22          MS. DELEO:  Sorry, Page 84.

23          THE COURT:  All right, Page 84.

24          MS. DELEO:  And you'll see the first box is American

25  Education Services and NPSL is listed as the third lender that

1   was --

2              THE COURT:  All right, I've got you.

3              MS. DELEO:  -- that was serviced by that entity.

4              THE COURT:  All right, yeah.  All right, I'm with

5   you.

6              MS. DELEO:  Okay.

7   BY MS. DELEO:

8   Q.   So, Mr. Demmons, this is your last student loan, is that

9   correct?  You had three for Key, one for Deutsche, one for

10  NPSL, and one for ECMC we discussed earlier, --

11  A.   Yes, ma'am.

12  Q.   -- is that correct?

13  A.   That's correct.

14  Q.   So this is your sixth student loan?

15  A.   Yes, ma'am.

16  Q.   And how much did you pay them in the year 2012?

17  A.   One hundred and sixty-one dollars and thirty-two cents.

18  Q.   And in the year 2013?

19  A.   Six ninety-eight point three zero.

20  Q.   And the year 2014?

21  A.   Five fifty-seven point four six.

22  Q.   Mr. Demmons, do you know if your private loans have an

23  income based repayment program?

24  A.   That's not available for those, ma'am.

25  Q.   Have you inquired as to whether or not?

Demmons - Direct                                                    80

1   A.   They're very limited in their scope.  I mean with respect

2   to Key they were very unwilling to work with me.  It took a

3   great deal of effort to get them to help me.  There are just no

4   other opportunities for me through them.

5   Q.   Okay.

6   A.   Such as the ones that ECMC's Counsel has offered like IRB

7   or William D. Ford programs, those are available for national

8   direct student loans, not private loans.

9   Q.   Okay.  What would be the impact on your household if your

10  student loans are not discharged?

11  A.   It would be devastating.  We would -- we don't have the

12  resources now.  I don't know what else we would have available

13  to do anymore than what we have tried to do.  We have

14  liquidated and sold everything that we had in assets.  We had

15  good credit scores, good -- excellent credit scores prior to

16  this whole bankruptcy, and cash in hand, and opportunity.  And

17  now we have no cash in hand, no credit, and no finances.  They

18  would truly hold us in undue hardship.

19  Q.   What would be the impact on your household if the Court

20  discharged your six student loans but not the two loans owed by

21  Ms. Fowler, your wife?

22  A.   Well, you would have to talk to her about the impact it

23  would have on her.  I think that we are, as I indicated when we

24  were going through this process, we've had travel expenses and

25  eating while we were traveling because -- we wouldn't have the

Demmons - Direct                                                    81

 1   money to pay that.  I mean we're struggling day-to-day to pay

 2   what we have.  Even being in this process has been struggle for

 3   us.  I guess that's the point I'm trying to make.

 4   Q.   Okay.  And do you believe you have any excess income in

 5   your household to make payments on Ms. Fowler's loans?

 6   A.   Absolutely not.

 7   Q.   Mr. Demmons, if you will please turn to Exhibit 5 --

 8            THE COURT:  Are you anywhere near the end of direct

 9   examination?

10            MS. DELEO:  Probably 40 minutes, an hour.

11            THE COURT:  Well, do you want to take a lunch break?

12            MS. DELEO:  Sure.

13            THE COURT:  All right, is this a convenient place?

14            MS. DELEO:  Absolutely.

15            THE COURT:  All right, would you like to break for

16   lunch?

17            THE WITNESS:  Yes, sir.  Thank you.

18            THE COURT:  Okay.  All right, it's 12:20.  Can we be

19   back at 2:00?

20            MS. DELEO:  Sure.

21            THE COURT:  All right, Court will adjourn until 2:00.

22            MS. DELEO:  Thank you, Your Honor.

23            THE WITNESS:  Thank you, Your Honor.

24                          *    *    *    *    *

25                          (Luncheon Recess)

1    **AFTERNOON SESSION**

2          THE COURT:  Be seated.  All right, let's resume.

3                     *    *    *    *    *

4               CONTINUED DIRECT EXAMINATION

5    BY MS. DELEO:

6    Q.   Mr. Demmons, could you please turn to Exhibit 5?

7    A.   Yes, ma'am.

8    Q.   What is this?

9    A.   This appears to be the cost of education for my past --

10   Q.   Medical school?

11   A.   -- past medical school.

12   Q.   Okay.  And what period of time is this to cover?

13   A.   This is --

14   Q.   The first page.

15   A.   The first page is to cover semesters one through five are

16   the basic sciences, and six through ten are the clinical

17   semesters.

18   Q.   Okay.  And what is the date that this document is

19   applicable for, what period of time?

20   A.   I believe it was effective May 20th, 2003.

21   Q.   Okay.  And if you turn to the next page, Page 79, what is

22   this?

23   A.   This is another cost of education schedule for effective

24   date May of 2005, two years later.

25   Q.   Okay.  And the last page in this section, what is this?

Demmons - Direct                                      83

1   A.   This is also yet another updated version from cost of

2   education from January -- effective January 2008.

3   Q.   Okay, and why do you believe this is important?

4   A.   This is important because the lender bases how much money

5   that they're going to lend to the students based on the amount

6   of education or based on the schedules that the school has put

7   together.

8   Q.   So if you could flip to Exhibit 6?

9   A.   Yes, ma'am.  Yes, ma'am.

10  Q.   And this starts first semester, Winter 2004.

11  A.   Yes.

12  Q.   And can you explain the rest of the entry?

13  A.   So Semester 1, Winter 2004 the cost of education was

14  13,720.

15  Q.   And where did that number come from?

16  A.   That came from the cost of education schedule provided by

17  the university.

18  Q.   So, if we look back to Exhibit 5, Page 78, --

19  A.   Yes, ma'am.  Cost of education for first semester was

20  13,720.

21  Q.   And that is a total cost of tuition and what other

22  categories?

23  A.   Fees and then books and supplies, room and board,

24  transportation, water, electricity, phone, internet, health

25  insurance, and miscellaneous.

Demmons - Direct                                    84

1   Q.   And so as established by your school at this point in time

2   this is the total cost per semester to attend --

3   A.   Yes.

4   Q.   -- the university?

5   A.   Yes, ma'am.

6   Q.   Okay.  So going back to the chart on Page 6 --

7            THE COURT:  On Exhibit 6?

8            MS. DELEO:  Yes, I'm sorry, Exhibit 6, Page 82.

9   BY MS. DELEO:

10  Q.   Did you receive a student loan for that Winter Semester

11  2004?

12  A.   Yes, ma'am.

13  Q.   And what was the disbursement that you received on this

14  loan?

15  A.   Sixteen thousand three twenty.

16  Q.   And is that less or more than the cost of attendance at

17  your school?

18  A.   More than cost of attendance.

19  Q.   Okay, so now let's look at the second semester.

20  A.   Yes, ma'am.

21  Q.   What is the cost of attendance there for that period?

22  A.   Thirteen thousand four hundred and fifty dollars.

23  Q.   And you received a second disbursement from Key?

24  A.   Yes, ma'am.

25  Q.   Of how much?

Demmons - Direct                                        85

1    A.   Sixteen thousand fifty dollars.

2    Q.   And does that result in an overage or a shortage of the

3    amount due?

4    A.   It appears to be an overage.

5    Q.   Okay, of how much?

6    A.   Two thousand six hundred dollars.

7    Q.   And why is this important that there is an overage of the

8    student loans that you're receiving?

9    A.   Cost of education.  The loan is exceeding cost of

10   education.

11   Q.   And why is that important to you?

12   A.   It's set by the university and that's the amount that the

13   lender lends.

14   Q.   Okay.  Going down to the third semester --

15   A.   Yes.

16   Q.   -- Fall 2004, --

17   A.   Yes, ma'am.

18   Q.   -- what is the cost of admission for the third semester?

19   A.   Thirteen thousand six fifty.

20   Q.   And how much did you receive from Key on that loan

21   disbursement?

22   A.   Sixteen thousand two fifty.

23   Q.   And again is that --

24   A.   With the same overage.

25   Q.   Of how much?

Demmons - Direct                                              86

1    A.    Two thousand six hundred.

2    Q.    The next semester your fourth semester, Winter 2005, what

3    was the cost of attendance?

4    A.    Thirteen -- for semester four or five?

5    Q.    For semester four.

6    A.    Oh, I'm sorry, semester four -- 13,700 -- oh, I guess I

7    don't need to go back to the cost, I was just confirming.

8    Sorry.

9    Q.    Okay.  And you received a disbursement on a loan from Key

10   to pay for your Winter 2005 semester?

11   A.    Yes, ma'am, 16,300.

12   Q.    And what was the result of how much they lent you, was it

13   exactly what school cost?

14   A.    It was 2,600 over.

15   Q.    Now what happened in this fifth semester, Summer of 2005?

16   A.    There was a -- it appears there's an increase in the cost

17   of education.

18   Q.    Okay.

19   A.    And there was a $16,600 disbursement with a $1,600

20   overage.

21   Q.    Okay, and that's based upon the increase in cost as

22   established by your university that the number changes?

23   A.    Yes, ma'am.

24   Q.    Okay.  And what happened in semester six?

25   A.    Semester six this is a different lender now.  There was a

1   -- in semester five there was a leave and then that tuition

2   carried forward.  So there was a living expense cost of 7,490

3   based on the cost of education for that period.

4   Q.   Okay, you're going to have to explain in a little more

5   detail if you will, Mr. Demmons.  Did you pay tuition from a

6   student loan for the Fall of 2005?

7   A.   Yes, ma'am.

8   Q.   From a student loan?

9   A.   It was paid from previous funds.

10  Q.   Explain what you mean by that.

11  A.   I had money in the account from the previous semesters

12  that was paid in semester five -- oh, I guess the leave of

13  absence in semester five.  I'm sorry, I'm looking at this --

14  I'm looking at the leave of absence.  Okay, I see how this is

15  written now.  So the semester -- the distribution for semester

16  five was made and then there was a leave of absence that

17  occurred, if I remember correctly, that was during Katrina.

18  And so there was prepaid tuition that was --

19  Q.   Who prepaid that tuition?

20  A.   I prepaid it.

21  Q.   You prepaid that tuition for Summer 2005 from funds you

22  held on hand?

23  A.   That was in the account.  Yes, it was in my account.

24  Q.   Okay.

25  A.   Yes.

1   Q.   And so you prepaid tuition.

2   A.   Yes.

3   Q.   And then what happens for the sixth semester because of

4   that prepaid tuition?

5   A.   The cost of education would come down by the cost of

6   prepaid tuition and fees.  So the only thing that was going to

7   be expensed for that semester because -- I'm sorry, I'm getting

8   up to speed here -- the only thing that there was a cost for

9   that particular semester would have been living expenses.  No

10  tuition was required because it was prepaid.  So there was a

11  disbursement made for the sixth semester for $15,000 and there

12  would be an overage of $7,510.

13  Q.   Because how much did you actually owe for your sixth

14  semester?

15  A.   I owed $7,490.

16  Q.   And how much did you receive from Deutsche?

17  A.   Fifteen thousand dollars.

18  Q.   So the amount you received exceeded the cost of

19  attendance --

20  A.   Yes, ma'am.

21  Q.   -- by?

22  A.   Seven thousand five hundred and ten dollars.

23  Q.   Okay.  For the seventh semester --

24  A.   Yes, ma'am.

25  Q.   -- what happened there?

Demmons - Direct                                                    89

1   A.   Tuition based on cost of education was $11,181.25 and I

2   received $16,130, and that left an overage of $4,948.75.

3   Q.   All right, and what happened on your eighth semester?

4   A.   Tuition for the eighth semester was $14,840.  I received

5   $15,530 and there was a $690 overage.

6   Q.   And for your last two semesters?

7   A.   For semesters nine and ten the cost of attendance was

8   based on their schedules for that period was $38,835, and I

9   received $57,690 from FCDB Trust.

10  Q.   So you received almost $20,000 more than what it cost to

11  attend the university?

12  A.   Whatever the calculation is.

13          THE COURT:  What semester are we on now?

14          MS. DELEO:  The very last one, Your Honor, ninth and

15  tenth at the bottom.

16          THE COURT:  Okay.  All right, I'm with you.

17          THE WITNESS:  It looks like somewhere around there.

18  I'm sorry, I'm not able to calculate it in my head.

19          THE COURT:  Fifteen -- 19,000, 19,000 something.

20          THE WITNESS:  Yes, sir.  Thank you.

21  BY MS. DELEO:

22  Q.   So they lent you $19,000 more than it cost to attend

23  school for those semesters, is that correct?

24  A.   Yes, ma'am, that's what it appears.

25  Q.   Okay.

Demmons - Direct                                              90

1   A.   And that was for two semesters not just -- right, because

2   these are combined.  Yes, ma'am.

3   Q.   Yes.

4        Mr. Demmons, how would you describe your lifestyle?

5   A.   Meager.  I think that we live a very meager lifestyle.

6   You know there's nothing extravagant.  There's not a -- I've

7   not been to see my mom since 2012 because of the income

8   situation.  I hope to at some point in the future, but I think

9   we -- there's nothing extravagant going on in our lives.

10            THE COURT:  I'm sorry?  How long has it been since

11  you've been to see your mom?

12            THE WITNESS:  Since 2012.

13            THE COURT:  2012.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  And where does she live?

16            THE WITNESS:  In Maine.

17            THE COURT:  Oh, okay.

18  BY MS. DELEO:

19  Q.   You're dressed nicely for court today.

20  A.   Thank you.

21  Q.   How old is your jacket?

22  A.   My mother bought me this jacket in 1999 when I attended

23  UNE and the shoes I'm wearing on my feet.

24  Q.   Have you ever purchased another jacket since 1999?

25  A.   I have but it was out of necessity during the match and it

1    was for a much larger me.

2    Q.    Okay.

3             MS. DELEO:  Your Honor, I tender the Witness.

4             THE COURT:  All right.

5                          *   *   *   *   *

6                        CROSS-EXAMINATION

7    BY MS. LASALLE:

8    Q.    Hi, Mr. Demmons.

9    A.    Hi.

10   Q.    I'd like to talk first about some of the duties you have

11   at your current job.  You said you're an ED Tech in the queue

12   track, is that correct?

13   A.    Yes.  Yes, ma'am.

14   Q.    Do you have to write on a chart?

15   A.    No, I don't chart.

16   Q.    Okay, you don't chart.  What about carrying equipment, or

17   supplies, or anything like that?

18   A.    I am very mindful about what I do.  I direct patient flow.

19   There's people that come into -- we have a series of four rooms

20   that are used for intake and a series of two rooms that we use

21   for treatment.  Sometimes we have to use the four rooms also

22   for treatment but we try to create virtual space which means we

23   bring people into the rooms.  They get triaged and then they

24   get intake by a nurse and then they get directed to whatever

25   room they need to go to, whether they go to treatment, or go to

1    x-ray, or go to get blood drawn, or something like that.

2    Q.   So how do you do -- what are kind of the steps that you

3    would take if someone were to come in and you had to walk them

4    through the process, what do you physically have to do?

5    A.   You all see there -- there is a -- we use Epic Software.

6    So you'll see their names come up on the screen.  We'll have --

7    say for example there's a list of people that are waiting to be

8    triaged.  So you go to the emergency room.  You get checked in

9    at the emergency room.  And then the triage nurse categorizes

10   the severity.  So we want to treat the most acute patients

11   first.  And then it's decided whether or not they're going to

12   be seen -- the people I work with are PA's and NP's.  It's

13   decided are they going to be seen by a mid level or an upper

14   level.

15        And where I come into play is they get -- the triage nurse

16   prints out a bunch of labels that go with the patient.  You're

17   probably aware of how this thing works.  But I will grab the

18   labels, get the stack of labels, organize the labels, and then

19   go and retrieve the patient from the waiting room and direct

20   them to the rooms.  When the intake nurse goes in and checks

21   the patient over, then they'll say that patient needs to go to

22   x-ray, or that patient should be directed to CT.  Sometimes

23   they need to be walked down, sometimes they don't.

24   Q.   And so that's what you do, you would physically walk --

25   A.   Yes, ma'am.

1    Q.    -- them where they need to go?

2    A.    Occasionally.

3    Q.    Put on their hospital bracelet maybe?

4    A.    No, I don't put it on.  That happens at triage.

5    Q.    Okay.  What about --

6    A.    I have very little contact with the patient.

7    Q.    Okay.

8    A.    I facilitate the flow.  Someone kind of has to oversee

9    what's happening with their paperwork, you know picking it up

10   and make sure that it follows them and moves them around.

11   Q.    And so are you using the computer systems at the hospital

12   for part of your job?

13   A.    I don't have a lot of access because I don't do any of the

14   testing and I don't -- occasionally I've done some testing.

15   I'll occasionally do like a point of care for cardiac enzymes

16   or glucose levels which there's a little -- it's like a little

17   holder with a button you push and it pokes a hole to get a

18   drop --

19   Q.    And you would be the one physically doing that?

20   A.    -- get a -- occasionally, yes.

21   Q.    What is "point of care," what are you talking about?

22   A.    Point of care is just when the patient comes in we're

23   seeing them at that particular point.

24   Q.    Okay.

25   A.    Like point of purchase, you see them at that.

Demmons - Cross                                                94

1  Q.   Okay.  Mr. Demmons, if you turn to Exhibit 3 --

2  A.   Could I also qualify something else, please?

3  Q.   Sure.

4  A.   I also am -- there's the other rooms down where our

5  treatment rooms are there's 7, 8, 9, and 10, and 7 is dedicated

6  just to psychiatric patients.  And someone has to sit with

7  them.

8  Q.   Is that something you would do?

9  A.   That's something I do as well.  And I go back and forth

10 between if I'm -- and that's the beauty of this job for me

11 because if I'm -- if I feel like I'm not doing really well I

12 can go sit for awhile.  I can exchange with someone and take --

13 like if they go for lunch or something like that, that type of

14 thing.

15 Q.   What happens if one of these psychiatric patients has an

16 episode and needs to be restrained, is that something you would

17 do?

18 A.   I would never.  I am not going to place myself in harm's

19 way.  We have security on staff that are there.

20 Q.   And so you'd have to call someone to deal with that?

21 A.   There's always someone around.

22 Q.   Okay.

23 A.   Yeah.

24 Q.   Okay, Mr. Demmons, I know that in the Pretrial Order and

25 in your prior testimony you talked about your salary being

1   12.25 an hour.

2   A.   Uh-huh (affirmative response).

3   Q.   And so when we look at Exhibit 3, if we just go to Page 65

4   which is the first one, we see that there's regular hours of --

5   you have 73 regular hours --

6   A.   Uh-huh (affirmative response).

7   Q.   -- at 12.25 an hour.

8   A.   Yes.

9   Q.   And then there's overtime.  So you do get paid overtime?

10  How does that work?

11  A.   They are being financially responsible they call it.

12  There is not a lot of overtime that they give.  But if they

13  make the overtime available and I'm in a capacity where I could

14  get it I will absolutely gladly take it.  But it's not a

15  regular thing.  They try to hold us to between 36 and 40 hours.

16  Q.   So what is considered a full-time work schedule for you,

17  is it 36 or is it 40 a week?

18  A.   Thirty-six, but I think 37 by the company is considered

19  full-time.

20  Q.   So anything over that would fall into this overtime

21  bracket?

22  A.   No, anything over 40 would fall into overtime like most

23  jobs.

24  Q.   Oh, okay.  No, not at most jobs, at your job --

25  A.   Yeah.

1    Q.   -- at what point do you incur overtime?

2    A.   Over 40 hours.

3    Q.   Over 40 hours.

4    A.   Yes, ma'am.

5    Q.   So what happens in that gap between the 37 that you

6    mentioned and 40?

7    A.   That depends.  There are shift differentials.

8    Q.   Okay.

9    A.   And I'm all over the place because they use me where they

10   need me.  That's I think part of the tradeoff for them.

11   Sometimes I go in early in the morning.  Sometimes I'll go in

12   mid-shift.  Sometimes I'll go in later shift.

13   Q.   And so you talk about shift differentials.

14   A.   Yes.

15   Q.   Is there a pay increase or --

16   A.   Yes, of course.

17   Q.   So that does explain if you go down there's what looks

18   like "EVE."  I don't know if that means evening?

19   A.   Evening, yes, ma'am.

20   Q.   Okay, so you get --

21   A.   That would be mid-shift.

22   Q.   So you get an extra dollar an hour --

23   A.   Uh-huh (affirmative response).

24   Q.   -- when you work there?  And what about "NGT"?

25   A.   That's nighttime.

1   Q.    Okay, so nighttime.

2   A.    That would be from I think from 6:45 at night to 6:45 in

3   the morning and that's just something that I'm really going to

4   do a lot.

5   Q.    Sure.  And so but when you do that you would get an extra

6   $2 on top of your 12.25, is that correct?

7   A.    You get an extra -- a dollar for each differential, yeah.

8   Q.    Okay.  You had mentioned that you believed you were

9   underemployed.  Can you explain what you meant by that?

10  A.    Well, I do have a lot of time invested in this, this

11  medical direction.  And I mean it took a lot of effort to get

12  through it.  That's all I mean.  I think that it's unfortunate

13  that this happened to me.

14  Q.    How many hours a week do you work on average, Mr. Demmons?

15  A.    I would say 36 to 40 maybe.

16  Q.    Okay.

17  A.    That's if my condition allows me to.

18  Q.    Can you request additional hours?

19  A.    Not over 40.

20  Q.    Not over 40.  Okay.

21  A.    And probably not over 36.  I think as they're going -- the

22  whole emphasis of Ochsner coming in is to maximize what they're

23  getting and to scale back.

24  Q.    Okay.

25  A.    And they are extremely financially fiscal with respect to

Demmons - Cross                                          98

1   overtime hours.

2   Q.   How do you get back and forth to work?

3   A.   I was walking for quite some time until we got the car to

4   use.

5   Q.   When did this stop that you were walking?

6   A.   I don't remember exactly when we got the car but --

7   Q.   You're referencing a car.  I know you talked before about

8   having no cars that work.

9   A.   Uh-huh (affirmative response).

10  Q.   So I guess first let's talk about when did the cars listed

11  on your schedules stop working?

12  A.   The minivan broke I think it was not last Christmas, the

13  Christmas before.

14  Q.   So we're talking Christmas of 2014?

15  A.   I believe so, yes.

16  Q.   Okay.  And then there's a truck --

17  A.   Yes.

18  Q.   -- as well?  Okay, when did that stop working?

19  A.   That's several months ago.

20  Q.   December of 2015?

21  A.   No.  I don't recall exactly, but it was several months

22  ago.

23  Q.   So after that truck stopped working you were walking to

24  work?

25  A.   I live a mile away.

Demmons - Cross                                                    99

1    Q.   Okay, so you were walking a mile every day to work?

2    A.   Uh-huh (affirmative response).

3    Q.   And then home --

4    A.   No, I ended up --

5    Q.   -- as well?

6    A.   -- people were conscious of the fact that I was walking

7    and they were giving me rides.

8    Q.   Okay, so you had to walk there but then someone was kind

9    enough to give you a ride home.

10   A.   No, and people would pick me up as well.

11   Q.   Okay.  You said you lived a mile away?

12   A.   Yeah.

13   Q.   Okay.  And you can't remember around when your car broke

14   down?

15   A.   This has been a very trying situation for us going through

16   this whole process.  I don't -- I just know that -- maybe could

17   I defer to my wife in --

18   Q.   I can ask her --

19   A.   Okay.

20   Q.   -- when she's on the stand.

21   A.   I don't -- maybe she'll know better.

22   Q.   Now you mentioned another car.  So this isn't a car that

23   you or your wife own?

24   A.   Right.

25   Q.   You're using someone's car?

Demmons - Cross                                      100

1   A.   It's my mother-in-law's.

2   Q.   Your mother-in-law's.  Where does your mother-in-law live?

3   A.   Arkansas.

4   Q.   Okay.  How is she able to allow you to use a car when she

5   lives in Arkansas?  Is it just an extra car that she has?

6   A.   By the grace of God we're able to have this, yeah.

7   Q.   And --

8   A.   I don't delve into her -- I think you'd have to ask her

9   that.

10  Q.   My question was more she's in Arkansas.  It's not like

11  she's down the street.

12  A.   No.

13  Q.   So I'm guessing this is maybe an extra car that she's able

14  to give you to use?

15  A.   She realizes the situation that we're in.  She realizes

16  what we're going through right now and she realizes that we

17  would have no way to get here and be here today to speak with

18  you if we didn't have it.

19  Q.   Sure.

20  A.   And they were concerned about us, me walking back and

21  forth and not being -- we had to walk and go get our groceries

22  and it was difficult.

23  Q.   Can you remember when you started using her car, your

24  mother-in-law's car?

25  A.   Yeah.  I think it was after -- maybe after Christmas or

Demmons - Cross                                             101

1    something like that.

2    Q.    After Christmas.

3          So, Mr. Demmons, --

4    A.    Maybe September -- I don't know exactly.

5    Q.    Wait, after Christmas or September?  Sometime maybe

6    fallish of 2015?

7    A.    Yes.

8    Q.    Does that maybe sound right?

9    A.    Yeah.

10   Q.    Okay.  So one of the exhibit, Exhibit 24, Mr. Demmons --

11   A.    Yes, ma'am.

12   Q.    -- are bank statements.  So --

13   A.    Could you slow down just a little bit, please?

14   Q.    Sure.

15   A.    I don't process as quickly as you.

16   Q.    Sure, not a problem.  I can slow down.

17   A.    Thank you.

18   Q.    I have a tendency to talk fast, so I can understand.

19   A.    Okay.  I'll try to speed up my hearing a little bit but --

20   Q.    No, it's not a problem.  I'll slow down.

21   A.    Thank you.

22   Q.    Or I'll try to.  Just let me know if I --

23   A.    Yes.

24   Q.    -- go a little too fast.

25         So Exhibit 24 --

1   A.    Yes, ma'am.

2   Q.    -- these are your bank statements, correct?

3   A.    Yes, ma'am, they are.

4   Q.    And they start around December of 2015.

5   A.    Yes, ma'am.

6   Q.    And then if you go through they go to let's say March,

7   does that look right, towards the end of March?

8   A.    Yes, ma'am.

9   Q.    So any gas purchases that I would see in these statements

10  this would have been gas that you put in your mother-in-law's

11  car, correct, --

12  A.    Yes, ma'am.

13  Q.    -- to go back and forth?

14  A.    The one that we were using.  Yes, ma'am.

15  Q.    So at least back to late December of 2015 you would have

16  been using her car and the gas purchases would have been for

17  that car, is that correct?

18  A.    I know that some of these gas purchases would have been

19  going back to visit for Christmas and --

20  Q.    Like for example let me just point out one to you on

21  Page 373.  It's going to be kind of midway through, but it's

22  12/28.  It says "Card purchase Splash Car Wash."

23  A.    Uh-huh (affirmative response).

24  Q.    So that would have been to have her car cleaned, correct?

25  A.    I think that the Splash Car Wash was an oil change if I

1   remember correctly.

2   Q.    Okay.

3   A.    Yeah.

4   Q.    Okay, so we know at least back through December --

5   A.    Yeah.

6   Q.    -- you were probably using her car?

7   A.    Yes.

8   Q.    Mr. Demmons, can you tell me what steps you have taken so

9   far to get a higher paying job?

10   A.    I have applied to I think like 40 jobs over at Chabert.   I

11   have applied --

12   Q.    What kind of jobs are you talking about?

13   A.    I have applied to variable types of jobs.   Things that I

14   felt might be somewhat appropriate for me to work in.   However,

15   once again the problem for me is am I appropriate for them and

16   that was mentioned to me.   As a matter of fact I met with

17   Talent Acquisition and they seemed to think that this capacity

18   is -- that I'm in has hurt me tremendously.

19   Q.    So you've applied for all jobs at Chabert --

20   A.    Yes.

21   Q.    -- so all kind of in the medical field?

22   A.    Not just Chabert.

23   Q.    Okay.

24   A.    I have applied to, as I mentioned earlier during

25   testimony, I have applied to colleges.   I have applied to non-

1   profits.  I have applied out-of-state.  I have applied in

2   state.  I have applied to the oil field industry.  I have

3   applied for research positions.

4   Q.   Let's take for example the research positions.  What kind

5   of positions are we talking about?

6   A.   Pathology, --

7   Q.   Okay.

8   A.   -- cancer research, different types of positions.

9   Q.   Are these the types of positions that if someone that

10  holds an M.D. but is not licensed you could work for one of

11  those kind of jobs?

12  A.   I thought maybe there might be some opportunity, but --

13  Q.   Do the pre-reqs require --

14  A.   -- most of those people --

15  Q.   -- an actual license to practice?

16  A.   Not all of them are as clear-cut as you think.  I think

17  you know they -- they have their requirements when they --

18  typically most of those types of positions they're looking for

19  someone with experience.  I've had some experience researching

20  but not the type of research that they're involved in.  So they

21  want someone that can kind of hit the ground running that they

22  don't have to kind of groom.

23  Q.   Sure.

24  A.   That's why I mentioned earlier it's kind of -- for me it's

25  more of a horizontal as opposed to vertical move for me.

Demmons - Cross                                        105

1   Q.   What about seeking employment outside of your field of

2   expertise?

3   A.   I did.

4   Q.   So --

5   A.   I told you I applied to the oil field industries.  I have

6   applied to universities.  I applied to some non-profits.  I

7   applied to a program through my old university that was a

8   collation of -- I have some experience in the past a little bit

9   with non-profit work and volunteering and it seemed like that

10  might be kind of a good fit.  It was one of my alma maters and

11  I didn't even get a call back.

12  Q.   And so all of those other jobs wouldn't require an M.D. or

13  even a license because they were outside of the medical field,

14  is that correct?

15  A.   A lot of -- no, I don't think they required you to have a

16  license, you had to be a practicing practitioner, a licensed

17  physician.  You know it doesn't hurt that you're -- I just

18  recently looked at a position but it just won't work because I

19  don't have certificates.  I'm kind of like the guy coming out

20  of college, "Well, we'd love to hire you, but you don't have

21  any experience."  You know so I mean we all experience that.

22  And now I'm at a situation where I'm 59 and I have some

23  education but I don't have any experience and no opportunity.

24  Q.   So you mentioned "certificates."  What type of

25  certificates are you talking about?

Demmons - Cross                                         106

1    A.   Well, I don't know.  I'm just saying that if I wanted to

2    teach in a university I'd have to be re-credentialed.  I can't

3    afford to get health insurance or keep up with things let alone

4    get my teeth, or my wife's teeth or eyes checked.  So going

5    back to school yet again is kind of out of the question.

6    Q.   And that's what would be required to get credentials or --

7    A.   I think so.

8    Q.   Okay.

9    A.   My niece has just gone through and is in education and

10   she's had to go back to get re-credentialed or get credentials

11   and it's taken her several years.

12   Q.   Okay.

13   A.   I can't be a nurse because that's a different set of

14   boards.  I can't be a PA even though I go to school twice as

15   long as they go.  I can't be a nurse practitioner.

16   Q.   And you can't be all of these things because you'd have to

17   take another set of tests associated with those?

18   A.   You have to go through -- I would have to go back and go

19   through the whole process --

20   Q.   Okay.

21   A.   -- of education again because it's a whole different

22   endeavor and there's just no opportunities out there.  They all

23   own their own boards and their own educational curriculums.

24   Q.   Okay.  Mr. Demmons, you had mentioned that you started

25   college when you were 42.

Demmons - Cross                                                    107

1    A.   Yes, ma'am.

2    Q.   What did you do before that time?

3    A.   I was -- I had a -- I used to teach people with

4    disabilities how to scuba dive and I had a dive shop and a

5    café.

6    Q.   Did you ever have an office job?

7    A.   Yes, I've worked in offices before doing some clerical

8    types of things.

9    Q.   Okay, what kinds of offices are we talking about?

10   A.   Like NRG Barriers.  They make insulating foam for roofs

11   and things like that, so types of positions.

12          THE CLERK:  I'm sorry, you're fading at the end.

13          THE WITNESS:  Oh, I'm sorry.

14          THE CLERK:  They make what?

15          THE WITNESS:  They make like roofing foams.  They

16   make sandwich foams, roofs that are modular that go together

17   for large-scale buildings.

18          I'm sorry, could I get a drink, please?

19          MS. LASALLE:  Oh, sure.

20          THE WITNESS:  Thank you.

21   BY MS. LASALLE:

22   Q.   Mr. Demmons, when you went back to school at 42 and you

23   were taking out these student loans you realized since you were

24   starting later your loans would obviously continue later on

25   into your life, is that correct?

1  A.   I had anticipated when I got through this that when I got

2  placed a lot of organizations will offer for each year that you

3  put into when you sign up with them and you become an attending

4  on their -- you become staff and hopefully further on as

5  attending, when you sign your contract with them not only do

6  they compensate you in the form of pay, but they also

7  compensate in the form of repayment which always from day one

8  my intention.  I've known many people that have gone through

9  this process that have gotten one for one year.  For every year

10  put in they get a year back in compensation of tuition, and

11  even two year.  A friend of mine went to Colorado and for every

12  year he went to school he got paid two years back.

13  Q.   So when you were 42 and you were going back through your

14  undergraduate program the goal was to then go on to med school

15  and then work in a job where in addition to your compensation

16  someone would take care of your student loans?

17  A.   Well, I had hoped.  I mean that's you know --

18  Q.   Sure, that was your goal or your hope.

19  A.   That would be the best.  That's was one of the options

20  that was available to me.

21  Q.   Mr. Demmons, in the Pretrial Order if you can turn to it I

22  believe it's Page 10, --

23  A.   Yes, ma'am.

24  Q.   -- Number 72, there's a statement there that you paid $98

25  per month to an IRA.

Demmons - Cross                                          109

1    A.   Yes, ma'am.

2    Q.   And then we saw on Exhibit 6 -- I'm sorry, three, that

3    there are certain amounts taken out each month or each pay

4    period from your paystub --

5    A.   Yes, ma'am.

6    Q.   -- for a 401(k)?

7    A.   Yes, ma'am.

8    Q.   So the IRA amount and the 401(k) those are two separate

9    things, correct?

10   A.   No, those are -- I think there might be -- maybe that was

11   written wrong, but I know that they had -- when Ochsner first

12   came in they had -- I'm trying to think of who they had as

13   their agent.  I know that they've changed agents over maybe the

14   last year or something like that, maybe less than last year,

15   maybe the last six months or so.

16   Q.   So what you're saying is that you're only putting into

17   your 401(k), you are not also putting into an IRA?

18   A.   No, ma'am.  These are one in the same.  I think --

19   Q.   They're the same.

20   A.   -- if we go back and we look at all of my documentation

21   there'll be -- I think the it was the standard was -- I think I

22   saw something and I think I mentioned this earlier, I think it

23   was like five percent --

24   Q.   Okay.

25   A.   -- you know that they were putting in there.  And when we

Demmons - Cross                                          110

1   came on as employees that's what they were doing with us.  I

2   don't know if this got converted.  I was you know obviously --

3   Q.   Okay, that's good enough, Mr. Demmons.

4   A.   Yeah.  And obviously that number would change per paycheck

5   if it's a percentage of the total amount, right?

6   Q.   Okay.

7   A.   Yeah.

8   Q.   Now, over your life you've kind of had a variety of jobs.

9   You went to med school --

10  A.   Uh-huh (affirmative response).

11  Q.   -- done a lot of things.  I want to go through kind of the

12  skills that you've attained over that time.

13  A.   Okay.

14  Q.   Computer skills, do you know how to use a computer?

15  A.   I do.

16  Q.   Mr. Demmons, can you turn to Exhibit 7?

17  A.   Uh-huh (affirmative response).

18  Q.   Did you create this exhibit?

19  A.   I most certainly did.

20  Q.   What software did you use?  Is this Excel?

21  A.   Excel, yes, ma'am.

22  Q.   Okay.  And the whole -- if you keep spanning through the

23  pages that's all Excel that you used to create that?

24  A.   Yes.

25  Q.   And how did you create this chart?  What information did

Demmons - Cross                                          111

1   you use to put it together?

2   A.   I used the information in your particular instance that

3   you provided me, and then provided the information that I

4   talked about with you earlier.

5   Q.   So you looked at the loan histories that my client

6   provided to you in discovery?

7   A.   Uh-huh (affirmative response).

8   Q.   And kind of interpreted those and put them here in this

9   chart?

10  A.   I didn't interpret them.  They were very clear.  You were

11  clear.

12  Q.   Or explained what it was --

13  A.   You provided --

14  Q.   -- and put it here in this chart?

15  A.   -- me a key and I used the key that you provided me with.

16  You were very detailed and I appreciate that.

17  Q.   Okay.

18  A.   It was just a -- it was hard to read.  We had to -- I

19  actually with the help of my wife we used a magnifying glass

20  that she has over there so we could see the numbers that you

21  were talking about.

22  Q.   Sure.

23  A.   But I appreciated you doing such a good job for us.

24  Q.   Sure.  And so you put that information into this chart?

25  A.   I think that a reasonably prudent person in my situation

Demmons - Cross                                            112

1   would want to evaluate anybody's information to get a good

2   handle --

3   Q.    Sure.  And, Mr. Demmons, I'm just talking about kind of

4   skills.

5   A.    Yeah.  Oh, yeah.

6   Q.    So we know you've got computer skills.

7   A.    Yeah, --

8   Q.    Research --

9   A.    -- as does the average seven-year old that types probably

10  40 or 50 or 70 words a minute faster than I do.  I do not type.

11  Q.    Possibly.

12  A.    Yeah.

13  Q.    Mr. Demmons, what about researching?  I know you talked

14  about applying for researching jobs.

15  A.    Uh-huh (affirmative response).  I did some in university

16  when I was there.

17  Q.    What types of research projects have you done in the past?

18  A.    I did when I was in medical school we did some HBOT

19  research to study the effects on oxygen on -- hyperbaric oxygen

20  on substant to P levels.

21  Q.    And did you have to write up kind of what your research

22  showed, put together some kind of paper, presentation,

23  something like that?

24  A.    Well, I guess if you would call it that.  We were -- it

25  was a new program.  My university was trying to get the program

```
                    Demmons - Cross                    113
```

1    off the ground and we were trying to help.  And we had a lot of

2    guidance with that.

3    Q.    Okay.  Can you hold a pen, Mr. Demmons?

4    A.    I can, yes.

5    Q.    You can?

6    A.    Yeah.

7    Q.    And you can take notes, right, that kind of thing?

8    A.    I can take some notes, yes, ma'am.  You saw the notes that

9    I took earlier.

10   Q.    Well, I was just going to ask you about that.

11   A.    Yes.

12   Q.    So the exhibit that I disputed earlier, --

13   A.    Yeah.

14   Q.    -- those are your handwritten notes on it, correct?

15   A.    Those are my handwritten notes.  Can I hold a pen for an

16   extensive period of time and do that?  No.  But --

17   Q.    But enough to write notes and things like that you can do

18   that?

19   A.    Yeah.

20   Q.    What about typing, do you have any --

21   A.    I don't type well.  I just mentioned that earlier.  I just

22   don't have that ability to type well.

23   Q.    Because you're a slow typer or --

24   A.    I am a slow typer --

25   Q.    Sure.

Demmons - Cross                                                       114

1   A.    -- and I'm -- I just don't have the strength to continue

2   typing for extended periods of time.

3   Q.    Okay.

4   A.    The documents that you're looking at were created over a

5   period of time.  They didn't just happen in a matter of

6   minutes.

7   Q.    Okay.  Mr. Demmons, next I'd like to talk about your

8   expenses.

9   A.    Yes, ma'am.

10  Q.    What steps have you taken since you filed bankruptcy to

11  kind of decrease your expenses?

12  A.    Can you be more specific?

13  Q.    And let's go back further, when your income started to go

14  down --

15  A.    Yes.

16  Q.    -- what did you do to decrease your expenses?  Did you cut

17  off your cable?  Did you may be cut off internet?  What are the

18  kinds of things that you did to --

19  A.    I think they are self-explanatory.  We got rid of cable as

20  was indicated and when you compare the two I'm always, as I

21  indicated in the discovery in one of your questions, that we're

22  always looking for opportunities to save whether it's via the

23  phone, internet, or whatever.  We don't have any television.  I

24  think we go without haircuts, or eye examinations, or dentist

25  exams.  I think that we don't have any health insurance.  I

Demmons - Cross                                                        115

1    think that we're cutting back pretty well.

2    Q.    Did you consider --

3    A.    We try to minimize every situation that we get involved

4    in.

5    Q.    Okay.  Did you consider possibly letting your house go and

6    renting instead of owning a home?

7    A.    It is very expense to rent and there's no future.  Our

8    equity -- we've already given all of our money to pay the loans

9    to the best of our ability.  We sold our stock.  We liquidated

10   everything we had to keep up with the payments and there's

11   nothing else to give.  The last thing we have is a roof over

12   our head.  I don't think that's much to ask.

13   Q.    Mr. Demmons, why did you reaffirm your home loan in your

14   bankruptcy?

15   A.    Why would I want to pay someone else's mortgage when I

16   have a house?

17   Q.    No, reaffirming means you --

18   A.    I know.

19   Q.    -- kept the personal liability on your loan as opposed --

20   A.    So if I didn't reaffirm it --

21   Q.    -- to discharge?

22   A.    -- then that would mean I would have to rent.  So why

23   would I want to pay someone else's mortgage?  I don't have any

24   place I can go.  I am married with a wife and I would prefer

25   the fact that we had the opportunity to rent a house that -- I

Demmons - Cross                                                    116

1    mean to keep our house and to pay the mortgage that we had that

2    we are comfortable with as opposed to get into something that I

3    don't know anything about and it might be more expensive.

4    Q.    Were you explained at the time that you were considering

5    your reaffirmation that you could continue to make voluntary

6    payments on your home loan without taking on that personal

7    liability?

8              MS. DELEO:  Objection, Your Honor.

9              THE WITNESS:  No, I was not explained that at all.

10             MS. DELEO:  Wait --

11             THE COURT:  Wait, just a minute, just a minute.

12             When your counsel objects give me a chance to rule on

13   it.

14             THE WITNESS:  I'm sorry.  I'm sorry, Your Honor.

15             THE COURT:  All right, now wait a minute.  You had an

16   objection?

17             MS. DELEO:  Yes, Your Honor.

18             THE COURT:  I didn't get it because he started

19   answering.  So what's your objection?

20             MS. DELEO:  Attorney client privilege as to the

21   advice on signing a reaffirmation agreement.  I was not his

22   bankruptcy attorney, but if she were here I'm sure she would

23   not want him to testify as to what their discussion was about

24   whether or not to sign a re-aff.

25             MS. LASALLE:  I will withdraw the question,

Demmons - Cross                                            117

1    Your Honor.

2              THE COURT:  Okay, that solves it.

3              THE WITNESS:  I'm sorry, Your Honor.  I apologize.

4              THE COURT:  No, that's all right.

5              THE WITNESS:  Sorry, ma'am.

6              MS. LASALLE:  Sure, no problem.

7    BY MS. LASALLE:

8    Q.   Mr. Demmons, can you turn back to Exhibit 24, please?  If

9    you go to Page 373, --

10   A.   Yes, ma'am.

11   Q.   -- what is the charge if you go down to January 4th for

12   Comcast of Houma?

13   A.   Comcast of Houma is just our internet.  We got rid of the

14   television and Karen's job is dependent upon -- Karen works

15   from home when she is working and she has hours, and that's an

16   internet system that has worked for us.  We have talked with

17   them about to see if we can reduce that somehow because we're

18   in a situation with them, you know, they're probably the least

19   -- we have always tried to work with them to get the lowest

20   bill with them and that just represents internet only.

21   Q.   Okay.  What about if we go, let's see, on that same bill

22   the next charge, AT&T.  What is that payment for?

23   A.   That is for our phones.

24   Q.   Cell phones or home phone?

25   A.   No, we don't have a home phone, we have cell phones.  And

Demmons - Cross                                             118

1   there's a line on there for $10 that Karen uses because when

2   she was communicating with her clients she would have to call

3   them and when she first started calling the people that she was

4   dealing with the area code wasn't showing up on their phones

5   and it was kind of scaring them.  So she had to have a number

6   that was -- with a prefix that fit their area code.

7   Q.    Sure.  So that's three phone lines that you have?

8   A.    Yes, ma'am.  One is used for business.

9   Q.    Okay.

10  A.    For her business for her work.

11  Q.    And you do have a Netflix membership, is that correct?

12  A.    Yes, we do.  That's under the entertainment portion.

13  Q.    Okay.  On Page 373, 12/22, there's a purchase for

14  GoDaddy.com.  What is that charge for?  I notice it's a

15  recurrent charge, so I didn't know what --

16  A.    Yeah.  Where is it, ma'am?

17  Q.    The very first charge it says "Card purchase DNH

18  GoDaddy.com"?

19  A.    Yes, ma'am.  I think -- that was 12?  I had spent 12 years

20  working with people with disabilities and helping them with the

21  scuba diving that I talked about and all of that.  And I

22  created this site that I used to have up and that's that domain

23  that I had that I --

24  Q.    Okay.  So these are monthly charges that you're incurring?

25  A.    No.  That's just a domain fee.

1   Q.    Can you to Page 378 of that exhibit?

2   A.    Uh-huh (affirmative response).

3   Q.    There are two charges if you go kind of three-quarters of

4   the way through the withdrawals, --

5   A.    Yes, ma'am.

6   Q.    -- two more charges for GoDaddy.

7   A.    Yes, and that's separate.  Since we've been through this

8   whole process I feel like, and Karen and I feel like this is

9   something that we need to share with people.  We were looking

10  at start a forum that is for mindful choices.  We want to help

11  people that are in a similar situation that are going through

12  difficult times to help them make mindful choices, kind of like

13  a forum.  That was like $4 I think it was, or something like

14  that.

15  Q.    And so that's to set up a website associated with that?

16  A.    No, it's -- well, we needed a domain so that we could go

17  out to text or to tweet you know.  We're thinking about it and

18  it's something that we feel very strongly about.  When you're

19  in this situation you have nowhere to go or no one to speak to

20  and there's no one that can advise you.  We were thinking about

21  maybe creating some guidance for people to help them not only

22  spiritual, mentally, but with their diets and all that and

23  helping them to think about sustainable lifestyle modifications

24  that will help them through this process.

25  Q.    Not to sound callous, but is this a way that you could

Demmons - Cross                                           120

1   make money --

2   A.   Not at all.

3   Q.   -- a way to bring in additional income possibly?

4   A.   Not at all.

5   Q.   So it's not intended for that?

6   A.   It's pure of heart.  If you're sitting on this side and

7   you're experiencing what I'm experiencing, what my wife is

8   experiencing, then it would be nice if I had someone that would

9   -- I could go out on the internet and find someone that was

10  genuine that really was experiencing undue hardship and how

11  they got through it.  Just like the people I worked with

12  before, I know what they were going through because now I've

13  lived it.  And if I'd of had someone out there when I was going

14  through it, it might have made a big difference in my life.

15  And if I can contribute maybe that's the one difference I can

16  make with my educational background that will make a difference

17  in the world.

18  Q.   Okay.  I notice that there are charges for it says "Terr

19  Par Con Gov."  I think that's Terrebonne Parish Consolidated

20  Government?

21  A.   You're entirely correct.

22  Q.   What are those charges for?

23  A.   That's for -- that's the gas -- I mean not gas, the sewer

24  and --

25  Q.   Water?

Demmons - Cross                                121

1   A.    -- water and electric and those type of things, Terrebonne

2   Parish our consolidated government.

3   Q.    Okay.  Comenity Bank, I notice there are charges each

4   month for that.  Can you tell me what that's for?

5   A.    I have no credit.  One of the credit cards that didn't

6   come off of my -- off of my discharge was a Pier 1.  Last year

7   we bought Christmas gifts for people from Big Lots and from the

8   dollar store.  And I saw a couple of things that were on sale

9   for next year because it's embarrassing to be in this way.  The

10  society that we live in you feel compelled to contribute

11  somehow.  And it's also it's under I think $70 or something

12  like that and it's a way for me to kind of reestablish my

13  credit building.  I have literally no credit.

14  Q.    So this was a credit card that you had pre-petition --

15  A.    Yes, ma'am.

16  Q.    -- that was excepted from discharge?  Is that -- it wasn't

17  discharged and you still have --

18  A.    There was no balance on it and it just never went away.

19  Q.    Okay.

20  A.    You know and I wasn't even aware of it until around

21  Christmas time or something like that I think it was or

22  something or other.

23  Q.    And so this is a credit card that you are using to keep

24  your credit up you said?

25  A.    I'm not using it regularly, but I'm making a couple of

Demmons - Cross                                                    122

1   payments on it so that I can show good payment faith to at

2   least try to get at some point -- you can't do anything in this

3   world without having credit.  There's no way to move forward

4   and we don't ever want to get back in this situation again.

5   But you know going forward even to refinance or something like

6   that we have to show that we're moving in a better direction.

7   You know I mean that's something that we need to be concerned

8   with.

9   Q.   What is the interest rate on your home loan, do you know

10  that off the top of your head?

11  A.   I think it's like 6.75 or 5.75.

12  Q.   Have you attempted to refinance?

13  A.   I have called.  I think her name is Patty Forrier

14  (phonetic).  I've called on several different occasions and I

15  tried to go through HARP and I didn't qualify.  They said that

16  you know I think at one point you had to be like so many months

17  behind and they used -- it didn't work for them.

18  Q.   Okay.  Do you have a pet?  I notice some charges for

19  PetSmart, that's the only reason I ask.

20  A.   They're not my pets per se, but there are some anoles and

21  geckos that live around my house.

22  Q.   What was the first?

23  A.   Anoles, lizards.

24  Q.   Oh, okay.

25  A.   They eat all the bugs in my house, but in the winter

Demmons - Cross                                                    123

1    they're sparse and sometimes I feed them crickets.

2    Q.    So you buy live crickets at PetSmart?

3    A.    No, I don't buy a lot of crickets, but when they're

4    starving I can't stand -- I don't want anything to suffer.

5    Q.    Okay.  How often do you eat out lunch or dinner a week?

6    A.    Not often, but this has been an unusual time for us.  We

7    had family come down over Mardi Gras.  We were eating out when

8    we were traveling for Christmas to visit.  And coming back and

9    forth between here we've had more out meals than we would like.

10   But this is an unusual circumstance for us because given the

11   amount of traveling distance and when we're leaving in the

12   morning we're getting up at 4:00 to be here, you know 4:30 and

13   we have to sustain ourselves.

14   Q.    You mentioned travel.  Where are you traveling to?

15   A.    We're traveling back and forth to here.  I been back and

16   forth to New Orleans several times --

17   Q.    So you're meaning New Orleans?

18   A.    -- from my home.  Yeah, to get my medical records, and to

19   put things together, and go see our attorney in Mandeville, and

20   bringing like the digital copies that we brought for discovery,

21   we've been back and forth several times.

22   Q.    What about any other travel?  I noticed charges from

23   Mississippi, Arkansas, Texas.  Have you traveled --

24   A.    Yeah, we went home to Arkansas.

25   Q.    Okay.

1   A.   The Texas is a -- that's where the station is, the home

2   base is located.

3   Q.   I'm sorry, "home base"?

4   A.   The home base of the company.

5   Q.   What company?

6   A.   If there's something listed like Texas it would be you --

7   your credit card company always isn't where it appears --

8   Q.   Oh, I understand, okay.

9   A.   -- where the service is isn't always where it appears that

10  the --

11  Q.   Okay, but the charges in Mississippi and Arkansas, this

12  would have been traveling --

13  A.   Well, you go through Mississippi to get to Arkansas.

14  Q.   Okay.  And so this is to visit Ms. Fowler's family, is

15  that correct?

16  A.   Yeah.  My family as well.

17  Q.   Oh, yes,

18  A.   Thank you.

19  Q.   Do you give any amounts to charity, Mr. Demmons?

20  A.   I would love to give to charity.  We have little bits in

21  the past, but not on a regular basis.  It's my hope.  Tithing

22  is very important to us and we would like to do that in the

23  future.

24  Q.   Mr. Demmons, when you filed your bankruptcy, your

25  schedules if you turn to Exhibit 1, --

Demmons - Cross                                          125

1   A.   Yes, ma'am.

2   Q.   -- I'll give you the page.  If you turn to Page 27, this

3   shows that you had $514,000 in unsecured creditors when you

4   filed your bankruptcy, correct?

5   A.   I think that number sounds familiar although I've heard a

6   couple of different numbers thrown around.

7   Q.   Now I've gone through and added up what looks like all the

8   student loan creditors that were listed.  Does a number of

9   approximately 430,000 sound about right to you?

10  A.   Four twenty-seven or four something maybe.

11  Q.   In that range sounds good?

12  A.   Before the discharge of the two lenders that zeroed those

13  balances out.  I think it's more like 328 or something now.

14  Q.   Well, let's talk about that.  So am I correct that Navient

15  agreed to discharge about $11,000 in student loans?

16  A.   Yes, ma'am.  They called and said that they would do that.

17  Q.   And Maine Educational Services discharged about $62,000,

18  $63,000?

19  A.   Yes, ma'am.

20  Q.   And FCDB, or I know it's listed as something else on

21  another chart, but they have not responded thus far and you're

22  moving for default --

23  A.   That is correct.

24  Q.   -- as to them?

25  A.   That's correct.

Demmons - Cross                                         126

1    Q.   And they have approximately $64,000 or so in student loan

2    debt, is that correct?

3    A.   I think it's higher than that now with interest.

4    Q.   Okay.

5    A.   Are you looking at -- are you basing it off of this

6    schedule from last year?

7    Q.   I think I was.

8    A.   And that number that we originally had was I think in

9    7/14, so we would have to actually --

10   Q.   Okay.

11   A.   -- that number is increased.

12   Q.   So, it's a little bit higher than that.

13   A.   Yeah.

14   Q.   Mr. Demmons, did you have health insurance in 2014?

15   A.   No, ma'am.

16   Q.   And on your taxes for 2014 did you report that you didn't

17   have health insurance?

18   A.   Yes.

19   Q.   And were you required to pay a fine or anything?

20   A.   No, but we will this year.

21   Q.   Why do you think you will this year?

22   A.   Because last year they abated that.  Not everybody was --

23   people weren't charged that last year.  My understanding we

24   weren't -- we filed exactly as we are.  I wouldn't presume that

25   I would fraudulent file that.

Demmons - Cross                                            127

1   Q.   And you haven't filed your taxes for '15 yet?

2   A.   No, I haven't.  After I finish this, then that's my next

3   order of business.

4   Q.   Okay.  Mr. Demmons, I understand that you and Ms. Fowler

5   settled your claims against Saba, is that correct?

6   A.   Yes, ma'am.  With prejudice I think that was settled.  I

7   think everybody is aware of that.

8   Q.   And the settlement amount was xxxx (redacted) --

9           MS. DELEO:  Objection.  Your Honor, if we can go off

10  record for a minute?

11          THE COURT:  Come up to the bench.  Off the record.

12      (Discussion at sidebar; off the record)

13          THE CLERK:  Okay, we're back on the record.

14          THE COURT:  All right, with reference to the

15  exception to the question by Counsel for one of the defendants,

16  a sidebar conference was held and the attorneys involved

17  pointed out to the Court that a confidentiality agreement was

18  signed between Dr. Demmons and his wife.

19          MS. DELEO:  Yes.

20          THE COURT:  And by which they agreed to keep -- not

21  disseminate the amount of the settlement or the dollars paid by

22  Saba to the plaintiffs.  The Court is going to overrule the

23  objection and order the Witness to answer the question, but

24  provide that that portion of the record containing the answer

25  be sealed and treated as confidential and not be available to

Demmons - Cross                                              128

1    anyone except for good cause shown and upon further order of

2    the Court.  And we'll tell you when we get to the end of the

3    confidential part.

4              THE COURT:  Can you also say something about the

5    audio recording if someone were to request the audio because we

6    can't redact it from the audio?  Could you say there would have

7    to be special permission to get an audio?

8              THE COURT:  Well, the only people that would request

9    it would be parties, so --

10             THE CLERK:  Anybody can.

11             THE COURT:  All right, what's the language I use for

12   that?

13             THE CLERK:  Well, just say a request for the audio

14   recording would have to --

15             THE COURT:  Any request for the audio will redact the

16   portion that's marked as confidential.

17             MS. LASALLE:  I don't think she can redact an audio

18   recording.

19             THE CLERK:  I can't redact the audio.  The audio is

20   the audio.  Just say you have to request it on motion and order

21   I guess for you to decide who can get the audio.

22             THE COURT:  Tell me what I'm supposed to say.

23             THE CLERK:  Just say they will have to do it by my

24   order, a motion and order I guess.

25             UNIDENTIFIED SPEAKER:  Showing good cause --

Demmons - Cross                                          129

1          THE CLERK:  Anybody can come in and pay $30 and buy

2   the CD of the audio recording if they -- I mean not that people

3   would, but they could.

4          THE COURT:  Well, let's just say the audio will not

5   be released except for order of the court and I'll deal with it

6   if it ever happens.

7          THE CLERK:  Okay.

8          THE COURT:  All right.

9                      *    *    *    *    *

10                 (REDACTED PORTION NOT TRANSCRIBED)

11                     *    *    *    *    *

12         THE COURT:  All right, mark the record the following

13  is not confidential and your question will be "Of the

14  undisclosed amount on the record," --

15         MS. LASALLE:  Correct.  What will you be doing with

16  it?

17         THE COURT:  -- whatever the rest of your question

18  was.

19         MS. LASALLE:  Sure.

20  BY MS. LASALLE:

21  Q.   Mr. Demmons, of the undisclosed amount --

22  A.   Yes, ma'am.

23  Q.   -- that we discussed that you'll receive, what are your

24  plans for that money?

25  A.   We hadn't made any plans.  I know that the majority of the

Demmons - Cross                                    130

1    money -- Karen spent the last of her retirement to go through

2    these proceedings.  I would like to see her become whole.  She

3    didn't have the opportunity to have -- to achieve the things

4    that they had promised her.  If there was any money left it

5    would be nice to be able to get the car fixed so we can return

6    the car that we've been borrowing and I suspect that that would

7    probably pretty much use it up.

8    Q.    Okay.

9    A.    We approached all Counsel and tried to make deals with

10   Counsel to close -- to make an offer to see if we could close

11   this out.  Counsel was -- their numbers were too far beyond us.

12   We made a good faith effort to try to close this out based on

13   what we had.  The last remaining assets that we could have we

14   offered to the individual lenders and they were unwilling to do

15   so, so --

16   Q.    Mr. Demmons, do you receive disability payments?

17   A.    I do not.

18   Q.    Are you eligible for disability payments?

19   A.    If I ended up being disabled it's like giving a person who

20   is visually impaired a cane.  You've taken away their ability

21   to thrive.

22   Q.    So you have never sought disability payments?

23   A.    I am not seeking disability.  As long as I am able to

24   breathe and move I will do what I can to be as productive as I

25   can.

1  Q.   We discussed your car wreck.

2  A.   Yes, ma'am.

3  Q.   And this was in 2010, correct, your car wreck --

4  A.   Yes, ma'am.

5  Q.   -- at issue?  Who was considered to be at fault for that

6  car wreck?

7  A.   Well, I was sitting at a red light.  I don't think it was

8  my fault.

9  Q.   I'm just asking --

10  A.   Yeah.

11  Q.   -- who was determined to be at fault?

12  A.   The texting driver.

13  Q.   And did you sue the texting driver?

14  A.   We -- she had uninsured -- she had 15,000 liability.

15  Q.   And so was anything paid to you for your damages?

16  A.   Yes, after the hospital bills were paid.

17  Q.   And so there was no further money --

18  A.   No.

19  Q.   -- just the $15,000?

20  A.   There was -- and I had some uninsured motorist on my

21  insurance policy but that was it.  And incidentally while we're

22  talking about that, that went to keep our bills going and went

23  to pay on the loans that we had and evidenced by the $11,000

24  that we pay to Key and the $22,000 plus that we paid over the

25  couple of years that we were keeping them going.

1  Q.   Okay.  Mr. Demmons, next I'd like to talk about the

2  payments that you made on the ECMC loan.

3  A.   Yes, I look forward to that.

4  Q.   So if you can turn to Exhibit 7, please?

5  A.   Could I also have, if you please, could I have my

6  breakdown just to keep my mind refreshed --

7  Q.   Sure.

8  A.   -- because that is an accurate record in my account.

9  Q.   Okay, Mr. Demmons, let's see.  So Page 84 of Exhibit 7.

10 A.   Yes, ma'am.

11 Q.   So we're going four rows down --

12 A.   Uh-huh (affirmative response).

13 Q.   -- after the heading.

14 A.   Yes, ma'am.

15 Q.   You show the first payment in 2003 of $140.90.

16 A.   Yes, ma'am.  I believe that was before your time and it

17 would not be applicable to your loans that you're overseeing.

18 But that showed that I was paying Nelnet at the time before you

19 took over.

20 Q.   So, Mr. Demmons, if you turn to Page 93 in Exhibit 7 --

21 A.   Yes, ma'am.

22 Q.   -- so this is a statement from Nelnet.

23 A.   Yes, ma'am.

24 Q.   Is this where you got the dollar amount of 140.90?

25 A.   That is a 1098-E for tax year 2001.

1    Q.    Okay.

2    A.    Yes.

3    Q.    And this is 2001 or 2002?

4    A.    2001.

5    Q.    2001.  Okay, I see that.

6          And so I think we've stipulated that the ECMC loan was

7    actually taken out in 2003, correct?

8    A.    Was it -- yes, ma'am, yes.  Yes.

9    Q.    So this payment wasn't actually --

10   A.    No, the consolidated was 11/13/2003.  You're correct.

11   Q.    Okay.

12   A.    Just trying to get on the same page.

13   Q.    So this payment would have been before that time?

14   A.    Yes, ma'am.

15   Q.    Okay.

16   A.    I was just doing this for completeness to show my history

17   with my intention of maintaining my relationship with Nelnet.

18   Q.    Sure.  I just want to make sure that we're clear as to

19   what payments were applied to ECMC's loan and not any other

20   loans.

21   A.    Yes, ma'am.

22   Q.    Now, in 2004 you list four payments, is that correct?

23             UNIDENTIFIED SPEAKER:  Where are you?

24             MS. LASALLE:  Oh, I'm sorry, it's the column on

25   Page 84, 2004.

1          THE WITNESS:  Yes.  With all due respect, ma'am, this

2    was taken off of the very detailed sheet that you gave me.

3          MS. LASALLE:  Uh-huh (affirmative response).

4          THE WITNESS:  So this is what you're listing based on

5    your records.  I just moved it into something -- a more

6    readable format.

7    BY MS. LASALLE:

8    Q.   Okay, and so are you disputing these four payments or

9    saying that they're maybe not accurate?

10   A.   I would compare these.  I've not done this yet, but I

11   would compare these payments to the payments that I have from

12   the actual agency and I would have more -- based on the fact

13   that I knew when I made a payment that you denied I made a

14   payment, I would say that there's more credibility in this than

15   the information that you provided for me.

16   Q.   Okay, I guess I'm -- is that --

17   A.   Yeah.

18   Q.   -- here in this book?  Is that an exhibit?

19   A.   Well, I'm sorry, ma'am, I just happened upon it early this

20   morning and I tried to see if I could get it presented so that

21   we could have an accurate accounting of what the numbers

22   actually represent and what actually was paid.  As I indicated

23   yesterday to you, I disputed the fact of -- the comment that

24   you were making saying that one of these or two of these loans

25   and the amounts were somehow not processed appropriately.  And

Demmons - Cross                                     135

1   I needed to research that to see in fact if that was true.  And

2   I believe that the people that were overseeing this loan that

3   keep an accurate record out there of -- and I confirmed this

4   with their servicing account at 4:30 or 5:00 this morning.

5   Q.   Who were you speaking to?

6   A.   Nelnet.

7   Q.   So you weren't speaking to ECMC who is the current holder

8   of the loan?

9   A.   But this was -- this was historical before you came into

10  the picture.

11  Q.   Right, and we provided you with history, correct, during

12  discovery?

13  A.   I disagree with the history based on what I got from the

14  people that originally made these loans to me.

15  Q.   Mr. Demmons, how many loans did you have with Nelnet

16  before some of these loans were discharged, do you know?

17  A.   No, I don't know.

18  Q.   Nelnet was just holding the loans that became the ECMC

19  loans, were they?

20  A.   No, we consolidated some, yes, ma'am.

21  Q.   So there were other loans in addition that Nelnet was

22  servicing not just for the ECMC loans, but other loans,

23  correct?

24  A.   That's correct.  Yes, that's correct.

25  Q.   So how do we know that what you're holding represents the

1   ECMC loan?

2   A.   Because of the consolidation date and the payments that

3   were made.

4   Q.   So can you tell me -- I'd like to go through the loan

5   history that --

6   A.   Yeah.

7   Q.   -- ECMC provided to you.  And we can go through --

8   A.   Okay.

9   Q.   -- what your records are showing versus what ECMC's

10  records are showing if possible.

11  A.   Okay.

12  Q.   Can you turn to Exhibit 17, please?

13  A.   Uh-huh (affirmative response).

14  Q.   And this loan history that you're looking at this is what

15  was provided to you by ECMC in discovery, correct?

16  A.   That's correct.

17  Q.   And this is what you looked at to put together Exhibit 7,

18  correct?

19  A.   Yes, I used this and I went to the Department of Education

20  to confirm.  Again, this was a very difficult document to read

21  because it's so small.  The print was very small and it was

22  obfuscated to some degree.  And I went to the Department of

23  Education and looked at what they had for a transaction history

24  for me and when I went in and out of forbearance.  And if I

25  remember correctly you had indicated that they do insure your

Demmons - Cross                                      137

1    loans, so they would also know.  So I have great confidence in

2    the record that we were looking -- that document that we were

3    looking at earlier.

4    Q.   Sure.  And so you were able to isolate on your history

5    only the loans that ECMC now holds, is that what you're saying?

6    A.   I believe so, ma'am.

7    Q.   Okay.  So do you see on your history the information you

8    have the payments that are listed in 2004 on Exhibit 7, so the

9    187.54 do you see that?

10             THE COURT:  How much?

11             MS. LASALLE:  One hundred eighty-seven fifty-four.

12   Judge Brown, we're looking at the column Year 2004 for ECMC.

13             THE COURT:  What page of the exhibit?

14             MS. LASALLE:  Page 84.

15   BY MS. LASALLE:

16   Q.   I guess let's make it easier.

17   A.   Yeah.

18   Q.   How many payments do you think you made in 2004?

19   A.   In 2004 I think I made two payments.

20   Q.   Okay.

21   A.   Are you in agreement?

22   Q.   Sure.

23   A.   Okay, good.

24   Q.   How many payments did you make in 2005?

25   A.   I made one payment in 2005.

1   Q.   Okay, 2006 do you show any payments?

2   A.   No, I was in forbearance or hardship and in medical

3   school.

4   Q.   And just so that we're clear, Mr. Demmons, Exhibit 7 it

5   goes from 2005 and then it picks up at 2010?

6   A.   2005 and goes to 2010, that's correct.

7   Q.   So you skipped '06, '07, '08, and '09 because you were in

8   med school during that time --

9   A.   That's correct.

10  Q.   -- during that time, correct?

11  A.   That's correct, yes.

12  Q.   Okay.  And then 2010 do you show any payments on your

13  records?

14  A.   2010 was the one that I disputed yesterday with you for

15  2,916.

16  Q.   Okay, so --

17  A.   It was made on 6/11/2010.

18  Q.   Okay, so your records show one payment in 2010?

19  A.   They're Nelnet's records, they're not mine, ma'am.

20  Q.   Whatever records you pulled this morning --

21  A.   Yes, ma'am.

22  Q.   -- they show one payment?

23  A.   Yes, that's correct.

24  Q.   What about 2011, do your records show that you made any

25  payments?

1   A.   No, ma'am.  In 2011 I believe I went into income based

2   repayment.  As a matter of fact I think that I started income

3   based repayment on 2/2/10 and in 2011 I actually went in, I

4   renewed on 2/2/11.  So I was in income based repayment

5   according to them and according to what I was able to find.

6   Q.   What about 2012, Mr. Demmons?

7   A.   2010 I --

8   Q.   Twelve, I'm sorry.

9   A.   2012 I renewed on 4/2/12.  I was in income based

10  repayment.

11  Q.   In 2013?

12  A.   In 2013 I was in income based repayment as of 10/2/13.

13  Q.   2014?

14  A.   2014 I went into what they call permanent standard income

15  based repayment and that continued until the end of the loan.

16  And I suspect that was when the bankruptcy filing was -- the

17  petition was filed.

18  Q.   Okay.  So from your calculations you show two payments in

19  2004, one payment is 2005, and one payment in 2010.  So four

20  payments, is that correct?

21  A.   Yes, but I'm also showing one in 2003 -- two in 2003 when

22  I was in -- attending UNE when I had these loans.

23  Q.   What was the date of those payments?

24  A.   There was a payment made on 3/6/2003 and one made on

25  11/13/2003.

Demmons - Cross                                                    140

1  Q.   And so both of those would have been before the loan was

2  consolidated with Nelnet -- I mean with ECMC, correct?

3  A.   It was -- yes, ma'am.  I'm sorry, it was before

4  consolidation.  I was making the point that I was paying on my

5  Nelnet loans.  Yes, ma'am, I'm sorry.

6  Q.   Okay.  So the loans that are associated with ECMC --

7  A.   Yes, ma'am.

8  Q.   -- you've made four payments, is that accurate?

9  A.   One, two, three, four -- I would agree with that, yes,

10  ma'am.

11  Q.   Okay, great.

12  A.   If you like I can give you the interest, applied to

13  interest and principal.

14  Q.   No, thank you though.

15  A.   Okay.

16  Q.   Mr. Demmons, you mentioned that at the time you filed the

17  bankruptcy your loan was in the income based repayment status,

18  correct?

19  A.   Yes, ma'am.  It went in on -- what was that, 2014?  It

20  went in -- it went in on 10/2/14 and I think that we filed in

21  June of 2014.

22  Q.   Okay.

23  A.   So I was in IRB and then it went -- IBR, I'm sorry, I keep

24  doing that, IBR.

25  Q.   And what was the payment that was due under that?

Demmons - Cross                                          141

1   A.   No payment was assessed.

2   Q.   So zero dollars was your payment?

3   A.   Yes, ma'am.

4   Q.   So when you went into bankruptcy your payment, your

5   monthly payment was zero dollars?

6   A.   Yes, ma'am.

7   Q.   Why did you seek a discharge of this loan if your payment

8   was zero dollars?

9   A.   What's the alternative with the loans coming on?

10  Q.   Is that something that you could continue?  Was that

11  something that they told you you could continue the IBR?

12  A.    Well, I think that the IBR is available for 20 years and I

13  think that given how tenuous my working capacity is I think

14  that it was appropriate for me to seek discharge so that I

15  could make a better life and get out of this hardship that I'm

16  in.

17  Q.   Did you contact ECMC to find out if you could stay in IBR

18  at that zero payment for an extended period of time?

19  A.   I contacted -- well, income based repayment is based on

20  your income.  Obviously if my income would go up then that

21  payment of zero would also go up sequential and it would go up

22  as well, right, --

23  Q.   Sure.

24  A.   -- percentagewise?

25  Q.   Did you contact them though to maybe see what the options

Demmons - Cross                                                    142

1    were prior to seeking to discharge your student loan?

2    A.   I contacted -- well, at the time of discharge, no, I did

3    not.  I think I was in IBR and we had a lot going on with the

4    petition.  Actually I guess I was kind of -- no, I don't think

5    -- I was in -- I was in income based repayment and --

6    Q.   At zero dollars.

7    A.   At zero dollars at that time.

8    Q.   Can you turn to Exhibit 11, please?

9    A.   Yes, ma'am.

10           THE COURT:  Page what?

11           MS. LASALLE:  Page 237.

12   BY MS. LASALLE:

13   Q.   Mr. Demmons, this is a letter that ECMC sent you, correct,

14   taking about different options under the William Ford Program?

15   A.   Yes, ma'am, and I'm grateful once again that these types

16   of programs have these types of opportunities.  And thank you

17   for sending it to me.

18   Q.   And, Mr. Demmons, this letter if you turn to Page 238, the

19   first bullet point says that based on your adjusted gross

20   income of 30,289 from your client's 2014 tax return, your IBR

21   income based repayment would be $78 per month.

22   A.   Yes, ma'am.

23   Q.   Okay.  And then if you skip down to the next bullet point,

24   again with that same income from that same tax return it says

25   that your payment would be $50 -- $52 per month.  Is that

 1  accurate?

 2  A.   That's what it says, but the income is -- I think the

 3  income is wrong.  Did we discuss this?  I think that in -- when

 4  Karen hadn't received her W-2 yet and her employer texted her

 5  the Social Security wages number, I think it was overstated and

 6  I think I conveyed that to you.  So, I can't be certain of

 7  this.  I'd have to add up the numbers for the income.

 8  Q.   So you're thinking that this income that was reflected on

 9  your 2014 tax return is actually higher than it was?

10  A.   Oh, the 2014.  I'm sorry --

11  Q.   Yeah, this is 2014.

12  A.   I thought this was based on -- I apologize for that.

13  Q.   Sure.  No, this is all that we had to go off of at that

14  time.

15  A.   Okay.  Yes, ma'am.

16  Q.   So, Mr. Demmons, we had talked earlier or I should say you

17  spoke with your lawyer earlier about the change in

18  circumstances that you've had since the beginning of the year.

19  A.   Yes, ma'am.

20  Q.   And in Exhibit 2 you filed -- you put together a new

21  Schedule I --

22  A.   Uh-huh (affirmative response).

23  Q.   -- that wasn't filed with the Court.  It was done I

24  understand yesterday.

25  A.   Yes, ma'am.

Demmons - Cross                                                    144

1   Q.   And it lists income only for you?

2   A.   Yes, ma'am.

3   Q.   Not for Ms. Fowler?

4   A.   That's correct.

5   Q.   So your income now would be 1578 after taxes approximately

6   according to this Schedule I, correct?

7   A.   Let me get to the Schedule I.

8   Q.   On Page 62.

9   A.   Yes, ma'am.  That's correct.

10  Q.   So have you reached out to ECMC to find out what maybe

11  what the new payment options would be under these two programs

12  based on this lower income?

13  A.   I just talked to -- I reached out and talked with ECMC

14  yesterday.  We were trying to work through this process and

15  ECMC confronted the Court this morning and said that they were

16  looking at options for me.  And I'm wondering how this is going

17  to play out.

18  Q.   Again --

19  A.   I haven't reached out to you to follow up with the letter

20  that you sent me because --

21  Q.   Okay, so you haven't followed up on the letter about the

22  Ford Program.

23  A.   -- our income has -- our income has gone from -- what did

24  you quote for the first --

25  Q.   Thirty thousand two eighty-nine --

Demmons - Cross                                           145

1  A.   Okay, well at --

2  Q.   -- in 2014.

3  A.   -- where I'm at now at 1587, 1587 times 12 is not 30,000.

4  So I think that right now we're not getting by, we're in undue

5  hardship.  I suspect that it would be even more difficult for

6  me to make a commitment to ECMC until I figure out exactly

7  where I am at.  And as a matter of fact I reached out to ECMC

8  and offered them a settlement which they flat out denied.  I

9  went out and offered part of the funds that we are anticipating

10 collecting and ECMC came back with a number that was six times

11 higher than what I offered.  So --

12 Q.   Okay.  So, Mr. Demmons, you did not follow up with ECMC

13 specifically about this letter and the options under the

14 William Ford Program?

15 A.   I followed up with ECMC regarding a settlement offer and

16 ECMC was not receptive.  And actually I think I was told after

17 these proceedings are over that ECMC would -- this IRB option

18 might be available if these loans are found not dischargeable.

19 Q.   So you didn't in advance of seeking dischargeability

20 follow up on this.  But this is something you might do after if

21 the loans are found to be non-dischargeable?

22 A.   Well, we need to see when the dust settles, right?  I

23 can't commit to something that I can't pay or I'll end up

24 exactly back where I am now.  I've learned my lesson from this.

25 I'm trying to build a life for myself, not put myself back in

Demmons - Cross                                                    146

1    the situation that I'm currently in.

2    Q.   Mr. Demmons, the letter that ECMC sent in Exhibit 11 also

3    attached certain public service loan forgiveness forms --

4    A.   Yes.

5    Q.   -- starting at 240 on.

6    A.   And I did look at that and I appreciate that, but none of

7    those would apply for me.  Through Ochsner you have to be a

8    full-time employee.  I don't even get health care coverage from

9    them.  I'm considered PRN.  If I was full-time, then I probably

10   wouldn't be able to maintain the job that I'm in.  So this is

11   not a possibility through Ochsner to do what I'm doing now.

12   Q.   And so the fact that Ochsner is a 501(c)(3) or the Chabert

13   clinic where you're working is a 501(c)(3) which is the

14   requirement, you're saying you wouldn't meet that?

15   A.   That might be available to someone that's full-time and

16   vested and getting insurance and all of the benefits that go

17   along with it, but I get no benefits.

18   Q.   Mr. Demmons, I think we spoke earlier and you talked about

19   full-time at your job being 40 hours a week or 36 hours a week?

20   A.   I think they consider full-time 37 hours --

21   Q.   Okay.

22   A.   -- and they are financially restricting hours right now.

23   They're trying to be -- what's the term I used, financially

24   cognizant, or financially responsible.

25   Q.   So you're saying that at your job you are not full-time?

Demmons - Cross                                            147

1    A.   I'm fortunate to get the hours that I get, and to do the

2    -- to get the hours that I try to get between 36 and 40, I go

3    between different departments and that's what this job also

4    allows me to do.  So if I miss a day because I'm not able to

5    move or I'm in pain, I am able to go to a different department

6    and say, "Do you need anybody today to sit for you?"  And this

7    is with the psychiatric ward on the -- well, actually -- pardon

8    me, it's the behavioral health unit.  I also go to them.  And

9    I've gone to St. Anne's.  You had mentioned that there's two

10   W-2's for me.  I had gone over there.  I think it's about 20

11   minutes away from where I live.  And obviously if we don't have

12   a car I can't get over there.

13   Q.   So I guess I'm unclear.  You're getting hours that are

14   enough to be full-time, is that correct?

15   A.   I'm getting hours that I try to make up the hours if I

16   miss due to my condition, due to my disability.

17   Q.   So you are considered a full-time employee or --

18   A.   They -- because I'm not full-time they put me where they

19   need me.  And then I try to scurry around to see where they're

20   missing people so that I can fill in and get enough to

21   maintain.

22   Q.   Mr. Demmons, what are some the limitations that you have

23   from your car wreck?  Do you have trouble walking?

24   A.   I have trouble functioning.  Every day I have trouble

25   functioning.  This has affected every aspect of my life

1    mentally, physically, sexually, my hopes, my dreams, my

2    aspirations.

3    Q.   I'd like to talk about the physical aspects.  What about

4    driving a car, do you have any problems driving a car?

5    A.   Yes, my arms fall asleep.

6    Q.   Okay.  Do you have any problems getting dressed in the

7    morning?

8    A.   Yes.  Some days I need to get help getting dressed, some

9    days I need to get help getting out of the car.  Some days I

10   need help bathing.

11   Q.   What about standing for long periods of time, sitting for

12   long periods of time, is that something that affects you?

13   A.   I'm in an extraordinary amount of pain at this particular

14   moment.

15   Q.   Okay.

16   A.   Sitting, standing, sleeping.  I think Dr. Kaye covered

17   that quite sufficiently today.

18           THE COURT:  Would you feel better if you sat?

19           THE WITNESS:  No, Your Honor, thank you though.

20           THE COURT:  Feel better standing?

21           THE WITNESS:  Yeah.  I feel at a disadvantage being

22   so low.

23           THE COURT:  Okay.

24           THE WITNESS:  Thank you.  I have to bend my head back

25   to kind of look up.  Thank you, sir.

Demmons - Cross                                              149

1   BY MS. LASALLE:

2   Q.   So, Mr. Demmons, you would agree that there were options

3   that were provided to you by ECMC in order to repay your loans?

4   A.   I agree that there are options out there.  Whether or not

5   I can meet those options and fulfill the agreement with them

6   that's another story, isn't it?

7   Q.   But you were provided with options by ECMC after filing

8   this action?

9   A.   And I am tremendously grateful for that.

10            MS. LASALLE:  No further questions, Your Honor.

11            THE WITNESS:  Thank you, ma'am.

12            MS. LASALLE:  Thank you, Mr. Demmons.

13            THE COURT:  All right.  Any other defendants wish to?

14            MR. MCCANDLISH:  Yes, Your Honor.

15            THE COURT:  All right.  Let's see, you're

16  representing --

17            MR. MCCANDLISH:  Yes, Your Honor.  Joe McCandlish

18  representing Key Bank and Deutsche Bank.

19            THE COURT:  What's the first bank?

20            MR. MCCANDLISH:  Key Bank.

21            THE COURT:  Key Bank.

22            MR. MCCANDLISH:  Yeah, K-e-y, B-a-n-k.

23            THE COURT:  Key Bank, all right.  That's two

24  different parties, right?

25            MR. MCCANDLISH:  Yes, Your Honor.

Demmons - Cross                                              150

1          THE COURT:  All right.

2          THE WITNESS:  Hello, sir.

3                    *   *   *   *   *

4                    CROSS-EXAMINATION

5   BY MR. MCCANDLISH:

6   Q.   All right, good afternoon, sir.  I'll try not to be

7   redundant, but then again I thought she was pretty thorough.

8   A.   She was very thorough.

9   Q.   So on both your schedules the initial one and the amended

10  on you mentioned transportation --

11         THE COURT:  Now, you say "amended one," are you

12  talking about --

13         MR. MCCANDLISH:  Exhibit --

14         THE COURT:  -- the schedule they filled out that was

15  not actually filed?  That's not really an amended schedule.

16         MR. MCCANDLISH:  Exhibit 2, Your Honor.

17         THE COURT:  Well, am I correct that's not an amended

18  schedule?

19         MS. DELEO:  It is not, Your Honor.  You're correct.

20         THE COURT:  It's not a schedule that was filed at

21  all.  It's just a document that Counsel and the plaintiff

22  filled out in order to draw a comparison between his financial

23  status as of the date of filing the schedules in the bankruptcy

24  and yesterday's date?  Yesterday?

25         MS. DELEO:  That's correct, Your Honor.

1           THE COURT:  Yeah, okay.

2           MR. MCCANDLISH:  All right, thank you, Your Honor.  I

3    apologize.

4    BY MR. MCCANDLISH:

5    Q.   Let me clarify in the initial schedules filed in the

6    bankruptcy case and on Exhibit 2 --

7    A.   Yes.  Yes, sir.

8           THE COURT:  Just refer to it as Exhibit 2.

9           MR. MCCANDLISH:  Okay, thank you, Your Honor.  I'm

10   sorry.

11   BY MR. MCCANDLISH:

12   Q.   More specifically, Page 64.

13   A.   Yes, sir.

14   Q.   You list transportation expenses other than car payments

15   of $150, correct?

16   A.   Yes, sir.

17   Q.   But you work you said about a mile from your house?

18   A.   Yes, sir.

19   Q.   And in your schedules, Exhibit 1, you listed a value for

20   your real estate on Page -- a couple of places, but Page 19 of

21   Exhibit 1 of $131,000, correct?

22   A.   Yes, sir.

23   Q.   Do you believe your home is still worth -- do you still

24   believe your home is worth $131,000 today?

25   A.   Every time there's a problem in the oilfield Houma is hit

Demmons - Cross                                          152

1   very, very hard.  I couldn't possibly say.  I would hope so,

2   but I highly doubt it.  There's been a lot of foreclosures in

3   our area and that drastically affects the values of the

4   properties.  One of the reasons is is that they always use the

5   largest square footages, there's three or four types of homes

6   and of some reason the brokers and the banks that are listing

7   these aren't delineating between the different sizes of homes.

8   So a much smaller home might equate to a house that's larger.

9   So I don't think given the current condition in the market, but

10  we would be very fortunate if it was valued at that.

11  Q.    So you don't have a more recent appraisal?

12  A.    No, sir.

13  Q.    Are you familiar with a website Zillow.com?

14  A.    Yes, sir.

15  Q.    Okay, would it surprise you if Zillow.com as of today

16  estimated the value of the property at $177,200.61?

17  A.    I would find that very surprising and I would like to see

18  someone buy a house in our neighborhood for that price.

19  Q.    Have you within the past year and a half have you looked

20  at a smaller house?

21  A.    No.  I think that the -- given the mortgage that we're

22  paying I think that if I was even to find a rent I would pay a

23  comparable price for that.  I think that it's a good house with

24  a good value mortgage-wise.  I don't think you can find if I

25  were to look for a house I would suspect I'd end up in more

Demmons - Cross                                              153

1   because I'd end up paying all the fees associated with

2   purchasing and I just don't -- I don't think that would be an

3   equitable move to move from something that maybe has the

4   potential to maybe grow more in the future.

5   Q.   So --

6              THE COURT:  Excuse me, what's the mortgage payment

7   now?

8              THE WITNESS:  Principal, taxes, and --

9              THE COURT:  Interest?

10             THE WITNESS:  Yes, are $1,036 which we --

11             THE COURT:  One thousand?

12             THE WITNESS:  One thousand thirty-six dollars,

13  Your Honor.

14             THE COURT:  Okay, thanks.

15             THE WITNESS:  Which when we compared the -- when we

16  go back to Attorney DeLeo's schedule, we found that that was

17  far below what was being -- I don't remember the particular

18  schedule, but it was far below what someone with our household

19  would be expected to pay.  So we're actually doing better than

20  what the mean is out there.  So, I don't think that would be a

21  wise move.

22  BY MR. MCCANDLISH:

23  Q.   Okay.  So a different question --

24  A.   Yes, sir.

25  Q.   -- but similar, over the past three years have you looked

Demmons - Cross                                              154

1    at a smaller house to purchase?  I know why you're not renting,

2    you explained that, --

3    A.   Yeah.

4    Q.   -- but to purchase a house in the past three years have

5    you looked at a smaller one?

6    A.   Well, I would say three years ago where would that have

7    put us time wise, in 2013 I was just starting to get myself on

8    track a little bit and we had expended all of our resources.

9    We had lost our creditworthiness.  So I don't even think if I

10   had the opportunity that would be a possibility at this time.

11   Q.   Okay.  So, no, it's safe to say you haven't looked?

12   A.   Yeah.  I don't think I could do better going out off the

13   street and purchasing.  I know people that are buying homes at

14   the hospital now and they're paying substantially more in

15   mortgages than I'm paying.

16   Q.   Can I get you to turn to Exhibit 24 --

17   A.   Yes.

18   Q.   -- which is the bank statements again there in the back?

19   A.   Yes, of course.  And thank you for your patience with me.

20   Q.   Sure.

21   A.   It's been a difficult day.

22   Q.   Thank you for your patience with me.

23   A.   No, no worries.

24   Q.   Are you there on Page 373 of Exhibit 24?

25   A.   Yes, sir.

1    Q.   Okay.  The statement here starts as of December 22nd,

2    2015, is that correct?

3    A.   Yes, sir, and that's the way it just broke out when I

4    printed it out.

5    Q.   Okay.

6    A.   I just -- there's a -- you go by the month, you pick the

7    month, and print it out.  I gave you from December on to show

8    where we were.

9    Q.   But there are prior statements that you've had at one

10   point, correct?

11   A.   This is December, December through January.  I would

12   suspect in the past I printed them out when I went through for

13   a previous attorney when we filed our petition.

14   Q.   You didn't bring any of those with you though today,

15   correct?

16   A.   No, sir.  No.

17   Q.   Okay.  On --

18   A.   Sir, actually while we're on this, there's a charge on

19   this that mentions the United States Post Office and I don't

20   know if it's on this particular one.  Could you help me find

21   it, please?  I just wanted to bring it to light because I find

22   it a little bit disturbing.  There's a company out there that's

23   called TransWorld Systems that I've been receiving demands for

24   payment for your lender.  And I'm just wondering why that would

25   be coming.  And I had to pay $13 and something to -- it was

Demmons - Cross                                          156

1  like 13 -- to the United States Post Office.  I don't think

2  it's appropriate for them to be sending me demand letters while

3  I'm in an adversary proceeding and I thought that we had --

4  Counsel had addressed this with you.  I got another letter

5  yesterday.

6  Q.   Do you have the letter with you then?

7  A.   I do, sir.

8  Q.   Okay.  Maybe after the hearing we can take a look

9  unless --

10  A.   Yes, sir.  Just while I had the opportunity while I we

11  were looking at these it sparked my memory.

12  Q.   Or unless your Counsel maybe requested it today, but maybe

13  after the hearing.

14  A.   Okay, thank you.

15  Q.   Thank you.

16          UNIDENTIFIED SPEAKER:  You said it was $13 even?

17          THE WITNESS:  Thirteen something.  We'll handle it

18  after.

19          MR. MCCANDLISH:  It's Page 381.

20          UNIDENTIFIED SPEAKER:  Page 381.

21          THE WITNESS:  Okay.  Yeah, okay, it was on -- just so

22  you're aware, I'd like that to be addressed while we're going

23  through this if you could, please.  I had to file -- I'll give

24  you the address and the letter that I sent to them.

25  BY MR. MCCANDLISH:

Demmons - Cross                                                157

1   Q.   Are you referring to the pin purchase USPS?

2   A.   Yeah, that's a certified letter that I had to send to them

3   because -- return receipt requested.  And the reason I bring it

4   up is like I said I was looking at this and my memory

5   remembered that I received a letter from them asking for full

6   amount for your loan that was due, not the Key Bank loan but

7   the other loan.

8   Q.   So, $13.48 you spent at the Post Office at that day,

9   correct?

10  A.   Yes, sir, to send a certified letter asking them to

11  provide verification.  And they said that they would get the

12  verification from you.  And I'm just curious why I'm receiving

13  that letter now while we're going through this process.

14  Q.   I don't know.

15  A.   They said they were hired by you to --

16  Q.   I don't know, --

17  A.   Okay.

18  Q.   -- but it's my turn if you will.

19  A.   I'm sorry.

20  Q.   Thank you.

21          THE WITNESS:  I'm sorry, Your Honor.  I'm sorry.

22  BY MR. MCCANDLISH:

23  Q.   I'll be glad to address it though with you at the

24  appropriate time.

25  A.   Okay.

Demmons - Cross                                            158

1    Q.   And I won't -- I don't want to go through every one of

2    these on here these charges, but I did have a couple of

3    questions.  Specifically here at the bottom of Page -- back to

4    373.

5    A.   Yes, sir.

6    Q.   -- card purchase Patio Leno Rist.  Is that a restaurant?

7    A.   Yes, sir.  It's when we were visiting family over holiday.

8    And you'll also notice there were a couple of cash payments.

9    Q.   I don't know.

10   A.   We -- you'll see a deposit in there.  And someplace in

11   here we went to lunch and to facilitate getting out of the door

12   I paid and then was reimbursed and then put the money back in

13   the account when we were done.

14   Q.   Okay, thank you.

15   A.   You're welcome.

16   Q.   And you mentioned before on Page 378 the Comenity.

17   A.   Yes, sir.  To clarify that hopefully, when I went

18   through --

19   Q.   Is that a credit card?

20   A.   That's a credit card that showed up that never got

21   discharged for some reason.

22   Q.   Never got closed after your bankruptcy, is that right?

23   A.   Yes, sir.  I think because there was a zero balance and --

24   Q.   You've had that though for some time, several months at

25   least?

1  A.   No, for years.

2  Q.   Okay.  Do you get statements every month either in paper

3  or electronically for the credit card?

4  A.   I get electronic, yes, sir.

5  Q.   Did you send them to me?

6  A.   Actually I neglected to.  I didn't even think of it.

7  Q.   Okay.

8  A.   I can tell you I think that the balance is $70 and it's

9  never been over like 120.  We bought some Christmas gifts as I

10 indicated.  Last year we were dealing with the dollar store.

11 Q.   Thank you.  I did request them from you though if you

12 recall.

13 A.   It was an oversight on my part.  We were putting together

14 a lot of stuff and trying to be as accurate as possible.

15 Q.   But again you didn't bring them with you today?

16 A.   No, but I could bring it up online if need be.

17 Q.   Okay.

18 A.   I'm sorry.  Sorry about that.

19 Q.   Oh, no -- no problem.  Just a couple of questions, like I

20 say, for you.

21 A.   There's a lot to cover during this process.

22 Q.   And then again Page 381 on February 26, oh about a fourth

23 of the way down, "NOLA Desi Kitch."  Is that a restaurant as

24 well?

25 A.   Yes, sir.

1    Q.    Okay.

2    A.    We had people come in to visit with us.

3    Q.    So that's a restaurant?

4    A.    Yeah.  Yes, sir.

5    Q.    At the bottom here, March 8th, there's another payment to

6    Comenity, is that correct?

7    A.    Yes, sir.

8    Q.    Okay, thank you.

9    A.    Is that the $27 payment that you're referring to I guess?

10   Q.    Yes, sir.

11   A.    Okay, thank you.

12          MR. MCCANDLISH:  Your Honor, if you give me just a

13   second, I don't -- many of these questions have been asked.

14   BY MR. MCCANDLISH:

15   Q.    So about $70 for Comcast, is that right?

16   A.    I think it's more like 60.

17   Q.    Sixty?  And that's the least expensive internet that you

18   could find?

19   A.    The most dependable, reliable.  There was a lot of data

20   going back and forth and it seemed to be the best deal.  I

21   think it was much higher than that before and obviously if

22   there's a better deal out there with them I would be happy to

23   find it.  But that appeared to be the best deal for the service

24   that we were getting at the time.

25   Q.    Okay.  You mentioned sometime ago now that Key does not

Demmons - Cross                                                   161

1    offer an income contingent repayment plan, is that right?

2    A.    They were very difficult to deal with.

3    Q.    Okay.   Within the past year have you made an offer to --

4    have you made an offer of some sort of income contingent

5    repayment plan to Key?

6    A.    If Counsel will recall, we made an offer to you just

7    recently.

8    Q.    Was that an income contingent repayment plan that you

9    offered?

10   A.    No, it was.   When I tried to make arrangements with them,

11   and if you look at the historical transaction history of me

12   making payments to them, they went through a process when I

13   went to AES and all of the sudden they elected to -- they

14   decided that they were no longer going to offer forbearances or

15   hardships.   And I have notes on the matter speaking with them.

16   And as your notes will indicate that you provided in discovery,

17   I indicated what was going on with me.   I worked with them.   I

18   had to go to outside sources to connect with them.   They didn't

19   understand the process.   They couldn't follow the process.   And

20   I did the best to the best of my ability to repay 11,000 or 600

21   and whatever dollars a month in the amount of 11,000 something

22   dollars that I repaid to them.

23   Q.    Indeed in the past six months you haven't made an offer of

24   payments to Key?

25   A.    No.   According to Tina Kinsley over at AES I think that

Demmons - Cross                                    162

1   closed out in June.  They're self-insured, they paid off and

2   there's been no further payments.

3   Q.   Okay.

4   A.   I think the 11,000 only moved the principal balance by

5   63 cents.

6   Q.   Which of my clients' loans did you say were based on a 10-

7   year repayment earlier?

8   A.   I think Key was based on 120 months.

9   Q.   Okay.

10  A.   And once again if we look at the number -- and actually I

11  think there's some complications also with that.  I found out

12  after the fact that they are origination fees built into this,

13  a substantial amount of origination fees that came through with

14  your contracts that you sent me.  And I contacted the Boston

15  office and spoke with them because there was -- supposedly

16  there was going to be an abatement and a refund of those

17  origination fees.  Amy Moberg, who I went to school with who

18  also got these loans at the same time --

19  Q.   Can we stick with --

20  A.   I'm sorry.

21  Q.   I'm asking very simple questions.

22  A.   I'm sorry, sir.

23  Q.   I appreciate what you're saying --

24  A.   I'm sorry.

25  Q.   -- but --

Demmons - Cross                                                    163

1   A.   Well, just for completeness I was just --

2   Q.   Sure.  Well, but it's yes/no questions, just you know it's

3   pretty simple.

4   A.   Okay, yes, sir.  I'm sorry.

5   Q.   And if you please turn to Exhibit 22, Page -- actually

6   361.

7   A.   Yes, sir.

8   Q.   Now, I've got to admit you may need your magnifying glass

9   for this one because I can't decide whether to keep my glasses

10  on or not to read it, but if you look at Page -- I'm sorry,

11  Paragraph D-14 is entitled "Repayment Period," is it not?  Are

12  you able to see that?

13            THE COURT:  Fourteen, Paragraph 14?

14            MR. MCCANDLISH:  Yes, sir.

15            THE COURT:  Okay, I got it.

16            THE WITNESS:  Could I borrow that, please?

17  BY MR. MCCANDLISH:

18  Q.   I'm sorry these aren't more legible, but they are legible

19  if you --

20       Does that paragraph read "Repayment period means the

21  period beginning on the day after the interim period ends and

22  continuing for no more than 300 months," and then "subject to

23  limitations on the period of repayments under applicable law."

24  And then there's one more sentence that I'm not concerned

25  about.

Demmons - Cross                    164

1    A.    What does it say on the --

2    Q.    You're welcome to tell me what it says somewhere else, but

3    I'm asking specifically about D-14.   Is that what it reads?

4    A.    Well, I guess from what I can see.   It doesn't read very

5    well, but I don't know exactly what that means.   So it won't

6    continue for anymore than 300 months but is -- so the 120 month

7    period that was stipulated cannot exceed 300 months or -- I

8    don't know.

9    Q.    Sure.   I'm just asking about that particular paragraph.

10   So if you're asking me --

11   A.    I didn't write it, sir, so I'll have to depend on you to

12   answer that for me.

13   Q.    Okay, I can't be a witness today.

14   A.    Okay.

15   Q.    All right.

16   A.    I guess what it says is -- yeah.

17   Q.    Okay, so if you'd please turn to Exhibit 18 and 19 --

18   A.    Okay.

19   Q.    -- which are the loan documents to Deutsche Bank.

20   A.    Yes, sir.

21   Q.    And Paragraph C-10 on these is Page 349 on the one -- on

22   yours it's 349.   And does this refer to a repayment period for

23   no longer than 240 months?

24   A.    Yes, it appears so, sir.

25   Q.    And you thought the payments though were calculated --

Demmons - Cross                                                165

1   that we had stipulated to were calculated more on 120 month

2   term?

3   A.   Yes, sir.

4   Q.   Okay, thank you.

5        Now, I'll be very brief as to your exhibit --

6   A.   Yes, sir.

7   Q.   -- Exhibit 7, or the joint exhibit that I believe you

8   drafted.  Just to clarify, Exhibit 7 you created based on

9   information as with respect to my clients.

10  A.   Yes, this came from discovery from your tables.

11  Q.   So was it specifically created -- did you use Exhibits 20,

12  21, and 23 to compile this summary?

13  A.   I used the -- I think I have a list of the ones.  This

14  looks like it and I'd have to see the ones that put together in

15  my folder that I have with this, but it looks like -- the ones

16  that say that I made the payments, borrow/payments, those are

17  the ones that I used, yes, sir.  And these came from the

18  documents that you provided me.

19  Q.   Okay, thank you.

20  A.   Yes, sir.

21  Q.   And Exhibit 3 just to clarify, you agree that these copies

22  of your pay records are accurate, is that correct?

23  A.   True and accurate, sir.

24  Q.   Are you able to wear a headset?

25  A.   Pardon me?

Demmons - Cross                                          166

1   Q.   Like headphones, a headset?

2   A.   I don't wear one.  I think I have 10 degrees mobility in

3   my neck both flexion, flexation and rotation.

4   Q.   But as far as putting a headset on with an earpiece and a

5   microphone, or having somebody put it on for you, as far as

6   that goes you don't have any impediment to doing that?

7   A.   I don't wear one so I don't know.  I have impediment just

8   getting out of bed, so I suspect it might be a problem for me.

9   Q.   Okay.  But you do know what a headset is, right?

10  A.   Yes, sir, like a telephone operator or something like

11  that.

12  Q.   Right, you have a small earpiece --

13  A.   Yeah.

14  Q.   -- and a small microphone.

15  A.   Yeah.

16  Q.   And you think you would not be able to wear a headset?

17  A.   I'd guess I'd have to try.  I can't know without trying

18  it.

19  Q.   Okay.

20          THE COURT:  I know this is cross-examination, but

21  what's the purpose of the question?

22          MR. MCCANDLISH:  Well, Your Honor, there are several

23  positions that may be out there whether it's part-time, full-

24  time, whether they pay more or less that can be customer

25  service, debt collection, telemarketing, you know sales, or any

Demmons - Cross                                    167

1    number of positions that he may be able to apply for or even

2    obtain that he may be able to work from home you know a certain

3    few extra hours a week with a computer and a headset I would

4    think.  But that was my next question is he applied for any

5    such position.

6             THE WITNESS:  I've not applied for a position wearing

7    a headset but I have applied in other industries and in other

8    states.

9             MR. MCCANDLISH:  Thank you.

10   BY MR. MCCANDLISH:

11   Q.   And you agree you're certainly a highly educated person,

12   right?

13   A.   I've seen to have gotten myself in a kind of a situation

14   here, so I -- you know I would like to think that I'm at least

15   average.

16   Q.   Okay, thank you.

17        Do you know Dr. Kaye outside of your professional visits

18   to him?

19   A.   No, I do not, sir.

20   Q.   Okay.

21   A.   I credit Dr. Kaye with saving my life.

22   Q.   In direct testimony, one final question is, you mentioned

23   I believe it was Key but any lender really will lend you a

24   certain amount of money based on your tuition cost, --

25   A.   Yes.

Demmons - Cross                                        168

1   Q.   -- is that right?

2   A.   I think so.

3   Q.   Okay.

4   A.   Cost of education I guess.

5   Q.   But you haven't particularly seen any lenders underwriting

6   policies along those lines, right?  It's just an inference that

7   you made that that's one of the things they base on the loan

8   amount on, is that right?

9   A.   I think that's everything that they base the loan amount

10  on.  That's why they define the amounts I guess, right?

11  Q.   But based on an inference --

12  A.   No, it's not an inference.  I mean these are the -- these

13  are the -- this is the cost of education.  This is what the

14  loan is -- this is what they provide you.

15  Q.   Well you haven't seen their underwriting policy as far as

16  what amount that they would --

17  A.   No, sir, I'm not an underwriter.

18  Q.   Okay.

19         MR. MCCANDLISH:  Just one second if I could,

20  Your Honor?

21         No further questions for this Witness.  Thank you,

22  Your Honor.

23         THE WITNESS:  Thank you, sir.

24         THE COURT:  Anybody else want to question the Witness

25  on cross?

Demmons - Redirect                                      169

1            All right, redirect.

2            MS. DELEO:  Real quick, please, Your Honor.

3            THE COURT:  All right.

4            If you need a break just say so.

5            THE WITNESS:  Could I just for a moment, Your Honor?

6            THE COURT:  Certainly.

7            THE WITNESS:  Thank you.

8            THE COURT:  The Court will take a 10-minute break.

9        (Recess from 4:10 p.m., until 4:21 p.m.)

10           THE COURT:  All right, let's continue.

11           If you want a break at any time you just say so,

12   because I'm not very considerate of lawyers and their

13   discomfort, but I am -- I try to be of witnesses.  If for any

14   reason you want a break you tell me.

15           THE WITNESS:  Thank you, Your Honor.

16           THE COURT:  Okay.

17           THE WITNESS:  I appreciate it.

18           THE COURT:  I should have told you that at the start

19   today instead of this late.

20           All right, let's go.

21           THE WITNESS:  Thank you, sir.

22                   *   *   *   *   *

23                   REDIRECT EXAMINATION

24   BY MS. DELEO:

25   Q.   Mr. Demmons, --

Demmons - Redirect                                        170

1   A.   Yes, ma'am?

2   Q.   -- during cross-examination you were asked questions

3   regarding your various computer skills and different physical

4   skills that you have despite the fact that you've come through

5   this accident.

6   A.   Yes, ma'am.

7   Q.   And I think Counsel was impressed by the Excel charts that

8   are in here that were made.

9   A.   Yes, ma'am.

10  Q.   And you stated that you made these charts.

11  A.   Yes, ma'am.

12  Q.   Could you clarify what you meant by you making these

13  charts?

14  A.   As I indicated, I don't type very well, but I have kind of

15  an affinity for seeing how things get together.  So, I lay out

16  the bones and when I go through the numbers Karen and I have

17  been working on everything together, so -- she does the

18  majority of all putting all of that in and adding as far as

19  like the interrogatories she does the typing on all of that.

20  Q.   So you create the format --

21  A.   Yes.

22  Q.   -- and she's doing the data entry, is that right?

23  A.   Yes, ma'am.  That is exactly correct.

24  Q.   Okay.

25  A.   I'm sorry I didn't make that clear.

Demmons - Redirect                                          171

1   Q.   That's fine.

2   A.   Could you hold a job where you would be required to type

3   all day?

4   A.   No, ma'am.

5   Q.   You also spoke about some proceeds that you're going to be

6   coming into possession shortly.  Did you attempt to make

7   payments with these monies and settle this lawsuit with your

8   student loan lenders?

9   A.   Yes, ma'am.

10  Q.   How many student loans are involved in this lawsuit?

11  A.   Six, ma'am.

12  Q.   Okay, six for you and two --

13  A.   Two for Karen.

14  Q.   Okay, so we're talking about a total of eight loans?

15  A.   Yes.

16  Q.   And the plan was to use whatever proceeds were at your

17  disposal less your attorney's fees --

18  A.   Yes, ma'am.

19  Q.   -- to attempt to settle these lawsuits, correct?

20  A.   That was our hopes.

21  Q.   Okay.  But because this trial had to go forward you did

22  not separately try to negotiate a settlement with ECMC and

23  their repayment programs other than the lump sum settlement?

24  A.   That's correct, ma'am.

25  Q.   Okay.  Could you please look at the Pretrial Order?

Demmons - Redirect                                                172

1    A.   Yes, ma'am.

2    Q.   And I'm looking at Number 63 on Page 9.   Could you read

3    Line Number 63?

4    A.   "The outstanding balance due on Debtors' eight remaining

5    student loans total is at least 367,280.65."

6              THE CLERK:   I'm sorry, can you put the microphone

7    back down.

8              THE WITNESS:   Oh, I'm so sorry.   Can you hear me now?

9              THE CLERK:   Yes, sir.

10             THE WITNESS:   Okay.

11             "The outstanding balance due on Debtors' eight

12   remaining student loans total at least $367,280.65."

13   BY MS. DELEO:

14   Q.   Okay.   And do you recall the amount of the ECMC loan?

15   A.   I believe, ma'am, that it was around 51 -- closer to

16   52,000.   I think it was 51,995 or something like that.

17   Q.   Okay.

18   A.   The most recent figure.

19   Q.   Would you agree that that's about one-seventh of the total

20   debt that you owe?

21   A.   Yeah, approximately.

22   Q.   And --

23   A.   Approximately.   I'm sorry.

24   Q.   Okay.   Could you read Number 64 for me?

25   A.   "The total monthly payments due Debtors under the terms of

Demmons - Redirect                                   173

1    the original student loan contract is $1,597.81."

2    Q.    Now, if you were able to enter into a separate settlement

3    repayment plan with ECMC that could be income based, or one of

4    the other programs that were offered, and that student loan

5    payment is $263 a month, what student loans are you still

6    looking at?

7    A.    We're looking at the Key loans, three Key loans, we're

8    looking at two Deutsche loans, and two NPSL loans.

9    Q.    And can you tell me by subtracting 263 from 1597 what that

10   would reduce your monthly payment to, to those lenders?

11   A.    I wish I could, ma'am, right now, but my head is not

12   functioning in that capacity.

13   Q.    Does $1,334 sound correct?

14   A.    I would say just based on the numbers it approximately is.

15   Q.    Okay.  If you can look to your original bankruptcy expense

16   sheet, Schedule J, Page 33, and put your finger there, and flip

17   to 63, Page 63 which is your new expense sheet, a question was

18   asked of you as to how you have reduced your expenses --

19   A.    Yes, ma'am.

20   Q.    -- since the filing of your bankruptcy petition.

21   A.    Yes, ma'am.

22   Q.    If you look at Item 6c what is that, what does that

23   entail?

24   A.    That's telephone, cell phone, internet, satellite, and

25   cable services.

Demmons - Redirect                                         174

1   Q.   And how much was that expense at the time you filed

2   bankruptcy?

3   A.   It was $235.

4   Q.   And what is it now?

5   A.   It's $183.

6   Q.   Okay.  If you will look at Number 9 which is your clothing

7   expense --

8   A.   Yes, ma'am.

9   Q.   -- what was the clothing expense on your original

10  bankruptcy schedules?

11  A.   One hundred and fifteen dollars.

12  Q.   And what is it reflected at now?

13  A.   Twenty-five dollars.

14  Q.   And lastly if you can look at Number 15c, which is vehicle

15  insurance?

16  A.   Yeah -- yes, ma'am.  That's $83.25.

17  Q.   Is what it was two years ago?

18  A.   Yes, ma'am.

19  Q.   And today what is that vehicle insurance?

20  A.   Seventy-nine dollars.

21  Q.   So, Mr. Demmons, have you made some cut in your expenses

22  since the bankruptcy case?

23  A.   Yes, ma'am, we're always looking.

24  Q.   Okay.  There was also a question as to whether you should

25  sell your home and move into another property.  Do you think

Fowler - Direct                                    175

1   you can get financing today to purchase another property?

2   A.   Not at all, ma'am.

3   Q.   So is that a realistic option for you?

4   A.   That is not a realistic option whatsoever.

5              MS. DELEO:  That's all I have, Your Honor.

6              THE COURT:  All right.  All right, are we through

7   with this Witness?

8              MS. DELEO:  Yes, Your Honor.

9              THE COURT:  You may step down, sir.  Thank you.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  All right, do you have another witness?

12             MS. DELEO:  I do, Your Honor, I have Ms. Fowler.

13             THE COURT:  All right.

14                      *   *   *   *   *

15             **KAREN S. FOWLER, WITNESS, SWORN**

16                      *   *   *   *   *

17             THE COURT:  Have a seat.  Give the Court Reporter

18  your full name and your current address.

19             THE WITNESS:  My name is Karen Fowler.  My address is

20  400 Baptiste Circle, Houma, Louisiana 70363.

21                      *   *   *   *   *

22                    DIRECT EXAMINATION

23  BY MS. DELEO:

24  Q.   Ms. Fowler, are you the Debtor in this Chapter 7

25  bankruptcy case?

1    A.    I am.

2    Q.    And did you also receive a bankruptcy discharge?

3    A.    Yes.

4    Q.    And why are you a party to this adversary proceeding?

5    A.    Because we needed to get rid of this or try to discharge

6    our student loan debt.

7    Q.    Okay, so you're looking for a discharge of both your loans

8    and your husband's loans?

9    A.    Yes.

10   Q.    Can you explain to me how -- well, starting from college

11   did you take out student loans in college?

12   A.    Yes.

13   Q.    And tell me your college background.  Where did you go to

14   college?

15   A.    So the first time I went to college was straight out of

16   high school.  I went to Arkansas State University.  I went on

17   scholarship and I didn't finish a degree there.  I married my

18   high school sweetheart.  And he went to pharmacy school in

19   Little Rock and so I also went with him and went to the

20   University of Arkansas at Little Rock and completed by biology

21   degree.  And at that time -- if you're wanting to know how I

22   paid, it was scholarship, stipends, Pell Grant, and I worked at

23   night.  And we didn't have any parental support or anything

24   like that.

25   Q.    What year did you get your college degree?

Fowler - Direct                                              177

1    A.   That was 19 -- I graduated with a biology degree in 1992.

2    Q.   So you had no student debt at that point in time, is that

3    correct?

4    A.   No.  When I graduated at that time I did have student

5    debt, but I paid those off.

6    Q.   That student loan debt has been repaid --

7    A.   Yes.

8    Q.   -- at this point.  Okay.

9         So tell me how you ended up in medical school in 2004.

10   A.   So -- sorry --

11        THE COURT:  Would you like some water?

12        THE WITNESS:  I have some, thank you.

13        THE COURT:  Okay.

14        THE WITNESS:  I'm just trying to figure out how much

15   of my life story to share.

16   BY MS. DELEO:

17   Q.   You can just jump right into medical school if you would

18   like.

19   A.   Well, to get there I mean it's kind of -- I kind of need

20   to say that I built a life and a dream with another person.  We

21   built a business together and I found myself going through a

22   divorce because he met someone else at age 35.  And I had

23   planned on having -- I built by life around him and our

24   business and at age 35 I had the rug pulled out from underneath

25   me literally.

Fowler - Direct                                          178

1    And I was looking for something.  I tried to figure out

2    what was next, so I started looking at the possibility of maybe

3    going to pharmacy school, or nursing school, or maybe

4    University of Arkansas Medical School.  And I actually began to

5    research how much time it would take me to go to any of those

6    types of programs.  And most of the programs required that I go

7    back and get further prerequisites to apply to their program or

8    they would require that I take examinations to get in.  Like

9    pharmacy has a pre-pharmacy program -- test, I'm sorry, that

10   you take.  And it was going to take me awhile to study for

11   things like that.

12       So, I went and talked to the University of Arkansas

13   Medical School because that had always been a dream of mine

14   that I hadn't been able to pursue.  And at the time I was also

15   looking online at various options.  And the school that I ended

16   up choosing and going to the offshore school was advertising an

17   extremely high USMLE pass rate and that was very impressive.

18   And they also promised that I would be able to go from my basis

19   sciences into my clinicals and it would be a quick process,

20   which was important to me at the time because I had -- I felt

21   like I had limited time to get my life back on track because

22   everything had changed unexpectedly for me at age 35 and I

23   wanted to have a family and my biological clock was ticking and

24   I needed to do something to create a life for myself and

25   hopefully meet someone and create and family.  And I had

1   limited time and limited dollars to do that, although I did

2   have a lot of money to invest to that end.

3        As I was saying, the University of Arkansas was

4   advertising -- or not advertising, but they admitted that their

5   USMLE pass rate was in the 80-something percentage and the

6   offshore school that I ended up selecting was advertising a

7   USMLE pass rate that was in the 90-something percentage.  And I

8   remember saying to the University of Arkansas "Why would I

9   select your program when your students do not appear to do as

10  well as the Caribbean school."  I understand now how those

11  numbers come about and it's -- I can't -- I wouldn't -- I can

12  explain those numbers and there's an explanation.  There's a

13  very clear explanation as to how those numbers are achieved,

14  but I guess this is not probably the forum to go into that.

15       But, anyway, based on the research that I was doing and

16  how long it would take me to possibly get into the University

17  of Arkansas, it was going to take a year-long application

18  process for instance, and how long it would take me to get in

19  the Caribbean school and they were promising me immediate entry

20  that I selected that school.  At that time I had approximately

21  a half million dollars in assets to apply to my life in getting

22  me to where I needed to be, hopefully meeting someone,

23  achieving a career and a family that I had always envisioned

24  with this -- with my life.

25  Q.   And so that's the Winter of 2004?

Fowler - Direct                                                    180

1    A.    There we go.

2    Q.    Okay.

3    A.    Yes.  I went to an offshore school in January 2004.

4    Q.    And did you have to accrue student loans to go to this

5    school?

6    A.    No, not originally.  Like I said, I had plenty of assets

7    to apply to it and I didn't want to go in debt.  It was a big

8    deal to me not to go in debt because I had pretty much

9    bootstrapped my way to this particular point in my life.  And

10   without family support or -- I'd worked hard for this.  I

11   didn't want to get in debt.  The idea of going into debt was

12   absolutely terrifying to me.  And I had a promissory note where

13   I was bringing in about $4,000 a month which I felt would

14   probably be adequate to cover my living expenses on the island.

15   That promissory note was set to end in December 2007.  So, my

16   hope was to get through the medical school program in a timely

17   fashion before this promissory note ended so that by the time

18   that money ran out I would actually be in a position of earning

19   income.

20   Q.    So when is the first student loan that you took out?

21   A.    I actually took one out in January 2006.

22   Q.    January 2006.  And was that to cover tuition and living

23   expenses?

24   A.    I applied.  The school was advertising these wonderful

25   loans and it seemed like a good idea at the time.  Obviously I

Fowler - Direct                                              181

1    wish I had never done that, but I applied and was given $15,000

2    for January 2006.

3    Q.   Okay.  So --

4    A.   That was the first disbursement.

5    Q.   So you have a total now of two student loan lenders that

6    you directly contracted with, is that right?

7    A.   I thought at the time it was the same type loan because

8    they were both called Health Xpress.  Now doing the research I

9    realize that I think Liberty Bank owned the first loan.  They

10   are now owed by Deutsche.  And the second loan is now owned by

11   NPLS Trust.

12          THE COURT:  Liberty Bank was located where?  Not the

13   Liberty Bank in New Orleans?

14          THE WITNESS:  No, it's the Liberty Bank that was

15   associated with a Student Loan Xpress scandal.

16          THE COURT:  Okay.

17          THE WITNESS:  I think it might have been Ohio, I'm

18   not sure.

19   BY MS. DELEO:

20   Q.   What was the total amount of the student loan debt that

21   you borrowed to attend medical school?

22   A.   So it was 31,030 or 130, 31,130 that is now held by

23   Deutsche, originally held by Liberty Bank.

24   Q.   Okay.

25   A.   And then the second loan amount that is now held by the

```
                         Fowler - Direct                        182
```

 1   FCDB NPLS Trust.  I would have to reference that number.

 2   Q.   If you look at Page 8 on the Pretrial Order --

 3            THE COURT:  Page what?

 4            MS. DELEO:  Page 8.

 5   BY MS. DELEO:

 6   Q.   If you go to Line 53 what is the amount of the Deutsche

 7   loan?

 8   A.   Thirty-one thousand one hundred and thirty dollars.

 9   Q.   And if you go down to Number 58 can you tell me the total

10   balance of the loan today in the last sentence?

11   A.   Forty-three thousand three hundred and nine dollars and

12   seventy-three cents.

13   Q.   Okay.  And then you also had a second loan and this one

14   was with FCDB?

15   A.   Yes.

16   Q.   And if you'd look at Number 60 what was the amount of that

17   loan?

18   A.   Thirty-eight thousand four hundred and sixty dollars.

19   Q.   And what is the approximate amount of the loan now to FCDB

20   or as of June 2, 2014?

21   A.   Fourteen thousand.  Is that right?

22   Q.   That's right.

23        Has FCDB filed an answer or taken any action in this

24   adversary proceeding?

25   A.   No, they haven't.

Fowler - Direct                                                      183

1   Q.   Did you pass the science portion of medical school?

2   A.   Yes.

3   Q.   Okay.  So what is the next -- how does the process evolve

4   once you pass the science portion?

5   A.   You go back to the U.S. or wherever it is that they're

6   going to assign your clinical rotations.  I returned to the

7   U.S. to be -- to wait, await an assignment.

8   Q.   Okay.  And when did you return to the United States?

9   A.   August 2006.

10  Q.   While you were awaiting the assignment of the clinical

11  portion --

12  A.   Yes.

13  Q.   -- of your school, did you make a payment of tuition to

14  your medical school from student loan proceeds?

15  A.   We were not actually allowed to have the student loan

16  proceeds in our --

17  Q.   Possession?  I'm sorry.

18  A.   -- I mean the school had the money.

19  Q.   Okay.

20  A.   And the school made the payments.

21  Q.   Okay.  So if you look on the Pretrial Order and Number 56

22  on Page 8 there was a disbursement on August 7, 2006 in the

23  amount of $16,130.

24  A.   Yes.  So, $7,305 --

25  Q.   Yes.

Fowler - Direct                                           184

1   A.   -- I believe went to me, and $8,835 -- $8,825 went to Saba

2   to pay -- I mean, sorry, went to my former medical school to

3   pay for clinical semester, my first clinical semester in the

4   U.S., semester six.

5   Q.   And that would have been for the Summer of 2006, Fall

6   2006?

7   A.   Fall, Fall 2006.

8   Q.   Okay.  And did you continue to borrow money in order to

9   stay in consideration for placement in this clinical program?

10  What happened to the proceeds of the second student loan?

11  A.   The day -- well, it was a confusing time because I had

12  originally been promised three disbursements from the first

13  loan and my second disbursement was denied because they said I

14  was less than half time and taking only one class and that I

15  was -- my third disbursement would be scheduled -- my second

16  disbursement would be given in August, which it was, and my

17  third disbursement would be given.  I don't remember what the

18  date was now, but my third disbursement would be given.  And I

19  didn't ever receive that and I couldn't figure out what had

20  happened to the money.  It became very confusing to me.

21      I hadn't started clinicals and I hadn't been given a

22  clinical assignment.  I had been promised one and that I would

23  start by a certain point, but I didn't.  And then I determined

24  that I needed to go ahead and take my Step 1 exam.  The night

25  -- the day before I took my Step 1 exam I was contacted by my

Fowler - Direct                                      185

1   former medical school and told that I needed to apply for a

2   student loan that day because they would be losing funding.  It

3   would be my last opportunity to get any type of financial aid

4   and that I needed to fill out that application immediately and

5   fax it back to them.  That was October 30th, 2007, which I did.

6   And that is the FCDB NPLS Trust loan.

7   Q.   Okay.

8   A.   But at the time I thought it had something to do with

9   getting the third disbursement of the original which I -- which

10  it wasn't.  Now I understand it wasn't.

11  Q.   So if you turn to Page 356 in the trial book --

12  A.   Yes.

13          THE CLERK:  It looks like it's Exhibit 19.

14          MS. DELEO:  Yes, Exhibit 19, 356.

15  BY MS. DELEO:

16  Q.   Is this the loan that is currently held by Deutsche Bank?

17  A.   It is an incorrect representation of that loan.  This

18  demonstrates exactly what I was talking about.  So you see I

19  was approved for an amount there.

20  Q.   Okay, are you talking about --

21  A.   Forty-six thousand six hundred and sixty with three

22  disbursements; the first disbursement being 15,000 which I did

23  receive.  And then if you turn to Page 2, the second

24  disbursement 16,130 which I received a part of that.  I

25  received $7,305 of that one.  The third disbursement I never

Fowler - Direct                                               186

1    received any amount of that at all.

2    Q.   Okay, so although Page 356 shows that you were to be

3    awarded an amount financed of $46,660, --

4    A.   Yes.

5    Q.   -- if we go to the Pretrial Order again on Page 8 the

6    actual amount of money that was lent to you was only $31,130.

7    A.   That's the amount of the loan that they get when they add

8    the first disbursement of 15,000 --

9    Q.   Uh-huh (affirmative response).

10   A.   -- plus the second disbursement of 16,130; of that I

11   received approximately $22,000.

12   Q.   And then the date as to the first disbursement would you

13   agree with that date that it was approximately January 19, 2006

14   that you got the 15,000?

15   A.   It cleared my First National Bank of Izzard County bank

16   account on 1/20/2006.

17   Q.   Okay.

18   A.   In the amount of $14,975.  They had held out a $25 wire

19   fee.

20   Q.   And the second disbursement it has a date of May 12, 2006?

21   A.   That's incorrect.

22   Q.   When did you actually receive access to that money?

23   A.   In August 2006.

24   Q.   Okay.  And this last disbursement for September 7, 2006,

25   it's your testimony that was never made?

Fowler - Direct                                        187

1   A.   Never.

2   Q.   While you were participating in this clinical program or

3   waiting to be assigned a spot in this clinical program --

4   A.   Right, I never actually participated.

5   Q.   Okay.  Did you take the Step 1 exam?

6   A.   Yes.

7   Q.   And did you pass the Step 1 exam?

8   A.   I did not.

9   Q.   Do you believe that that had any reflection on allowing

10  you to participate in the clinical program?

11  A.   Yes.

12  Q.   Were you considered by your medical school to be a student

13  in Fall of 2006 when the clinical -- when you came back to the

14  United States and went to Louisiana to wait for the assignment

15  were you considered a full-time student at that point in time?

16  A.   I considered myself that.  I don't consider that myself --

17  I don't consider myself that now because it never -- I was

18  never given the opportunity to utilize that $8,825 tuition.

19  Q.   Okay.

20  A.   So I'm not sure what -- what they considered me as.

21  Q.   Okay.  Did you graduate from medical school?

22  A.   No.

23  Q.   Could you go back to medical school today or take the

24  Step 1 and try to complete it and then go back and finish

25  medical school today?

Fowler - Direct                                    188

1    A.    I highly doubt that that would be an option.   No.

2    Q.    And why do you say that?

3    A.    Well, it would be ridiculous for me to pursue that at this

4    point in my life I guess.   There's a lot of comments I could

5    make here.   So if I found a school that was willing to take me

6    and allow me to do that, and if I had the capacity to do, and I

7    don't think that I do, but if I -- if everything was perfect

8    and somebody took me, I would still not be able to match in a

9    U.S. residency program at this point in my life and this point

10   in the bottlenecked situation that the residencies, U.S.

11   residencies are experiencing.

12   Q.    Okay.   Did you have some event that occurred in your life

13   that has impacted your ability to work?

14   A.    I have a series of events that changed -- changed me

15   drastically as far as my ability to handle stress, if that

16   makes sense.   I experienced when I was in medical school an

17   incident that -- a personal incident that was very traumatic

18   that caused me to have some repressed memories surface from my

19   childhood and there were -- there was then a kind of sequential

20   list of things that led me into a spiraling downward position

21   including some female reproductive issues that resulted in

22   multiple miscarriages.   I had some deaths in the family.   I had

23   stress with trying to pass the USMLE Step 1.   And the

24   incredible stress of the burden of feeling like I was going

25   into debt and maybe my plan was not working.   The Arkansas

1  State Medical Board was making the decision that students from

2  my medical school would not be allowed to practice medicine in

3  that state, and that was the entire reason that I had went

4  there in the first place.  And I felt like I had thrown

5  hundreds of thousands of dollars of good money in a bad

6  direction.  And my fear was coming true that it wasn't actually

7  going to pan out into a viable career.

8  Q.   Now, these physical, emotional issues that you're

9  referring to, do they exist today?

10 A.   Yes.

11 Q.   Okay.  Tell me today what it is that you suffer from that

12 hurts your ability to earn an income.

13 A.   The basic part of it is that I no longer tolerate stress

14 well.  I suffer from deep, horrible depression and anxiety.

15 Sometimes I shut down and sometimes I'm just not very

16 functional.

17 Q.   Does this happen often?

18 A.   Yeah, I live with a cloud, a cloud over me, if that makes

19 sense.

20 Q.   And has this led to any physical limitations?

21 A.   Yeah, I mean in that anytime someone is depressed you

22 know how you feel physically, it's -- you don't feel like

23 yourself.

24 Q.   Okay.  So, have you seen a doctor?

25 A.   No.

1  Q.   Are you taking any prescriptions for your medical

2  condition?

3  A.   No.

4  Q.   Do you believe your condition is both physical and

5  psychological?

6  A.   I'm sorry?

7  Q.   Is it both physical and psychological or is one more than

8  the other?

9  A.   I would say it's more psychological and emotional than

10  physical.

11  Q.   Okay.  What limitations does this pose for the types of

12  jobs that you feel like you're capable of holding?

13  A.   I don't like to leave my house and that is why I do work

14  from home.

15  Q.   Okay.  Now, we have heard Mr. Demmons testify as to his

16  physical infirmities.  Are you staying at home also to care for

17  him?

18  A.   Yes.  Absolutely.  It's crucial that I work together with

19  him so that he can be high functioning -- higher functioning.

20  So that's one of the benefits of working from home, absolutely.

21  Q.   Does working from home also give you other freedom?

22  A.   Yes, I can set my own schedule.

23  Q.   And that helps with your psychological stress?

24  A.   Yes.

25  Q.   Now, turning to the exhibits, Plaintiff 1, if you will

Fowler - Direct                                        191

1    turn to Page 15?

2              THE COURT:  Fifteen?

3              MS. DELEO:  Fifteen.

4    BY MS. DELEO:

5    Q.   When you filed bankruptcy this page reflects that you had

6    some retirement funds, particularly a Roth IRA of $8,000.  Do

7    you still have this retirement fund?

8    A.   No.

9    Q.   What happened to this retirement fund?

10   A.   I've utilized that for legal fees.

11   Q.   Okay.  If you turn to Page 17, your bankruptcy schedules

12   reference a Newmar Fifth Wheel.

13   A.   Yes.

14   Q.   Do you still have that?

15   A.   Yes.

16   Q.   And can you describe to me its current condition?

17   A.   When -- yes.  This fifth wheel is what I -- well, I'm

18   sorry, I can't seem to talk without bringing everything back to

19   my decision to go to medical school.  I lived in this for three

20   years prior to going to school to save money to go, enhance my

21   funds.  And it was damaged and improperly repaired and so the

22   ceiling leaked water eventually and now it's molded and the

23   slide out on it no longer works.  It's no longer usable or

24   livable or repairable as far as that goes.

25   Q.   So would you give this asset a value of zero today?

Fowler - Direct                                                    192

1   A.    It could quite possibly be a negative value to have it

2   towed away I guess, --

3   Q.    Okay.

4   A.    -- so zero, yes.

5   Q.    Can you turn to Page 31, please?

6   A.    This is the original Schedule I that was prepared when you

7   filed your case.

8   A.    Yes.

9   Q.    And how much income does it reflect that you earned at

10  that time, your gross income?

11  A.    One thousand seven hundred forty-three dollars and ninety-

12  four cents.

13  Q.    Do you have any income today?

14  A.    I haven't earned any income this year in 2016.

15  Q.    As of January 1st through today --

16  A.    Correct.

17  Q.    -- you've had no income?

18  A.    Correct.

19  Q.    Turning to the second page, if you go down to Line 5c it

20  indicates that you were making contributions to a retirement

21  plan.

22  A.    Yes.

23  Q.    Of $84 a month?

24  A.    It was based on a percent -- or it is based on a

25  percentage of the pay.

1   Q.    Okay.

2   A.    And the question was am I -- is it --

3   Q.    Are you making retirement contributions --

4   A.    Yes.

5   Q.    -- today?

6   A.    Yes.

7   Q.    Today are you making retirement contributions?

8   A.    Not without income, I mean no.

9           THE COURT:  What page are you on now?

10          MS. DELEO:  Thirty-two.

11          THE COURT:  Thirty-two?

12          MS. DELEO:  Thirty-two.

13          THE COURT:  All right, I got behind.  Give me just a

14  minute.

15          MS. DELEO:  That's okay.

16          THE COURT:  All right, I'm with you.

17          MS. DELEO:  All right.

18  BY MS. DELEO:

19  Q.    Have you attempted to find any other employment?

20  A.    Yes.  Before I got this job I applied to hundreds of jobs.

21  I never received any type of follow up with any of them.

22  Q.    What about since January have you attempted to find any

23  other employment?

24  A.    No.

25  Q.    Do you believe that you're restricted in the type of

1   employment that you're capable of seeking?

2   A.   At this time I do.

3   Q.   Okay.  Do you believe that you still need a job that will

4   keep you in the home?

5   A.   Absolutely.  But I don't consider myself without a job.  I

6   know that that's how it appears since I don't have income, but

7   as soon as they find something for me to do, or they need me, I

8   hope to get some hours.

9   Q.   And how much do you earn an hour?

10  A.   Ten dollars and thirty cents.

11  Q.   Do you have any income from a source other than

12  employment?

13  A.   No.  I mean what Bill brings home obviously.

14  Q.   Right.  Looking back at your original schedules on Page 34

15  you had net income of $38.20 a month.  Do you have any net

16  income today?

17  A.   No, we don't.

18  Q.   If you could please turn to Page 64 which shows your

19  current expenses?

20  A.   Yes.

21  Q.   Could you please explain to me the food expense of $800?

22  That seems high compared to the rest of your expenses.

23  A.   Yes.  That's wishful thinking.  I think Bill testified to

24  the fact that we've adopted a whole food plant based diet to

25  reduce the inflammation in his system so that he's more

1  functioning.  So ideally I calculate that to be what it would

2  cost to properly feed us with that type of food which are fresh

3  fruits, vegetables, no processed food, no meat, or dairy, or

4  cheese, just a clean healthy diet.

5  Q.   How much do you think you actually spend on food?

6  A.   We base it paycheck by paycheck and what we can -- what's

7  available there any given week.  It's a tight, usually a very

8  tight situation.

9  Q.   Do you pay your bills before you buy food?

10 A.   Absolutely.

11 Q.   Is your house note current?

12 A.   It is.

13 Q.   Do you pay your house note before you buy food?

14 A.   Before anything, yes.  And sometimes we have to extend

15 that to the last possible second.  So, we're always trying to

16 play catch up, yeah.

17 Q.   Are there any discretionary funds or any discretionary

18 expenses on this budget on Page 64?

19 A.   Not that I can find, although if I can find something I

20 will gladly slash it.

21 Q.   You have an entertainment expense of $25.  What does that

22 include on a monthly basis?

23 A.   Netflix is 7.99 a month.

24 Q.   So in actuality is that your entertainment expense?

25 A.   It is.  I mean fortunately being in this area we have a

1   lot of free entertainment.

2   Q.   And I think there was testimony before you do not have

3   cable TV?

4   A.   No.

5   Q.   But you spend $7.99 a month on Netflix?

6   A.   Yes, and I also buy crickets for the anoles and geckos.

7   Maybe that's entertainment too because I enjoy that.

8   Q.   Okay.

9   A.   Explain to me your current lifestyle.

10  A.   It's very minimal, minimalistic in what we have to work

11  with financially at this time.

12  Q.   When is the last time you had your hair cut?

13  A.   Last -- I think last May or June I got one of those

14  receipts off the back of -- a coupon off the back of a Walmart

15  receipt and it was for The Style -- I think it's called The

16  Style Shop or something like that, the little beauty shop

17  inside or hair cutting place inside Walmart and it was for

18  $12.95.  And it was at the beginning of the summer and the

19  ticket didn't expire until the end of August I think.  And I

20  decided to hold onto that ticket, that coupon and save money

21  over the summer to put back the $12 to get my hair cut at The

22  Style Place.  And by the time it got there our truck had broken

23  down at that time and we didn't have another vehicle that we

24  borrowed, we didn't have that vehicle yet, so we were walking.

25  And on the last day before that coupon was to expire I walked

Fowler - Direct                                                   197

1   to Walmart which is about two miles from my house with the

2   money that I had saved all summer.  And the lady at The Style

3   Shop says "It expires today and I can't take that coupon."  So

4   I didn't get it cut that day.  So, I don't remember the time

5   before that I had it cut.

6   Q.   Do you need glasses?

7   A.   Yes.

8   Q.   Do you have glasses?

9   A.   I have the magnifying glass and that's what I use.  I used

10  to have glasses when I was in medical school.  That

11  prescription no longer -- or the glasses that I had no longer

12  work.  My eyes -- my sight has changed.  And, no, I don't have

13  glasses.  I need glasses, yes.

14  Q.   So you use a magnifying glass?

15  A.   I do and that helps with the close up stuff.  But my

16  vision was actually -- the far vision that's most severely

17  affected, so you're a bit blurry.

18  Q.   When is the last time you have been to a dentist?

19  A.   May 2006 I had to leave the island to have four root

20  canals.  That was the last time.

21  Q.   Do you feel that you need dental work?

22  A.   Terribly.

23  Q.   Are you --

24  A.   I'm in pain, yes.

25  Q.   You have pain from --

Fowler - Direct                                         198

1   A.   Yes.

2   Q.   -- lack of dental work?

3   A.   Yes.

4   Q.   You talked about or there was testimony about going to see

5   your parents around Christmas and some people coming to see you

6   at Mardi Gras.

7   A.   Yes.

8   Q.   Is that basically what you would consider a social outing?

9   A.   Yes.  The prior Christmas we had tried to drive home.  We

10  were driving the minivan at that time and I broke down December

11  2014 somewhere in Mississippi.  We got that -- managed to get

12  that back home and it's sitting in the driveway.  It hasn't

13  moved since.  So it was very important to get to go home this

14  past Christmas 2015 and, yes, I went home to Arkansas for

15  Christmas this year.

16  Q.   Do you have medical insurance?

17  A.   No.

18  Q.   What about Christmas this year, what did you do about

19  Christmas gifts?

20  A.   I bought the gifts at the Dollar Tree for the most part.

21  Also you know just writing people a nice Christmas card and

22  telling them how much they mean.  You know something that's not

23  a financial, material gift actually can mean more to people

24  than a gift.  So, I did things like that.

25  Q.   And what about gifts that you were given?

Fowler - Direct                                                      199

1   A.   I returned them all to Walmart and converted that money

2   into money to spend for food.

3   Q.   Gifts from other people?

4   A.   So the gifts -- fortunately, my family buys all their

5   gifts at Walmart and fortunately Walmart has a good return

6   policy because I was able to sustain us with those right up

7   until very recently.  I was taking an item back at a time and

8   exchanging it for food.

9   Q.   When is the last time you bought a new piece of clothing?

10  A.   Actually I had my class reunion in October and I treated

11  myself to this white shirt that I have on today.  So, I bought

12  this shirt to go to my class reunion in Melbourne, Arkansas,

13  Class of 1985.

14  Q.   Do you recall the price?

15  A.   I think it was around $40.

16  Q.   Okay.  Is there any room in your budget to cut an expense?

17  A.   No, but if I could find one I would -- I would gladly do

18  it.

19  Q.   Do you know the amount of the monthly payments on your

20  student loans?

21  A.   Not without referencing something.

22  Q.   Okay.  If you can look to Page 8 --

23        MS. DELEO:  Of the Pretrial Order, Your Honor.

24  BY MS. DELEO:

25  Q.   -- Sentence Number 59, --

Fowler - Direct                                                200

1   A.    Yes.

2   Q.    -- what is your monthly student loan payment to Deutsche?

3   A.    Two hundred and fifty-two dollars and ninety-six cents.

4   Q.    And if you turn the page to Page 9, what would be your

5   monthly payment on your FCDB loan?

6   A.    Ninety-seven dollars and twenty-eight cents.

7   Q.    And does total approximately $350?

8   A.    Yes.

9   Q.    Can you household afford to repay $350 a month?

10  A.    No.

11  Q.    As to your current physical and emotional pain and your

12  need to stay at home as a caregiver for your husband, do you

13  expect this event to continue for an indefinite period of time?

14  A.    Yes.

15  Q.    At the time when you originally took these student loans

16  which began in January --

17  A.    2006.

18  Q.    -- 2006, were you suffering the physical and mental

19  conditions that you've described?

20  A.    No.

21  Q.    Were you having to care for Mr. Demmons?

22  A.    No.

23  Q.    Do you believe that you'll continue to have these physical

24  and psychological limitations into the future and that this

25  will impact your future earnings?

Fowler - Direct                                    201

1   A.   Unfortunately, yes.

2   Q.   If you will please turn in the exhibit book to Page 84,

3   it's Exhibit 7, and if you look at the bottom of the page it

4   indicates American Education Services and the Deutsche loan.

5   Can you tell me what payments have been made on the Deutsche

6   loan since your leaving medical school?  Let's say for the

7   period or for the year 2011.

8   A.   2011 for both loans or which loan?

9   Q.   For Deutsche.

10  A.   For Deutsche $433.72.

11  Q.   And how much did you pay to Deutsche for the year 2012?

12  A.   Two thousand three hundred and seventy-four dollars and

13  fourteen cents.

14  Q.   Are you sure that is not $1,373?

15  A.   Yes.  I'm not sure what I just said, but I see the number

16  $1,373 indicated year 2012 for Deutsche.

17  Q.   Okay.  And how much did you repay your student loan in

18  2013 to Deutsche?

19  A.   One thousand three hundred and sixty-five dollars and

20  fifty-five cents.

21  Q.   And what about the year 2014?

22  A.   Two hundred and fifty-two dollars and ninety-six cents.

23  Q.   Now as to your other student loan which is the FCDB NPLS

24  Trust --

25  A.   Yes.

Fowler - Direct                                          202

1   Q.   -- have you also made payments to them on their student

2   loan?

3   A.   Yes.

4   Q.   How much did you pay them in the year 2012?

5   A.   One thousand one dollar eight cents.

6   Q.   And 2013?

7   A.   Seven hundred and fifty-five dollars and fifty-two cents.

8   Q.   And what about 2014?

9   A.   Eight hundred and fifty-one dollars and seventy-one cents.

10  Q.   Ms. Fowler, have you been proactive in contacting your

11  student loan lenders and updating them as to your financial

12  situation?

13  A.   Personally I shut down in my ability to deal with my

14  financial situation too depressed to be able to face this

15  overwhelming burden of debt that I didn't even feel like was

16  accurate because of the -- the way that funds had been handled

17  with the medical school and the information that I was able to

18  obtain at the time.  And my husband has been the one that's

19  left -- has been left with the burden of dealing with them and

20  keeping my -- keeping things in order and letting them know of

21  status changes and such.

22  Q.   So you rely on Mr. Demmons to do that for you?

23  A.   Yes.

24  Q.   Does he generally pay the household bills?

25  A.   Yes.

Fowler - Direct                                              203

1   Q.   Do you believe your loans with Deutsche and FCDB to be

2   protected student loans that are non-dischargeable in

3   bankruptcy?

4   A.   No, I don't believe them to be that at all.

5   Q.   And why is that?

6   A.   These loans for the most part -- well, actually I wasn't

7   even in school.  I never received any type of educational

8   benefit from any of the tuition that was taken from these

9   loans.

10  Q.   Okay.  And ultimately wasn't that tuition refunded to a

11  lender in agreement that you were not a student despite the

12  fact that you received student loans?

13  A.   The wrong amount was refunded to the wrong lender.

14  Q.   Okay.  If you could please turn to Exhibit Number 6,

15  Page 83?  Do you recognize what this document is?

16  A.   It's talking about cost of education.

17  Q.   Cost of attendance?

18  A.   Cost of attendance, yes.

19  Q.   At your medical school?

20  A.   Yes.

21  Q.   Now for the fifth semester the cost of attendance says

22  living expenses only $4,750.  Why is that?  Did you pay cash to

23  your medical school --

24  A.   Yes, yes --

25  Q.   -- for tuition?

Fowler - Direct                                                204

1    A.    -- so I had already prepaid tuition that semester out of

2    my own funds and so the living expenses is what I would have

3    been entitled to for Winter 2006.

4    Q.    And how much did you receive as a disbursement from

5    Deutsche for that semester?

6    A.    Right.  So in my bank account that I have record I have

7    $14,975.  This reflects $15,000 because there was a $25

8    transfer fee.

9    Q.    And that's a transfer from your medical school to you?

10   A.    From -- yes, yes, yes.  From my former medical school.

11   Q.    And so you received in excess of the cost of attendance at

12   school?

13   A.    Ten thousand two hundred and fifty dollars.

14   Q.    All right, now for the sixth semester --

15   A.    Yes.

16   Q.    -- and that is the semester that you began --

17   A.    That I was scheduled to begin clinicals.

18   Q.    Okay, and what was the cost of attendance for that

19   semester?

20   A.    Sixteen thousand one hundred and thirty dollars.

21   Q.    And what was the disbursement you received for that

22   semester?

23   A.    I received $7,305.  My former medical school withheld

24   $8,825 for tuition and fees.

25   Q.    So the second Deutsche disbursement is in the exact same

Fowler - Direct                                                    205

1    amount as the cost of attendance for that semester, is that

2    correct?

3    A.   Yes, for the cost of attendance for the semester that I

4    never attended.

5    Q.   Okay.  And the last item shows Fall and Winter, Fall 2007

6    and Winter 2008 which would be your seventh and eighth

7    semesters, correct?

8    A.   If I had been allowed to attend that would have been my

9    seventh and eighth semester.

10   Q.   Okay.  And the cost of attendance for that period at your

11   medical school was how much?

12   A.   Thirty-one thousand and fifty dollars.

13   Q.   And this was your FSDB loan --

14   A.   Yes.

15   Q.   -- and so what was the disbursement they gave you for that

16   period?

17   A.   Thirty-eight thousand four hundred and sixty dollars.

18   Q.   So is that more than the cost of attendance?

19   A.   Yes, an overage of $7,400.

20   Q.   Ms. Fowler, is it true that your medical school refunded

21   all of the tuition charged to you related to any student loan

22   that you took?

23   A.   It's not true that they returned all of what I think they

24   should have returned, but they did return the majority of what

25   they should have returned.  They returned it to the wrong

Fowler - Direct                                    206

1   lender.

2   Q.   Okay.

3   A.   Some of it was to the right lender and some of it was to

4   the wrong lender.

5   Q.   Okay.

6   A.   In other words Deutsche, who is represented here today,

7   should have received some refund money for the tuition of the

8   semester -- of one of the semesters that I never attended.

9   They did not receive that.

10  Q.   Okay.  So is it your contention that these are not non-

11  dischargeable student loans because you were not a student?

12  A.   Yes.

13          MS. DELEO:  I'm going to tender the Witness,

14  Your Honor.

15          THE COURT:  All right, well I imagine cross-

16  examination is going to last a little while so it's probably a

17  good time to take a break.

18          MS. DELEO:  Sure.

19          THE COURT:  Well, not just take a break, but I mean

20  quit for the day.

21          MS. LASALLE:  Your Honor, I'm flying out of town

22  tomorrow at 8:00 a.m.

23          THE COURT:  How can you be out of town?  We scheduled

24  this for three or four days.

25          MS. LASALLE:  I know but I thought today we were

Fowler - Cross                                    207

1    supposed to go for the one day.  My cross-examination will not

2    be that long, Your Honor.  I can do it in like 10-15 minutes.

3              THE CLERK:  We were supposed to do just this day and

4    Saba tomorrow.

5              MS. LASALLE:  Saba was supposed to be tomorrow.

6              THE COURT:  I know that.  All right.

7              Jennifer, you all right?

8              THE CLERK:  Yes, sir.

9              MS. LASALLE:  I'll make it as quick as possible,

10   Your Honor.

11             THE COURT:  All right.  Well, we're not going to go

12   tomorrow?

13             MS. LASALLE:  No, Saba is done.  You wanted to have

14   trial tomorrow, did you?

15             THE COURT:  All right.

16                         *    *    *    *    *

17                         CROSS-EXAMINATION

18   BY MS. LASALLE:

19   Q.    Hi, Ms. Fowler.

20   A.    Hello.

21   Q.    When you filed your bankruptcy you were employed, correct?

22   A.    Yes.

23   Q.    And you were employed with E&F Fowler, Inc.?

24   A.    That's right.

25   Q.    And since that time do you consider yourself to still be

1   employed by them?

2   A.    I do.

3   Q.    Okay.  Yesterday we received an amended Schedule I, if you

4   turn to Exhibit 2, Page 61.

5   A.    Yes.

6   Q.    So it shows that you're still employed but it shows zero

7   salary.

8   A.    Correct.

9   Q.    Can you explain how you're still employed but you don't

10  have any income at this time?

11  A.    They use me on an as needed basis.

12  Q.    And so they don't have hours to give you at this point?

13  A.    That's right.

14  Q.    What have you done since January to maybe find something

15  else to do while you're not getting any hours from them?

16  A.    I have pretty much exclusively worked on this case.  So,

17  this has taken an inordinate amount of time.

18  Q.    What job skills would you say that you have?  Can you use

19  a computer?

20  A.    Yes.

21  Q.    You prepared or you assisted in creating Exhibit 7,

22  correct?

23  A.    Yes.

24  Q.    And you also said you helped out with the discovery

25  responses?

Fowler - Cross                                                 209

1   A.   Yes.

2   Q.   Preparing the responses.

3   A.   Yes.

4   Q.   So you can use Word, Excel?

5   A.   I'm not as computer savvy, but I can type.

6   Q.   Okay.  What about research skills, did you do any research

7   when you were in --

8   A.   Yes.

9   Q.   -- med school?

10  A.   Oh, you --

11  Q.   Just in general --

12  A.   Yes.

13  Q.   -- research --

14  A.   Yes.

15  Q.   -- but anything maybe specific kind of clinical research

16  or things like that, is that kind of stuff what you've done in

17  the past?

18  A.   I've always -- anytime I've been involved it's been in a

19  low level.  I've not spearheaded any type of major research on

20  my own.

21  Q.   But you participated --

22  A.   But I participated as a student in research type projects

23  in the past.

24  Q.   Now, you said on direct examination that you are suffering

25  from anxiety and depression, correct?

1   A.   Yes.

2   Q.   When -- around what time did that begin?

3   A.   Around -- when I had my miscarriage when I was in the

4   second -- the one when I was in the second trimester that was

5   the most devastating time period of my life every.

6   Q.   Was that like 2006 or was it --

7   A.   And that was -- no, give me just a second.

8   Q.   Sure.

9   A.   That was 2008.

10  Q.   2008.  Did you see any doctors at that time?

11  A.   I had my -- I followed up with the miscarriage in the

12  hospital but I did not see doctors after that.

13  Q.   And so since that time you haven't seen a doctor to

14  diagnose you for depression or anxiety --

15  A.   No, I haven't.

16  Q.   -- or provide you with any medicine?

17  A.   No.

18  Q.   You have worked from home in the past, correct, when you

19  were working for E.F. Fowler I think -- E&F Fowler --

20  A.   Yes.

21  Q.   -- is from home?

22  A.   Yes.

23  Q.   So have you thought about looking for another job that you

24  could maybe also do from home while you're waiting for more

25  hours to come in from your current job?

1  A.   I haven't had the time or the ability available with the

2  burden of taking care of Bill and preparing this.  There's a

3  lot goes into that and so no.

4  Q.   So once this case is over with will you have more time?

5  You won't be working on the legal side.  Will you be able to

6  have more time to look for a job?

7  A.   It will probably be dependent on how Bill's condition is

8  and how my depression is.

9  Q.   Mr. Demmons testified that he's working during the day.

10 A.   Yes.

11 Q.   So when he's at work you're not caring for him at that

12 time, right, you're at home?

13 A.   Right.

14 Q.   So that would provide you some time to work when he's not

15 there and you have to take care of him, correct?

16 A.   Well, if he's not there it doesn't mean I'm not doing

17 thing to make his life more manageable.

18 Q.   So you're not going to have any excess --

19 A.   I mean I take care of the home and I provide him with the

20 things that he needs such as his diet and taking care of every

21 aspect of the home.  He you know doesn't have the ability to

22 mow the yard and -- or take care of the house in any capacity

23 at all.  He's kind of a full-time job.

24 Q.   You mentioned that you liquidated one of your IRAs to pay

25 for legal fees.  If you turn to Page 44, Ms. Fowler, this is

1   the Disclosure of Compensation from your bankruptcy attorney.

2   Do you see where it shows $1,144?

3   A.   Yes.

4   Q.   So are these the legal fees that you're referring to that

5   you liquidated the IRA to pay these attorney's fees for filing

6   your Chapter 7 case or were there other attorney's fees that

7   you used that money for?

8   A.   Part of it probably went to this, but --

9   Q.   "This" meaning --

10  A.   -- the majority of it has gone to the filing of this

11  adversary.

12  Q.   And so to paying your current attorney's fees?

13  A.   Yes.

14  Q.   Just a couple of charges that I want to ask you about,

15  Ms. Fowler.  Mr. Demmons talked about a third phone line that

16  you have for purposes of work?

17  A.   Yes.

18  Q.   Do you need that any longer because you're not working at

19  this time or -- or you're not getting hours.  I shouldn't say

20  you're not working.  Do you need that third phone line?

21  A.   It's an extra $10 a month and I feel like I need to keep

22  it because when I do contact patients it's difficult to

23  communicate with them just because I have an out-of-state area

24  code with my personal phone.  And this extra $10 a month

25  insures that these people will talk to me, if that makes sense.

Fowler - Cross                                    213

1   Q.   Okay, sure.

2        I think we went through with Mr. Demmons the Comcast which

3   is your internet fee of like $60 a month.

4   A.   Yes.

5   Q.   Have you looked into anything less expensive?  I know that

6   you have AT&T for your cell phone.  Have you looked into other

7   less --

8   A.   We have.  We're always looking at that, stopping by in the

9   mall trying to get them to give us better prices and you know

10  -- yes.

11  Q.   And this is the best rate that you could get?

12  A.   This is the best price that we've come up with.  But if

13  anybody wants to sell me something cheaper I'd be glad to buy

14  it right now.

15  Q.   Sure.

16          MS. LASALLE:  No further questions, Your Honor.

17          THE COURT:  All right, --

18          MS. LASALLE:  Oh, you know what, I've just --

19          THE COURT:  Sure.

20          MS. LASALLE:  -- two more.

21  BY MS. LASALLE:

22  Q.   I'd asked Mr. Demmons about the car.  Can you tell me

23  exactly when the --

24  A.   Yes.

25  Q.   -- truck stopped working?

Fowler - Cross                                                    214

 1  A.   Yes.  So --

 2           THE COURT:  We've already covered that.  They were

 3  going up to Arkansas in December of 2014 --

 4           MS. LASALLE:  That was the first car.  There's a

 5  second car.

 6           THE COURT:  Oh, I'm sorry.

 7           MS. LASALLE:  Sure.

 8           THE COURT:  All right.  The one I'm talking about is

 9  the --

10           MS. LASALLE:  The minivan, and so the truck.

11           THE COURT:  All right.

12           THE WITNESS:  He's right.  After the minivan broke

13  down we had to put money into the truck because it wasn't

14  running at that point.  We put money in and got it running for

15  a little while.  And then it broke down in June or July last

16  summer.

17  BY MS. LASALLE:

18  Q.   Of 2015?

19  A.   Of 2015.

20  Q.   And when did you start using your mother's car?

21  A.   September of 2015.

22  Q.   Great, thank you.

23           MS. LASALLE:  No further questions, Your Honor.

24           THE COURT:  All right.  Well, we're going to adjourn

25  for the day.

Fowler - Cross                                    215

1          Well, do you have some -- how long is your cross-

2    examination going to be?

3               MR. MCCANDLISH:  No, Your Honor, I mean 30 seconds.

4               THE COURT:  Oh, well all right, come on then.  All

5    right, I'm sorry.

6                     *    *    *    *    *

7                        CROSS-EXAMINATION

8    BY MR. MCCANDLISH:

9    Q.   Really, ma'am, just very, very briefly.  If you could turn

10   to Page -- I'm sorry, turn to Exhibit Number 19 which is

11   Page 353 in your exhibit book.

12   A.   Yes.

13   Q.   And I just want to confirm that that's the loan that you

14   had signed back in 2005, correct?

15   A.   Yes.

16   Q.   And if you turn to Page 356, the amounts here are

17   inaccurate, rather the amounts that you gave previously as to

18   the disbursements were accurate, correct?

19   A.    If you'll notice the date at the top of that letter,

20   January 19th, 2006, that was the intended distribution payment.

21   Since I was denied one of the distributions by my former

22   medical school that amount is actually wrong and I do have

23   letters that look just like this one that have the correct

24   number of 31,130.

25   Q.   Okay, but you had mentioned that this was incorrect and

Fowler - Cross                                                216

1  that's all that's incorrect as far as you can tell --

2  A.   No.  The problem is -- the other problem is that the

3  tuition was not refunded to that loan and I wasn't an actual

4  student at the time of that disbursement.

5  Q.   Okay.

6  A.   So I feel like --

7  Q.   But as far as --

8  A.   -- I owed Deutsche a significant less amount than this,

9  that is stated because I never received any number approximate

10 to that number.  My number is more like 22,000.

11 Q.   Because --

12 A.   And I can -- I can show that.  I can document that as much

13 as need be.

14 Q.   That's because a refund went somewhere else you say?

15 A.   That's -- you understand that I didn't receive these three

16 disbursements.

17 Q.   Right.

18 A.   I received two disbursements.

19 Q.   Right.

20 A.   And when the tuition -- because I wasn't actually a

21 student, the tuition was refunded and it was refunded to the

22 other NPL.  Actually it was refunded to Great Lakes, but they

23 had the wrong loan identifier number on it, and so all the

24 money went back to the loan that's now held by NPLS Trust.

25 Q.   Okay.

1          MR. MCCANDLISH:  Thank you, Your Honor.  No further

2     questions for this Witness.

3          THE WITNESS:  Thank you.

4          THE COURT:  Okay.  Anybody else?

5          All right, do have any redirect?

6          MS. DELEO:  One question, Your Honor.

7                    *    *    *    *    *

8                    REDIRECT EXAMINATION

9     BY MS. DELEO:

10    Q.   Ms. Fowler, when you stated that you have no time or

11    ability to seek another job at this point in time because of

12    the legal work that we were putting together for this case,

13    although this lawsuit will be over will you continue to have to

14    stay at the home in order to take care of Mr. Demmons and all

15    of the needs that you're currently providing for?

16    A.   Yes.

17    Q.   Okay, thank you.

18         THE COURT:  Lisa, go get the docket book.  They've

19    got to agree on another day.

20         THE CLERK:  For what?

21         THE COURT:  For this, to finish this.

22         THE CLERK:  Well, we're finished I think.

23         THE COURT:  No, the defense hasn't put on anything.

24    She hasn't closed.  They're not finished.

25         MS. LASALLE:  We do not have any witnesses to put on,

1    Your Honor.  I think the only thing left is that Ms. DeLeo is

2    going to call Mr. Demmons again to testify regarding

3    Ms. Fowler's condition.

4              MR. MCCANDLISH:  Your Honor, the only case I would

5    have is to move to introduce some of the documents that we put

6    in here.

7              THE COURT:  Well, nobody has moved to introduce any

8    documents.

9              MS. DELEO:  Yes.

10             MS. LASALLE:  Right, Your Honor, we were going to do

11   that at the very end so --

12             THE COURT:  Well, are you telling me you can make

13   this the end today?

14             MS. DELEO:  Yes.

15             MS. LASALLE:  Yes.

16             THE COURT:  All right, how long do you think it's

17   going to take?

18             MS. LASALLE:  Robin, I don't know.

19             MS. DELEO:  I'm just going to put on Mr. Demmons to

20   testify as to taking care of the student loans on behalf of

21   Ms. Fowler and to describe her physical demeanor and her

22   ability to hold a job.

23             THE COURT:  All right, this is a part of your case --

24             MS. DELEO:  To corroborate her testimony.

25             THE COURT:  All right, so you're recalling him in

1    your case in main.

2                    MS. DELEO:  Yes.

3                    THE COURT:  All right.

4                    MS. DELEO:  Okay?

5                    THE COURT:  All right.

6                    MS. LASALLE:  I can't promise I won't object.

7                    THE COURT:  That's what y'all want to do to, you want

8    to finish it today?

9                    MR. MCCANDLISH:  Yes, Your Honor, if we could that

10   would be great.

11                   MS. LASALLE:  Yes, Your Honor.

12                   THE COURT:  All right.

13                   MR. MCCANDLISH:  Thank you, Your Honor.

14                   MS. DELEO:  Your Honor, at this time I would like to

15   introduce and admit into evidence the exhibits that we used

16   today.

17                   THE COURT:  Well, all of them?

18                   MS. DELEO:  No.  Starting with Number 1 which are the

19   Debtors' bankruptcy schedules.

20                   THE COURT:  All right, is there any objection?

21                   MS. LASALLE:  No, Your Honor.

22                   THE COURT:  Number 1 is admitted.

23                   MS. DELEO:  Number 2, Your Honor, is the new

24   Schedule I and J created by the Debtors.

25                   THE COURT:  All right.

1          MS. LASALLE:  No objection.

2          THE COURT:  It's admitted.

3          MS. DELEO:  Number 3, Your Honor, are the paystubs

4     received by Mr. Demmons for January through April.

5          MR. MCCANDLISH:  No objection.

6          MS. LASALLE:  No objection.

7          MS. DELEO:  Number 4 --

8          THE COURT:  Did you say no objection?

9          MR. MCCANDLISH:  No objection.

10         MS. LASALLE:  No objection.

11         THE COURT:  All right, that was three.  Okay, it's

12    admitted.

13         MR. MCCANDLISH:  Your Honor, I think we've discussed

14    most of these exhibits in here prior, so I --

15         THE COURT:  All right, if you can tell me which ones

16    you object to, then we'll admit all the ones except the ones

17    you've objected to and we'll hear argument on that.

18         MS. LASALLE:  I don't think I have objections to any

19    of them, Your Honor.

20         MR. MCCANDLISH:  I have no objections, Your Honor.

21         THE COURT:  All right.

22         You don't have any do you, Trey?

23         MR. SUNDMAKER:  I'm thinking about it.

24         THE COURT:  Don't think about it very long.

25         All right, so there's no objections.  All the

Demmons - Direct                                                  221

1  exhibits in the exhibit book are admitted into evidence, is

2  that correct?

3              MS. DELEO:  Yes, Your Honor.

4              MR. MCCANDLISH:  Thank you, Your Honor.

5              THE COURT:  All right, that's good.

6              All right, now what else?

7              MS. DELEO:  Now I'm going to --

8              THE COURT:  Close.

9              MS. DELEO:  -- speak to Mr. Demmons, right?

10             THE COURT:  Oh, no you're not going to -- you're

11 going to ask -- all right, go ahead.

12                   *   *   *   *   *

13        **WILLIAM A. DEMMONS, III, WITNESS, PREVIOUSLY SWORN**

14                   *   *   *   *   *

15                    DIRECT EXAMINATION

16 BY MS. DELEO:

17 Q.   Mr. Demmons, how long have you known Ms. Fowler?

18 A.   January 1st, 2004.

19 Q.   And can you describe her demeanor when you originally met

20 her?

21 A.   She -- when I met her she was a very outgoing, kind,

22 compassionate, fun loving, articulate, bright, wonderful woman.

23 I mean I was taken from the very first moment and it was

24 literally the first moment.  I think she was very detailed and

25 organized and we ended up in the same anatomy lab.  And she was

Demmons - Direct                                        222

1   very focused and driven.  And it was good for me.  I was -- she

2   had visited the island to make sure it was the right place for

3   her.  She knew what she wanted and she was going after it and

4   so it was encouraging.  I had left I think the day before and

5   closed up everything and got ready to go and take advantage of

6   this opportunity.  So, she had a big -- it was a big impression

7   on me.  She was extremely knowledgeable in the areas that we

8   were studying and quite capable.  So she was -- and she was

9   very vibrant.

10  Q.    And did she hold a job during this period of time?

11  A.    Yeah.  When we were -- there's a little -- she was an

12  Anatomy TA and she went on to be the Neuro TA, a Neuro TA.  And

13  so she was quite active within the community.  She was very

14  active with the local hospital volunteering with the hospital

15  down there contributing.  It was a small hospital that was in

16  need.  And she was very active within the HBOT community.  The

17  school, our past medical school was trying to get this off the

18  ground.  It took an inordinate amount of dedication and work to

19  help them do that and she thought it was good for the

20  university.

21          THE COURT:  Excuse me for interrupting you.  "TA" is

22  therapy assistant?

23          THE WITNESS:  It's a teaching assistant, Your Honor.

24          THE COURT:  Teaching assistant.

25          THE WITNESS:  Yeah, I'm sorry, Your Honor.

 1           THE COURT:  Okay.

 2   BY MS. DELEO:

 3   Q.   Did there come a point in time where her -- where she

 4   changed?

 5   A.   Yeah.  There was some circumstances surrounding placement

 6   and continuing with the program.  She -- I remember her wanting

 7   to -- I was not of the same mindset.  I like to dot my I's and

 8   cross my T's and evaluate and then I make my decisions over a

 9   little more period of time.  But she knew exactly where she was

10   going with this whole thing.  And when it didn't happen for her

11   she started to become despondent and withdrawn and there was

12   complication after complication for her with this.

13        I think there always the pressure to continue to keep

14   moving forward and the feeling that she was experiencing

15   feeling under duress which when she says "shut down" it was

16   like the lights were on but nobody was home.  I mean I remember

17   weeks upon weeks where I couldn't get anything from her.  And

18   we started drifting in kind of a capacity.  I think definitely

19   the whole process affected her.  She was working her way

20   through that and trying to stay active because she, as she

21   indicated it was her goal to do this as quickly as possible.

22   She had a plan.  She was effecting that plan and then there was

23   a cog -- you know whatever they call it, something broke, the

24   cogs didn't twist anymore.

25        And then when she started having her female problems that

Demmons - Direct                                                  224

1    was kind of like a huge tipping with everything else that was

2    going on for her.  It changed everything about her.

3    Q.   Did she have more than one miscarriage?

4    A.   She did.  She had a hemolytic disorder.  I don't know

5    because of her Rhesus factor negativity maybe she wasn't

6    treated appropriately.  It could have developed at some point

7    earlier.  There's no telling at this point.  But the day before

8    she was scheduled for one of her OB-GYN appointments or

9    actually that morning she was hemorrhaging profusely and she

10   was in her second trimester.  So we took her to Terrebonne and

11   had her looked at.  But there had been other -- other

12   instances.  And at that time we weren't married which was a

13   total violation of her constitution and that in itself was a

14   lot for her to handle.

15   Q.   So how would you describe her condition today?

16   A.   I would use the term sometimes of "indentured servitude"

17   in the sense that she -- there's nothing, no job waiting for

18   her after this.  She started crawling her way out a little bit

19   and then she's stricken with me.

20   Q.   Do you feel that she is physically and psychologically

21   able to work outside of the home?

22   A.   I think that she's trying to find her way.  I don't think

23   that she's that same person that she was.  I think that this

24   has -- she doesn't handle -- it used to be (snaps fingers)

25   "Let's go, Bill," you know I mean this type of thing and it's

Demmons - Direct                                    225

1    not that way anymore.  It's not -- she doesn't handle stress

2    the same way.  She doesn't deal with stress the same way.  She

3    doesn't manage her life the same way.  And it's -- it has

4    genuinely affected her.  It's withdrawn her.  She's not

5    outgoing and she doesn't have a social network.

6    Q.    And you think this hurts her employability?

7    A.    Well, I don't see the same person with the same confidence

8    that I saw.  I don't see that person that knew exactly what she

9    wanted.  I don't see that person that was capable of figuring

10   out what she needed to do and affecting it.

11   Q.    Okay.  On a more kind of concrete way, can you tell me

12   what her physical limitations are that stop her from working

13   outside of the home that you've observed?

14   A.    I would say it's more of a depressive of mental capacity

15   as opposed to physical capacity.  But of course there's

16   physical ailment that's associated with depression.  Depression

17   fosters physical ailment.  You know if you're feeling depressed

18   you have an upset stomach, irritable bowel disease -- or

19   disorder.  You know there are plenty of physical things that go

20   along with it.

21           MS. LASALLE:  Your Honor, I'm going to object to this

22   line of questioning to the extent that Mr. Demmons is going to

23   go down the line of what the physical manifestations of any

24   mental illness are.  He's not testifying as an expert.  He's

25   testifying as to what her actual conditions are, not what the

Demmons - Direct                                    226

1   possible side effects would be.

2           THE WITNESS:  Well, these are the side effects.  I'm

3   sorry if I didn't say it clearly.

4           MS. LASALLE:  Sure.  No, I know, but you're here to

5   testify --

6           THE COURT:  Well, wait, and let me rule on the

7   objection.

8           MS. DELEO:  I think he's explaining, Your Honor, of

9   what she is suffering from.

10          THE COURT:  Well, he can give an explanation of her

11  day-to-day conduct because he's in close contact with her and

12  he observes all this.  He can't really give a medical opinion

13  as an expert witness.

14          MS. DELEO:  Right.

15          THE COURT:  And so the objection is good that -- I'm

16  sorry, yeah, the objection is good to that extent.  But he can

17  give a recitation of her day-to-day --

18          MS. LASALLE:  Sure, Your Honor.

19          THE COURT:  -- activities and her improvement or lack

20  of improvement.

21          MS. LASALLE:  Correct, Your Honor, but he's gone

22  beyond that talking about general symptoms of someone with you

23  know this kind of issue.  He's not talking about specifically

24  to Ms. Fowler and that's where my objection lies with him

25  giving any expert testimony.

1          THE WITNESS:  I'm sorry.

2          MS. DELEO:  I'll try to reword it, Your Honor.

3          THE COURT:  All right, I'll sustain the objection in

4   part.

5          MS. DELEO:  Okay.

6   BY MS. DELEO:

7   Q.   Mr. Demmons, --

8   A.   Yes, ma'am.

9   Q.   -- has Ms. Fowler also suffered some physical side effects

10  or symptoms as a result of her -- along with her depression?

11  A.   She used to be very, very thin.  She gained a lot of

12  weight during this period which made her more depressed.

13  Q.   Does she have irritable bowel?

14  A.   Yes, ma'am.

15  Q.   Is she capable of interacting with other people?

16  A.   Not in the capacity that she once did.  I don't think she

17  -- I won't speak for her, but I don't see the desire to

18  interact with people.  I see the fact that she's more

19  withdrawn.

20  Q.   Do you see some type of physical or psychological reason

21  that she cannot hold a job outside of the home?

22  A.   Going through this process I think I've expressed on

23  numerous occasions that this was really debilitating to her in

24  addition to everything else that was going on and just to get

25  her to -- the anxiety that she's been exhibiting and just her

Demmons - Direct                                          228

1   inability to deal.  She doesn't deal well.

2   Q.    And do you anticipate this to continue into the future?

3   A.    I'm not capable of determining that as Counsel pointed

4   out, but I can say from knowing her from 2004 through current

5   I've noticed that there's been a substantial change,

6   progressive change and it's not been comfortable for me to

7   witness.

8   Q.    Do you anticipate you needing her as a caregiver for the

9   future?

10  A.    First of all I wouldn't be here if it wasn't for her.  I

11  told you I had assigned myself -- I couldn't take where I was

12  at any longer.  I was just so physically compromised and in so

13  much pain and that was a lot for her to carry.  She had all of

14  the things that was going on with her, her loss of her

15  opportunity, and my loss only perpetuated her loss and created

16  more heartache and more hardship for her.

17  Q.    And do you anticipate her having to continue caring for

18  you in the indefinite future -- for the indefinite future?

19  A.    I always try to be optimistic, but I've become more and

20  more realistic on where I stand with my condition and I am

21  very, very dependent upon her, some days more than others.  And

22  that's a lot for her to have to deal with.

23  Q.    And is that going to continue for the indefinite future?

24  A.    Well, according to Dr. Kaye who is a physician I have a

25  chronic, progressive disease, or impairment, or disability,

1   however he titled it, and it's not going to get better.

2   Q.    So you will continue to need her care?

3   A.    I will continue to need her care.  Some days I need it

4   more than others.  Some days I need help just getting out of

5   the car.  Some days I need help tying my shoes.  Sometimes I

6   need help getting out of the shower.  It's variable.  It's not

7   like every day is the same, it's forever changing.

8   Q.    Were you the one that handled contacting her student loan

9   companies and advising them as to the household's financial

10  status?

11  A.    Yes, ma'am, of course with her permission.  When I would

12  make contact she would give authority to me to speak on her

13  behalf.  And to maintain good faith and to try to keep things

14  going and keep her in the right status, I did that.

15  Q.    But you were proactive on her behalf with those lenders?

16  A.    I have always been proactive with all of our lenders in

17  all of our bills.

18  Q.    Mr. Demmons, if Ms. Fowler's loans are not discharged what

19  is going to be the impact on your household?

20  A.    It affects our household in the same capacity.  There's --

21          THE COURT:  I think you already asked him that,

22  didn't you?

23          MS. DELEO:  I think I asked him about his loans.

24          THE COURT:  You asked him about the household I

25  thought.

1             MS. DELEO:  Household.

2             MS. LASALLE:  You also asked her about her --

3             MS. DELEO:  About his loans?

4             MS. LASALLE:  About her loans.

5             MS. DELEO:  About her loans.

6             MS. LASALLE:  Yes.  You asked her what her impact on

7    the household would be if she had to repay the 350 or whatever

8    a month.

9             THE COURT:  I only raise this objection because it's

10   6:10.

11            MS. DELEO:  Okay.

12            THE COURT:  Otherwise, I'd let it go, Counsel.  All

13   right, we have already heard it --

14            MS. DELEO:  Okay, thank you.

15            THE COURT:  -- and it is duplicitous.

16            MS. DELEO:  Thank you, Your Honor.

17            THE COURT:  And this is no time for duplicity.

18            MS. DELEO:  I understand.

19            THE COURT:  All right, any questions?

20            MS. LASALLE:  No, Your Honor, no questions.

21            MR. MCCANDLISH:  No, Your Honor.

22            THE COURT:  All right, you may step down,

23   Mr. Demmons.  Thank you, sir.

24            THE WITNESS:  Thank you, Your Honor.

25            THE COURT:  All right, Robin, do you have any other

1   evidence?

2         MS. DELEO:  No other evidence, Your Honor.

3         THE COURT:  All right.  Do the Defendants have any

4   evidence they wish to offer?

5         MS. LASALLE:  No, Your Honor.

6         MR. MCCANDLISH:  No, Your Honor.

7         THE COURT:  All right.  Do have any documents you

8   wish to enter?

9         MS. LASALLE:  No, Your Honor, they've all been

10  admitted through the bench book.

11        THE COURT:  All right.

12        All right, so the Defendants rest.  So you don't get

13  a chance on rebuttal to put on anything.

14        All right, that ends the matter but for the

15  attorneys' obligation now.

16        MS. DELEO:  Your Honor, I would like to move for the

17  entry of a default judgment against the Defendant that didn't

18  appear in this proceeding.  That's ECMC.

19        MS. LASALLE:  No.  No, no, no.

20        MS. DELEO:  I'm sorry, FCBD.

21        THE COURT:  Okay.

22        MS. LASALLE:  I'm here, no default.

23        THE COURT:  All right, do we have the name right?

24  All right, --

25        MS. LASALLE:  As long as it's not ECMC.

1      THE COURT:  -- now you have proper service on them

2   and they never made any reply at all?

3      MS. DELEO:  They never made any reply, Your Honor.

4      THE COURT:  They had no contact with you?

5      MS. DELEO:  No.  And I talked to the servicer that

6   handles the loans and was told that they're well aware of it,

7   but they were not going to participate.  And we had the Clerk

8   enter an entry of default --

9      THE COURT:  All right.

10      MS. DELEO:  -- against FCDB NPSL on February 2nd,

11   2016.

12      THE COURT:  All right.  All right, then I'll grant a

13   default judgment.  And do you want this default judgment in a

14   definite amount or you want a default judgment for any and all

15   loans claimed to be owed by the Debtors, both of them, --

16      MS. DELEO:  Yes.

17      THE COURT:  -- to FCDB or NPLS Trust or is that one

18   in the same?

19      MS. DELEO:  That's the same entity, Your Honor.

20      THE COURT:  Okay.  All right, it's so ordered.

21      MS. DELEO:  Thank you.

22      THE COURT:  Prepare the judgment.

23      MS. DELEO:  Thank you.

24      THE COURT:  All right, now as to the matter on which

25   we've taken testimony and other evidence, I'm not going to be

233

1    able to decide this from the bench I don't think.  I think I'm

2    going to require briefs.  And I don't want you to write an

3    opus.  I think that the Plaintiffs ought to write or give me a

4    brief and I think it ought to be limited to 25 pages.

5            MS. DELEO:  That's fine, Your Honor.

6            THE COURT:  And I'll give you -- 15 days is

7    sufficient?

8            MS. DELEO:  That's fine.

9            THE CLERK:  Fourteen.

10           THE COURT:  Fourteen.  I'm sorry.  All right, 14

11   days.

12           MS. DELEO:  Fourteen days.

13           MS. LASALLE:  And then, Your Honor, we'll file a

14   response once that's --

15           THE COURT:  Yeah.

16           MS. LASALLE:  Okay.

17           MR. MCCANDLISH:  Fourteen days, Your Honor, from

18   today or 14 days from when we can get the -- I think maybe we'd

19   like to see the transcript of hearing to be able to reference.

20           THE COURT:  All right, if you're going to order a

21   transcript it will be 14 days.  Provided you promptly order the

22   transcript, it will be 14 days from the time you receive it.

23   Technically it should be 14 days from the time you receive it

24   and pay for it.

25           All right.  And did I give you a page limitation?

1          MS. DELEO:  Twenty-five pages.

2          THE COURT:  All right, can you reply in 20 pages?

3          MS. LASALLE:  Sure.  Now, Your Honor, Ms. DeLeo is

4   going to do hers 14 days from today and then we have 14 days

5   after hers or are we doing them all on the same day?

6          THE COURT:  No, you can have 14 days.

7          MS. LASALLE:  After?

8          THE COURT:  Yeah.

9          MS. LASALLE:  Okay.

10          THE CLERK:  Are you each submitting one?

11          MR. MCCANDLISH:  Yes.

12          MS. LASALLE:  Yeah, I'm pretty sure.

13          THE COURT:  You're going to submit separate?

14          MS. LASALLE:  Yes.

15          MR. MCCANDLISH:  Yes.

16          THE COURT:  All right, will the same deadline be all

17   right for both of you?

18          MS. LASALLE:  Sure.

19          MR. MCCANDLISH:  Yes.

20          THE COURT:  Okay, good.

21          MR. MCCANDLISH:  Thank you, Your Honor.

22          THE COURT:  In the unlikely event that you wish to

23   file a reply, Robin, it will be seven days --

24          MS. DELEO:  Okay.

25          THE COURT:  -- from the time you receive their

235

```
 1   briefs, the Defendants' briefs.

 2           THE CLERK:  How many pages, seven?

 3           THE COURT:  No, I can't do -- can't make that seven,

 4   14.  I should make it seven -- 14.

 5           MS. DELEO:  Okay.

 6           THE COURT:  All right, any questions?

 7           MS. LASALLE:  No, Your Honor.

 8           MS. DELEO:  No, sir.

 9           MR. MCCANDLISH:  No, Your Honor.

10           THE COURT:  All right, thank y'all for cooperating

11   and putting together the exhibits.  I think that went quite

12   well.

13           Court's adjourned.

14           MS. DELEO:  Thank you, Judge.

15           MR. MCCANDLISH:  Thank you, Your Honor.

16           MR. SUNDMAKER:  Thank you, Your Honor.

17           MS. LASALLE:  Thank you.

18                   *    *    *    *    *

19

20

21

22

23

24

25
```

## <u>C E R T I F I C A T E</u>

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

<u>/S/Ann B. Schleismann</u>            <u>5/6/16</u>
  ANN B. SCHLEISMANN             Date