## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:** | * | **CHAPTER 7** |
| | * | |
| **William A. Demmons and** | * | **DIVISION "B"** |
| **Karen S. Fowler** | * | |
| **Debtors** | * | |
| | * | **CASE NO. 14-11638** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| **William A. Demmons and** | * | |
| **Karen S. Fowler** | * | |
| | * | |
| **Plaintiff/ Debtors** | * | **ADV PROC. NO. 15-01024** |
| | * | |
| **versus** | * | |
| | * | |
| **R3 Education Inc., dba Saba University** | * | |
| **School of Medicine; American** | * | |
| **Educational Services; Maine** | * | |
| **Educational Services; Navient Solutions,** | * | |
| **Inc., and Nelnet, Inc, FCDB NPSL, LLC** | * | |
| **Deutche Bank, Key Bank, NA, Key Bank** | * | |
| **USA, NA, Educational Credit** | * | |
| **Management Corporation,** | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>POST TRIAL MEMORANDUM OF LAW BY DEBTORS</u>

William A. Demmons ("Demmons") and Karen Fowler ("Fowler"), Chapter 7 Debtors and Plaintiffs in the above referenced Adversary Proceeding (Demmons and Fowler are collectively referred to as "Debtors") submit this Post Trial Memorandum of Law in support of their Adversary Proceeding seeking to discharge their student loans and represent as follows:

I. **<u>Debtors have Established Undue Hardship and their Student Loans should be Discharged</u>**

Demmons and Fowler are husband and wife who filed Chapter 7 on June 25, 2014 and received a general discharge on September 30, 2014.[1] Debtors filed this Adversary Proceeding for the purpose of discharging a total of ten student loans (eight belonging to Demmons and two belonging to Fowler) totaling $438,686.[2]  Following the filing of the Adversary Proceeding, two lenders voluntarily agreed that their student loans would be discharged.  At the time of trial, Demmons had a total of six loans; three with "Key Bank"; one with Deutsche Bank; one with FCDB NPSL Trust; and one with ECMC. Fowler had two loans in the Adversary Proceeding; one with  Deutsche Bank and one with FCDB NPSL Trust.

As of April 12, 2016, the eight student loans remaining total approximately $370,008.84.[3], Student Loan Lender ECMC announced at the start of Trial that it had unilaterally agreed to reduce the Demmons loan balance to $25,000.[4] At the conclusion of trial, this Court granted Debtors' Motion for Default Judgment against student loan lender FCDB NPLS Trust, for failure to defend or otherwise take any action in the Adversary Proceeding.[5] Therefore, based upon the elimination of the two FCDB NPLS Trust loans (one owed by Demmons and one owed by Fowler) and the ECMC agreement to reduce Demmons loan balance to $25,000, the Debtors remain liable for a total of six student loans totaling approximately $260,606.45.[6] Of the total loan debt, Demmons has five loans with a current balance of approximately $217,296.72 and Fowler has one student loan with a balance of $43,309.73.

[1] Joint Pre-Trial Order II(A)((1) and (A)(6).
[2] Joint Pre-Trial Order II(B)(9).
[3] Three Key Student Loans totaling $123,679.37(Joint Pre-Trial Order II(B)(22)) plus one ECMC loan of $51,955.25 (Joint Pre-Trial Order II(B)(34)); plus one Deutsche Bank loan of $68,617.35 (Joint Pre-Trial Order II(B)(46)); plus one FCDB Loan of $72,443.56 (Joint Pre-Trial Order II(B)(48)) plus Fowler Deutsche Bank loan of $43,309.73 (Joint Pre-Trial Order II(B)(58)) plus Fowler FCDB loan of $14,031.35 (Joint Pre-Trial Order II(B)(60)).
[4] Trial Transcript, page 4, lines 18-22.
[5] Trial Transcript, page 232, lines 12-20.
[6] Key Bank total of three loans is $123,679.37 (Joint Pre-Trial Order II(B)(22)) plus ECMC reduced balance of $25,000 (Trial Transcript, page 4, line 22) plus Deutsche Loan of $68,617.35 (Joint Pre-Trial Order II(B)(46)) plus Fowler Deutsche Loan of $43,309.73 (Joint Pre-Trial Order II(B)(58)).

Under 11 U.S.C. Section 523(a)(8), a discharge under Section 727 does not discharge an individual debtor from any debt unless excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents, for-

> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit, or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B)  any other educational loan that is a qualified education loan as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

Debtors aver that their eight remaining student loans (collectively referred to as "Student Loans" be discharged based on undue hardship.  The Fifth Circuit has adopted the Second Circuit's *Brunner* test for discharging student loans based upon undue hardship.[7]  *Brunner* requires that the debtor establish that (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for the debtor and the debtors' dependents if forced to repay the student loans; (2) additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. *Brunner v. New York State Higher Education Services Corporation*, 831 F.2d 395 (2nd Cir. 1987).  The Debtors bear the burden of proof, by a preponderance of evidence, that each of the three elements necessary for a discharge have been met. <u>In re McMullin,</u> 316 BR 70 (Bankr. ED La 2004). Demmons and Fowler have established each of the Brunner elements and their student loans should be discharged based upon undue hardship.

---

[7] *In re Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003).

**A.** **Demmons and Fowler Established at Trial that They Cannot Mmaintain a Minimum Standard of Living for the Debtor and Dependents if Forced to Repay the Student Loans.**

If forced to repay the loans, Debtors would be unable to maintain even their minimal subsistent standard of living for *their household* (relating to Debtor and dependents). Under this prong, Courts examine the debtor's current financial condition to see if payment of the loans would cause the Debtors' standard of living to fall below the minimally necessary[8]. Where the debtor's monthly expenses exceed his monthly income, then the present inability to maintain a minimal standard of living is proven. *In re Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003). Implicit in this inquiry, however, is a showing that the debtor is both minimizing her expenses and maximizing her income. *In re Poche*, 1995 WL 688782 (E.D. La. 1995).

Demmons and Fowler are a household size of two[9] (referred to as the "Demmons Household"). The Demmons Household monthly income at the time of trial was $1,984.49,[10] significantly below the median monthly gross income average in Louisiana of $4,215 (or $50,580 per year).[11] The Demmons Household has no operating vehicle[12] and relies upon the use of a borrowed vehicle.[13] Demmons works as a med-tech at Ochsner wherein he earns $12.25 per hour.[14] Fowler, who had the time of the bankruptcy filing earned monthly gross income of $1748,[15] is not currently working and has earned no income since December, 2015 (the four

---

[8] <u>In re McMullin,</u> 316 BR at 74
[9] Trial Transcript pg  47; line 23.
[10] Trial Exhibit 2 (bates pg 62).
[11] Trial Transcript pg. 58; lines 10-23.
[12] Trial Transcript pg. 49; lines 12-22.
[13] Trial Transcript pg 50, lines 3-4.
[14] Trial Transcript pg. 50, line 17.
[15] Trial Transcript, pg. 52, lines 4-5

month time period preceding trial of the Adversary Proceeding).[16]  Fowler's current job (although she has had no hours this year) allows her to work from home, giving her the ability to simultaneously earn income while providing care for Demmons (the primary income earner).  As soon as Fowler's employers finds something for her to do, she hopes to get some hours. Fowler earns $10.30 per hour when she has been assigned work.[17]

Demmons' contribution of approximately $53 per paycheck to his 401K at Oschner is the result of the employer's mandatory retirement policy.[18] Therefore, this is not the same factual situation as in *In re Newchurch* wherein Judge Dodd found that a debtor had failed the first prong of *Brunner* because the debtor voluntarily diverting $500 per month to pay an annuity rather than to pay student loans.[19]  In the present case, Demmons' contribution to his 401K is a condition of his continued employment at Ochsner.  Moreover, even if Demmons could stop the $53 per paycheck contribution, this $106 monthly increase in income will not make Demmons monthly net income positive.[20]

Debtors expenses are reasonable and not inflated– Debtors finance no car payments although neither of their two vehicles are operative; Debtors expenses are below the threshold set forth by the IRS for the housing, utilities, clothing, personal care and "miscellaneous" categories; and Debtors net income after deducting expenses set forth on Schedule J are either minimal[21] or negative.[22]  The Debtors' entertainment expense is a monthly charge from Netflix of $7.99.[23]

---

[16]  Trial Transcript pg. 52, line 15.
[17]  Trial Transcript pg. 194, lines 5-8.
[18]  Trial Transcript pg. 53, lines 16-25.
[19]  *In re Newchurch*, 2006 WL 3246593 (Bankr. M.D. La. 2006).
[20]  *See* Trial Exhibit evidence negative monthly net income of $1,139.44
[21]  Exhibit 1; Schedule J, (bates pg 34)
[22]  Exhibit 2; Schedule J, (bates pg 64)
[23]  Trial Transcript pg. 195, line 23.

Debtors have no discretionary expenses. [24]  Debtors have no cable television.[25] Debtors have no health insurance.[26]

Fowler has not been to a dentist since 2006 when she had four root canals. She has current dental pain but cannot afford a dentist.[27]  Fowler hasn't updated her eye glass prescription since medical school (2010) and uses a magnifying glass for reading purposes.[28] Christmas gifts given to the Debtors were returned to Walmart for a credit so that the Debtors could purchase food.[29]  Demmons has been unable to visit his mother in Maine since 2012 due to their financial constraints.[30]  The Demmons household lives a very meager lifestyle.[31]

At the time of the filing of the Bankruptcy Petition, Exhibit One, Schedule I evidences Debtors monthly gross to be $3,211.44 (*See* Exhibit One, Bates pg 32).  This is below the Louisiana Median Income for a household size of two as evidenced by Trial Exhibit 4.  After deduction of reasonable expenses, at the time of their Bankruptcy filing, Debtors had net monthly income of $38.20.[32]  In actuality, the Debtors have no net monthly income today.[33] Two years later, in preparation for the Adversary Proceeding, Debtors created a new Schedule I and J which more accurately reflects their current financial circumstances.  The new Schedule I and J reflects negative net monthly income of $1,139.44.[34]  A payment of any student loan would

---

[24] Trial Transcript pg. 195, lines 19-20.
[25] Trial Transcript pg. 196, line 4.
[26] Trial Transcript pg. 198, line 17.
[27] Trial Transcript pg. 197, lines 18-25.
[28] Trial Transcript pg. 197, lines 6-17.
[29] Trial Transcript pg. 199, lines 1-8.
[30] Trial Transcript pg. 90, lines 7-16
[31] Trial Transcript pg. 90, line 5
[32] Trial exhibit One, page 34
[33] Trial Transcript pg. 194, line 7
[34] Trial exhibit Two, bates page 64.

preclude the Debtors from maintaining even their current subsistent standard of living.  The

Debtors lack the ability to repay Student Loans in a reasonable time or in a meaningful manner.[35]

Based upon the Debtors financial condition either at the date of the filing of the

Bankruptcy Petition (Trial Exhibit 1) or on the date of the trial of the Adversary Proceeding,

approximately two years later (Trial Exhibit 2), Debtors' had negative or minimal income.

Therefore, prong one of the Brunner test has been established.

**B.** **Demmons and Fowler have established that Additional Circumstances Exist indicating that their Current State of Affairs is Likely to Persist for a Significant Portion of the Student Loan Repayment Period.**

Also known as the "future hopelessness test," this prong is often the hardest of the

*Brunner* prongs to establish.  Here, Courts generally evaluate whether "additional

circumstances" have impacted upon the debtor (or the debtor's dependents) future earning

potential, but were not present when the loans were applied for, or which have been exacerbated.

*Id.  In re Gerhardt,* 348 F.3d at 92.  Examples of "additional circumstances" include psychiatric

problems, lack of usable job skills, severely limited education, chronic illness or disability

(mental or physical) that interferes with the debtor's ability to work and generate income. *Id.* The

Debtor must show a total incapacity in the future to pay his debts for reasons not within his

control. *Id.*

In December, 2010, after graduating from medical school but prior to completion of his

medical residency match program, Demmons was involved in a car accident.[36]  Demmons was

not at fault in the car accident, as his car was sitting at a stop light when he was rear-ended by a

---

[35] *In re McMullin,* 316 Br at 75.

texting driver.[37] When Demmons was rear-ended, he hyper-flexed his neck and it compressed his spinal cord, which had no place to swell, creating a lesion.[38] Following the car accident, Demmons had nausea and headaches which failed to abate. He lost sensation in his arms, hands and legs, followed by burning sensations making him feel as if his hands, arms and legs were on fire.[39] His condition became progressively worse and as a result, Demmons worked very little in 2011 and did not work at all in 2012.[40] Demmons went back to work at Ochsner in 2013 but because he can't stand or sit, or do things for a long period of time, he is allowed to move throughout different departments.[41] Although he can write, Demmons has very weak hands and problems with dexterity and motor skills.[42] He doesn't have the strength or dexterity to open up a bag of chips.[43] He also lacks sensations that normal people would feel when grabbing a hot pan.[44] Demmons is able to ambulate but is very weak, suffering from atrophy in his feet and throughout his whole body.[45] Demmons has only a ten degree mobility in his neck – both flexion, extension and rotation.[46] His physical limitations have made him very depressed.[47] Due to his physical limitations following the car accident, Demmons was unable to "match" or thereafter become a licensed physician.

Dr. Alan Kaye, a tenured professor, Chairman of the Anesthesia Department and Director of Interventional Pain Management at Louisiana State University School of Medicine, testified

---

[37] Trial Transcript pg. 42, lines 2-3.
[38] Trial Transcript pg. 42, lines 22-25.
[39] Trial Transcript pg. 42, lines 1-8.
[40] Trial Transcript pg. 43, lines 11-17.
[41] Trial Transcript pg. 44, lines 16-21.
[42] Trial Transcript pg. 45, lines 9-13.
[43] *Id.*
[44] *Id.*
[45] Trial Transcript pg. 46, lines 3-4.
[46] Trial Transcript pg. 166, lines 2-3.
[47] Trial Transcript pg. 46, lines 19-25; pg. 47, lines 1-3.

on behalf of Debtor as to the severity of Demmons' injuries sustained in the accident. At trial, Dr. Kaye was admitted as an expert in the field of pain management and anesthesiology.[48]

Dr. Kaye began seeing Demmons as a patient in the summer of 2011, after Demmons' December, 2010 car accident.[49] Demmons has some of the most pronounced and severe damage to his cervical spine, and to a lesser degree to his lower lumbar spine, that Dr. Kaye has seen in his 27 years of practice. [50] Dr. Kaye treated Demmons with cervical epidural steroid injections, until his clinic for the indigent was closed in 2013.[51] The purpose of the injections were to calm angry nerve roots causing so much of Demmons' pain, discomfort and catastrophic deficits into Demmons' shoulder, arms, hands and fingers.[52] Demmons has been unable to continue with the injections since the clinic closure in 2013. Dr. Kaye, however, examined Demmons as of the week of trial and found further setbacks since the injections were stopped in 2013.[53] Looking at Demmons' physical condition today, Dr. Kaye believes that any benefit from the earlier injections was short-lived and dubious….as if "I never had touched him."[54]

As to Demmons' current physical limitations, Dr. Kaye testified that Demmons has profound motor weakness in his arms, hands and even pretty significant deficits in his legs. He is limited in anything that would require strength and coordination with his upper body. He is able to ambulate but is limited in his vigor and his capacity to do anything that is physical.[55] Demmons has lost 1/3 of his body weight and weighs 70 pounds less than when previously

---

[48] Trial Transcript pg. 7, lines 13-19.
[49] Trial Transcript, pg. 8 lines 1-3.
[50] Trial Transcript, pg. 8 lines 3-7.
[51] Trial Transcript pg. 8, lines 18-24,
[52] *Id.*
[53] Trial Transcript, pg. 9, lines 20-22; page 10, lines 7-8.
[54] Trial Transcript pg 16, lines 19-23.
[55] Trial Transcript, pg. 13, lines 3-10.

examined in 2012. He has profound sensory and motor deficits. He has abnormal reflexes.[56] In

27 years, Demmons' physical condition is among the very worst Dr. Kaye has witnessed.[57]

Dr. Kaye further testified:

I haven't even mentioned all the psychological issues of somebody who dreamed for them self and went through all the steps of pre-medical education and medical education who now can't even tie their shoe. So he has depression. He has anxiety. He has sleep issues. He is catastrophically damaged in his current state and I don't see in the future any evidence, looking at him over a six-year period, that he suddenly get better or be able to function, certainly not as a doctor. And there's no residency in the United States that he could do or would be selected to at his advanced age with his disability because you need to have physical robustness. And I say this as a program director for 23 years who selects residents; no one is going to select a 59-year old man with a severely damaged spine who can't tie his shoe into their program to become a physician…. [58]

As to the length of Demmons' injury and future treatment concerning the correction of

Demmons' spinal issues, Dr. Kaye testified that "it can't be cured."[59] Demmons is not going to

get better today, this week, in the foreseeable future…..He clearly has undue hardship.[60] He's

alive, but I am certain that he will remain with undue hardship in this very, very damaged spine

that he has.[61] He has a permanent physical disability.[62] He remains with catastrophic deficits

today, there's no doubt in my mind.[63]

Although Demmons had been involved in a prior car accident in 1985 which resulted in

Demmons having a cervical laminectomy, Demmons had completely recovered from the earlier

---

[56] Trial Transcript, pg 15, lines 12-15.
[57] Trial Transcript, pg. 19, lines 5-6.
[58] Trial Transcript, pg. 10, lines 21-25 and pg. 11, lines 1-10.
[59] Trial Transcript pg. 11, line 13.
[60] Trial Transcript pg. 10, lines 11-13.
[61] Trial Transcript, pg. 10, lines 19-20.
[62] Trial Transcript pg. 12, lines 21-22.
[63] Trial Transcript pg. 16, line 24.

car accident before the subsequent accident in 2010. Therefore, an aggravation of a pre-existing injury is not the cause of Demmons current infirmities. After the first surgery in 1985, Demmons was stabilized and functional.[64] He was able to complete his medical studies.[65] Many people have stable futures with a cervical laminectomy. The [later] car accident really did him in.[66]

Demmons also testified that he had fully recovered from the 1985 accident.[67] In fact, after recovery from the initial accident which was cured with the cervical laminectomy, Demmons was an avid kickboxer, an active marathoner and triathlete.[68] He was in excellent physical condition while in medical school.[69]

As to Ms. Fowler, "additional circumstances" impacting her ability to repay her or Demmons' student loans are evidenced by Fowler's testimony of her own psychological issues as well as the role she plays as the caregiver of Demmons. As to her own mental capabilities, Fowler cannot tolerate stress.[70] While in medical school, she experienced a series of traumatic events that caused her to have some repressed memories from her childhood, multiple miscarriages, deaths in her family, and female reproductive issues (hemolytic disorder).[71] Fowler continues to suffer from deep, horrible depression and anxiety that causes her to physically shut down. [72] Demmons describes this as "the lights were on but nobody was home."[73] Demmons testified at trial that there was an occasion he could recall that there were

---

[64] Trial Transcript pg. 18, lines 14-25.
[65] *Id.*
[66] Trial Transcript pg. 18, lines 23-25; page 19, line 1.
[67] Trial Transcript pg. 24, lines 1-6.
[68] *Id.*
[69] Trial Transcript, pg. 39, line 16.
[70] Trial Transcript pg. 188, lines 14-25.
[71] Trial Transcript pg. 188, lines 15-25 and pg 224, line 4.
[72] Trail Transcript pg.,188, lines 14-16.
[73] Trial Transcript pg. 223, line 16.

"weeks upon weeks" where he couldn't get anything out of her.[74] As a result of her depression, Fowler does not like to leave her house.[75] Fowler's physical and emotional issues continue to exist today[76] and will continue into the indefinite future.[77]

When she can work, Fowler must work from home so she can provide ongoing caregiving services benefiting Demmons, who is the primary wage earner of the household.[78] Working from home gives her the ability to schedule her time to work when it's most beneficial to the Demmons Household.[79] Fowler must be available to provide care to Demmons as he is often unable to care for himself. He has problems driving a car because his arms fall asleep.[80] Some days Demmons needs help to get dressed, to get out of the car, and to bathe.[81] Demmons cannot mow the grass or take care of the house in any capacity at all.[82] Fowler makes Demmons' life more manageable as she cares for the home and provides him with things he needs, such as his diet.[83] Fowler's caretaking of Demmons is a full time job.[84] Due to Demmons' permanent physical disability, Fowler's caretaking of Demmons will be required for the rest of his life.

Demmons does not believe that he could find employment paying him a higher monthly income and providing the physical accommodations that Ochsner (Chabert) currently provides. Demmons has attempted to move to higher paying jobs within Chabert by applying to over 40

---

[74] Trial Transcript pg. 223, lines 16-17.
[75] Trial Transcript pg. 190, line 13.
[76] Trial Transcript pg. 189, line 10.
[77] Trial Transcript pg. 200, lines 11-14.
[78] Trial Transcript, pg. 190, lines 18-20.
[79] Trial Transcript, pg. 190, lines 18-24.
[80] Trial Transcript pg. 148, lines 3-5.
[81] Trial Transcript pg. 148, lines 6-10.
[82] Trial Transcript pg. 211, lines 21-23
[83] Trial Transcript, pg. 211, lines 16-23.
[84] Trial Transcript, pg. 211, line 23.

different positions[85] and has also applied for jobs outside of the medical field, such as colleges, non-profits, jobs out of state, the oil field industry and research positions.[86]  Any job move for Demmons in the future will be a horizontal move as opposed to a vertical move.[87]  Demmons has applied to multiple positions outside of his field of expertise (medical).[88]  This is not a case where Demmons has chosen to work solely in the medical area at a low paying job; rather Demmons has actively sought employment in a number of areas.  His financial distress is not self-imposed.

Demmons and Fowler clearly meet the required elements of the Brunner second prong by demonstrating an unforeseeable change in circumstances that is likely to persist and will forever impact their ability to earn income in the future. This case is clearly factually distinguishable from *In re Roach*, where the debtor was apparently healthy, presumably intelligent and well-educated and could show no evidence of extraordinary burdens which would impair future employment prospects.  *In re Roach*, 288 B.R. 437, 445 (Bankr E.D. La. 2003).  Neither Demmons nor Fowler are healthy and they both have tremendous burdens which will forever impact their ability to make even the smallest repayment of their student loans.

### C. <u>Demmons and Fowler have made a good-faith effort to repay the loans.</u>

While there are many factors courts use to determine good faith under Brunner the overarching inquiry is whether the debtor's default is the result of factors beyond his control.[89]  Specifically, courts looks at : (1) the attempts by the Debtor to maximize income through employment while minimizing expenses; and (2) the number of payments the debtor has made

---

[85] Trial Transcript pg. 103, lines 8-11
[86] Trial Transcript pg. 103, lines 10-25 and pg. 104, lines 1-3
[87] Trial Transcript pg, 104, lines 24-25
[88] Trial Transcript pg. 105, lines 1-23
[89] In re Gnahova 2016 WL 1238831 (Bankr. ND Tex. 2016).

on the loan combined with any other attempts by the debtor to negotiate forbearance, deferral or an income based repayment plan. A debtor's good faith is measured by his efforts to obtain employment, maximize income and minimize expenses.  *In re McMullin*, 316 B.R. 70 (Bankr. E.D. La. 2004).

Debtors have satisfied the income maximization prong.  Debtors inability to receive better or higher paying jobs are limited by their physical and mental conditions, which are beyond their control.

As previously stated, Demmons has sought employment in other areas outside of the medical field in an attempt to increase the household income, to no avail. Dr. Kaye testified that Demmons is not capable of having a more advanced job than the one he currently holds.[90] Demmons is doing as much as he can do.[91]

Fowler has also sought employment in other areas, but due to her inability to leave the home, is stymied from employment outside of the home. Additionally, it is essential that Fowler maintain a job where she can work flexible hours from home in order to provide continued care giving services to Demmons.   The Debtors are simply out of resources to maintain good faith payments to the lenders.

Simply missing loan payments does not show lack of good faith – there is no per se requirement that the debtor pay a certain percentage or minimum amount of the student loans in order to be found in good faith and the failure to make a payment, standing alone, does not establish a lack of good faith.  In re McMullin at 81. The Debtor's request for deferment or

---

[90] Trial Transcript pg. 12, lines 6-10.
[91] *Id.*

14

forbearance constitutes another indication of the debtor's good faith. *Id*. at 78. The Debtor's failure to seek out every available repayment plan does not bar a finding of good faith. *Id.*

Admitted into evidence at trial was Debtors' Exhibit 7. This is a chart created by Debtors outlining the repayments made on their various student loans. There can be no doubt that the Debtors are in good faith. Even during 2011 and 2012 – the period immediately following Demmons' car accident in which little to no income was earned by Demmons, student loan payments were made on both Demmons and Fowler's student loans.  See Exhibit 7. The Demmons Household paid Demmons' student loans a total of $15,713.31 for the years 2011 - 2014[92] and $6,383.72 on Fowler's student loans over the same period of time.[93]  After depleting all of their available resources, the Debtors stopped making the student loan payments upon the filing of their Bankruptcy Petition in 2014.

As to Demmons' ECMC student loan, he made payments to the lender in 2004 and 2005, despite the fact that no payment was yet due because he was enrolled as a full time student in medical school. *See Exhibit 7*. Although no payment was made on the ECMC loan following graduation from medical school, the Demmons Household was in an income based repayment plan[94] throughout 2011-2014. *See Exhibit 7.*

Further evidence of good faith is demonstrated by Demmons continued contact with the student loan lenders on behalf of himself and Fowler. Demmons actively contacted the student loan companies informing the lenders of their financial plight.  Demmons negotiated an income repayment plan with ECMC (his only lender that offered such an option). He also worked

---

[92] Trial Exhibit 7, bates page 84.
[93] Trial Exhibit 7, bates page 84.
[94] Id. Citing In re Russ, 365 BR 640, 645 (Bankr. ND Tex. 2007).

extensively with Key Bank and American Educational Services (servicer for Deutsche Bank) in attempt to maintain the accounts in good standings.  The Debtors were proactive in maintaining contact with their student loan lenders and did their utmost to repay the loans despite their unfortunate circumstances.  As mentioned at trial, Debtors settled a portion of the Adversary Proceeding with their medical school and received a lump sum of money. Debtors used that money in order to eliminate the loans at issue herein, however, all lenders rejected the settlement proposal advanced by Debtors.[95]

**D. Alternatively, if not Dischargeable based upon Undue Hardship, Demmons' three Student Loans to Key Bank should be Discharged as private Student Loans originated prior to the law change in BAPCPA.**

Alternatively, Demmons three student loans to Key Bank are dischargeable as such loans were originated in 2004, prior to the major 2005 amendments to the Bankruptcy Code through BAPCPA.[96]  BAPCPA added new subsection 523(a)(8)(B) which extends nondischargeability to private loans.  Prior to the BAPCPA amendment, private student loans were dischargeable if such loans were not guaranteed by a governmental entity or nonprofit institution.[97]

The Key Bank loans are private student loans which were dischargeable in bankruptcy at the time of the origination of the three loans. The 1998 Bankruptcy Code should apply to determine the dischargeability of these student loans, not BAPCPA. Demmons has a contractual right to rely upon the bankruptcy provisions in effect prior to October 2005, which would allow Demmons to avoid repaying the Key Bank Loans.

---

[96] Joint Pre-Trial Order, Paragraph 14, pg. 3.

16

**E.  Alternatively, if the Loans are not Discharged based upon Undue Hardship, the Student Loans should be Discharged as the Loans are not "Student Loans" that are Protected from Discharge under the Bankruptcy Code.**

Should this Court determine that undue hardship has not been proven, Debtors argue that the three Key Bank loans and the two Deutsche bank loans (collectively referred to as the "Private Loans") be discharged as these loans are not protected "student loans" under 523(a)(8)(B). Under 523(a)(8)(B), a discharge under Chapter 7 does not discharge from any debt…..for

> (B) any other education loan that is a qualified education loan, as defined in Section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

In interpreting the exemptions to discharge under Section 523(a), there is a general N/C that exceptions to discharge must be narrowly construed. Therefore, the Bankruptcy Code specifically incorporates the definitions contained within the Internal Revenue Code ("IRC") 11 U.S.C. Section 523(a)(8)(B).

If the Private Loans fail to fall within the definition of a "qualified education loan" as set forth within the I.R.C., such loans are dischargeable – whatever their nature.  Creditors bear the burden of demonstrating that educational loans fall within categories of student loan debt protected from discharge absent a showing of undue hardship to Debtor that would result from exempting debt from discharge.  Under I.R.C. Section 226(d)(1), a "qualified education loan" is "any indebtedness incurred by the taxpayer *solely* to pay **qualified higher education expenses**." (*emphasis ours*).  "Qualified higher education expenses" is further defined as the "cost of attendance" ("COA") at an eligible educational institution as determined by the particular

institution. COA means the amount determined by the institution for tuition and fees plus an allowance for books, supplies, transportation, room and board, and miscellaneous personal expenses. The IRS guidelines defer to educational institutions in how COA is defined. Private loans that fund expenses beyond the education institution COA should be fully dischargeable, as such loans are not "solely" used to pay qualified education expenses.

Any money lent to a student who has already reached the federal limit under the schools' COA, is NOT protected as a private student loan under the Bankruptcy Code because the Student Loan is not a "qualified educational loan" protected by Section 523(a)(8)(B).

The Cost of Attendance at Saba for the Demmons and Fowler's relevant years was introduced as Trial Exhibit 5 (bates pages 78-81). This is the COA documented by Saba and must be used to evaluate whether funds advanced for the Private Loans were "qualified". As shown by Trial Exhibit 6, each and every year (with the exception of Fowler Semester 6), the student loan proceeds received by Demmons and Fowler exceeded the applicable COA. Because Loan Proceeds exceed COA, the proceeds could not have been solely to pay qualified education expenses. Therefore, the Key Bank and Deutsche Bank loans are not "qualified education loans" protected from discharge under Section 523(a)(8)(B).

### F. The Fowler Deutsche Bank Loan was Not Incurred for educational purposes.

In order to be a qualified educational loan under Section 523(a)(8)(B), the "loan must have been taken out to pay expenses for education furnished during a period in which the recipient was an eligible student."[98] The Fowler Deutsche Bank loan is also not a "qualified education loan" because it was not a student loan since Fowler was not a "student." Debtor's

---

[98] Student Loan Law, 5th Edition, National Consumer Law Center (2015); pg. 196.

medical school prohibited her from attending clinical rotation because Fowler had not

successfully passed the USMLE Step I examination.  After initially withholding tuition to pay

itself (for semesters 6, 7 and 8), Saba later refunded the proceeds to the loan now held by FCDB

NPLS Trust, Therefore, since Fowler was never allowed to attend semesters 6, 7 and 8, she was

not a student and therefore incapable of being the recipient of a "qualified student loan."

II.    **Conclusion**

For the foregoing reasons, the eight student loans should be found dischargable as

such loans create undue hardship on Demmons and Fowler (both as Debtors and as dependants).

Alternatively, Demmons' Key Bank student loans should be discharged as private student loans

originated prior to October, 2005.  Alternatively, Demmons and Fowler's private loans should be

discharged as the loan amounts exceed the school's cost of attendance and therefore, the

educational loans were not used solely to pay educational expenses. Lastly, Fowler's Deutsche

student loan should be discharged as it cannot be a qualified educational loan because Fowler

was not considered by her educational institution to be an eligible student.

Respectfully submitted,

THE DE LEO LAW FIRM LLC
/s/ Robin R. De Leo
Bar Roll No. 20347
800 Ramon St.
Mandeville, LA 70448
(985) 727-1664
(985) 727-4388 (Facsimile)

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing Post Trial Memorandum of Law was served

19

on June 1, 2016 upon the following:

Earl F. Sundmaker                                trey@sundmakerfirm.com
The Sundmaker Firm
1027 Ninth St.
New Orleans, LA 70115


Joseph M McCandlish                              jmccandlish@weltman.com
Weltman Weinberg & Reis Co., LPA
3705 Marlane Drive
Grove City, OH 43123


Heather LaSalle                                  hlasalle@mcglinchey.com
McGlinchey Stafford, PLLC
601 Poydras Street, 12th Floor
New Orleans, LA 70130


                                  THE DE LEO LAW FIRM LLC
                                  /s/ Robin R. De Leo
                                  Bar Roll No. 20347
                                  800 Ramon St.
                                  Mandeville, LA 70448
                                  (985) 727-1664
                                  (985) 727-4388 (Facsimile)