**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | * | **BANKRUPTCY CASE NO. 14-11638** |
| **WILLIAM A. DEMMONS, III** | * | |
| and | * | |
| **KAREN S. FOWLER,** | * | |
| | * | |
| Debtors, | * | |
| ************************************ | * | ***************************************** |
| **WILLIAM A. DEMMONS, III** | * | **ADVERSARY PROC. NO. 15-01024** |
| and | * | |
| **KAREN S. FOWLER,** | * | |
| Plaintiffs, | * | |
| | * | |
| versus | * | |
| | * | |
| **R3 EDUCATION, INC. dba SABA** | * | |
| **UNIVERSITY SCHOOL OF MEDICINE;** | * | |
| **AMERICAN EDUCATIONAL** | * | |
| **SERVICES; MAINE EDUCATIONAL** | * | |
| **SERVICES; NAVIENT SOLUTIONS,** | * | |
| **INC.; STATE OF COLORADO,** | * | |
| **DEPARTMENT OF HIGHER** | * | |
| **EDUCATION, COLORADO STUDENT** | * | |
| **LOAN PROGRAM d/b/a COLLEGE** | * | |
| **ASSIST; FCDP NPSL LLC; DEUTCHE** | * | |
| **BANK; KEY BANK N.A.; KEY BANK** | * | **JUDGE JERRY A. BROWN** |
| **USA, N.A.** | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | * | * * * * * * * * * * * * * * * * * * * * * * * |

**POST-TRIAL BRIEF OF EDUCATIONAL CREDIT MANAGEMENT CORPORATION**

NOW INTO COURT, through the undersigned counsel, comes defendant Educational Credit Management Corporation ("**ECMC**") who files its Post-Trial Brief with the Court in response to the Post-Trial Brief submitted by plaintiffs, William A. Demmons ("**Demmons**") and Karen S. Fowler ("**Fowler**," and together with Demmons, the "**Plaintiffs**" or "**Debtors**") [Doc. No. 152].

## FACTUAL AND PROCEDURAL BACKGROUND

A.     **The ECMC Loans.**

On or about September 21, 2003, Demmons executed a Federal Family Education Loan consolidation note in connection with his student loans used to finance his undergraduate education that began when he was 42 years old (the "**Note**").[1] The total amount disbursed under the Note was $37,726.08, which was for two loans.[2] The original principal balance of the first loan was $19,207.46 and the original principal balance of the second loan was $18,519.62.[3]

The original student lender in connection with the Note was Wells Fargo ELT Nelnet Ed Loan Funding I (the "**Lender**"), with Tennessee Student Assistance Corporation and later College Assist designed as the guarantor, and Nelnet Loan Services Inc. designated as the servicer (the "**Servicer**").[4] Upon the Debtors' bankruptcy filing, the Servicer filed a claim on behalf of the Lender with the guarantor College Assist which claim was paid on or about June 2, 2015, after which all right, title and interest in the Note was transferred to College Assist.[5] Upon filing the captioned adversary proceeding, College Assist assigned all of its rights, title and interest in the consolidated loans evidenced by the Note to ECMC on or about November 9, 2015.[6] ECMC is the current guarantor and holder of all right, title and interest in the Note.[7] ECMC is a non-profit entity.[8] Therefore, the Note is guaranteed by a non-profit institution and, in turn, is reinsured by the United States Department of Education.[9]

---

[1] *See* Pretrial Order, Doc. No. 141 at p. 5; *see also* Trial Transcript, Doc. No. 148 at 21-22; *see also* Trial Exhibit 12.
[2] *See* Pretrial Order, Doc. No. 141 at p. 5.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.* at p. 6.
[9] *Id.*

Prior to the trial on the adversary proceeding, the balance due under the Note, as of March 16, 2016, was $51,955.25, which Note bears interest at the rate of 3.625%.[10]

### B. Alternative Options Offered by ECMC to Demmons Prior to the Trial.

On April 1, 2016, ECMC offered to reduce Demmons' payments on his student loans through two separate options.[11] The first option, income based repayment ("**IBR**"), would allow Demmons to make payments of $78 per month for twenty-five (25) years and, after that time, the balance of the loans would be cancelled by the United States Department of Education.[12] The second option, REPAYE under the William D. Ford Program, would allow Demmons to make payments of $52 per month for twenty-five (25) years and, after that time, the balance of the loans would be cancelled by the United States Department of Education.[13] Because Demmons works for a clinic designated as a 501(c)(3), the Public Service Loan Forgiveness Program may allow him to limit his payment term under both the IBR and REPAYE options to ten (10) years after which time the balance of the loans would be forgiven.[14] The payment amounts set forth in the ECMC's April 1, 2016, letter were based on the Debtors' 2014 tax returns, which were the last tax returns provided to ECMC by the Debtors.[15]

### C. The Debtors' Bankruptcy Filing and Subsequent Adversary Proceeding.

The Debtors filed their chapter 7 bankruptcy on June 25, 2014 (the "**Bankruptcy Case**").[16] According to their bankruptcy schedules, the Debtors had unsecured debts totaling $512,962.56 at that time, with $429,215.80, or just over 83%, of that debt being held by student

---

[10] *Id.* at p. 5; *see also* Trial Exhibits 11, 12.
[11] *Id.* at p. 6; *see also* Trial Exhibit 11.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *See* Trial Exhibit 11. If Demmons had provided ECMC with his 2015 tax return showing a reduction in income, the payment amounts set forth in the April 1, 2016, letter would have been reduced based on that decreased income.
[16] *See* Bankruptcy Case No. 14-11638, Doc. No. 1; *see also* Trial Exhibit 1.

loan lenders which financed the Debtors' undergraduate and medical school educations.[17] On March 12, 2015, the Debtors filed the captioned adversary proceeding seeking to discharge all of their student loan obligations.[18]

**D.     The Trial.**

The trial in this matter was held on April 12, 2016. On the morning of trial, ECMC entered a stipulation into the record whereby it agreed to reduce the balance due under its two loans evidenced by the Note from $51,955.25 to $25,000.00.[19]

**DEMMONS FAILED TO ESTABLISH UNDUE HARDSHIP TO ENTITLE HIM TO A DISCHARGE OF HIS STUDENT LOANS WITH ECMC**

**A.     Introduction.**

Demmons chose to go back to school at the age of 42 to obtain an undergraduate degree so that he could go on to medical school. That undergraduate education was financed through student loans held by, among others, ECMC. At the age of approximately 53, Demmons graduated from medical school but was not able to obtain a medical residency and thereafter suffered an injury in a car wreck. Now Demmons and his wife Fowler seek to discharge all of their student loans, which include not only ECMC's loans, but several other loans held by Key Bank and Deutsche Bank.

When Demmons took out the ECMC loans, he made certain assurances that he would pay back the amounts borrowed. "When a student loan borrower accepts money from the government, [he] strikes a bargain. And '[l]ike all bargains, it entails risk. It is for each student individually to decide whether the risks of future hardship outweigh the potential benefits of a

---

[17] *Id.* at 19-26; *see also* Trial Exhibit 1. *See In re Wynn*, 378 B.R. 140, 150 (Bankr. S.D. Miss. 2007) (stating that "Where a debtor's financial filings indicate that all or most of his scheduled debt consists of student loans, a suggestion of lack of good faith is raised in that the debtor's dominant motive in seeking relief is to evade student loan obligations").
[18] Doc. No. 1.
[19] *See* Trial Transcript, Doc. No. 148 at p. 4.

-4-

deferred-payment education."[20] Here, Demmons struck a bargain and obtained his undergraduate degree, which afforded him the opportunity to go on to medical school. While Demmons may have experienced hardships since completing his education, he has failed to establish that his hardships were undue as required by 11 U.S.C. § 523(a)(8) to allow the discharge of his student loans.[21] Accordingly, Demmons request for discharge of the ECMC student loans should be denied.

### B. Standard for Discharge of a Student Loan.

In order for a debtor to have otherwise nondischargeable student loan debt discharged, he must prove that excepting the debt from discharge will impose an undue hardship on him and his dependents.[22] A true undue hardship must be shown, as a mere "garden-variety" hardship is insufficient justification for the discharge of a student loan debt.[23] A court must give due regard to Congress' mandate imposing stringent standards on discharging federally funded debt.[24] Student loans are treated differently under the dischargeability rules of the Bankruptcy Code because the federal government loans students money despite the borrowers' credit worthiness.[25] This service by the federal government justifies the stricter undue hardship standard for dischargeability, which must be more than unusual hardship suffered by all bankruptcy debtors.[26]

The Bankruptcy Code does not define "undue hardship."[27] In order to make the determination of undue hardship required under 11 U.S.C. § 523(a)(8), the Fifth Circuit adopted the test articulated by the Second Circuit in *Brunner v. New York State Higher Education*

---

[20] *Wynn*, 378 B.R. at 151 (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (Bankr. S.D. N.Y. 1985)).
[21] *Wynn*, 378 B.R. at 151.
[22] *Wynn*, 378 B.R. 140 at 146.
[23] *In re Salyer*, 348 B.R. 66, 69 (Bankr. M.D. La. 2006).
[24] *Pratt v. Educ. Credit Mgmt. Corp.*, 375 B.R. 753, 759 (Bankr. S.D. Tex. 2007).
[25] *Id.* (citing *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993)).
[26] *Id.* (citing *In re Frushour*, 433 F.3d 393, 399 (4th Cir. 2005)).
[27] *Wynn*, 378 B.R. at 146.

*Services Corp.*, 831 F.2d 395 (2d Cir. 1987).[28] Under the *Brunner* test, to show undue hardship which would entitle a debtor to a discharge of his student loan debt, a debtor must demonstrate three elements: (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loan; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loan; and (3) that the debtor has made good-faith efforts to repay the loan.[29] The debtor bears the burden of proving that all three elements of the *Brunner* test are met by a preponderance of the evidence and, if the debtor fails to prove even one element, his student loan debt cannot be discharged.[30]

ECMC alleges that Demmons failed to meet the three elements of the *Brunner* test to show undue hardship entitling him to a discharge of his student loan debt. For this reason, this Court should enter a judgment denying Demmons request to discharge the ECMC student loans.

### C. Demmons Failed to Meet the First Element of the *Brunner* Test.

The first element of the *Brunner* test is whether the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loan.[31] To determine whether Demmons can maintain a minimal standard of living for himself and his dependents, the Court must consider the total household income to conduct its minimal standard of living analysis.[32]

---

[28] *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003).
[29] *Id.*
[30] *Wynn*, 378 B.R. at 147 (citing *Salyer*, 348 B.R. at 70).
[31] *Gerhardt*, 348 F.3d at 91.
[32] *Id.* at 147-48 (internal citations omitted).

### 1. The Debtors' Income.

The Debtors' Schedule I filed in their Bankruptcy Case showed income for both Demmons and Fowler, both of whom were working in 2014.[33] According to Schedule I, the Debtors had a total monthly income of $2,562.79.[34] According to Schedule J filed in their Bankruptcy Case, the Debtors had total monthly expenses of $2,524.59, leaving disposable income of $38.20 per month.[35] Just before trial, the Debtors prepared a new Schedule I and J, which were introduced at trial as Exhibit 2 (the "**Amended Schedules**").

Notably absent from the Amended Schedules was income from Fowler, who testified at trial that she has not worked in 2016 and has not attempted to find a job in 2016 despite having both an undergraduate degree and some medical school training and having no physical impediments to working.[36] Because Fowler is not working and has not attempted to find any other employment, the Debtors' overall income is less than it could be.[37] As a result, only Demmons is earning an income to support the Debtors, resulting in a lower amount of income each month to pay their expenses. For this reason, the Debtors have not maximized their income potential, resulting in less money each month to pay their expenses.

---

[33] *See* Bankruptcy Case No. 14-11638, Doc. No. 1 at p. 29-30; *see also* Trial Exhibit 1.
[34] *Id.*; *see also* Trial Exhibit 1.
[35] *Id.* at p. 31-32; *see also* Trial Exhibit 1. The Debtors' Schedule J shows a home loan payment, including escrow items, of $1,069.40; utilities, including electricity, water and phone and television, of $451.94; $450 for food; $115 for laundry/dry cleaning; $60 for personal care; $120 for medical/dental expenses; $150 for transportation; $25 for entertainment; and $83.25 for car insurance. *Id.*
[36] *See* Trial Transcript, Doc. No. 148 at p. 192-93, 208. *See In re Davis*, 373 B.R. 241, 248 (W.D. N.Y. 2007) (stating that "The bankruptcy court must consider the debtor's total household income, including not only the debtor's income, but also the income of a non-debtor spouse, live-in companion, life partner, or contributing co-habitant"); *see also In re Dorsey*, 2015 WL 9237826, at *1 (Bankr. E.D. La. December 16, 2015).
[37] According to the Schedule I filed with the Bankruptcy Case, Fowler actually had a higher monthly income that Demmons. *See* Bankruptcy Case No. 14-11638, Doc. No. 1 at 29-30; Trial Exhibit 1. His gross monthly income was listed at $1,462.50, while her gross monthly income was listed at $1,748.94. *Id.*

### a. Additional Income of the Debtors.

Testimony was presented to the Court regarding a cash settlement awarded to the Debtors from the settlement of a lawsuit with their medical school.[38] This is additional income that must be attributed to the Debtors. If the ECMC student loan debt and other student loan debt is discharged, the Debtors will keep this money while their student loan lenders are stripped of their right to collect from the Debtors the amounts lent to them to finance their educational pursuits.[39] This is neither fair nor equitable and should not be allowed by the Court.

### 2. The Debtors' Expenses.

While Fowler does not work, testimony was presented that the Debtors maintain a third phone line and internet for her prior job.[40] Such expenses are not needed or reasonable in light of the fact that Fowler no longer is employed. In addition, the Debtors pay a monthly charge for an internet domain that they maintain for personal use.[41]

While the Debtors presented the Amended Schedules to the Court at trial, they acknowledged that the amount listed for food, $800, was not accurate and was high because they really do not spend this amount of money on food each month.[42] The Debtors testified that they actually spend closer to $450 per month on food, as stated in the original Schedule J filed in the

---

[38] *See* Trial Transcript, Doc. No. 148 at p. 127-130 (dollar amount has been redacted from transcript). The Debtors, as alleged in their post-trial brief, made a settlement offer to ECMC in full satisfaction of the ECMC loans. *See* Doc. No. 152 at p. 16. However, the settlement amount was nominal and, as a result, ECMC did not accept that settlement.

[39] *See In re Marcotte*, 455 B.R. 460, 469 (Bankr. D. S.C. 2011) (citing *Cekic-Torres v. Access Group, Inc.*, 431 B.R. 785, 790-91 (Bankr. N.D. Ohio 2010) (stating that "a debtor, even though having little income, may still be found to have the ability to repay their student loan when it is shown that the debtor has, or will likely have, access to significant assets which would be utilized to repay the loan . . . [t]o hold otherwise and allow a debtor with significant assets to escape their student-loan obligations would undercut the inherent nature of an 'undue' hardship inquiry")).

[40] *See* Trial Transcript, Doc. No. 148 at p. 117-18; Trial Exhibit 24.

[41] *See* Trial Transcript, Doc. No. 148 at p. 119-20.

[42] *Id.* at 55-59; *see also* Trial Exhibit 2. The amount listed on Schedule J (filed in the Bankruptcy Case) for food was $450, which is $350 less than what is listed in the Amended Schedules. *See* Bankruptcy Case, 14-11638, Doc. No. 1 at 31-32.

Bankruptcy Case.[43] Moreover, the Debtors list medical and dental expenses of $120 on the Amended Schedules, but testified that they do not spend any money on medical and/or dental costs, making this cost on the Amended Schedules inaccurate and overstated.[44]

In addition to the foregoing expenses, the Debtors testified that they reaffirmed the debt in connection with their home loan and also maintain a pre-discharge credit card which they use post-discharge for purchases.[45] It was not necessary for the Debtors to reaffirm the debt on their home loan.[46] According to the Debtors' bankruptcy schedules filed in the Bankruptcy Case, the house had a value of approximately $131,000.[47] The reaffirmation agreement signed with the Court showed that the Debtors reaffirmed the total debt in the amount of $116,115.58 with an interest rate of 5.875%.[48] By reaffirming the home loan, the Debtors assumed personal liability on their home loan, but are now seeking to discharge more than $400,000 in student loan debt.[49] Similarly, the Debtors chose to keep a pre-discharge credit card and use that credit card for purchases post-discharge.[50]

---

[43] *See* Trial Transcript, Doc. No. 148 at p. 59.
[44] *See* Trial Transcript, Doc. No. 148 at p. 62-64; *see also* Debtors' Post-Trial Brief, Doc. No. 152 at p. 6.
[45] *Id.* at 115-16, 121-22; *see also* Bankruptcy Case No. 14-11638, Doc. No. 10.
[46] The Bankruptcy Code requires a debtor to file a statement of intention within 30 days of his bankruptcy filing to state whether he will retain – through redemption or reaffirmation – or surrender debts that are secured by property of the estate. 11 U.S.C. § 521(a)(2)(A). However, the Bankruptcy Code further provides that an individual debtor in a chapter 7 case cannot "retain possession of personal property" unless he within 45 days after the first meeting of creditors enters into a reaffirmation agreement or redeems the property from the security interest. *Id.* at 521(a)(6). Because the Debtors' home was not personal property, it was not required to be reaffirmed under 11 U.S.C. § 521(a)(6).
[47] *See* Bankruptcy Case No. 14-11638, Doc. No. 1 at p. 10; Trial Exhibit 1.
[48] *See* Bankruptcy Case No. 14-11638, Doc. No. 10.
[49] The Debtors were not required to reaffirm their home loan. They could have not reaffirmed the loan and received a discharge of their personal liability and thereafter simply continue making voluntary payments on the home loan so that they could continue to live there.
[50] *See* Trial Transcript, Doc. No. 148 at p. 121-22.

a. **Pre-Bankruptcy Payments on the ECMC's Loans.**

Demmons testified that his pre-bankruptcy payment for his ECMC student loans was $0 per month under the IBR plan offered.[51] He further testified that he has made no attempts to determine if that $0 payment would be applicable today, after his bankruptcy filing, with his reduced income.[52]

When taken together, the testimony and evidence presented to the Court at trial show that the Debtors have not maximized their income due to Fowler's unemployment. Moreover, while the Debtors have reduced some of their expenses, they chose to keep an unneeded phone line, internet service and an internet domain, to reaffirm their personal liability on their home loan and to maintain a credit card while at the same time trying to walk away from more than $400,000 in student loan debt used to finance their undergraduate and medical school educations. Finally, the Debtors have received a cash settlement payment from their medical school that they will be able to keep if they are successful in discharging their student loans. For these reasons, ECMC asserts that the Debtors have failed to meet the first element of the *Brunner* test.

D. **Demmons Failed to Meet the Second Element of the *Brunner* Test.**

The second element of the *Brunner* test is whether additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loan.[53] Additional circumstances required by the *Brunner* test encompasses "circumstances that impacted on the debtor's future earning potential but which [were] either present when the debtor [] applied for the loans or [have] since been exacerbated."[54] Proving that the debtor is currently in financial straits is not enough, instead, the debtor must specifically

---

[51] *Id.* at p. 36-37, 140-41.
[52] *Id.* at p. 141-146.
[53] *Gerhardt*, 348 F.3d at 91.
[54] *In re Newchurch*, 2006 WL 3246593, at *3 (Bankr. M.D. La. November 2, 2006)(citing *Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003)).

-10-

prove "a total incapacity . . . in the future to pay [his] debts for reasons not within [his] control."[55] Examples of additional circumstances include illness, disability, a lack of usable job skills, or responsibility for a large number of dependents.[56]

### 1. Additional Circumstances Do Not Exist.

Even if Demmons is currently unable to repay his student loans – a fact that ECMC disputes given the availability of the IBR option – current inability to pay is not enough to warrant a discharge of Demmons' student loan debt. "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'"[57] Demmons' testimony at trial proves that he is highly educated and possesses advanced job skills.[58] Moreover, his bankruptcy schedules show that he has no dependents other than Fowler.[59] Demmons' trial testimony does not show any illness, but rather complications resulting from a second car wreck that occurred in 2010, after he graduated from medical school and after he failed to match with a residency program.[60]

Dr. Alan Kaye, Demmons' physician who treated him after the second car wreck and examined him before trial, testified that Demmons' injuries were severe and prevented him from holding a pen and caused "significant deficits in his legs."[61] However, Demmons testified that

---

[55] *Id.*
[56] *Newchurch*, 2006 WL 3246593, at *3 (citing *Olyer v. Educ. Credit Mgmt. Corp.*, 397 F.3d 382, 386 (6th Cir. 2005)).
[57] *See Brunner*, 831 F.2d at 396.
[58] *See* Trial Transcript, Doc. No. 148 at p. 110-114 (Demmons testified that he has computer skills, including knowledge of Excel, analytical skills to review a loan history, and the ability to research and write).
[59] *See* Bankruptcy Case No. 14-11638, Doc. No. 1 at p. 31; Trial Exhibit 1.
[60] *See* Trial Transcript, Doc. No. 148 at p. 131. Demmons first car wreck, which caused significant back and neck injuries occurred in 1985 prior to his obtaining the student loans held by ECMC. *Id.* at p. 23. The second car wreck in 2010 took place after Demmons took out the ECMC loans and *after* he was unable to secure a residency program. *Id.* at 23, 29; Trial Exhibit 12.
[61] *See* Trial Transcript, Doc. No. 148 at p. 10-13, 17.

he works between 36-40 hours a week at his current job, that he can hold a pen and write,[62] and that he regularly walked to work – a one mile distance – and also regularly walked to the grocery store when he did not have the use of a car.[63] Moreover, Demmons stood at the witness stand for more than two hours rather than sitting during his trial testimony on both direct examination and cross examination. While Demmons may have suffered injuries to his neck and back from his second car wreck, the testimony provided at trial demonstrates that he has extensive education, and various skills and expertise that allow him to work and earn a living in his current job or another job in or outside of the medical field.[64] Therefore, Demmons cannot show a total incapacity to pay his debts in the future, since he is able to work and currently works today.

### 2. Demmons' Age is Not an Additional Circumstance.

Demmons testified at trial that he is currently 59 and that he graduated from medical school in 2010, at which time he would have been approximately 53 years old.[65] Dr. Alan Kaye testified that no one would give a residency to someone with Demmons' "advanced age" and injuries.[66] But Demmons' age is not a factor that should be considered by this Court as an "additional factor" since he chose to take out the loans with ECMC when he was 42 to get an undergraduate degree and to then go on to medical school thereafter, deferring the payment on his ECMC student loans during that time.[67] Numerous courts have rejected the age-dependent argument, establishing that a debtor who chooses to incur student loan debt later in life should

---

[62] During trial, Demmons relied upon extensive hand written notes that he wrote the morning of trial concerning payments he made on his student loans.
[63] *See* Trial Transcript, Doc. No. 148 at p. 97-100, 113.
[64] *See Gerhardt*, 348 F.3d at 93 (stating that "nothing in the Bankruptcy Code suggests that a debtor may choose to work only in the field in which he was trained, obtain a low-paying job, and then claim that it would be an undue hardship to repay his student loans").
[65] *See* Trial Transcript, Doc. No. 148 at p. 36, 105.
[66] *See* Trial Transcript, Doc. No. 148 at p. 11. In fact, Demmons testified that his match for a residency took place in March 2010 before his May 2010 graduation and that he did not match into any residency program. *Id.* at 40. Therefore, Demmons failed to match in March 2010 *before* his December 2010 car wreck, so the failure to match into a residency cannot be the result of a later car wreck. *Id.*
[67] *See* Trial Transcript, Doc. No. 148 at p. 22.

not be allowed to complain about repaying that debt later in life.[68] By going back to school later and financing that education, Demmons had an expectation at the outset that his student loan payments would continue on later into his life.

### 3. Other Student Loans Have Been Discharged.

In addition, to date, the Debtors have already had their student loans with Navient, Maine Educational Services and FCDB discharged either by stipulation or default.[69] The loans held by these three lenders total approximately $160,291.88, which amount has been discharged by this Court making the Debtors no longer responsible for these amounts and reducing their overall student loan debt at the time of the filing of the Bankruptcy Case by just over 37%.[70]

---

[68] *See, e.g.*, *In re Hart*, 438 B.R. 406, 411-12 (E.D. Mich. 2010) (holding that because antidiscrimination rules prevent federal student loan lenders from considering a debtor's age, they likewise "should not be at increased risk of not being repaid when lending to older borrowers. Appellant should not be able to use her age as a reason for her inability to pay the loan back"); *Fabrizio v. U.S. Dep't of Educ.*, 369 B.R. 238, 249 (Bankr. W.D. Pa. 2007) (denying discharge and observing that "the simple fact that the debtor will have to pay his educational loans later into life is merely a consequence of his decision to incur debt for educational purposes during his thirties"); *Spence v. Educ. Credit Mgmt. Corp.*, 541 F.3d 538, 544 (4th Cir. 2008) (finding that well-educated and qualified but underemployed 61-year-old debtor who had taken on loans late in life could not establish undue hardship); *Jones v. Educ. Credit Mgmt. Corp.*, 392 B.R. 116, 129 (Bankr. E.D. Pa. 2008) (rejecting debtor's argument that his age precluded meaningful full-time employment in part because he chose to obtain additional higher education later in life); *In re Robinson*, 390 B.R. 727 (Bankr. W.D. Okla. 2008) (finding debtor's obligation to make student loan payments later in life is simply a function of her age at the time she obtained her degree and executed the Consolidation Note, and her exercise of forbearances prior to filing her bankruptcy case); *Jones v. Bank One Texas*, 376 B.R. 130, 139 (W.D. Tex. 2007) (stating that "Debtor cannot now use her age as ground to avoid repaying her student loans later in life, which resulted in the student loan debts persisting into her later age"); *DeRose v. EFG Tech. et al.*, 316 B.R. 606, 609 (W.D. N.Y. 2004) (observing that "[t]his Debtor was able to get student loans . . . at age 45 and completed the requirements at age 50. Were I a policymaker, I would not hear her to complain that she is too old now to repay the debt. . ."); *Chapelle v. Educ. Credit Mgmt. Corp.*, 328 B.R. 565, 572 (Bankr. C.D. Cal. 2005) ("age does not constitute an 'additional circumstance,' especially when [the debtor] is healthy and does not suffer from any age-related illnesses that affect her ability to work"); *Educ. Credit Mgmt. Corp. v. DeGroot*, 339 B.R. 201, 212 (D. Or. 2006) (stating that "where debtors choose to incur educational debt later in life, the fact that they will reach retirement age during the loan repayment period is not enough alone to justify discharge"); *Educ. Credit Mgmt. Corp. v. Waterhouse*, 333 B.R. 103, 112 (Bankr. W.D. N.C. 2005) (holding that advanced age does not satisfy the second prong of *Brunner*).

[69] *See* Doc. Nos. 14 (stipulation between Debtors and Navient), 113 (stipulation between Debtors and Maine Educational Services), and 150 (order granting default judgment in favor of debtors and against FCDB).

[70] *See* Doc. Nos. 14 (Navient's loan was in the amount of $11,025.81), 113 (Maine Educational Services' loan was in the amount of $62,791.16), and 123 (FCDB's loan was in the amount of $86,474.91); *see also* Trial Exhibit 1.

### 4. Demmons' Underemployment.

Finally, there remains a question as to whether Demmons is underemployed since he maintains a fairly low-level job despite having a medical degree and advanced job skills. In fact, Demmons himself stated at trial that he believed he was underemployed. Specifically, when asked "Do you agree that you are underemployed in your current field," Demmons responded "I would like to think so."[71] But choosing a low-paying job whether inside or outside a borrower's preferred profession cannot merit undue hardship relief.[72]

Demmons possesses an education and a set of skills that are relevant over a wide spectrum of vocations, e.g., researching, writing, secretarial, and adjunct teaching, to list a few. To the extent that Demmons alleges his current underemployment as an additional circumstance to satisfy the undue hardship standard, this is simply insufficient. Demmons' and Fowler's present economic circumstances are not evidence of Demmons' future earnings potential a mere six years after graduating in light of his education and skills.

Overall, the testimony and evidence presented to the Court at trial show that while Demmons may have physical limitations as a result of his second car wreck, he has ample education and usable job skills and expertise to allow him to find and maintain a job. Demmons proved he has the ability to write, use computers and work a full time job in some capacity in either the medical field or other field to pay his debts. For these reasons, ECMC asserts that the Debtors have failed to meet the second element of the *Brunner* test.

---

[71] *See* Trial Transcript, Doc. No. 148 at p. 63, 97.

[72] *See Oyler*, 397 F.3d at 386 (stating that "By education and experience [Oyler] qualifies for higher-paying work and is obligated to seek work that would allow debt repayment before he can claim undue hardship"); *Newchurch*, 2006 WL 3246593, at *3 (finding that the debtor failed to meet the *Brunner* test when, among other things, he failed to seek out other employment opportunities despite holding a bachelor's degree and a master's degree and had marketable skills); *In re Storey*, 312 B.R. 867 (Bankr. N.D. Ohio 2004) (concluding that it was the debtor's choice to remain in a low-paying job and that such a choice, for whatever reasons, prevented discharge of student loans); *In re Melton*, 187 B.R. 98, 102 (Bankr. W.D. N.Y. 1995) (stating that "A debtor may not create undue hardship by a free decision to be less than optimally employed, however noble the motive").

E.    **Demmons Failed to Meet the Third Element of the *Brunner* Test.**

The third element of the *Brunner* test is whether debtor has made good-faith efforts to repay the loan.[73] Good faith may be shown by the debtor's efforts to obtain employment, maximize income and minimize expenses to enable the debtor to make payments on their loan.[74] A debtor's efforts to seek out repayment options, such as under the William D. Ford Program, is an important indicator of good faith.[75]

1.    **Failure to Maximize Income and Minimize Expenses.**

The testimony presented at trial reveals that the Plaintiffs have not attempted to maximize their income, as demonstrated by Fowler's failure to seek other employment once her hours were cut to zero with her prior job.[76] Since the end of 2015, for more than six (6) months Fowler has remained unemployed despite being educated, with job skills and the physical ability to work.[77]

Fowler's own testimony was that she is limited to working from home due to anxiety.[78] However, no testimony was presented at trial from a medical expert or otherwise to establish any physical or mental impediment to Fowler working either inside or outside of the home.[79] In fact, the only testimony presented was that of Demmons who stands to gain something from Fowler's self-serving work limitation. And Demmons testimony regarding his observations of Fowler are not those of a medical expert. The Plaintiffs simply failed to offer an corroborating evidence, expert testimony or otherwise, to substantiate Fowler's alleged psychological impairment. As

---

[73] *Gerhardt*, 348 F.3d at 91.
[74] *In re McMullin*, 316 B.R. 70, 78 (Bankr. E.D. 2004) (citing *Roberson*, 999 F.2d at 1136); *see also In re Pratt*, 375 B.R. 753, 763 (S.D. Tex. 2007) (citing *Frushour*, 433 F.3d at 402).
[75] *Pratt*, 375 B.R. at 763 (citing *Frushour*, 433 F.3d at 402).
[76] *See* Trial Transcript, Doc. No. 148 at p. 192-93, 208.
[77] *Id.* Fowler testified that she is a caregiver to Demmons. *See* Trial Transcript, Doc. No. 148 at p. 190.
[78] *See* Trial Transcript, Doc. No. 148 at p. 188-90, 209-10.
[79] "The majority rule is that substantial and credible evidence, such as corroborating evidence, must be presented" to support allegations of medical disability. *See In re Burton,* 339 B.R. 856, 874 (Bankr. E.D.Va. 2006)*; see also In re Nightingale*, 543 B.R. 548 (Bankr. M.D.N.C. 2016)(requiring something more than debtor's testimony that a medical impairment creates work-related limitations).

such, Plaintiffs have failed to maximize their income because Fowler, an educated individual, has not sought employment outside of the home in any type of vocation.

Fowler also testified that she cannot work because she provides caregiving services to Demmons.[80] However, Demmons testified that he works between 36-40 hours per week, which affords Fowler plenty of time when Demmons is not in the home, and her caregiving services are not needed, to contribute income to the household.[81] Fowler also testified that she did not work in 2016 because she was preparing their discharge case for trial.[82] However, the Debtors are not *pro-se* litigants who must prepare and defend their case alone. Rather, the Debtors have a capable and experienced bankruptcy attorney who has represented them throughout the life of their adversary proceeding and has been paid by the Debtors for some of the services rendered. Therefore, preparing the case for trial is neither an adequate nor acceptable reason to explain why Fowler has been unable to work in 2016.

Moreover, while the Plaintiffs have attempted to minimize some expenses, others have not been minimized, such as the third phone line, internet service and internet domain that the Plaintiffs maintain, along with the reaffirmation of their home loan and maintaining a credit card post-discharge.[83]

### 2. Demmons' Actions Do Not Demonstrate Good Faith.

Demmons consolidated his undergraduate loans with ECMC in 2003.[84] Thereafter, he testified that he made four payments on the ECMC loans over a nearly thirteen year period.[85] He sought deferment and/or forbearance of those loans while he was in medical school.[86] Demmons

---

[80] *See* Trial Transcript, Doc. No. 148 at p. 190, 210-11.
[81] *See* Trial Transcript, Doc. No. 148 at p. 97.
[82] *Id.* at p. 210-11.
[83] *See supra* notes 40, 41, 45.
[84] *See* Trial Transcript, Doc. No. 148 at p. 22, 29-30; Trial Exhibit 12.
[85] *Id.* at 139-40; Trial Exhibit 17.
[86] *See* Trial Transcript, Doc. No. 148 at p. 33-37.

further testified that just before his bankruptcy filing, his payment due on the ECMC loans, which was set up for IBR, was $0 per month due to his low income.[87] However, Demmons testified that he did not inquire with ECMC as to whether he could maintain that $0 per month payment through his bankruptcy and beyond.[88] Instead, the Plaintiffs filed this adversary proceeding seeking to discharge their student loans.

Demmons testified that despite receiving the letter from ECMC dated April 1, 2016, setting out various options available to him under the William D. Ford Program, he did not consider or pursue any of those options.[89] Rather, Demmons opted to see if his student loans with ECMC could be discharged in this adversary proceeding.[90] In fact, Demmons testified that his goal at the outset of taking out his student loans was to have the loans paid off for him through service rather than through actual payments made by him.[91] Specifically, he stated:

> Q: Mr. Demmons, when you went back to school at 42 and you were taking out these student loans you realized since you were starting later your loans would obviously continue later on into your life, is that correct?
>
> A: I had anticipated when I got through this that when I got placed a lot of organizations will offer for each year that you put into when you sign up with them and you become an attending on their – you become staff and hopefully further on as attending, when you sign your contract with them not only do they compensate you in the form of pay, but they also compensate in the form of repayment which always from day one [was] my intention. I've known many people that have gone through this process that have gotten one for one year. For every year put in they get a year back in compensation of tuition, and even two year. A friend of mine went to Colorado and for every year he went to school he got paid two years back.

---

[87] *Id.* at 36-37, 140-41.
[88] *Id.* at 141-46.
[89] *Id.* at 142-46. *See In re Pratt*, 375 B.R. 753, 763 (S.D. Tex. 2007) (finding that debtor did not seriously consider or pursue her the options available to her which could reduce her student loan payments when she did not apply for the William D. Ford Program, but instead "chose to wait and see if her debt would be discharged")
[90] *See* Trial Transcript, Doc. No. 148 at p. 145-46.
[91] *Id.* at 107-08.

> Q: So when you were 42 and you were going back through your undergraduate program the goal was to then go on to med school and then work in a job where in addition to your compensation someone would take care of your student loans?
>
> A: Well, I had hoped.[92]

### 3. Debtors' Ration of Student Loan Debt.

Finally, courts weigh the ratio of the student loan debt to the debtor's total indebtedness as part of the good faith analysis.[93] Based upon the Debtors' bankruptcy schedules, 83% of their unsecured debt was held by student loan lenders.[94] Now, six short years after graduating from medical school, Demmons and Fowler seek to discharge all of their student loan debt, including Demmons' student loans with ECMC. These facts are in further support of a lack of good faith. The exception from discharge of student loans under 11 U.S.C. § 523(a)(8) "was enacted to prevent indebted students or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."[95]

These facts, when viewed as a whole, show that the Plaintiffs have not established good faith as required by the *Brunner* test. Accordingly, ECMC asserts that the Plaintiffs have failed to meet the third element of the *Brunner* test.

## CONCLUSION

For the reasons set forth herein, Plaintiffs have failed to establish all three requirements of the *Brunner* test in order to meet the undue hardship standard to receive a discharge of their student loans. Accordingly, ECMC respectfully requests that this Court grant judgment in its favor and against Plaintiffs finding that they have failed to meet the undue hardship discharge

---

[92] *Id.*
[93] *See In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005)(stating that a high ratio of student loan debt to total indebtedness contributes to a finding of a lack of good faith); *see also In re Russ,* 365 B.R. 460 (Bankr. N.D. Tex. 2007)(finding that 90.8% ratio contributed to a lack of good faith); *In re Kelly,* 351 B.R. 45, 55 (Bankr. E.D.N.Y. 2006)(finding that 70% ratio contributed to a lack of good faith).
[94] *See supra* note 17; Trial Exhibit 1.
[95] *In re Kielisch*, 258 F.3d 315, 320 (4th Cir. 2001) (quoting *In re Hornsby*, 144 F.3d 433, 436-37 (6th Cir. 1998)).

requirement in 11 U.S.C. § 523(a)(8) and denying Demmons a discharge of his student loans held by ECMC.

Respectfully submitted, this 15th day of June, 2016.

/s/ Heather LaSalle Alexis_____
HEATHER LaSALLE ALEXIS (#31227)
MARK J. CHANEY, III (#35704)
McGlinchey Stafford PLLC
601 Poydras Street, 12th Floor
New Orleans, LA 70130-3477
Telephone: (504) 586-1200
Facsimile: (504) 324-0749

Counsel for Educational Credit Management Corporation

1629214.3