**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| William A. Demmons | ) | DIVSION B |
| Karen S. Fowler | ) | |
| | ) | CASE NO. 14-11638 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| William A. Demmons and | ) | |
| Karen S. Fowler | ) | |
| | ) | |
| Plaintiffs, | ) | ADV PRO NO. No. 15-01024 |
| | ) | |
| vs. | ) | |
| | ) | |
| R3 Education Inc. | ) | |
| dba Saba University School of Medicine, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**POST TRIAL MEMORANDUM OF DEFENDANTS, KEYBANK, N.A.**
**& DEUTSCHE BANK NATIONAL TRUST CO.**

Defendants, KeyBank, N.A. (hereinafter referred to as "KeyBank") and Deutsche Bank National Trust Co. (hereinafter referred to as "Deutsche Bank") (collectively, "Defendants"), submit their Post-Trial Memorandum, pursuant to the Court's order of April 13, 2016 [Doc. 144].

**STATEMENT OF THE CASE**

On June 25, 2014, Debtors William A. Demmons ("Demmons") and Karen Fowler ("Fowler"), who are husband and wife, filed a Chapter 7 case.[1] Debtors received their discharge

---

[1] Joint Pretrial Order, Doc. 141, pg. 2.

1

on September 30, 2014.[2] On March 12, 2015, Debtors filed the within adversary proceeding, seeking to determine dischargeability of their student loan debt.[3]

As of the filing of the Bankruptcy Petition, Debtors' student loans totaled $438,686.[4] Three of Demmons' loans are held by KeyBank.[5] The current total balance is $123,679.37.[6] The last payment Demmons made on the KeyBank loans was on May 14, 2014.[7] Demmons' monthly payment is $630.27.[8]

Demmons executed a Health Xpress Loan Application/Promissory Note which is now held by Deutsche Bank.[9] The balance due under the Deutsche Master Note totals $68,617.35.[10] The monthly payment is $168.48.[11]

Fowler executed a Health Xpress Loan Application/Promissory Note, now held by Deutsche Bank.[12] The balance due is $43,309.73.[13] Fowler's current monthly payment is $252.96.[14]

For purposes of trial, Debtors' gross monthly salary totals $3,608.00.[15]; Debtors' total monthly expenses are $2,234.67 per month.[16]

---

[2] Id.
[3] Id.
[4] Id. at 3.
[5] Id.
[6] Id. at 4.

[7] Id. at 5.

[8] Id. at 4.
[9] Id. at 6.
[10] Id. at 7.
[11] Id.
[12] Id. at 6.
[13] Id. at 10.
[14] Id. at 8.

Demmons was involved in a car accident on December 14, 2010 where he sustained injury.[17] Fowler has substantial female health issues.[18]

## ARGUMENT

I. **The Standard for Undue Hardship in the Fifth Circuit: The *Brunner* Test**

11 U.S.C. § 523(a)(8) provides that a discharge under §§ 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt…

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified educational loan…"

11 U.S.C. § 523(a)(8).

In determining whether the repayment of the student loans would constitute "undue hardship" on the debtor, the Fifth Circuit has adopted the *Brunner* test. *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003). The *Brunner* test requires a debtor to prove:

a. The debtor cannot maintain, based on current circumstances, a "minimal" standard of living for the debtor and debtor's dependents if forced to repay the student loans;

b. Additional circumstances exist indicating that that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

---

[15] Id. at 10.
[16] Id.
[17] Id. at 7.
[18] Id. at 9.

3

c. The debtor has made good faith efforts to repay the student loans. *See Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. N.Y. 1987). "If one of the elements of the test is not proven, the inquiry ends, and the student loan cannot be discharged." *In re Russotto*, 370 B.R. 853, 856 (Bankr.S.D.Fla.2007).

> **A. Debtors could maintain a minimal standard of living if forced to repay their student loan debt.**

Though there is no exact criteria for determining a minimal standard of living, courts have found that a debtor cannot satisfy this test "merely because repayment of [the student loans] would require some major personal or financial sacrifices." *In re Salyer*, 348 B.R. 66, 71 (Bankr. M.D. La. 2006) *citing In re Elmore,* 230 B.R. 22, 26 (Bankr. D. Conn.1999). Further, the first prong "demands more than a showing of tight finances: it requires that a debtor prove he cannot afford reasonably necessary living expenses if he is forced to repay his student loans." *In re Salyer*, 348 B.R. 66, 71 (Bankr. M.D. La. 2006). In addition, "minimal does not mean preexisting and it does not mean comfortable." *Educational Credit Mgt. Corp. v. Stanley,* 300 B.R. 813, 817 (N.D.Fla.2003). In essence, "the debtor must specifically prove "a total incapacity ... in the future to pay [his] debts for reasons not within [his] control." *In re Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003).

When evaluating whether Debtors can maintain a minimal standard of living, household, rather than individual, income should be considered for each individual's loans. Courts have noted that "the Court must examine 'the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of the debtor's lifestyle.'" *In re Wynn*, 378 B.R. 140, 147-48 (Bankr. S.D. Miss. 2007) citing *In re White*, 243 B.R. 498, 509 (Bankr. N.D. Ala. 1999). In addition, "[w]ell established case law makes it clear that total household income, including that

of a non-debtor spouse, ... must be considered in conducting this minimal standard of living analysis, as well as its relevance in generally determining undue hardship under the Bankruptcy Code." *In re Wynn*, 378 B.R. 140, 148 (Bankr. S.D. Miss. 2007) *citing* Davis v. Educ. Credit Mgmt. Corp. (In re Davis), 373 B.R. 241, 13 (W.D.N.Y. 2007). *See Russ v. Texas Guaranteed Student Loan Corp.* (*In re Russ* ), 365 B.R. 640 (Bankr.N.D.Tex.2007). In "other areas of §523 litigation, numerous courts have held that the income of the non-filing spouse was to be considered when determining the dischargeability of a debt." *In re Wynn*, 378 B.R. 140, 148 (Bankr. S.D. Miss. 2007).

Debtors have college educations and advanced level training within the medical field. While Demmons may have diminished physical abilities subsequent to his accident, he maintains a high level of intelligence, knowledge, and experience in a variety of disciplines.[19] In addition, Demmons has continued to work 36 to 40 hours a week.[20] Recently, he was walking a mile back and forth to work, suggesting that Demmons maintains physical capability to continue to work and make an effort to repay his student loan debt.[21] Demmons also possesses an ability to increase his income, given that his current employer is attempting to "scale back" and Demmons considers himself "underemployed."[22]

Fowler mentioned at trial that she hasn't had any income since January.[23]

A recent decision involving an educated debtor noted that "[w]hile acknowledging that the Plaintiff has made some recent efforts toward finding employment, the court finds these

---

[19] Trial Transcript pg. 45, lines 3-24. See also pg. 107, lines 3-17
[20] Trial Transcript pg. 97, line 15.
[21] Trial Transcript pg. 98, lines 1-3; 18-25.
[22] Trial Transcript pg. 97, lines 8-23.
[23] Trial Transcript pg. 193, lines 22-24

efforts to be very selective and, aside of the registration with [job search websites], limited to casual inquiries... The Plaintiff provided the court with no evidence that she has at any time 'pounded the pavement' to find a job by traditional methods…" *In re Kelly*, No. 14-05006-5-DMW, at *6 (Bankr. E.D.N.C. Mar. 24, 2016). Further, "Plaintiff's lack of desire and motivation is an insult to those similarly situated, especially to those lacking the gift of an education" *Id*. at *7.

In the present case, Fowler has not shown a serious attempt to look for alternative employment and therefore, is capable of having additional future income.

While making payments on the loans in question may prove difficult, Debtors have not demonstrated a total incapacity in the future to repay their student loan debts given their recent ability to have employment and their current underemployment with respect to those jobs they currently maintain.

> **B.    Debtors have not proven additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period.**

The second prong of the *Brunner* test is "additional circumstances exist indicating that this state of affairs is likely to persist [for a significant period of time]" *In re Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003) citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 396 (2d Cir. N.Y. 1987). The "second prong considers the likelihood that the debtor's financial situation will improve sufficiently in the future to permit her to resume the payment of her educational loans." *In re Barron*, 264 B.R. 833, 841 (Bankr. E.D. Tex. 2001). "Under Brunner, undue hardship does not exist simply because the debtor presently is unable to repay his or her student loans; the inability to pay must be 'likely to continue for a significant time,' …such that

there is a 'certainty of hopelessness.'" *In re Mosley*, 494 F.3d 1320, 1326 (11th Cir. 2007) (quoting *In re Cox*, 338 F.3d at 1242 and *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001).

In evaluating whether a debtor was able to satisfy the second prong of the *Brunner* test, courts "have characterized this as "a demanding requirement" necessitating "a certainty of hopelessness" which confirms that the debtor will not be able to repay the loans. *In re Spence*, 541 F.3d 538, 544 (4th Cir. 2008) citing *In re Frushour*, 433 F.3d 393 (4th Cir. 2005).

Bankruptcy courts at times have found age and income level to not be reasons enough to discharge student loans. Though a debtor "was in her late 60s and has a low-paying job", one court found that ae debtor was still "a reliable, diligent worker with a master's degree along with completed Ph. D. course work. Her grades were excellent, and her education is not so outdated that higher-paying alternatives would be unreachable." *Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d 538, 544 (4th Cir.2008).

In another case, a court reached a similar conclusion, finding that a debtor "in her sixties…well-educated…in generally good health…knowledgeable, articulate, and professional in appearance and demeanor" was "capable of obtaining employment that will enable her to repay the Student Loans." *In re Kelly*, 548 B.R. 99, 106 (Bankr. E.D.N.C. 2016).

In the present case, both Demmons and Fowler are well-educated. At trial, Demmons expressed, "I did very well in undergraduate school. I was in the top percents."[24] Demmons conceded that he was at "at least average" in his education level and affirmed that he was underemployed in his current field.[25] Demmons has also has computer skills, research skills, and

---

[24] Trial Transcript pg. 38, lines 13-14.
[25] Trial Transcript pg 65, line 6-8. See also pg. 167, line 14-15.

has held a variety of jobs during his career.[26]

In citing a diminished capacity to work long-term, Demmons noted various physical conditions, largely stemming from a car accident in 2010. Despite his condition, Demmons has continued to work up to 40 hours a week and was recently walking a mile back and forth to work.[27] Despite noting that he "can't stand…for a long period of time," Demmons requested to stand up to give testimony at trial.[28] Demmons also made clear that he does not "intend of collecting Social Security disability, or unemployment."[29] Therefore, despite Demmons' claims regarding his diminished physical capacities, evidence suggests that he has a desire to work, is capable of working now, and of continuing to work in the future.

Demmons' accrued student loan debt substantially later in life than the traditional student, having started college at age 42. This is evidence of a conscious decision or choice to also be in repayment of these loans later in life.[30] Though Demmons cites large efforts in finding alternative or higher paying employment, little evidence was introduced to document this claim.

At least one court found that sending out "over one hundred" resumes without success was not enough evidence of undue hardship. *Brunner,* 46 B.R. at 756-58, *aff'd,* 831 F.2d 395 (2d Cir.1987). In addition, the Fifth Circuit has confirmed that "nothing in the Bankruptcy Code suggests that a debtor may choose to work only in the field in which he was trained, obtain a low-paying job, and then claim that it would be an undue hardship to repay his student loans" *In re Gerhardt*, 348 F.3d 89, 93 (5th Cir. 2003).

---

[26] Trial Transcript pgs. 110-112.
[27] Trial Transcript pg. 98.
[28] Trial Transcript pg. 21 lines 10-11. See pg. 44, lines 17-18.
[29] Trial Transcript pg. 65, lines 12-13.
[30] Trial Transcript pg. 106, lines 24-25.

Demmons possesses an advanced level of education, intelligence, and work ethic. Though Demmons is older and maintains an arguably low-paying job, these factors are not enough to present an undue hardship. Demmons continues to work and communicates an unwillingness to stop working. Demmons' situation does not rise to the level of a "certainty of hopelessness" contemplated by case law. See *In re Spence*, 541 F.3d 538, 544 (4th Cir. 2008).

Fowler has obtained a similar education and training to that of Demmons in accruing her student loan debt. Though Fowler has worked in the past, she has not received any income since January and has not attempted to find other employment during this time.[31] In citing evidence for her diminished capacity to work, Fowler notes that she has suffered from various psychological and emotional ailments related to stress, anxiety, and depression as a result of career struggles as well as personal difficulties related to women's health issues.[32]

Though courts have been careful not to "belittle" mental health issues, courts have held that the debtor "has the burden of demonstrating how these problems impair her ability to work." *In re Brightful*, 267 F.3d 324, 330 (3d Cir. 2001). In evaluating a debtor's claims that she suffered from mental health related issues, the court noted that "[the debtor's] testimony, while perhaps supporting the general conclusion that she has emotional and psychiatric problems, is notable for its lack of detail. It contains no explanation of the precise nature of her problems, and no explanation of how her condition would impair her ability to work..." *Id*. Despite that fact that the debtor had to live with her sister, "most likely would never attain her college degree, lacks useful vocational training, suffers glaring psychiatric problems, is emotionally unstable…" the Court did not grant an undue hardship discharge. *Id*. at 329. The court noted that at the "very

---

[31] Trial Transcript pg. 192-193.
[32] Trial Transcript pg 188, lines 12-25.

least" an "explanation as to how she was able to work full-time…in the past and yet cannot do so in the future" was required. *Id*. at 330.

In the present case, while a general conclusion of emotional and psychological problems can be supported, Fowler has admitted that she has not seen a doctor to diagnose these issues.[33] Even if Fowler was confined to work within the home due to various psychological problems, it is unclear as to why she would be unable to find work in the future, given that she had been consistently working from home and has not attempted to find an alternative source of employment or income since January 2016.

Fowler also notes that a reason for her limited ability to work is that she serves as a caretaker to Demmons.[34] In describing her role as a caretaker, Fowler describes taking care of Demmons as being a "full-time job."[35] However, because Demmons is working outside of the home, he is not in need of a full-time caretaker.

Fowler may be able to find additional employment in the near future. The second prong of *Brunner* has not been met.

    **C.**    **Debtors have not made a good faith effort to repay their student loan debt, as they have not maximized their income**.

Courts have traditionally looked at payments, attempts to maximize income, and efforts to negotiate a payment plan to determine if there has been a good faith effort to repay the loans. *Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). The good faith analysis requires the Court to consider the Debtor's "efforts to obtain employment, maximize income, and minimize expenses." *In re Russ*, 365 B.R. 640, 645 (Bankr. N.D. Tex. 2007). Failure to obtain additional employment can be evidence that a debtor has not made a good faith effort to maximize their

---

[33] Trial Transcript pg. 189, lines 24-25.
[34] Trial Transcript pg. 190, line 18.
[35] Trial Transcript pg. 211, line 23.

10

income. *In re Birrane*, 287 B.R. 490, 500 (B.A.P. 9th Cir.2002).

Though Debtors may have made an effort to minimize their expenses, they have not made a good faith effort to maximize their income or employment.

Mr. Demmons did not seem to know whether he would be able to wear a headset.[36] He provided no evidence to indicate he has applied for perhaps even a part-time job that may allow him to work from home. This would include telemarketing, customer service, or perhaps collections.

Ms. Fowler's belief that taking care of Mr. Demmons is a full-time job, would not prevent her from similarly applying to a part-time position.

Demmons and Fowler both appear to be motivated, intelligent, and educated individuals with a capability to further maximize their employment, yet have not done so. For these reasons and those facts mentioned in section I.B. above, Debtors have not demonstrated the requisite good faith to satisfy the third prong of the *Brunner* test.

**D.     Alternatively, even if the Court finds an undue hardship, Debtors' settlement with Saba University should go to the creditors.**

At minimum, the amount Debtors obtained through settlement of their pre-petition claim with Saba University, is an asset, or even current income, for consideration to be distributed to Debtors' creditors. Actually, for the reasons that follow, the terms of the settlement reached with the school should be used for payment to the student loan creditors regardless of whether Debtor is able to satisfy the *Brunner* test.

---

[36] Trial Transcript pg. 166.

11

In Paragraph 77.1 of their Amended Complaint[37], Debtors note that to "the extent that Fowler's Student Loans are not found to be dischargeable, the debt and accrued interest otherwise payable by Fowler should be recoverable from Saba…" Further, Paragraph 80.12 of the Amended Complaint provides that if "the Court should find that the Demmons student loans are not dischargeable, Demmons avers that Saba should be liable for the interest charged to Demmons on the loan proceeds that were not returned to student loan lenders." Therefore, the Debtors expressed intent for the proceeds of any Saba settlement to be used to satisfy creditors. Without a judgment in favor of Defendants, then, there would be no suit regarding Saba. Debtors should not get a windfall when the purpose of the suit against Saba was to satisfy creditors.

The settlement between Saba University and Debtors should be applied toward the claims of the student loan creditors, regardless of whether Debtors satisfy the *Brunner* test.

II. **The loans held by Defendants qualify as "educational" loans under 11 U.S.C. § 523(a)(8).**

   A. **Plaintiffs' Loans are Educational Because their Purpose was for Education.**

A court's inquiry into whether a loan is "educational" must start with a determination of the "purpose" of the loan. *In re Joyner*, 171 B.R. 762, 763 (Bankr. E.D. Pa. 1994). A loan is considered "educational" if it is intended to allow a debtor to meet the expenses incidental to the debtor obtaining his education. *In re Pelzman*, 233 B.R. 575, 580 (Bankr. D.D.C. 1999). Furthermore, the use of the funds by the debtor is not determinative as to whether the loan is educational. *Murphy v. Penn. Higher. Ed. Assist. Agency (In re Murphy),* 282 F.3d 868, 870 (5th Cir. 2002). In this case, because the

---

[37] Doc. 58.

"purpose" of the Loans was to facilitate the Plaintiff's education, the loans are "educational" and fall within the scope of § 523(a)(8).

### B. Money loaned in excess of the cost of tuition is not excepted from discharge.

The Fifth Circuit has focused on the stated purpose of the loan at the time it was obtained, rather than how the proceeds were actually used by the borrower when determining whether a loan is "educational." *Murphy*, 282 F.3d at 873. In *Murphy*, the debtor sought to have the portion of his student loans used for living and social expenses discharged. *Id*. at 870. The court stated that permitting a debtor to discharge educational loans just because he used them for non-educational purposes would create an absurd result. *Id*. at 873. Responsible students who used the loan proceeds to finance an education would retain the burden of repaying the loans, while irresponsible students who used the loans for social, recreational, or other non-educational uses would receive the benefit of the discharge. *Id*. Further, "[s]ection 523(a)(8) does not expressly state that only loans 'used for tuition' are nondischargeable. Nor does it define educational loans as excluding living or social expenses." *Id*. at 871.

Other courts have also held that it is the purpose of the loan which determines whether it is "educational." *In re Sokolik*, 635 F.3d 266 (7th Cir. 2011). The court noted that a "purpose" test was more consistent with the language of § 523(a)(8), which does not expressly state that only loans "used for tuition" are nondischargeable. *See Id*. A "purpose" test also aligns with the broader goal of protecting lenders against debtors who divert educational funds to other uses. *Id*. Finally, the court stated that an inquiry into the nature and character, rather than the use, of the loan would prevent a court from having to determine whether loan proceeds were used for educational or personal expenses, or some combination of both. *Id*.

13

Paragraph P of the Key Bank Master Note states, "I will use the proceeds of any Loan subject to the terms of this Note for my educational expenses (i) at an eligible institution or (ii) relating to the Loan Programs under which I obtained such Loan."[38] Paragraph Q of the Key Bank Master Note outlines that the loan applications signed under penalty of perjury and again certifies use for educational expenses.[39] This indicates the purpose of the loans, which is solely educational.

      C.      **The Loans in question are subject to BAPCPA.**

Debtors have argued that the Loans made prior to October 2005 should be subject to the pre-BAPCPA dischargeability provisions for private student loans. However, the time in which the bankruptcy case was filed controls the dischargeability of the student loans. In a recent case, a plaintiff argued "that prior to 2005, private student loans were dischargeable in bankruptcy and as the two loans originated as private loans in 2004, the debt is dischargeable, regardless of the consolidation of the loans in 2006." *Shaw v. EduCap, Inc.* (*In re Shaw*), 2015 Bankr. LEXIS 658, 4-5 (Bankr. S.D. Tex. Mar. 3, 2015). The court disagreed, finding that "Section 523(a)(8) was last amended in 2005 and those amendments were effective for all cases filed on or after October 17, 2005. The instant chapter 7 bankruptcy case was filed on January 28, 2008. Thus, section 523(a)(8) in its current form is applicable to the instant case." *Id*. at 8 Other courts have noted that "[s]ince issues involved in an adversary proceeding originate from the main bankruptcy case, the law governing the main bankruptcy case will govern the adversary proceeding" *Id.* at 8, n. 2. See also *In re Kilroy,* 354 B.R. 476 (Bankr.S.D.Tex.2006). Therefore, current law

---

[38] Exh. 22, page 4, bates 363.

[39] Id.

regarding the dischargeability of the loans applies; standards prior to 2005 may not be considered.

### III. CONCLUSION

For the foregoing reasons, the loans in question should be excepted from discharge. Alternatively, if the court finds an undue hardship, the funds from the Saba settlement should be applied to the loans held by Defendants.

Respectfully Submitted,

/s/Joseph M. McCandlish
Joseph M. McCandlish Esq.,
Admitted *Pro Hac Vice*
Attorney for Defendants KeyBank, N.A.
and Deutsche Bank National Trust Co.
**Weltman, Weinberg & Reis Co., L.P.A.**
3705 Marlane Drive
Grove City, OH  43123
(614) 801-2619
(614) 801-2601 (fax)
jmccandlish@weltman.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 15, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Copies of this filing are being served this same date on all parties or their counsel of record in accordance with Fed.R.Bankr.P. and the Local Rules by operation of the court's electronic filing system or via First Class Mail, postage prepaid.

<u>Electronic Filing through the court's electronic filing system upon:</u>
Robin R. DeLeo, Attorney for Plaintiffs
Email: jennifer@northshoreattorney.com

C. Davin Boldissar, Attorney for R3 Education, Inc. dba Saba University School of Medicine
Email: nobankecf@lockelord.com

Bradley C. Knapp, Attorney for R3 Education, Inc. dba Saba University School of Medicine
Email: bknapp@lockelord.com

Jane Jackson, Attorney for State of Colorado, Department of Higher Education, Colorado Student Loan Program d/b/a College Assist, *State of Colorado, Department of Higher Education, Colorado Student Loan Program d/b/a College Assist*
Email: jane.jackson@kellyhart.com

Earl F. Sundmaker, Attorney for Key Bank N.A. and Deutsche Bank National Trust Co.
Email: trey@sundmakerfirm.com

<u>And by First Class Mail, Postage Prepaid upon:</u>

William A. Demmons, III
Karen S. Fowler
400 Baptiste Circle
Houma, LA 70363

American Educational Services
Eddie Upshaw, Registered Agent
Rt 2, Box. 15
Spearsville, LA 71277

Maine Educational Services
National Education Association
Jonathan S R Beal, Registered Agent

16

PO Box 1400
Portland, ME 04104

Navient Solutions, Inc.
Corporate Service Company, Registered Ag
320 Somerulos St.
Baton Rouge, LA 70802-6129

FCDB NPSL LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

FCDB NPSL LLC
c/o Goal Structured Solutions
401 West A Street, Su 1300
San Diego, CA 92101

Deutsche Bank
Through Legal Department
60 Wall Street 36th Floor
New York, NY 10005

/s/ Joseph M. McCandlish
Joseph M. McCandlish Esq.,
Admitted *Pro Hac Vice*
Attorney for Defendants KeyBank, N.A.
and Deutsche Bank National Trust Co.
**Weltman, Weinberg & Reis Co., L.P.A.**
3705 Marlane Drive
Grove City, OH 43123
(614) 801-2619
(614) 801-2601 (fax)
jmccandlish@weltman.com