**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 7 |
| | * | |
| **William A. Demmons and** | * | DIVISION "B" |
| **Karen S. Fowler** | * | |
| **Debtors** | * | |
| | * | CASE NO. 14-11638 |

*****************************************************************

| | | |
|---|---|---|
| | * | |
| **William A. Demmons and** | * | |
| **Karen S. Fowler** | * | |
| | * | |
| Plaintiff/ Debtors | * | ADV PROC. NO. 15-01024 |
| | * | |
| versus | * | |
| | * | |
| R3 Education Inc., dba Saba University | * | |
| School of Medicine; American | * | |
| Educational Services; Maine | * | |
| Educational Services; Navient Solutions, | * | |
| Inc., and Nelnet, Inc, FCDB NPSL, LLC | * | |
| Deutche Bank, Key Bank, NA, Key Bank | * | |
| USA, NA, Educational Credit | * | |
| Management Corporation, | * | |
| Defendants | * | |

*****************************************************************

### DEBTORS' REPLY BRIEF TO DEFENDANTS' POST TRIAL MEMORANDUMS OF LAW

William Demmons ("Demmons") and Karen Fowler ("Fowler"), Chapter 7 Debtors and Plaintiffs in the above referenced Adversary Proceeding (Demmons and Fowler are collectively referred to as "Debtors") submit this Reply Brief in response to the Post- Trial Memorandums of Law filed by ECMC, Deutsche Bank, and Key Bank (collectively the "Student Loan Lenders") and represent as follows:

1

### I. SUMMARY OF ARGUMENT

It is clear from the briefs filed that both Plaintiffs and Defendants agree that *Brunner* is the appropriate standard for the Court to rely upon to determine the dischargability of student loans. All parties also agree *Brunner* requires the satisfaction of three distinct elements. Debtors have met their burden of proof in establishing undue hardship under *Brunner*. Alternatively, the Private Loans are not protected from discharge as such loans are not "qualified educational loans" as required by statute. The Private Loan Lenders have not met their burden of proof in establishing that the Private Loans fall within the parameters of protection from discharge.

### II. APPLICATION OF BRUNNER

The Fifth Circuit has adopted the Second Circuit's *Brunner* test for discharging student loans based upon undue hardship.[1] *Brunner* requires (and all parties agree) that the debtor must establish that (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for the debtor and the debtors' depends if forced to repay the student loans; (2) additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. *Brunner v. New York State Higher Education Services Corporation*, 831 F.2d 395 (2nd Cir. 1987). Demmons and Fowler have established each of the Brunner elements and their loans should be discharged based upon undue hardship.

#### A. **Based Upon Current Income and Expenses, Debtors Cannot Maintain a Minimal Standard of Living if Forced to Repay the Student Loans**

---

[1] *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003).

2

Debtors introduced testimony of their income and expenses as of the Bankruptcy filing date[2] and their income and expenses as of the trial date, approximately two years after the filing date.[3] Based upon Debtors' original Schedules I and J, Debtors' net monthly income is $38.20.[4] This was the Debtors net income even though Fowler had full time employment. Therefore, the Defendants argument that the Debtors are not maximizing their income because Fowler is not currently employed is false. Even with both Debtors fully employed, Debtors lack the ability to make a substantial student loan payment. The thirty-five dollars a month net income is insufficient to pay even ECMC's lowest offer of $52.00 per month (and that would only be dealing with one of the six remaining loans).

Since the filing of the Bankruptcy Petition, Debtors financial situation has become even more desperate as Fowler has not been given any hours from her employer during the first four months of the year. Based upon Debtors' income and expenses as of the date of trial, Debtors' produced new Schedules I and J evidencing a negative net monthly income.[5]

Under either financial standard – Debtors' mathematically cannot maintain a minimal standard of living if forced to repay the loans. Where the debtors' monthly expenses exceed their monthly income, then the present inability to maintain a minimal standard of living is proven.[6] A payment of any substantial amount would preclude even the subsistent standard of living that the Debtors currently maintain.[7] Therefore, the Court need only mathematically review the Debtors Schedules in order to deduce that Debtors have met the requirements for *Brunner's* first prong.

---

[2] Trial Exhibit 1
[3] Trial Exhibit 2
[4] Trial Exhibit 1
[5] Trial Exhibit 2
[6] *In re Gerhardt,* 348 F.3d 89, 92 (5th Cir. 2003); *In re McMullin*, 316 B.R. 70 (Bankr. E.D. La 2004)
[7] *In re McMullin*, 316 B.R. 70, 75.

1. <u>Adjustments to Debtors' Budget</u>

Even assuming *arguendo*, that the Court is required to probe further into Debtors' income and expenses as argued by the Defendants, the adjustments suggested by the Student Loan lenders are ludicrous.[8] A "minimal standard of living" is not to be equated with "poverty", which may be defined as indigencey, destitution, or want, and which is characterized by lack of basic necessities[9]. The Debtors' expenses are more than reasonable and not inflated– Debtors finance no cars; Debtors expenses are below the threshold set forth by the IRS for housing, utilities, clothing, personal care and "miscellaneous" categories; the Debtors "entertainment expense" is a monthly charge from Netflix of $7.99; and Debtors have no discretionary expenses, no cable television, and no health insurance.[10]

Defendants complain that Debtors signed a reaffirmation agreement with their mortgage lender, yet Defendants fail to articulate why this fact impacts on their claims. They can't argue that Debtors' home mortgage payment of $1060.00 is too high because it is below the median average in the state. Instead Defendants seem to be insinuating that Debtors should be homeless and direct their "excess" housing proceeds to satisfying student loans.

2. <u>Maximizing Income</u>

Ignoring the fact that the Debtors had basically no net income even when Fowler was fully employed, Defendants argue that the Debtors have failed to maximize their household income since Fowler is currently not earning any income. Yet Fowler testified that prior to her

---

[8] Defendants complain of Debtors maintenance of a third phone line and internet for Fowler to work at home (at a cost of $10 per month [trial transcript pg. 212 line 210]) and a monthly charge for an internet domain.
[9] In re Ivory, 269BR890 (bankr ND Ala 2001)
[10] Trial Transcript pg. 198, line 17.

current job, she "applied to hundreds of jobs."[11] Fowler has a reasonable expectation that "as soon as they find something for me to do, or they need me, I hope to get some hours."[12] Even if Fowler's positive thinking is rewarded and she receives additional hours, as evidenced by Trial Exhibits 1 and 2, the Demmons' Household income is insufficient to maintain a minimal standard of living. The Debtors lack the ability to repay student loans in any meaningful manner.[13]

3. <u>The Saba Settlement Funds</u>

The Defendants have the gall to argue that the Saba settlement proceeds should be turned over to the Student Loan Lenders. Prior to this trial, Debtors, in good faith, made settlement proposals to all of their student loan lenders – which settlement offers were to be funded with the majority of the Saba settlement proceeds. The Student Loan Lenders rejected the offers as "too low." Now however, after trial, the Student Loan Lenders demand that the settlement proceeds be turned over to them. Defendants should not be allowed to have their cake and eat it too. They refused to settle and forced Debtors to proceed to trial. It would be inequitable after the conclusion of trial to give to the Defendants what Debtors had offered to give to them in order to forego the stress, embarrassment and cost of trial.

The Private Lenders argue that the Amended Complaint shows it was the Debtors original intent to recover funds from Saba in order to fund repayment of the Private Student Loans, so the settlement money ordered to be turned over. Debtors' original intent is meaningless. The settlement with Saba was never contingent upon the amount of student loans,

---

[11] Trial Transcript pg. 193; line 20.
[12] Trial Transcript pg. 194; lines 7-8.
14 *In re McMullin*

enforcement of the student loans, dischargability of student loans, *etc.*. Rather, the settlement with Saba was to avoid litigation – just as the terms of the settlement offered by Debtors to the Defendants was to avoid trial. The Defendants rejected settlement.

Demmons testified that he intended to use the Saba settlement proceeds to purchase a vehicle since they currently own no operable vehicle.[14] It would also be prudent for Demmons and Fowler to use the settlement proceeds to elevate their current standard of living, although by no means are the settlement funds sufficient to even lift Debtors to a "minimal standard" of living. Debtors could purchase health insurance; pay for necessary dental surgery and maybe even get prescription eye glasses.

### B. **Additional Circumstances Exist**

To satisfy this factor, Courts evaluate whether "additional circumstances" have impacted upon the debtor (or the debtor's dependents) future earning potential.[15] Examples of "additional circumstances" include psychiatric problems, lack of usable job skills, severely limited education, chronic illness or disability (mental or physical) that interferes with the debtor's ability to work and generate income.[16] The Debtor must show a total incapacity in the future to pay his debts for reasons not within his control.[17]

On four separate occasions Defendant ECMD inaccurately states in its briefs that Demmons' car accident occurred after his failure to match. This is untrue. In fact, Demmons

---

[14] Trial Transcript pg. 129-130
[15] *In re Gerhardt*, 348 F.3d at 92.
[16] *Id.*
[17] *Id.*

6

testified that he "graduated in May of 2010 and in December of 2010, was in a car accident, prior to the match in the following February 2011."[18]

Debtors presented the expert testimony of Dr. Alan Kaye, who testified that Demmons has some of the most pronounced and sever damage to his cervical spine, and …. lower lumbar spine, than he has ever seen in his 27 years of practice.[19] Demmons condition "can't be cured."[20] Demmons is not going to get better.[21] He has a permanent physical disability.[22]

Defendants presented no contradicting expert testimony. Instead, the Student Loan Lenders – without a shred of medical evidence - argue in their Post-Trial Memorandums that obviously Demmons condition cannot be that bad because he is smart; he works;[23] he occasionally walked to work;[24] he can hold a pen; he can write; and he may even be able to wear headphones. Arguments of counsel should be given no weight as compared to the expert testimony of Dr. Kaye.

Demmons is being crucified for struggling to work despite his physical infirmities. Because Demmons works, he is underemployed. Thus, under the Defendants' analysis, if Demmons simply quit his job – he'd be more likely to pass the *Brunner* test.

To the contrary, as in *McMullin*, despite numerous health issues, Demmons has held down a job.[25] Demmons current employment is the best employment option *available to him*.

---

[18] Trial Transcript, pg. 40, lines 21-22.
[19] Trial Transcript, pg. 8 lines 3-7.
[20] Trial Transcript pg. 11, line 13.
[21] Trial Transcript pg. 10, lines 11-13.
[22] Trial Transcript pg. 12, lines 21-22.
[23] Demmons works "36-40 hours ….if my condition allows me to." Trial Transcript pg. 97; lines 14-17.
[24] Demmons testified that "people were conscious of the fact that I was walking and they were giving me rides…people would pick me up as well." Trial Transcript pg. 99; lines 6-10.
[25] *McMullin v. US Dept of Educ.*, 316 BR 70, 81 (Bankr. E.D. La. 2004).

The nonfinancial accommodations made by Demmons' employer are what causes Demmons to stay at his current place of employment – not because he "chooses" a low paying job. Demmons testified that:

> I intend on working as long as I can. I don't intend on collecting Social Security disability or unemployment. I don't believe in it. I never have. I think that as long as I can work, I'm a contributing member and I can hold my head high….My [job] moves will be more horizontal than vertical. And I think that I'll be hindered by the fact that I have severe limitations…. I have searched for jobs within the hospital, within research areas… within other universities…[I get] latitude where I'm working now. So maybe I get a job tomorrow and they like me but they're not going to be comfortable with my work if I don't show up for a month and a half after I start. And that's the most debilitating aspect of this. I can deal with the pain, I can push through it, but I can't change it. It is totally beyond my control and so is my ability to be able to function. …I can sneeze and I won't be able to move for a week if my head goes a certain way.[26]

Although asserted by the Defendants, Demmons has not and does not argue that his age is a factor which should be considered as "additional circumstances;" rather, it is Demmons' physical condition – which is permanent and was caused by factors outside of his control – that has led to Demmons' inability to earn a higher salary.

As to Ms. Fowler, "additional circumstances" are evidenced by both her own physiological problems and her obligations as a caretaker for Demmons that will extend for the rest of his life. Fowler is not at fault in the car accident that stripped Demmons of the ability to care for himself. Additionally, this limitation on Fowler's future employability was unknown and unknowable at the time that Fowler's student loans were incurred.

Defendants argue that because Fowler's physical and emotional issues were not supported by the testimony of a physician, her testimony is somehow disingenuous and insufficient to support a finding of dischargability. Defendants, however, cite to no case law

---

[26] Trial Transcript pgs. 65-66

requiring a physician's testimony for the purpose of obtaining a discharge. In fact, case law indicates that a permanent physical disability is not a prerequisite to discharge of a student loan.[27] In *Educational Credit Management Corp v. Polleys*, a debtor stipulated that "no medical or physical condition prevents her from returning to work." The court concluded that while a permanent medical condition will certainly contribute to the debtor's inability to repay a loan, it is not necessary if "the debtor's situation is already bleak." There has been an abundance of evidence introduced at trial as to the bleakness of these Debtors' situation.

Defendants additionally argue that Debtors "present economic circumstances are not evidence of their future earning potential a *mere* six years after graduating." Neither of the Debtors can ever be practicing physicians. Demmons has a permanent physical disability which will forever hinder his ability to obtain employment and is in pain "sitting, standing, sleeping..."[28] Fowler will always be required to have a flexible job so she can provide care taking for Demmons and based upon her own issues, has limited employability. It has not been a "mere six years" for Debtors; but six years of devastating financial hardship that is unlikely ever to change.

Demmons and Fowler can clearly meet the required elements of the Brunner second prong by demonstrating an unforeseeable change in circumstances that is likely to persist and will forever impact their ability to earn income in the future.

### C. Demmons and Fowler Have Made a Good-Faith Effort to Repay the Loans.

---

[27] *In re McMullin*, 316 B,R. at 78 *citing Educational Credit Management Corp v. Polleys,* 356 F.3d 1302, 1311 (10th Cir. 2004).
[28] Trial Transcript pg. 148; lines 11-25.

A debtor's good faith is measured by his efforts to obtain employment, maximize income and minimize expenses.[29] There is no per se requirement that the debtor pay a certain percentage or minimum amount of the student loans in order to be found in good faith and the failure to make a payment, standing alone, does not establish a lack of good faith.[30] The Debtor's failure to seek out every available repayment plan does not bar a finding of good faith.[31]

Admitted into evidence at trial was Debtors' Exhibit 7, a chart created by Debtors evidencing the payments made by Debtors on each of their student loans to the Defendants. Multiple payments were made on their outstanding student loans.

ECMC argues that it has presented two alternative programs available to Demmons and his failure to choose either program is evidence of his lack of good faith. To the contrary, under the programs, Demmons would be required to make payments of $78 per month for twenty years; or $52 per month for twenty years.[32] Although these payments may appear paltry at first blush, the Demmons household – in its very best circumstances when both spouses are employed – yields a net income of only $38 per month.[33]

Also demonstrating the Debtors' good faith is their efforts to maximize their income and reduce their expenses as set forth in the arguments above. The Demmons household expenses have been trimmed to the bone. Even pretending Fowler was employed as she was pre-petition,

---

[29] *In re McMullin*, 316 BR. 70 (Bankr. E.D. La. 2004).
[30] *Id.* at 81.
[31] *Id.* at 78
[32] Defendants also continue to argue that Demmons may be eligible to be included in the Public Service Loan Forgiveness Program which would reduce his repayment period to 10 years. However, Demmons specifically testified that this program is not applicable to Demmons because he is not a full time employee. *See* Trial Transcript at pg 146, lines 2-17.
[33] *See* Trial Exhibit 1.

there is no money to make meaningful student loan payments. Lastly, Debtors' good faith is evidenced by their offer – despite their destitution - to use the Saba settlement funds to settle this Adversary Proceeding with the Student Loan Lenders.

Defendants argue that this Court should take into consideration the amount of student loan debt compared to that of other unsecured debt in order to evaluate the Debtors good faith. Defendants have failed to cite any Fifth Circuit authority or court within the Fifth Circuit that has adopted this rationale and as a result, Debtors would urge the Court to find that this factor is completely inapplicable to a finding of good faith.

### C. Alternatively, If the Loans are Not Discharged Based Upon Undue Hardship, the Private Student Loans Are Dischargeable as the Loans are not "student loans" Protected from Discharge under the Bankruptcy Code.

If this Court determines that undue hardship has not been established, Debtors argue that the three Key Bank loans and two Deutsche bank loans (the "Private Loans") should still be discharged as the Private Loans are not "student loans" excepted from discharge. Further, the Private Loan Lenders have not met their burden to proof in establishing the status of the debt as falling within the parameters of Section 523(a))(8)(B).

The 2005 Amendments to the Bankruptcy Code changed the provisions of Section 523(a)(8), fragmenting part of the statue that had previously been an integrated whole and adding § 523(a)(8)(B).[34] When recently reviewing Section 523(a), the Supreme Court noted that "When Congress acts to amend a statute, we presume it intends its amendments to have real and

---

[34] *In re Creeger*, 2016 WL 3049972 (Bankr. N.D. Ohio, May 20, 2016).

substantial effect."[35] Courts must limit the Bankruptcy Code's discharge exceptions to those "plainly expressed."[36] "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."[37]

Following the BAPCPA amendments, Section 523(a)(8)(B) limits dischargability to "any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986…" The loan at issue, therefore, is specifically required to meet the criteria of a "qualified educational loan" under the Internal Revenue Code (IRC). The obligation at issue has to be an educational loan at the time the tuition payments are made... in order for the loan to be nondischargeable. [38] Refinancing debt that does not qualify as an education loan cannot turn such an obligation into a nondischargeable educational loan.[39]

Under the IRC, a "qualified education loan" is defined as "any indebtedness incurred by the taxpayer *solely* to pay **qualified higher education expenses**." (*emphasis ours*).[40] "Qualified higher education expenses" is subsequently defined as the "cost of attendance" ("COA") at the educational institution as determined by the particular institution." The COA is the amount *determined by an institution* to cover the costs of tuition and fees plus an allowance for books, supplies, transportation, room and board, and miscellaneous personal expenses.

Trial Exhibit 6 evidences the Saba calculation of Cost of Attendance, which must be used to determine "qualified higher education expenses." Because the amount lent on the Private

---

[35] *Husky Int'l Electronics v. Ritz*, 2016 U.S. LEXIS 3028 (May 16, 2016).
[36] *Bullock v. BankChampaign, NA*, 569 U.S. ___, 133 S.Ct. 1754, 1760, 185 L.Ed.2d 922 (2013).
[37] K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).
[38] *In re Creeger, Id.*
[39] *Id.*
[40] 26 U.S.C. Section 221(d)(1).

Loans to Demmons and Fowler exceeded the applicable Cost of Attendance established by Saba, the loans **could not have been used *solely* to pay qualified higher education expenses** (because those are limited by COA). The regulations associated with IRC 221(d)(1) make it clear that "mixed-use loans," like debts associated with a credit card that is used for expenses other than tuition, are not "qualified educational loans." [41]

Private loans that fund expenses beyond what the education institution determines to be the reasonable COA should be wholly dischargeable as the proceeds are not *solely to pay qualified higher educational expenses*. As shown by Trial Exhibit 6, each and every year (with the exception of Fowler Semester 6), the student loan proceeds received by Demmons and Fowler exceeded the applicable COA. Therefore, the private loans were not solely used to pay qualified higher education expenses and therefore, are not "qualified education loans" protected from discharge under Section 523(a)(8)(B).

Because the Fifth Circuit's decision in *Murphy*[42] was rendered in 2003, prior to the Bankruptcy Code revisions in 2005 to specifically incorporate the definitions contained within the Internal Revenue Code, the Defendants reliance on *Murphy* and other pre-BAPCPA cases in defining a protected "student loan" is misplaced. In *Murphy*, the Fifth Circuit concluded that the "purpose" of the loan prevailed over the actual use of loan proceeds to determine whether a private loan was a protected student loan. In rendering its decision, the Fifth Circuit found that "Section 523(a)(8) does not expressly ….. define "educational loans"". [43] This is no longer true under BAPCPA, which now incorporates the definitions contained within the IRC to define that only "qualified educational loans" are protected from discharge. The Court should no longer

---

[41] *In re Creeger*, 2016 WL 3049972; *citing* 26 CFR 1.221-1(e)(4) Example 6.
[42] *Murphy v. Penn. Higher Ed. Assist. Agency,* 282 F.3d. 868, 870 (5th cir. 2002).
[43] *Id.* at 871.

consider cases that conclude that "if the purpose of the loan is to facilitate education, it is a student loan."[44] Instead, Courts are required by statute to evaluate whether a "student loan" meets the parameters of qualifications set forth by the Internal Revenue Code.

The burden of proof in establishing the status of the obligation as an "educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code" is on the lender.[45] Thus, the Private Loans are dischargeable.

## III. CONCLUSION

For the foregoing reasons, the Debtors have met the burden of proof in establishing undue hardship under Section 528(a)(8) and their student loans should be discharged. Alternatively, the Private Loans should be discharged as such loans are not "qualified educational loans" and are therefore, dischargeable.

Respectfully submitted,

THE DE LEO LAW FIRM LLC
/s/ Robin R. De Leo
Bar Roll No. 20347
800 Ramon St.
Mandeville, LA 70448
(985) 727-1664
(985) 727-4388 (Facsimile)

---

[44] See for example the following pre-2005 cases cited by Defendant Key Bank and Deutsche Bank in its Post-Trial Brief at page 12 – *In re Joyner*, 171 B.R. 762 (Bankr. E.D. Pa. 1994); *In re Pelzman*, 233 B.R. 575 (Bankr. D.D.C. 1999); *In re Murphy*, 282 F.3d 868 (5th Cir. 2002).

[45] *In re Creeger*, 2016 WL 3049972 (Bankr. N.D. Ohio 2016); *Rumer v. Am. Educ. Servs.*, 469 B.R. 553, 561 (Bankr. M.D. Pa. 2012); *Brown v. Citibank NA* 539 B.R. 853, 857 (Bankr. S,D, Cakl, 2915); *In re Roth*, 490 B.R. 908, 916-17 (BAP 9th Cir. 2013)("the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters…").

**CERTIFICATE OF SERVICE**

      This is to certify that a copy of the foregoing Reply to Post Trial Memorandum of Law was served on June 22, 2016 upon the following:

| | |
|---|---|
| Earl F. Sundmaker<br>The Sundmaker Firm<br>1027 Ninth St.<br>New Orleans, LA 70115 | trey@sundmakerfirm.com |
| Joseph M McCandlish<br>Weltman Weinberg & Reis Co., LPA<br>3705 Marlane Drive<br>Grove City, OH 43123 | jmccandlish@weltman.com |
| Heather LaSalle<br>McGlinchey Stafford, PLLC<br>601 Poydras Street, 12th Floor<br>New Orleans, LA 70130 | hlasalle@mcglinchey.com |

                                    THE DE LEO LAW FIRM LLC
                                    /s/ Robin R. De Leo
                                    Bar Roll No. 20347
                                    800 Ramon St.
                                    Mandeville, LA 70448
                                    (985) 727-1664
                                    (985) 727-4388 (Facsimile)