UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                     CASE NO. 14-11638

WILLIAM A. DEMMONS, III AND                               SECTION "B"
KAREN S. FOWLER

    DEBTORS                                            CHAPTER 7
************************************************************************
WILLIAM A. DEMMONS, III AND
KAREN S. FOWLER
      PLAINTIFFS

VERSUS                                                    ADV.P. NO. 15-1024

R3 EDUCATION, INC. dba SABA
UNIVERSITY SCHOOL OF MEDICINE, et al.

## <u>MEMORANDUM OPINION</u>

This matter came before the court on April 12, 2016 as a trial on the complaint and

amended complaint of plaintiffs William A. Demmons, III ("Demmons") and Karen S.

Fowler ("Fowler") against defendant Saba University School of Medicine for breach of

contract and fraudulent misrepresentation, and against defendants American Educational

Services, Maine Educational Services, Navient Solutions, Inc., State of Colorado,

Department of Higher Education, Colorado Student Loan Program d/b/a College Assist,

Nelnet, Inc, Key Bank, N.A., Key Bank USA, N.A., Deutsche Bank National Trust Co.,

Educational Credit Management Corporation,  and FCDB NPSL LLC, seeking to have

ten student loan debts declared dischargeable pursuant to 11 U.S.C. § 523(a)(8).  Prior to

the trial on the complaint, Demmons and Fowler either entered into settlement agreements

1

with or were granted default judgments against all of the above entities except for the

Educational Credit Management Corporation ("ECMC"), Key Bank, N.A. ("Key Bank"),

and Deutsche Bank National Trust Co. (Deutsche Bank").  For the reasons set forth

below, the court finds that the debtors have shown that they are entitled to a discharge of

their debts to ECMC, Key Bank and Deutsche Bank.

## I.    Background Facts

Demmons and Fowler, a husband and wife,[1] both attended medical school in the

Netherlands Antilles at Saba University School of Medicine ("Saba").  Demmons

graduated, but before he could begin his residency, he was involved in a car accident that

left him permanently disabled.  Fowler did not graduate and also suffers from serious

health problems.  At the time of the trial, Demmons was 59 years old, and Fowler was 48

years old.  During the time they were enrolled in medical school, they each took out

student loans that they now seek to discharge.  At issue before this court are six loans

incurred by Demmons and one loan incurred by Fowler.  Three of Demmons' loans are

held by Key Bank.  The total of the Key Bank loans is $123,679.37.  One of Demmons'

loans is held by Deutsche Bank; the total amount of that loan is $68,617.35.  Demmons'

remaining two loans are held by ECMC with a balance due of $51,955.25.[2]  On the

morning of the trial, however, ECMC stated on the record that it had agreed to reduce the

---

[1]  They were married in 2012.

[2]  All of these balances were given by the loan holders around the date of the trial.  The balances on these loans have likely increased since then.

balance of Demmons' loans to $25,000. Fowler's loan is held by Deutsche Bank and totals $43,309.73. The monthly payment due on Fowler's loan is $252.96 and the monthly payments for Demmons' six loans total $1,061.75.[3] The debtors received their Chapter 7 discharge on September 30, 2014, and on March 12, 2015 filed this adversary complaint seeking discharge of their student loans.

## II.    <u>Legal Analysis</u>

The discharge of student loans in bankruptcy is governed by the current version of 11 U.S.C. § 523(a)(8), which states:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt– unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependants, for--
> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.[4]

Since 2003 bankruptcy courts in the Fifth Circuit must use the *Bruner* test when analyzing student loan discharge cases.[5] The *Bruner* test, set forth by the Second Circuit

---

[3] This amount is from the joint pre-trial order and does not take into consideration the reduction in the amount of the ECMC student loan to $25,000.

[4] This version of section 523(a)(8) became effective on October 17, 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").

[5] *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003).

3

in 1987, is a three part test that requires the court to find 1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependants if forced to repay the loans; 2) that additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and 3) that the debtor has made good faith efforts to repay the loans.[6]

### A.    Can the debtors, based on their current income and expenses, maintain a "minimal" standard of living?

The debtors put on evidence at the trial as to their current standard of living. At the time of trial, Demmons was working at the Chabert Medical Center in Houma, Louisiana. Demmons testified that he currently works as an Emergency Department technician making $12.25 an hour. Demmons submitted as evidence the paystubs from his job from January 2016 up to the time of trial. He is paid every other week. His take home pay in that time period ranged from a high of $1,108.48 to a low of $632.58.[7] This averages $1,642.79 per month. Fowler was not earning any income at the time of the trial in April 2016.[8]

---

[6] *In re Brunner*, 831 F.2d 395 (2nd Cir. 1987).

[7] Trial Exhibit 3.

[8] Fowler has worked in the past, and the court will address her situation in a later part of this opinion, but for purposes of the *Bruner* test, the court focuses on the debtors' current situation in its analysis of this first part of the test because it concerns their *current* standard of living.

4

As to expenses, Demmons submitted several months worth of bank statements,[9] and updated schedules I and J, which although not filed into the record in the main bankruptcy case, were provided to give the court a picture of the debtors' current situation.[10]   It is clear that the debtors spend all of their income every month just to pay their basic living expenses.  The debtors pay $1,036 per month on the mortgage on their home.  This included the monthly principle and interest as well as taxes and insurance. They list separately a payment of $31 per month for flood insurance.  The debtors pay $79 per month for vehicle insurance on their two vehicles, a 2000 Chrysler minivan and a 2000 Dodge Ram truck.[11]  They have no car note payments.  The debtors' updated schedule J stated that they pay approximately $400 per month for utilities, which includes electricity, heat, water, sewer,  cell phone and internet service.  The debtors scheduled $150 for transportation, $120 for medical expenses, $25 for laundry and clothing, $60 for personal care products, $800 for food and housekeeping supplies and $25 for

---

[9]  Trial Exhibit 24.

[10]  Trial Exhibit 2.

[11]  Both vehicles have high mileage and at the time of trial, neither vehicle was running, and the debtors were borrowing a vehicle from Ms. Fowler's mother.  Demmons testified that they were still paying insurance on the non-operational vehicles because they hoped to get the vehicles repaired in the near future, and if they cancelled the insurance policies, then the cost of obtaining new policies would significantly increase this expense, because the rates would be higher.  Additionally, although there was no testimony as to this, the court notes that in the state of Louisiana, if an individual cancels his vehicle insurance, he is required to turn in the license plates to the office of motor vehicles, or face an expensive fine.  Thus, if Demmons cancelled the insurance, he would be subject to additional costs for re-registering the vehicles when they were repaired, which might not be any more cost effective than simply paying the monthly insurance until the vehicles are repaired.

entertainment.

The testimony of the debtors and their bank statements showed, however, that they do not spend quite this amount. The debtors' bank statements show that in the three months preceding the trial, they spent on transportation related expenses a total of $291.25.[12] The debtors spent a total of $1,514.30 over three months on what the court will call food and miscellaneous housekeeping expenses. The bank statements showed the debtors shop at places like Walmart, Sam's Cub, Target and Rouses (a grocery store).[13] Utilities were $320.83 for January, $348.24 for February and $347.94 for March. There were some minimal expenses shown for fast food charges, $29.52 in January, $129.87 in February and $59.89 in March. Demmons testified that normally they cook at home and eat a lot of rice, beans, and potatoes because those are inexpensive foods. He further explained that the fast food costs were abnormal because they spent more time than usual traveling to meet with their attorney in the few months before the trial and thus

---

[12] There were three months of bank statements that covered the periods of December 22, 2015 to January 20, 2016 ("January statement"); January 21, 2016 to February 18, 2016 ("February statement") and February 19, to March 22, 2016 ("March statement"). The transportation expenses for the January statement were relatively high at $204.21, which Demmons explained by testifying that most of those expenses related to the costs incurred in driving to Arkansas to visit their families for Christmas. The Feburary transportation expenses were $33.85 and the March transportation expenses were $53.19.

[13] Specifically, for food and miscellaneous housekeeping expenses, the debtors spent $452.94 as shown on the January statement; $387.65 as shown on the February statement and $683.71 as shown on the March statement.

6

were not at home to cook for themselves as much as they usually would.[14]

Both Demmons and Fowler testified that they had foregone medical treatment because they cannot afford it.  Fowler testified that she cannot see properly without glasses, but that she cannot afford glasses, so she has none.[15]  She also testified that she needs dental care but has not visited a dentist since May of 2006 although she has pain from lack of dental care.  She testified that she returned the gifts they received this past Christmas to Walmart and exchanged them for food.  She further testified that she suffers from depression and anxiety but has not seen a doctor for her problems, nor does she take medication.  Demmons also testified that he often goes without or rations his medications because he cannot afford them.  The court finds that the debtors are trying very hard to hold down their expenses and to live within their income.

There were some specific items that the creditors took issue with at the trial, so the court will address those in detail.  Demmons was questioned about several charges totaling $40.84 over the three month period mentioned above to godaddy.com.[16] Demmons explained that this was for a website domain fee for a website he was trying to

---

[14]  The court notes that the meals out were not at expensive or fancy restaurants, but rather at places like Taco Bell, KFC and the like.  Additionally the debtor testified that a cluster of the meals, which occurred in February, were incurred because they had family from out of town come to visit, which resulted in a temporary extra expense for that month.

[15]  She stated that she could not see her attorney clearly from the witness stand.

[16]  This would average out to $13.61 per month, but the court is not sure that it is even this much, because it looks like one or more of the charges may have been a one-time fee as opposed to a monthly payment.

create.  The creditors also questioned a charge of $45.25 to the Patio Line Restaurant.

Demmons explained that while visiting relatives in Arkansas, the family had gone out to

eat together, and to simplify matters, he had paid the bill, and had then been reimbursed in

cash from the others.

Several charges to Petsmart totaling $19.76 were questioned.[17]  Demmons

explained this expense by testifying that there are several lizards living near his house,

and that they help control bugs and other pests, but that in the winter, there is not as much

for the lizards to eat, so on a couple of occasions he bought some crickets at the pet store

to feed the lizards. Finally the creditors questioned payments on a credit card, and

Demmons explained that because this card had no balance when he filed his bankruptcy

petition, it was not discharged.  He further explained that after he received his discharge,

he has used it a few times in an attempt to rebuild his credit.  From his testimony, it did

not strike the court as if Demmons has been running amok making outrageous charges on

this credit card.[18]  The court finds that these small charges that the creditors question so

aggressively are really not enough to make any difference in the debtors' financial

situation.

The creditors also question the debtors' decision to reaffirm the debt on their home

---

[17]  This would be an average expense of $6.59 per month for crickets, that per Demmons'
testimony is only during a couple of the winter months.  During the rest of the year, crickets and
other bugs that lizards like to eat are plentiful in Louisiana.

[18]  The three payments he made on the card were for $50, $43.79 and $27, which could
presumably be lumped in with the household expenses without causing that category to balloon
to out of control proportions.

mortgage.  The debtors live in a modest three bedroom ranch house in Houma, Louisiana.

Their monthly mortgage payment including taxes and insurance is $1,036.  They have

some equity in the home, but not a large amount.[19]  One creditor questioned why the

debtors don't sell the house and buy something smaller, and another questioned why they

don't sell the house and rent an apartment.  The court finds that the debtors' decision to

remain in their home is a reasonable one.  The debtors have to live somewhere.  Their

home is not unreasonably expensive or extravagant.  Practically speaking, with their

current financial situation, they would not be able to find a lender to finance the purchase

of a new, smaller home.  Additionally, they would probably not save significant amounts

of money renting, and then there would be additional costs incurred for moving and a

damage deposit.  Finally, the debtors choice to remain in their home gives them stability,

which in view of Fowler's depression and anxiety is important.  If they were to move to a

rental apartment with cheaper rent, there is no guarantee that the rent would not go up

over time, or the property could be sold, and the debtors forced to find a new rental,

potentially at a higher rate.  The debtors are guaranteed that as long as they keep current

with their mortgage payments, they will have a place to live at a fixed price, and the court

finds that is was not an unreasonable or unwise decision for the debtors to reaffirm the

loan on their home.

--------

[19]  The scheduled value of the home was $131,000, and the debtors schedules show they still owe approximately $116,000.  Under Louisiana law, they are entitled to a $35,000 homestead exemption, so even if they sold the home to realize the equity, those funds would be exempt from their creditors.

A final category of expenses, though small, attracts the creditors' attention and
irritation.  That is the $10 per month that the debtors pay for an extra telephone line for
Fowler's work, and the monthly internet fee of $60, also for Fowler's work.  Fowler
testified that although her employers had not had hours available to her for several
months, she still considers herself employed by them, and that the extra phone line was
required for the job.  The $10 per month is not going to make any difference in the
Debtors' budget as far as their ability to pay the student loans are concerned.
Additionally, in the year 2016, the court finds that it is not unreasonable for a debtor to
have internet service *even if* it is not strictly for work purposes.[20]

After reviewing the debtors' income and expenses, the court finds that the debtors
have met their burden as to the first part of the Bruner test.  *Bruner* does not require the
debtor to live in abject poverty to satisfy the first prong.[21]  Here, the debtors are living a
very minimal lifestyle, with no discernable extravagances.  They have foregone necessary
medical and dental care and continue to suffer from medical conditions that require
ongoing treatment and medications that they cannot afford.[22]  They cannot afford to make

---

[20]  The court notes that on the website for the Office of the U.S. Trustee, under the section
entitled "Means Test Information," there is information about the IRS standards for housing and
utilities, which is used by the U.S. Trustee in evaluating a debtor's allowable expenses.  The
housing and utilities standard specifically includes internet.  *See*
https://www.justice.gov/ust/means-testing/means-testing-cases-filed-between-may-1-2014-and-o
ctober-31-2014-inclusive

[21]  *In re Hornsby* 144 F.3d 433 (6th Cir. 1998);

[22]  *Educational Credit Management Corp. v, Smith*, 2011 WL 4625397 at * 6 (S.D. Tex.
2011).

necessary repairs to their vehicles.  In fact, as the debtors' attorney pointed out at trial, the

means test tables for Louisiana debtors would allow them $3,095 per month for housing,

utilities, transportation, health care and a living allowance.[23]  The debtors are nowhere

near spending that amount of money per month.  It is clear that the debtors have met the

first part of the *Bruner* test so the court turns next  to the really hard part of the *Bruner*

test.

### B.  Do additional circumstances exist indicating that thi state of affairs is likely to persist for a significant portion of the repayment period?

The second prong of the *Bruner* test asks if "additional circumstances exist

indicating that this state of affairs is likely to persist for a significant period of time."[24]

Additional circumstances encompass facts or conditions that have an impact on the

debtor's future earning potential but which were either not present when the debtor

applied for the loans or have since been exacerbated.[25]   This second aspect of the test is

meant to be a demanding requirement.  Thus, proving that the debtor is currently in

financial straights is not enough.  Instead the debtor must specifically prove a total

---

[23] This is for a family size of two, living in Terrebone Parish, Louisiana.  This number is based on the IRS collection financial standards, which is used by the U.S. Trustee to determine whether a debtor's expenses are reasonable when assessing whether an abuse of the bankruptcy system exists.  This is a *minimum* amount debtors are allowed, and often, if the debtor can prove actual expenses in excess of this figure, that will be allowed.  Demmons and Fowler have expenses that are just a little over *one half* of this minimum level.

[24] *Gerhardt* at 92.

[25] *Id citing In re Roach,* 288 B.R. 437 (Bankr. E.D.La 2003).

11

incapacity in the future to pay his debts for reasons not within his control.[26]  The second

prong of the *Bruner* test recognizes that a student loan is "viewed as a mortgage on the

debtor's future.[27]  However, in applying this prong, courts need not require a "certainty of

hopelessness."  Instead, a realistic look must be made into the debtor's circumstances and

the debtor's ability to provide for adequate shelter, nutrition, health care, and the like.

Importantly, "courts should base their estimation of a debtor's prospects on specific

articulable facts, not unfounded optimism."[28]

The debtors income for the several years prior to trial was as follows: in 2015,

Demmons earned $24,437.46 and Fowler earned $8,624; in 2014, Demmons earned

$15,856.18 and Fowler earned $19,932; in 2013, Demmons earned $11,638.03 and

Fowler earner $16,472.34; in 2012, Demmons earned nothing and Fowler earned

$11,997.48.  These are gross income figures before any deductions for taxes or anything

else.  Income figures before 2012 were not provided to the court.  The court notes that

2014, the year they filed their bankruptcy petition, was the year they earned the most, and

---

[26]  *Gerhardt* at 92.

[27]  *Educational Credit Management Corp. v. Polleys*, 356 F.3d 1302, 1310 (10th Cir.
2004).  This 10th Circuit case involved a 45 year old single mother who had not paid any amount
on her student loans, was in good physical health, but had severe mental health problems.  She
had stipulated that she had no physical medical condition that prevented her from obtaining
work, but the bankruptcy court, the district court and the 10th Circuit all found that her mental
health condition was such that she met the undue hardship requirements of § 523(a)(8).

[28]  *Id, citing* Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy:
Must Debtors Be Impoverished to Discharge Educational Loans?,* 71 Tul. L.Rev. 139, 197
(1996).

the schedules they filed with their initial bankruptcy petition show that even at that time, their monthly net income was only $38.20.[29]

### 1.    Demmons

Demmons had a cervical laminectomy in 1985.[30]  Thereafter he was able to function normally.  He attended college and then medical school, and graduated from medical school in May 2014.  Then, on December 14, 2010 Demmons was involved in a car accident which resulted in further serious spinal damage, leaving him with several medical problems that persist to this day.[31]  Dr. Kaye, who was recognized as an expert at the trial testified that Demmons has severe damage to his cervical spine and to a lesser extent to his lumbar spine resulting in permanent physical disability with profound motor weakness in his arms and hands, and some weakness in his legs.  Demmons also has limited strength and coordination, abnormal reflexes, and motor and sensation deficits. Dr. Kaye testified that he has treated Demmons since the summer of 2011, and had examined him most recently on April 11, 2016, the day before the trial.  Dr. Kaye testified unequivocally that in that time, Demmons has never approached normal function,

---

[29]  Additionally, the debtors qualified to file a Chapter 7 petition and not a Chapter 13, which means that they were below the median family income for a family of their size in Louisiana.  This allowed them to discharge the rest of their debt instead of entering into a repayment plan.

[30]  Dr. Kaye, who testified as an expert at the trial explained that this procedure removed pieces of Demmons' spine to free spinal nerve roots that were causing pain.

[31]  Demmons' car was rear-ended by another car.  The driver of the other car had only $15,000 in liability insurance, and although Demmons has some uninsured motorist coverage that paid some of his medical bills, there was no big insurance payout from the car accident.

that he can't be cured, and that he will not get better in the foreseeable future.  Dr. Kaye

further testified that he has developed a rapport with Demmons, and that from his

observations, Demmons is very motivated to improve, is trying very hard to function as

best he can, that the job Demmons currently has is about as much as he is capable of

doing, and that he has no doubt that Demmons' condition is permanent.

    The creditors have trouble with the idea that the financial condition of  a person

who has received medical training, such as Demmons, will not increase in the future, but

they presented no evidence to support their arguments.  On cross examination, counsel for

ECMC questioned Dr. Kaye about a report in Demmons' medical records dated 6/27/11

that stated Demmons had good strength in his upper and lower extremities.[32]  Dr. Kaye

responded that the report was not drafted by him, but rather a neurosurgeon who was

evaluating Demmons for surgery, and that he did not feel he could comment on the report.

He then reiterated that when he saw Demmons in the summer of 2011, his opinion was

that Demmons had severe spinal damage that limited his function.  Neither ECMC nor the

other creditors put on their own medical witness to counter Dr. Kaye's testimony.[33]  The

---

[32]  Trial Exhibit 8 at p. 138.  A five year old medical report by an unidentified surgeon is
not considered very good evidence of either the first or second prong of the *Brunner* test,
particularly as weighed against the testimony at trial by Dr. Kaye as to Demmons' condition in
2016 and the chances of his condition improving in the future.

[33]  Despite not putting on any sort of medical expert as a witness, ECMC questioned the
extent of Demmons' disability in its post-trial brief, noting that Demmons had stood at the
witness stand for over two hours when he testified at the trial.  Demmons asked the court if he
could stand rather than sit, because sitting was worse for his back than standing.  The court also
notes that standing for that length of time did seem to tire Demmons.  Further Demmons testified
that he was in "an enormous amount of pain" from standing to testify at the trial.

14

court found Dr. Kaye to be a credible witness, and given the length of time over which he

has treated Demmons, the court accepts his testimony and finds that Demmons' has

permanent medical disability.

In addition to Dr. Kaye's testimony about Demmons's ability to work, Demmons

testified on his own behalf.  As stated above, Demmons works at a hospital in Houma,

Louisiana as an emergency department technician.  He testified that his job duties consist

of directing patients in the emergency department at the hospital where he works to the

proper room, making sure that their paperwork accompanies them, organizing labels

associated with their paperwork, and then occasionally directing them for further testing

within the hospital, and accompanying them if necessary.  He testified that he also works

in the behavioral medicine department sitting with psychiatric patients who are not able to

be left alone.  He explained the one of the reasons this job works well for him is that if he

becomes too tired by his duties in the emergency room, he is able to switch to the

behavioral medicine department, where he need only sit with the patients.

Additionally, Demmons testified that his medical condition often renders him

unable to work at all for periods of time, and that not only is his job flexible enough to

accommodate his medical limitations, but also that his employer is understanding of his

medical condition.[34]  As an example, he testified that the year before the trial (2015) he

---

[34] Despite the creditors arguments to the contrary, most employers would not be willing
to accommodate the changes in work schedule that Mr. Demmons' condition sometimes
requires.

missed a month and a half of work because of medical problems.  Demmons testified that

although he tries to work as many hours as he can, he is not classified by the hospital as a

full time employee, and thus is not eligible for medical insurance or other benefits

available to full time employees.  He testified that if he does work more than 40 hours in a

particular week, he can earn overtime pay, but that the opportunities for this are rare, and

not consistent.  He also testified that working certain shifts results in extra hourly pay, but

that he is scheduled when the hospital needs him, and that he has no control over whether

he is scheduled for a shift that results in a higher hourly payment.

Demmons testified that since he had his accident, he has been unable to get

accepted in a residency program to complete his medical education and gain licensing as

a physician, despite trying several times.  He further testified that he has applied for 30 to

40 jobs since 2010, in varying fields including colleges, non-profits, research in

pathology and cancer, and the oil industry.  He has applied for jobs both in and out of

state.[35]  Demmons stated that he had received no job offers as a result of his job search.

He also stated that despite his education, he is a 59 year old man with significant health

problems, and he is limited in the types of work he can do.[36]

---

[35]  Under cross examination Demmons pointed out that although he is probably qualified
to teach or be a physicians assistant or a nurse, the expense and additional course work
associated with the licensing requirements for these professions are significant barriers to his
finding employment in these professions.

[36]  Demmons also testified that he isn't sure that there are a lot of employers that would
be accepting of an employee that started a new job and then needed to take significant amounts
of time off on a regular basis.  The court agrees that this would be a significant impediment to
finding and keeping a new job.

The court finds Demmons' testimony credible.  The creditors, although strenuously arguing that Demmons should have no problem finding better compensated employment, presented *no* countervailing evidence to the testimony of Dr. Kaye and Demmons.[37]   Additionally, all of the creditors argue that Demmons, an educated man, should surely be able to find some type of other work that would enable him to pay back his loans.[38]  The court thinks not.  Demmons impressed the court with his testimony that he is doing the best that he can.  The fact that Demmons chooses to work at all instead of applying for social security disability benefits, for which he would likely be qualified, is a further indication that Demmons is not shirking his responsibilities, as claimed by the creditors.  Demmons was not at fault in the car accident that injured him; he has found a job that accommodates his physical condition, and he works as many hours as he is able.

ECMC also argues that Demmons' age is of no consequence because he applied for the student loans and went to medical school at a relatively late age, and thus his age should not be considered by the court.  ECMC cites several cases in its brief to this effect.  The court agrees that age alone is not always a relevant factor in these cases.  In this case, however, Demmons' age, coupled with his permanent medical disability, constitutes an

---

[37]   *Speer v. Educational Credit Management Corp.*, 272 B.R. 186, 195 (Bankr. W.D. Tex. 2001).

[38]   Counsel for Key Bank suggested that Demmons should try to find work as a telemarketer from his home in his off hours to make extra money.  Given Demmons' medical condition, the court has no doubt that the work Demmons does is probably exhausting for him. Indeed, he testified that he has to sometimes go to sit with the psychiatric patients because the work in the emergency room tires him.  Key Bank's proposition does not seem to be a viable solution in this particular case.

additional circumstance affecting the likelihood of Demmons' future chances of getting a job that will enable him to pay back his loans.[39]

Demmons has proved the additional circumstances part of the *Bruner* test. The evidence presented shows that Demmons' permanent medical disability is a significant hindrance in his attempts to find employment that would produce more income than he currently makes. Additionally, the court finds that this constitutes "additional circumstances" indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loans as required by *Bruner*.

## 2.    Fowler

Fowler testified that she is not currently earning income from her job, but that she has worked in the past, and she is still currently working for her employer but that she had not had any assignments for the past several months. It is stipulated that Fowler has autoimmune hematologic abnormalities resulting in substantial female health issues.[40] Fowler testified that she suffers from depression and anxiety. The depression and anxiety began while she was in medical school, and worsened when she had a miscarriage in 2008. Doubtless the depression and anxiety were not helped when Demmons was involved in the car accident in 2010. Fowler testified that she has difficulty leaving the house, and thus she cannot work outside of the home, which makes her current job ideal,

---

[39] For example, if Demmons were 30 instead of 59, perhaps his chances of recovery from his injuries would be greater.

[40] Joint pre-trial order, ¶ 61 of the uncontested facts.

because it allows her to work from her house.  Demmons testified to corroborate Folwer's

account of her condition.

Although ECMC dedicates a portion of its brief to attacking Fowler's testimony,

citing her "alleged psychological impairment," ECMC does not even hold a loan owed by

Fowler.  And ECMC certainly did not present *any* evidence that Fowler's mental health

issues are not genuine. Deutsche Bank, who *is* the holder of Fowler's student loan,

concedes that "a general conclusion of emotional and psychological problems can be

supported,"[41] but then goes on to argue that Fowler is at fault because she has not been to

a doctor for treatment and diagnosis of these issues.  This argument ignores the fact that

the debtors do not have enough money to attend to their health needs.  As with Demmons,

none of the creditors put on any evidence of their own, but instead attack the credibility of

the debtors' testimony.  The court finds Fowler to be credible, truthful and sincere in her

testimony.

When asked on cross examination, Fowler testified that in the past she had applied

for hundreds of jobs, and the only one she could find was her current job.  She testified

that she has not searched for other employment since January 2016.  Her reasons for that

were her mental health problems, her need to be at home in case her husband experienced

problems that required her assistance,[42] and the fact that she considers herself to be

---

[41]  Deutsche Bank's post-trial brief (P-154) at p. 10.

[42]  Both Fowler and Demmons testified that due to his condition, problems can arise at
any time for which he might require assistance.  A few of the examples given were that he might
get "stuck" and be unable to get out of the car, or that he could sneeze, and the resulting shock to

employed currently.  The court recognizes that Fowler's additional circumstances are

perhaps a closer call than Demmons, but the court finds that additional circumstances

exist that make Fowler unlikely to find future employment better than her current job.

The court notes that even though Fowler currently is not earning money from this job, her

past history with this company gives the court a range of possible income for her.  At the

peak, Fowler was making $19,932, and the debtors were making pre-tax annual income of

$35,788, or $2,982 per month.  Their average annual income over the last 3 years has

been $32,319.  At the time of trial, they were on track to make significantly less in 2016

than the three year average.

ECMC and Demmons negotiated an Income Based Repayment ("IBR") plan in the

years 2011 to 2014.  This resulted in a monthly loan payment of zero based on Demmons'

income, and ECMC's brief states that based on the 2014 peak income, the monthly IBR

payment for Demmons would have been $52.  If the debtors paid $52 per month for the

next 20 years, ECMC would realize $12,480 on its loan, which is likely not even enough

to cover the interest.[43]  And that is only *one* of the seven student loans that Demmons and

Fowler owe.  ECMC also recognizes, in its brief, that based on the income of the debtors

---

his spine could render him unable to move for days at a time.  The court can see how his
unpredictable need for help could make it difficult for her to have regular employment.  And,
since they have no money to pay their medical bills and basic living expenses, options that might
seem to make sense such as hiring someone to help him when these situations arise are not
realistic for these debtors.

[43]  This would also not pay off even the reduced loan amount of $25,000 that ECMC
agreed to before the trial.

at the time of trial, Demmons' monthly payment under an IBR plan would be zero.

Significantly, Demmons testified that on the Key Bank loans, for which he was not able to negotiate a forbearance or an IBR agreement, he has made payments totaling almost $11,000 over the last 4 years, with the result that the principle amount of the loans has been reduced by only 63 cents. Despite the arguments by the creditors that if the debtors really tried they could pay their loans, it is obvious to the court that these debtors will never be able to pay off their student loans. The court finds that the second, and more difficult prong of the *Bruner* test has been met.

### C.    Have the debtors made good faith efforts to repay the loans?

### 1.    Demmons

At trial Demmons presented evidence regarding his attempts to repay the loans. Demmons has made payments on the loans totaling $15,713.31 over the course of several years.[44] Demmons has also negotiated IBR agreements on some of the loans; this resulted in his not being required to make any payments on some of the loans. Demmons testified that the debtors used money he received from his car accident,[45] and money from Fowler's retirement account to make payments on their loans.

ECMC argues that Demmons is not acting in good faith, because he declined to enter into further IBR agreements with them after he filed this adversary proceeding.

---

[44]  Trial Exhibit 7.

[45]  That the debtors used this money - which probably should have gone to pay for his medical expenses and medications - to pay student loans, is additional evidence of the debtors' good faith attempts to pay the student loans.

21

ECMC has advanced this argument in other courts with mixed success.[46]  As stated above, there is no evidence that accepting ECMC's IBR plan will make any significant difference on the debtors' ability to repay their student loans.  Additionally, some courts have pointed out that there are tax consequences for the debtor who enters into an IBR plan because during the plan, the amount of the loan continues to grow, and then at the end of the plan, the amount of the loan that is then forgiven can become a tax liability for the debtor.[47]  Thus the debtor is asked to exchange one non-dischargeable debt,  a student loan debt, for another non-dischargeable debt, a tax debt, which is not much progress towards the fresh start envisioned by the Bankruptcy Code.

## 2.    Fowler

The evidence shows that Fowler also made payments on her loans.  Since 2011, she has paid $6,383.72 towards her student loans.  Fowler also testified that although she hadn't been overseeing the payment and management of her student loans herself, Demmons had been doing so for her.  Demmons confirmed this in his testimony.  The court finds that Fowler has made good faith efforts to repay her loans.

The court finds that both of the debtors have met their burden of showing that they

---

[46] *Educational Credit Management Corp. v. Mosely*, 494 F.3d 1320, 1327 (11th Cir. 2007); *Barrett v. Educational Credit Management Corp.,* 487 F.3d 353 (6th Cir. 2007); *Brondson v. Educational Credit Management Corp.,* 435 B.R. 791 (1st Cir. B.A.P. 2010) (no *per se* rule that availability of a zero payment income based repayment plan should result in a finding of nondischargeability); *Wolfe v. U.S. Dept. Of Education,* 501 B.R. 426 (Bankr. M.D. Fla. 2013).

[47] *Educational Credit Management Corp. v. Mosely*, 494 F.3d 1320, 1327 (11th Cir. 2007); *Barrett v. Educational Credit Management Corp.,* 487 F.3d 353 (6th Cir. 2007); *Wolfe v. U.S. Dept. Of Education,* 501 B.R. 426 (Bankr. M.D. Fla. 2013).

have made a good faith effort to repay their loans, and thus have satisfied the third part of

the *Bruner* test.

### D.    The settlement with Saba

The morning of the trial, the debtors informed the court that they had reached a

settlement with Saba University on their breach of contract and fraudulent

misrepresentation claims.  The amount of the settlement is confidential per the terms of

the settlement agreement, but the settlement was discussed at trial off the record.  The

student loan creditors all argue that the court should require the amount of the settlement

to be applied to the student loans.  It was not clear from the terms of the settlement

presented to the court which portion of the settlement was for Demmons' claims, and

which portion was for Fowler's claims, but given the pleadings in the matter and the facts

stipulated in the joint pre-trial order, it appears that the majority of the settlement

probably will be applied to Fowler's claims.  Off the record the debtors reported to the

court that a large portion of the settlement will be used to pay their attorney's fees for this

litigation.

The request of the creditors to apply the remaining settlement proceeds to the

student loans would in essence be requiring the court to issue a partial discharge of the

student loan debts.  This court has declined in the past to issue a partial discharge, finding

that § 523(a)(8) does not allow it.[48]  Even if the court were inclined to allow a partial

---

[48] *In re Roach,* 288 B.R. 437 (Bankr. E.D.La. 2003).

discharge, there is not enough evidence in the record to allow the court to make an

informed decision about how to allocate the proceeds.  Thus, the court declines to do so.

## III.    <u>Conclusion</u>

The *Bruner* test is a difficult test to satisfy, and this court does not take lightly the

Fifth Circuit's admonitions in *Gerhardt* that the test be demanding.  In this case, however,

the debtors have proved their entitlement to a hardship discharge by satisfying all three

prongs of the *Bruner* test.  The student loan debts are discharged in their entirety because

requiring payment creates an undue hardship for the debtors.[49]   A separate order will be

entered.

New Orleans, Louisiana, October 7, 2016.

Jerry A. Brown
U.S. Bankruptcy Judge

---

[49]  Because the court finds that all the loans still at issue are dischargeable, it need not
consider the debtors' alternate argument that three of the Key Bank loans and two Deutsche
Bank loans, which were private loans, are not "educational" loans under § 523(a)(8).